## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF NEW JERSEY

QUINTILES IMS INCORPORATED and IMS
SOFTWARE SERVICES, LTD.,

                Plaintiffs,

v.

VEEVA SYSTEMS, INC.,

                Defendant.

Civil Action No.: _____
*Jury Trial Requested*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Quintiles IMS Incorporated ("Quintiles IMS") and IMS Software Services, Limited ("IMS Software Services," and together, "IMS" or "Plaintiffs"),[1] by and through their attorneys Kelley Drye & Warren LLP, as and for their Complaint against Defendant Veeva Systems, Inc. ("Veeva" or "Defendant") allege as follows:

## INTRODUCTION

1.     This is an action to address blatant corporate theft and other egregious and illegal misconduct by Veeva, a direct competitor of IMS, and involves Veeva's repeated misuse and mishandling of confidential and proprietary information over a period of years.  Veeva stole confidential and proprietary information from IMS Market Research Offerings, as defined herein.  Its theft continues to this day.  Veeva has used the stolen information from IMS Market Research Offerings, and continues to use it, to develop and improve its own competing products and services and to compete unfairly with IMS.

---

[1] On October 3, 2016, IMS Health Holdings, Inc. and Quintiles Transnational Holdings Inc. merged.  However, as most of the allegations herein occurred prior to the merger, this Complaint refers generally to IMS.

2.      Further, Veeva has wrongfully used other confidential and proprietary information from IMS Market Research Offerings around the world when, at times, it was permitted limited access for a limited purpose.  Although Veeva has repeatedly offered assurances that information from IMS Market Research Offerings would be protected from misuse while in Veeva's care, and that any inadvertent misuse could effectively be detected and reported, these assurances have been repeatedly shown to be false.  Indeed, from as far back as 2011 through the filing of this Complaint, Veeva has knowingly accessed, interfered with, and used the confidential and proprietary information owned by IMS to better its own products and market position.

3.      Veeva's unlawful use of IMS confidential and proprietary information has been designed to, and has achieved, at least three critical Veeva business goals: (i) use of IMS confidential and proprietary information in the development and improvement of Veeva technology-based products and services; (ii) use of IMS confidential and proprietary information in the development and improvement of Veeva data and technology products; and (iii) use of IMS confidential and proprietary information in the marketing and promotion of Veeva data products.

4.      Over the past several years, responding to client needs, IMS has made repeated efforts to work with Veeva to enable Veeva's access to information from IMS Market Research Offerings, while also protecting IMS's intellectual property.  Sometimes IMS and Veeva were successful—IMS has issued more than 50 licenses to Veeva to access this information for use by their common clients.  In other circumstances, Veeva could not assure IMS that its information would be safe from abuse and, as a result, clients were unable to benefit from some of IMS's Market Research Offerings in combination with Veeva's master data management offering. IMS has devoted significant human resources and spent substantial sums to find ways to work with Veeva based on its representations despite these difficult challenges created by Veeva.

5.      However, it has become increasingly clear to IMS that Veeva has been wrongfully misappropriating IMS confidential and proprietary information.  In fact, Veeva senior management recently made various admissions to IMS that confirm that this unlawful conduct has been occurring.  In addition, in 2016, a client alerted IMS that Veeva had improperly gained access to IMS confidential information in Veeva's computer systems (held for the sole benefit of that client), and used it for Veeva's benefit for competitive purposes.  Veeva failed to inform IMS about these unlawful uses until confronted by IMS.  Regarding this client incident, Veeva admitted it had improperly taken IMS confidential information held in Veeva's computer systems in other circumstances—both with that same client and other clients.

6.      Veeva, moreover, has repeatedly disparaged IMS, has falsely claimed to clients that IMS data was protected from misuse while in Veeva's possession, and made false claims about the legitimacy of IMS's concerns.  In other words, while trying to itself appear as a victim and impugn IMS's long-standing reputation for working cooperatively with its clients and third parties to allow clients to obtain the full benefit of IMS Market Research Offerings, Veeva has actually been misappropriating and improperly obtaining access to IMS confidential and proprietary information through deceptive means.

7.      Veeva's actions, as detailed in this Complaint, constitute, among other things, theft of trade secrets, tortious interference with contract, unfair trade practices and unjust enrichment.  IMS seeks damages and a permanent injunction preventing Veeva from continuing its improper uses of information from IMS Market Research Offerings.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this dispute arises by virtue of Defendant's violations of, *inter alia*, 15 U.S.C.

§ 1125(a) and 18 U.S.C. § 1836, *et seq*.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

9.       Defendant is subject to personal jurisdiction in this district as Defendant is registered to conduct business within the State of New Jersey and has in fact conducted business therein, as Defendant has or had contacts, transacts and solicits or has transacted and solicited business in this district or derives substantial revenue from services rendered within the District, and has committed tortious acts within the District and/or has committed tortious acts outside the District which has caused injury within the District.  Moreover, Defendant has or had continuous and systematic contacts within this District.

10.       Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant resides in the District, pursuant to 28 U.S.C. § 1391(c)(2).

## FACTS RELEVANT TO ALL CLAIMS

**The Parties**

11.       Quintiles IMS is organized and existing under the laws of the State of Delaware with dual corporate headquarters at 83 Wooster Heights Road, Danbury, Connecticut, and 4820 Emperor Boulevard, Durham, North Carolina.  Quintiles IMS has offices at 100 IMS Drive, Parsippany, New Jersey, is registered under its predecessor name, IMS Health Incorporated, to conduct business within the State of New Jersey, and in fact conducts a significant portion of its business in this State, and/or derives substantial revenue from services rendered within this District.

12.       IMS Software Services is a corporation organized and existing under the laws of the State of Delaware with headquarters at 83 Wooster Heights Road, Danbury, Connecticut, and holds the rights to certain intellectual property at issue in this case.

13.    IMS, directly and through various subsidiaries around the world, provides, among other things, market research, analytics, technology and services to the life sciences, medical device, and diagnostics and healthcare industries, to clients in over 100 countries.  IMS's global reach allows IMS's life sciences clients to improve their understanding of, and interaction with, the global healthcare environment and in turn improve patient outcomes and save lives.

14.    Since its founding more than sixty years ago, IMS has invested substantial sums to bring a wide range of innovative market research, analytics, technology and services offerings to the life sciences, medical device, and diagnostics and healthcare industries.  Through those years, clients have realized substantial benefits from their use of IMS offerings.  As a consequence, IMS grew from a small business operating in two countries to a multi-billion dollar business employing over 50,000 people, operating in more than 100 countries.

15.    Upon information and belief, Defendant Veeva is a publicly traded information and technology services company, organized and existing under the laws of the State of Delaware, with its principal place of business at 4280 Hacienda Drive, Pleasanton, California, and is registered to do business in the State of New Jersey.

16.    IMS and Veeva are competitors.

**IMS Market Research Offerings**

17.    To provide clients with market research products that combine healthcare data, market research and proprietary analytics ("IMS Market Research Offerings"), IMS invests hundreds of millions of dollars each year to build and improve one of the largest and most sophisticated information technology infrastructures in healthcare.  By processing data from over 45 billion healthcare transactions annually, IMS's infrastructure connects complex healthcare data while applying a wide range of privacy, security, operational, legal and contractual protections for

data in response to local law, supplier requirements and industry leading practices in locations across the world.  IMS Market Research Offerings are the product of the extensive skill and knowledge of IMS's experienced workforce who use IMS know-how, technology, processes and other proprietary intellectual property to create offerings unique to the communities that they serve.

18.   IMS invests hundreds of millions of dollars annually to develop and maintain the information underlying its Market Research Offerings.  IMS sources data, which does not contain any individual patient identifying information, from more than 100,000 data suppliers, representing more than 800,000 locations in countries around the world, including data from drug manufacturers, wholesalers, distributors, retail pharmacies, grocery stores, healthcare providers, government agencies and others.  IMS also continuously invests in locating, recruiting and working with many sources of data, and developing and implementing innovative technologies and methodologies to apply to that data.  IMS does this in countries throughout the world, specifically adapted to the needs and nature of healthcare in each local market.

19.   IMS also applies proprietary technology and know-how to edit, standardize, analyze and apply various statistical, processing and other methodologies to estimate or gather information relating to many aspects of healthcare practice in the real world, enabling IMS to produce syndicated or customized reports, audits and models, such as market forecasts and market intelligence, as well as other products and services, some of which are discussed below.

### *IMS's Healthcare Professional Data Offerings*

20.   One category of IMS's Market Research Offerings is known as "Healthcare Professional Data" services, which span more than 100 distinct offerings localized in more than ninety countries and described further below.

21.     IMS acquires information about healthcare professionals (and healthcare organizations) from tens of thousands of sources such as pharmacies, wholesalers, insurers, hospitals, integrated health networks, government agencies, medical associations and other organizations.

22.     IMS maintains millions of individual abstracts of healthcare professionals.[2] IMS Healthcare Professional Data includes up-to-date contact information of millions of individual healthcare professionals and their professional inter-relationships.  These records may include, among other things and depending on the locality, the names, phone numbers and addresses, current and past, of a variety of types of healthcare professionals, as well as current license status, hospital and professional affiliations, primary and secondary specialties, certifications and other relevant information about their professional practices.  IMS practices regarding the collection, holding and processing of information about healthcare professionals vary to comply with applicable data protection laws.

23.     Accurate data on healthcare professionals and organizations is important to IMS's life sciences clients for a number of reasons.  Healthcare Professional Data, for example, is used to: (i) market prescription medicines directly to physicians; (ii) share information with physicians about new medicines and newly approved uses for existing medicines, important label changes, safety warnings and changes in medical guidelines; (iii) distribute free samples; (iv) assist with drug recalls; (v) recruit healthcare practitioners for participation in clinical trials; (vi) comply with risk management program requirements; and (vii) conduct research in the public and private sectors, increasing the transparency of national, regional and local healthcare systems, improving health services and increasing efficiencies to lower costs.

---

[2] In some localities all around the world, IMS also has related Market Research Offerings which profile hundreds of thousands of healthcare organizations.

24.     Even a small margin of error in Healthcare Professional Data can have significant consequences.  Veeva's own marketing materials state that the lost value and the opportunity cost of a 4% error rate in such data, for instance, can result in tens of millions of dollars in missed profits for life sciences companies.  According to Veeva, if just one out of every 25 sales calls is unsuccessful due to inaccurate or out-of-date healthcare professional data, a sales team of 300 representatives will waste $1.7 million in resources that could have been better directed.  Veeva estimates that, if that one call was made with accurate data, the same sales team could yield $10.9 million in additional sales.

25.     In addition, many life sciences companies use IMS's Healthcare Professional Data to support their efforts to meet regulatory compliance obligations, such as information and disclosure reporting requirements under the Federal Physician Payments Sunshine Act (and similar laws in other countries) in connection with marketing or selling pharmaceutical products.

26.     IMS has proprietary processes in place to develop and maintain the accuracy of its Healthcare Professional Data.  IMS employs hundreds of research associates known generally as data stewards, as well as hundreds of data quality analysts, who routinely monitor thousands of data sources and resolve data conflicts for its Healthcare Professional Data.  Among other tasks, these individuals process more than 1.5 million updates to IMS's Healthcare Professional Data per month globally, as well as perform scheduled maintenance, data investigations and complete client specific projects.

*IMS's Sub-National Information Offerings*

27.     Another category of IMS's Market Research Offerings is known as "Sub-National Information" services, which comprise multiple unique offerings in more than 50 countries and are described more fully below.

28.     The Sub-National Information offerings provide an estimate of sales, dispensing or prescribing of medicines at the regional, zip code and individual prescriber levels, with granularity varying based on local regulations and sources.  IMS Sub-National Information offerings generally include some overlapping attributes with IMS Healthcare Professional Data.

29.     There are two primary types of Sub-National Information services: sales information services, (*e.g.*, DDD™ information services) and prescription information services (*e.g.*, Xponent™ information services).  Sales information services provide proprietary estimates relating to the distribution of medicines.  Prescription information services provide proprietary estimates relating to the prescribing of medicines by healthcare professionals and dispensing of medicines.

30.     IMS Sub-National Information provides users with a large amount of detailed and reliable data, reflecting estimates of prescribing and dispensing activity for medicines.  For example, IMS's prescribing and dispensing activity estimates can be viewed in the United States by geographic areas such as state, metropolitan statistical area, county, zip code, prescriber and by anonymous patient cohorts.

31.     To create and develop Sub-National Information offerings, IMS carefully recruits and selects data suppliers and collects information on over 100,000 pharmaceutical and biotechnology products.

32.     IMS collects Sub-National Information from a wide variety of data suppliers, including drug manufacturers, wholesalers, distributors, various types of pharmacies

(*e.g.*, chain and independent retail pharmacies and mail service pharmacies), hospitals, government and services organizations, group purchasing organizations, clinics, insurers, information technology vendors and others.  IMS collects the information in a wide variety of formats and employs various privacy-protecting techniques.

33.     Following collection of this information, IMS employs a wide variety of proprietary technologies and processes to cleanse, bridge, edit and organize data.  For example, following receipt of data from suppliers, IMS employs a variety of initial quality control checks and processes to ensure data has been properly and accurately delivered to IMS.

34.     IMS also uses proprietary data cleansing, editing and other sophisticated tools, including proprietary tolerances and business rules, to find and resolve quality issues in the data supplied to IMS.  IMS also standardizes data for each transaction and links information received from suppliers to IMS reference files, which include physicians and other healthcare professionals, healthcare organizations, medicines, integrated health networks and data classification schemes.

35.     IMS also employs additional quality control checks and processes in connection with maintaining applicable IMS databases, where the cleansed and standardized Sub-National Information is stored.

36.     IMS then applies a combination of sophisticated computer processing, statistical sampling and projection methodologies, advanced analytics, forecasting methodologies and the skills and experience of its employees to create and deliver customized reports to clients through a variety of means, such as secure portals and direct delivery of data into client data warehouses.

37.    IMS Sub-National Information offerings are extraordinarily valuable to clients trying to understand real world healthcare practice.  These services are used extensively by life sciences companies for the reasons described in ¶ 23 above, but also with internal sales forces to set goals, determine resourcing, measure performance, calculate compensation and efficiently allocate company resources.  But its utility extends even beyond life sciences companies.  For example, the Centers for Disease Control and Prevention use some of this information to study antibiotic use and treatment variability in local areas throughout the United States.

**IMS's Technology Offerings**

38.    In addition to IMS Market Research Offerings, IMS also offers a wide variety of technology solutions to its life sciences clients, which include Client Relationship Management ("CRM Application") and Master Data Management ("MDM Application") solutions.

39.    A CRM Application is a computer-based application—whether installed on client computers, third-party hosted, or available through Software-as-a-Service ("SaaS")—that helps a sales force gather and organize information about its clients to help facilitate or improve relationships and interactions with each of those clients.  Companies in the life sciences industry with sales forces generally use a CRM Application.

40.    Both Healthcare Professional Data and Sub-National Information are frequently used by life sciences companies in CRM Applications.

41.    An MDM Application refers to software developed to reconcile or link various records of demographic or other reference information relating to individuals, organizations, plans or products, which may have been obtained from different sources or at different times or pre-existing in a given database.  An MDM Application is generally used to link

information and records relating to an individual (*e.g.*, a physician) or an organization (*e.g.*, a hospital) to one client master file.

42.     Both Healthcare Professional Data and limited amounts of related reference data from Sub-National Information are frequently used by life sciences companies in MDM Applications.

43.     IMS's CRM and MDM Applications are a valuable part of IMS's business.

44.     IMS uses confidential and proprietary information from IMS Market Research Offerings to improve its CRM and MDM Applications.  For example, IMS designs and implements periodic updates and enhancements to its CRM and MDM Applications.  IMS determines what changes to make based on a number of factors, including analyzing requests from IMS's life sciences customers, and also the unique attributes of IMS Market Research Offerings. IMS relies on IMS Market Research Offerings not only to determine if an update is desirable and will deliver an improved customer experience, but also to design and effectively test any updates for maximum reliability.

45.     As a result, for example, certain IMS CRM Applications are capable of analyzing IMS Market Research Offerings to determine sales opportunities that might not otherwise be apparent based on the data itself or that another CRM Application might not be capable of identifying.

46.     To accommodate clients who want to use IMS Healthcare Professional Data with non-IMS CRM or MDM Applications, IMS often makes available an Application Program Interface ("API"), subject to a third party agreement to protect IMS confidential information, as discussed below.  The API allows the IMS system hosting IMS Healthcare Professional Data to connect with a third-party vendor's software.

**IMS Carefully Protects IMS Market Research Offerings**

47.     IMS undertakes substantial efforts to protect its many IMS Market Research Offerings around the world.

48.     In addition to availing itself of applicable trademark, copyright, and trade secret protections under the law, IMS has also dedicated a significant amount of resources to securing patent protections over its many unique methodologies and products, including its software solutions.  Indeed, dedicated IMS employees work closely with other employees all over the globe to discuss the progress of innovations and advancements, and then promptly secure patents.  IMS takes steps to enforce these patents when necessary.

49.     IMS also regularly uses employment agreements, including non-disclosure agreements and confidentiality agreements, to protect information flowing to its employees and third parties in the course of its business to secure its intellectual property.

50.     IMS further employs technical restrictions to prevent the theft of data and intellectual property, including restrictions on the use of USB and other portable data storage devices.

51.     Moreover, IMS licenses its Market Research Offerings to its life sciences clients for a wide variety of internal uses, subject to certain requirements and restrictions articulated in a client license agreement.  Under IMS customary terms, client licenses do not allow a client to share information from IMS Market Research Offerings with any third party.

52.     IMS's life sciences clients, however, sometimes employ third-party vendors, such as Veeva, to provide certain services to those clients.  For some of those services, IMS's life sciences clients ask that IMS grant a license to the client's third party vendor so the vendor can use the information from IMS Market Research Offerings to perform those services for that client.  If IMS agrees to license information from IMS Market Research Offerings to a

third-party vendor in these circumstances, the third party vendor is restricted to use that information for the purpose(s) specified in the agreement and solely for the benefit of the specified client.  Such a license is memorialized in a Third Party Limited License Agreement[3] ("TPA Agreement").

53.     Since approximately 1992, IMS has required the use of TPA Agreements to allow third party vendors access to and use of information from IMS Market Research Offerings. The purpose of IMS's TPA Agreement program is to protect the substantial investment IMS makes in its intellectual property, while at the same time accommodating client reliance on third-party vendors to analyze, process and utilize information from IMS Market Research Offerings.

54.     A TPA Agreement requires the vendor to understand and acknowledge the confidential and proprietary nature of IMS Market Research Offerings.  A TPA Agreement also places detailed restrictions on the ability of the vendor to use IMS Market Research Offerings.

55.     Among other provisions, IMS's TPA Agreements contains terms and conditions substantially as follows:

(a)     "No information may be used, directly or indirectly, to enhance, improve, update, validate, create, develop, benchmark or perform any similar service on any other [vendor] data, information, technology [or] methodology;"

(b)     "No information may be used, directly or indirectly, to cleanse, correct, match, de-duplicate, or perform any similar service on any other [vendor] data, information, technology [or] methodology;"

(c)     "Vendor may not download, print, copy, transfer or otherwise remove Information from Client's systems or local instance … except as necessary in order to make such Information available for use solely as part of Client's Application;"

(d)     "Vendor may not hold any Information for common use for the benefit of two or more clients (including, for example, through the creation or maintenance of linkages or bridge files between Information and any other data);"

---

[3] These agreements have also been referred to as "Third Party Access Agreements" and similar named agreements. For convenience, all of these types of agreements will be referred to as "TPA Agreements."

(e)     "Access to the Information shall be restricted to employees of Vendor who need to access such information in connection with the Permitted Use set forth above in this [TPA Agreement]…In no event shall [IMS] Information be accessed by any employee or agent of Vendor with responsibilities involving the design or development of any of Vendor's (i) data sets or (ii) MDM Software…;"

56.     IMS enters into a TPA Agreement where it is reasonably satisfied the confidential and proprietary IMS information to be licensed to the third party vendor will not be at unreasonable risk of misuse or misappropriation.

57.     Over the years, IMS has entered into many TPA Agreements, covering many licenses, so clients may maximize the benefits they receive from the use of IMS Market Research Offerings, while at the same time protecting IMS confidential and proprietary information.

58.     In circumstances in which IMS has been asked to license information from an IMS Market Research Offering to a third party vendor that competes directly with the requested IMS Market Research Offering, IMS generally seeks written assurances that the third party will implement adequate safeguards and controls to avoid the misuse and misappropriation of IMS intellectual property.  In general, IMS receives adequate assurances, but on exceedingly rare occasions, it does not and in those instances IMS will not enter into a TPA Agreement with a third party vendor until they provide those assurances to the reasonable satisfaction of IMS.

**Veeva's Competing Products**

59.     Veeva is a competitor to IMS in healthcare technology and information.

60.     Until relatively recently, Veeva was solely a CRM Application provider to the pharmaceutical industry in the United States.  Upon information and belief, Veeva began developing its own MDM Application technology offering in or around 2012 and began offering an MDM Application to life sciences companies in or around 2013.

15

61.     In or around June 2013, Veeva acquired an entity named AdvantageMS, and began offering healthcare professional data and healthcare organizational data in the United States. At that time, Veeva publicly announced the acquisition added "a database of … active healthcare providers (HCPs), healthcare organizations (HCOs) and affiliations across the United States to Veeva Network. This acquired data, combined with Veeva's advanced cloud software and data stewardship services, provides life sciences companies with an accurate, up-to-date view of their customers in one solution."

62.     Around the time of the acquisition, Veeva announced it would build on its newly acquired healthcare professional data offering by relying on a "crowdsourcing" network architecture to improve the accuracy and completeness of its healthcare professional data.  In other words, Veeva proposed that it would (a) obtain healthcare professional data and healthcare organizational data from life sciences clients for MDM Application services, and (b) use the data received from clients to improve its own healthcare professional data and healthcare organizational data and share the improved data with Veeva's clients.

63.     Because many life sciences and other companies rely on IMS Healthcare Professional Data, this crowdsourcing proposal was just another way of advising clients that Veeva would disseminate IMS Healthcare Professional Data without IMS's consent to better everyone's data collectively.  Such proposed crowdsourcing would have violated the express terms of IMS's client agreements, IMS's TPA Agreements, and IMS's proprietary rights in information belonging to it.

64.     Indeed, the very nature of a crowdsourcing model is completely antithetical to respecting the confidential and proprietary nature of IMS Healthcare Professional Data, and likewise the confidential and proprietary information belonging to clients and third parties.

Veeva's initial crowdsourcing proposal demonstrated its cavalier attitude towards respecting the confidential and proprietary information of IMS, clients and others.

65.     Veeva eventually dropped its proposed crowdsourcing model, but maintained its cavalier attitude through 2016 with regard to the proprietary nature of IMS Health Care Professional Data.  In fact, Veeva's CEO wrote to IMS in 2016 that "[w]e are not talking about military secrets.  We are talking about reference data."

66.     On or about March 24, 2015, Veeva announced it had healthcare professional data offerings, which were intended to be used in conjunction with its MDM Application, available in Australia, China, the United Kingdom and the United States.  Veeva intended to expand and provide healthcare professional data offerings in many more countries in order to compete with IMS's global presence.  Since then, upon information and belief, Veeva has added healthcare professional data offerings in approximately 35 more countries.

**Veeva Is Well Aware of the Confidential and**
**Proprietary Nature of IMS Market Research Offerings**

67.     A number of IMS clients that rely on and use IMS Market Research Offerings also use Veeva's CRM Application.  As such, IMS Healthcare Professional Data and IMS Sub-National Information exists in some joint clients' instances of Veeva's CRM Application.

68.     To protect the confidentiality of that data, IMS and Veeva have entered into many TPA Agreements.  In total, IMS and Veeva have entered into more than 50 TPA Agreements since 2011.

69.     For its part, once a TPA Agreement is in place, IMS enables its client to upload IMS Healthcare Professional Data and/or Sub-National Information for use in Veeva's CRM Application, as well as some attributes of IMS Sub-National Information for use in Veeva's

MDM Application.  As it does with other CRM and MDM Application vendors, IMS frequently makes an API available to Veeva, client-by-client for a fee, to make it easier for Veeva to work with life sciences companies.

70.     As a party to these IMS TPA Agreements, Veeva has acknowledged on countless occasions the proprietary and trade secret nature of IMS Market Research Offerings and is fully aware that, absent a TPA Agreement, it is not entitled to access or obtain **any** IMS Market Research Offerings.  Veeva is also aware that under an IMS TPA Agreement, it agrees that data will be provided (i) "*solely for the benefit of the Client*" [*i.e.*, the life sciences company]," (ii) and solely for specific authorized uses.

71.     Based on the TPA Agreement terms and the Parties' relationship to date, Veeva has been fully aware that IMS Market Research Offerings are not to be used for its benefit in any way, but only to further an IMS client's articulated and permitted purpose.

72.      Despite knowledge of the proprietary nature of IMS Market Research Offerings and the restrictions placed on the use of IMS Market Research Offerings, Veeva has nevertheless engaged in a number of activities designed to improperly obtain the benefit of IMS Market Research Offerings, as discussed below.

**Veeva's Admitted Theft and Misuse of**
**IMS Market Research Offerings to Improve Its Products**

73.     Veeva's improper use of IMS Market Research Offerings, including the underlying Healthcare Professional Data and Sub-National Information, is threefold.  First, Veeva uses IMS Market Research Offerings to regularly improve and enhance its CRM and MDM Applications to gain a competitive edge over IMS.   Second, Veeva uses IMS Healthcare Professional Data and Sub-National Information to shortcut development and maintenance of its own healthcare professional data products offered around the world.  Third, Veeva uses IMS

18

Healthcare Professional Data and Sub-National Information to gain insight into the proprietary features and accuracy of IMS Healthcare Professional Data in order to aggressively tailor its own sales and marketing tactics.  Each of these impermissible uses is described more fully below.

1. *Veeva Used IMS Market Research Offerings to Improve Its CRM and MDM Applications*

74. Just as IMS regularly updates its CRM and MDM Applications, Veeva also regularly updates and enhances its CRM and MDM Applications.  As set forth herein, Veeva's CRM and MDM Application updates and enhancements are improperly and inevitably improved by Veeva's use of IMS Market Research Offerings.

75. Relating to some joint clients, upon information and belief, Veeva uses IMS Market Research Offerings to develop functionality for and to enhance its competitive offerings without IMS's consent.

76. Veeva has admitted to accessing IMS Healthcare Professional Data and Sub-National Information in order to resolve technology issues reported by its CRM and MDM Application clients.  In so doing, Veeva makes no effort to firewall the individuals tasked with developing and enhancing Veeva's CRM and MDM Applications from those individuals tasked with resolving these technology issues.  In fact, a senior Veeva executive, in conversations with an IMS senior executive, has explicitly admitted that the same Veeva CRM or MDM Application software engineers are responsible for both functions.

77. When a particular life sciences client experiences a technological issue with Veeva's CRM or MDM Application, that client will reach out to Veeva's technological support team.  After going through two lower levels of support, which provide general functionality advice, a client's persistent issue will be escalated to a third level of support.

78.     The third level of support comes directly from Veeva's CRM or MDM Application engineers.   These individuals are the same individuals who design and implement updates and enhancements to Veeva's CRM or MDM Applications to improve their functionality and reliability.

79.     To resolve the particular client's Veeva CRM or MDM Application issue, the engineers will access IMS Healthcare Professional Data and/or Sub-National Information used in that client's application instance then, upon information and belief, broadly apply the knowledge and insight they gather about IMS Market Research Offerings to design and implement improvements to Veeva's CRM and MDM Applications—not just for a single Veeva client, but for all Veeva clients who use its CRM.   This is an impermissible use of IMS Healthcare Professional Data and Sub-National Information.

80.     Upon information and belief, these CRM and MDM Application engineers further impermissibly use IMS Healthcare Professional Data and/or Sub-National Information to test any planned updates and enhancements to the Veeva CRM and MDM Application.

81.     Upon information and belief, Veeva also uses IMS Market Research Offerings for the same reason IMS uses IMS Market Research Offerings—it replicates the real technological environment so as to resolve and anticipate as many software design errors and other software issues as possible.   While IMS has the right to use its own intellectual property for this purpose, Veeva does not.

82.     Moreover, because of the widespread use of IMS Market Research Offerings, the better aligned Veeva's CRM and MDM Applications are to IMS Market Research Offerings, the greater market advantage Veeva holds against its CRM and MDM Application competition like IMS.   For example, by using direct knowledge of IMS Market Research

Offerings, Veeva can reduce the time it takes to load IMS Healthcare Professional Data and Sub-National Information into the Veeva CRM or MDM Application, making it a more attractive product over a slower loading CRM or MDM Application.

83.     Veeva's strategy to improve its CRM and MDM Applications in this way also undercuts the unique attributes of IMS's CRM and MDM Applications.

84.     As Veeva continues to design, test and implement its updates and improvements through the unauthorized and routine use of IMS Healthcare Professional Data and Sub-National Information, Veeva improperly capitalizes on IMS's intellectual property and unfairly competes with IMS's CRM and MDM Applications.

85.     Veeva has been at all times aware that it could only access IMS Market Research Offerings if it had an executed TPA Agreement with IMS, and that it was bound to the enumerated permissible uses therein.

86.     In these ways and for these reasons, Veeva obtained and continues to obtain unauthorized access to IMS Market Research Offerings to improve the operation of its CRM and MDM Applications.

    *2.  Veeva Used IMS Healthcare Professional Data and Sub-National Information to Improve its Data Product*

87.     Veeva only recently entered into the healthcare professional data business and, accordingly, has not invested the extensive time and millions of dollars that IMS has to develop its competing Market Research Offerings into a desirable and marketable offering. Instead, Veeva has elected to use IMS Healthcare Professional Data and Sub-National Information impermissibly and illegally to develop and manage its own healthcare professional data products to compete with IMS around the world.

88.     Veeva initiated its entry into the healthcare professional data market by first attempting to confuse the marketplace.  Indeed, Veeva engaged in blatant trademark infringement of IMS's OneKey® offering by adopting a nearly identical trademark—"OpenKey"—for its healthcare professional data product.

89.     On April 30, 2015, IMS was forced to file a trademark infringement and unfair competition lawsuit against Veeva in federal court in the Southern District of New York.

90.     Shortly thereafter, Veeva quickly changed the confusingly similar "OpenKey" name for its fledgling healthcare professional data product to "OpenData." IMS voluntarily dismissed the trademark infringement action.

91.     Thus, Veeva deliberately entered into the healthcare professional data space by attempting to poach off of IMS's brand and reputation.  As it did in proposing a crowdsourcing model for use with its MDM Application, Veeva showed its continued disregard for IMS's longstanding intellectual property.

92.     Since that time, Veeva has continued to engage in other types of wrongful conduct, further detailed herein, and all aimed at obtaining benefits from IMS Market Research Offerings to which it is not entitled.

93.     Veeva claims that it has sourced, validated, cleansed, standardized and organized into its own localized healthcare professional databases—of strikingly similar qualities and characteristics to IMS Healthcare Professional Data—in approximately 45 new countries within a fraction of the time and effort it took IMS to do the same.  Veeva claims to have achieved this progress through the use of a single call center located in Budapest, Hungary.  This is unlikely as a technological and practical matter.

94.     In a related effort to misappropriate IMS Market Research Offerings, Veeva has been attempting to gain access to IMS Healthcare Professional Data for use with its MDM Application.  Upon information and belief, Veeva seeks to do so in order to gain a new and unpoliced avenue of access to IMS Healthcare Professional Data to exploit.

95.     Throughout a two year ordeal, Veeva has gone to great lengths to manipulate IMS and the market to achieve its goal of processing IMS Healthcare Professional Data in Veeva's MDM Application by insisting IMS and Veeva enter into TPA Agreements that Veeva has no intention of abiding by.

96.     Veeva has acknowledged that the technical architecture and organizational structure of Veeva's MDM Application and OpenData allows IMS Healthcare Professional Data stored in a client's instance of Veeva's MDM Application to flow into OpenData.  In other words, Veeva has designed its MDM Application to misuse—indeed steal—IMS Healthcare Professional Data, consistent with its historically cavalier attitude towards IMS's intellectual property.

97.     In this way, Veeva hopes to expand its unauthorized access to IMS Healthcare Professional Data and continue its scheme of misappropriating IMS Healthcare Professional Data and exploiting permissible uses under IMS TPA Agreements to improperly build OpenData from country to country.

98.     By design and operation, Veeva's MDM Application and Veeva's OpenData generally do not operate separately.  Just for example, employees of both operations are co-located within the same offices, data sits in the same technical and physical environment, and employees have responsibilities to both organizations.

99.     Therefore, much as the Veeva CRM and MDM Application software engineers double as problem solvers with direct access to IMS Market Research Offerings and

system developers who use that access to better their products, some of Veeva's employees supporting Veeva's MDM Application and its OpenData offerings are one and the same. Thus, if these Veeva personnel obtain access to IMS Healthcare Professional Data, it will be used to improve that MDM Application *and* the competing localized OpenData product.

100.    To eliminate that unnecessary risk, IMS has been working with Veeva for more than two years to resolve serious issues regarding the protection of IMS Healthcare Professional Data. Veeva, nonetheless, has refused to remedy many important issues and rejected practical solutions suggested by IMS, and has instead engaged in a campaign to spread false information to the industry.

101.    When Veeva first sought to include IMS Healthcare Professional Data in its MDM Application, Veeva lied to IMS and IMS clients about having the necessary safeguards and controls to protect IMS Healthcare Professional Data from misuse, as well as the ability to detect and report any misuse. In fact, Veeva had nothing more than window dressing used as part of a public campaign, which was designed to harm IMS's reputation and relationship with its clients by deceiving life sciences clients and causing them to pressure IMS to allow IMS Healthcare Professional Data to be included in Veeva's MDM Application.

102.    Veeva made and continues to make a number of false and misleading public statements about its claimed operational safeguards and controls. Veeva's website has stated the following: "Veeva has controls in place and has engineered the Veeva Network [MDM Application] software to safeguard the integrity and ownership of third party data and will not combine IMS [Healthcare Professional Data] with Veeva OpenData. Veeva has outlined these controls to IMS and offered to document them in a binding agreement."

103.    Veeva's goal of having life sciences companies pressure IMS into relinquishing IMS Healthcare Professional Data was made clear by Veeva's following website statement:  "Customers can help by letting their IMS representative know that working with all vendors on equal footing is the right thing to do."

104.    In September 2015, Veeva also published on its website a presentation that included the following statements purporting to show the separate technical and organizational structure of Veeva's MDM Application and Veeva's OpenData products, thus conveying to potential clients that IMS Healthcare Professional Data is not at risk when placed in the Veeva MDM Application:





105.    This presentation remains on Veeva's website to this date.

106.    These representations were and remain false.  Veeva lacks adequate safeguards and controls between Veeva's MDM Application and Veeva OpenData.  Indeed, by design, Veeva's MDM Application and OpenData physically exist in the same technical structure, minimizing technical separation and maximizing connectivity between data stored by the client in its Veeva MDM Application and Veeva's OpenData dataset.

107.    Also false is Veeva's statement that its MDM Application and OpenData products have "Separate general managers, each reporting to Veeva CEO."  In reality, a single General Manager, Jim Cushman, is responsible for both Veeva Network and OpenData.

108.    Moreover, Veeva states that "Private Mode" protects IMS Healthcare Professional Data from being added into the Veeva environment and being misused to improve OpenData.  In reality, a client's "Private Mode" is merely a designation that can be toggled on and off by Veeva, as Veeva has the ability to control and operate the client's instance of its MDM

Application.  In addition, when IMS proprietary information is introduced into the Veeva system, Veeva frequently has no means to track how and when that data entered the system.  Veeva, therefore, is policed only by its own integrity, but at the same time, Veeva, as detailed herein, has been intentionally misappropriating IMS Healthcare Professional Data.

109.    Veeva also published the following statements on its website, directed at licensors of IMS Healthcare Professional Data offerings:

(a)    Veeva worked with IMS for more than 18 months to give visibility into and confirmation of Veeva's practices to fully protect IMS' reference data (IMS HCRS or IMS OneKey) when loading into Veeva Network.

(b)    The following controls ensure the protection of IMS Data IP within Veeva Network [MDM Application].  Even with these controls in place, IMS will not allow IMS HCRS or IMS OneKey data into Veeva Network.

**Veeva segregation of resources that build and maintain Veeva OpenData and Veeva Network [MDM Application]:**  The teams that compile and steward Veeva OpenData are not shared with any other groups, they do not influence the Veeva software products, and they do not have access to any Customer instance of Veeva Network [MDM Application] that would house IMS data.

**Veeva Data Bridge:**  Our technical solution (the Data Bridge) provides isolation at the country/customer level so that data access and DCR processing of IMS data by Veeva's data teams is completely disabled as to customers that are using IMS HCRS or OneKey data for a particular country. . . .

**IMS Client Contractual Restrictions:**  IMS customers are contractually restricted, via their contracts with IMS, from providing data to Veeva unless a TPA is in place.  Customers are responsible for adherence to their IMS contracts and, in our experience, they are very aware of the applicable requirements and restrictions.  Customer adherence to IMS contracts is an additional deterrent against inadvertent disclosure of IMS data to Veeva.

110.    Veeva well knows that these statements are false.  IMS determined, through an independent assessment performed by a prominent global independent audit firm (the "Audit Firm"), the absence of Veeva's claimed safeguards and controls to protect IMS Healthcare Professional Data.  Indeed, the sequence of the assessment itself demonstrates that, contrary to

Veeva's public pronouncements to potential clients, Veeva lacked the needed organizational and operational safeguards and controls.

111.    Veeva initially consented to the assessment in September 2015, after it represented to an IMS client the existence of many of the above-described alleged safeguards and controls, resulting in IMS proposing to Veeva and IMS's client that Veeva back up its numerous representations.

112.    Contrary to Veeva's representations regarding its existing safeguards and controls, when the Audit Firm sought to begin the assessment shortly thereafter, Veeva changed direction and stated that it was not ready for the assessment and asked to defer it twice.

113.    When the Audit Firm was finally allowed onto Veeva's premises to conduct the assessment in late October 2015, the reason for Veeva's delay was apparent.  Veeva was not ready for the assessment when initially proposed in September 2015 because it in fact had no or insufficient programs or policies in place, including those regarding governance and training its employees about the need to protect IMS Healthcare Professional Data.

114.    The Audit Firm finished its assessment and released an Assessment Report in January 2016.

115.    Based on the Audit Firm's findings, IMS determined that Veeva did not have, among other things, the safeguards and controls required between Veeva's MDM Application and OpenData to sufficiently protect IMS Healthcare Professional Data stored in the Veeva MDM Application.

116.    Based on the Audit Firm's findings, IMS determined that:

- Veeva's MDM Application and OpenData lacked organizational separation. While Veeva had consistently represented that its OpenData and its MDM Application organizations were separate, so that IMS Healthcare Professional Data used by Veeva for its MDM Application would not result in data access by

Veeva employees with OpenData responsibilities, in fact, IMS determined that
those businesses operate with shared people, technology and facilities;

- Veeva's MDM Application and OpenData lacked technical controls.  While
Veeva represented that it had implemented technical controls to prevent the use of
IMS Healthcare Professional Data to improve Veeva healthcare professional data,
in fact, the very architecture of the Veeva MDM Application, as well as Veeva's
processes, were inadequate and deficient for a number of reasons and did not
prevent the exporting and commingling of IMS Healthcare Professional Data;

- Veeva lacked the ability to meaningfully enter into contractual safeguards.
While Veeva had signed TPA Agreements to protect IMS Healthcare Professional
Data, Veeva employees were not adequately informed about the TPA Agreement
requirements regarding the handling and confidential nature of IMS Healthcare
Professional Data; and

- Veeva's MDM Application and OpenData were not effectively auditable.   While
Veeva represented that audits could be conducted to verify that sufficient
safeguards and controls exist and prevent the misuse of IMS Healthcare
Professional Data, or at the least detect misuse, whatever audit logs existed were
difficult to use and revealed limited information, so as to be completely
ineffective in either preventing or detecting misuse of IMS Healthcare
Professional Data.

117.    IMS's conclusions as a result of the Audit Firm's assessment have been

separately validated by a leading digital security firm.

118.    Thus, IMS has determined that Veeva gained unauthorized access to IMS

Healthcare Professional Data for its own benefit.   Veeva continues to solicit and obtain

unauthorized access to IMS Healthcare Professional Data and Sub-National Information to

continue its scheme to improperly develop OpenData systematically from country to country.

### 3.  Veeva Used IMS Healthcare Professional Data to Improve its Sales Methods

119.    On May 18, 2016, a global life sciences company, referred to herein as "the

Client," informed IMS that over one month earlier Veeva accessed and obtained IMS Healthcare

Professional Data from the Client's CRM Application.  Veeva was well aware that it had no right

to access this IMS Healthcare Professional Data and that by contract the Client was prohibited

from providing Veeva with any IMS Healthcare Professional Data, absent IMS's consent through a TPA Agreement. Indeed, at the time, Veeva had spent about two years attempting to convince IMS to enter into TPA Agreements so as to expand its access to IMS Healthcare Professional Data for its MDM Application.

120. The Client informed IMS that, on April 3, 2016, Veeva asked an employee in the Client's IT department for permission to pull IMS Healthcare Professional Data from the Client's Veeva CRM Application instance. Upon information and belief, Veeva made this request to an individual at the Client whom Veeva knew was not aware of the contractual restrictions that prohibited the Client from approving Veeva's requested data extract. Approval was granted on April 4th and Veeva pulled the requested IMS Healthcare Professional Data extract then or shortly thereafter.

121. A Veeva senior executive has acknowledged that Veeva then performed an analysis of IMS Healthcare Professional Data to "conduct a data quality report vis-à-vis the comparable Veeva OpenData dataset." Veeva has further acknowledged that this "data quality report" included a direct analysis of IMS Healthcare Professional Data, which Veeva has also acknowledged it had no right to obtain absent an IMS TPA Agreement. A full month later, after analyzing IMS Healthcare Professional Data, Veeva requested a meeting with the Client in order for its sales team to review the results of its prohibited data analysis and to try to market its own healthcare professional data product.

122. Veeva has expressly acknowledged that its purpose in illicitly accessing and obtaining IMS Healthcare Professional Data was to conduct a comparison between its own healthcare professional data and IMS Healthcare Professional Data. In other words, Veeva was trying to obtain an improper competitive advantage by reviewing a competitive product it was

otherwise not entitled to review and by stealing the superior proprietary work product of a competitor to enhance its own fledgling product rather than invest the necessary time, effort, and financial resources into improving it themselves.   Having knowledge of IMS Healthcare Professional Data content allows Veeva to either copy the type of proprietary and distinguishing features that IMS has developed, and gone to extensive lengths to protect, or to make biased comparative sales presentations it otherwise would not be able to make.

123.    IMS learned of Veeva's improper access of its Healthcare Professional Data only because an employee of the Client recognized Veeva's improper activities after the fact and reported the incident to IMS.

124.    IMS has strong reason to believe that this was not the only time Veeva has accessed IMS Healthcare Professional Data in the possession of life sciences clients by targeting individuals who may not understand the nature of its illicit activities.   Both prior to and after the incident involving the Client, Veeva improperly and deceptively obtained—indeed stole—IMS Healthcare Professional Data.   In fact, a Veeva senior executive admitted that Veeva engaged in substantially similar unauthorized access of IMS Healthcare Professional Data on multiple occasions.

125.    As a result of Veeva's many misrepresentations and misconduct, IMS has been and continues to be injured.

126.    IMS's reputation as a global provider of Healthcare Professional Data and Sub-National Information and client relationships have suffered due to Veeva's unfair competitive practices.

127.    The value of IMS's intellectual property, including but not limited to its Healthcare Professional Data and Sub-National Information included in its Market Research

Offerings, has been diluted by, among other things, Veeva's misappropriation of distinguishing characteristics of IMS Market Research Offerings offered around the world and its CRM and MDM Applications.

128.    IMS has lost and continues to lose business, and has faced increased pressure to lower its prices to stay competitive in the marketplace against Veeva.

129.    IMS will continue to be damaged by price reductions and lost business as long as Veeva continues its improper conduct, including its public misrepresentations regarding the safeguards and controls it purports to have with regards to its CRM and MDM Applications and OpenData products in order to induce IMS into entering TPA Agreements Veeva has no intention of respecting.

## LEGAL CLAIMS

### COUNT I
### FEDERAL THEFT OF TRADE SECRETS
### (THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq.*)

130.    IMS alleges and incorporates the allegations of paragraphs 1 through 129 as if fully set forth herein.

131.    IMS owns and possesses certain confidential, proprietary and trade secret information, referred to herein as IMS Market Research Offerings, and which constitutes a protectable trade secret.

132.    This confidential, proprietary and trade secret information relates to a product and/or service used in, and/or intended for use in, interstate or foreign commerce.

133.    IMS has taken reasonable measures to keep such information secret and confidential.

134.    This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

135.    In violation of IMS's rights, including, upon information and belief, following the enactment of the Defend Trade Secrets Act, Veeva has used its technology and other property to misappropriate IMS's trade secrets, and continues to propagate and/or disseminate IMS's trade secrets, in various improper and unlawful ways as alleged herein.  Veeva has derived actual economic value from its misappropriation and expects to continue to derive further value.

136.    Veeva's misappropriation of IMS's confidential, proprietary and trade secret information was intentional, knowing, and willful.

137.    Veeva has failed to return IMS's confidential, proprietary and trade secret information, and has attempted to conceal its theft and use of such information.  Upon information and belief, if Veeva's conduct is not remedied, and if Veeva is not enjoined, Veeva will continue to misappropriate, disclose, and use for its own benefit, and to IMS's detriment, IMS's trade secret information.

138.    IMS has been harmed and will continue to be irreparably harmed by Veeva's violation of the Defend Trade Secrets Act. IMS is entitled to damages, in an amount to be determined at trial, and affirmative actions to protect IMS trade secret information, including a seizure of all documents or information in Veeva's possession concerning or relating to IMS's trade secret information, as well as an award of exemplary damages and attorneys' fees.

## COUNT II
## THEFT OF TRADE SECRETS
## (N.J. STAT. ANN. § 56:15)

139.     IMS alleges and incorporates the allegations of paragraphs 1 through 138 as if fully set forth herein.

140.     A senior Veeva executive admitted that Veeva CRM and MDM Application engineers regularly access IMS Market Research Offerings under the guise of resolving technological issues reported by life sciences clients, in New Jersey and elsewhere, but actually use that access to unlawfully gain insight into IMS Market Research Offerings for purposes of improving and enhancing Veeva's CRM and MDM Applications broadly.

141.     Veeva has also unlawfully obtained direct and unauthorized access to IMS Healthcare Professional Data and some attributes of Sub-National Information, in New Jersey and other states, as well as internationally, to use and refer to it as a foundation for its own localized competing healthcare professional data products in New Jersey, other states, and various countries across the world.

142.     In addition, on or about April 4, 2016, Veeva unlawfully obtained IMS Healthcare Professional Data from the Client.

143.     Upon information and belief, both prior to and after that date, Veeva obtained IMS Healthcare Professional Data and some attributes of Sub-National Information from life sciences companies other than the Client in New Jersey and elsewhere.

144.     Veeva has gained such access and used IMS Healthcare Professional Data and some attributes of Sub-National Information in these ways notwithstanding its full knowledge and understanding of the trade secret nature of these IMS Market Research Offerings that it had no right to obtain or otherwise access absent IMS's permission.

145.     The IMS Market Research Offerings Veeva acquired and used is a trade secret in that, among other things, IMS expends great effort and expense to assemble and process through the use of extensive human resources and proprietary technologies and systems, and is thereby subject to protection under New Jersey law.

146.     IMS Market Research Offerings are a compilation of information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons, such as Veeva, who can obtain economic value from its disclosure.

147.     IMS has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of its Healthcare Professional Data and Sub-National Information by virtue of, among other things, its contracts with its clients that limit the rights of those clients to use and disseminate IMS Market Research Offerings, and its requirements that where data is disclosed to third parties, it may only be disclosed under circumstances where the third party expressly agrees to limitations on the use of the data and to respect the proprietary and confidential nature of the data.

148.     Veeva used IMS's trade secret information by, among other things, (i) using it to design, test, and implement improvements and enhancements to its CRM and MDM Applications, (ii) using it to develop and improve Veeva's healthcare professional data product, OpenData, domestically and across the world, rather than investing in legitimate development practices, and (iii) running biased analyses on IMS Healthcare Professional Data to compare it to Veeva healthcare professional data for sales and marketing purposes.

149.     The foregoing conduct of Veeva constitutes an actual misappropriation and misuse of IMS's confidential trade secret information, without authorization, in violation of the

New Jersey Trade Secrets Act, N.J. Stat. Ann. § 56:15.

150.    As a direct and proximate result of Veeva's theft of IMS's trade secret information, IMS has suffered and is suffering damages in an amount to be determined at trial, as well as irreparable harm which cannot be fully remedied by damages and accordingly for which an injunction is sought to prevent Veeva from obtaining further unauthorized access to IMS Market Research Offerings.  IMS is also entitled to punitive damages and attorneys' fees.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT

151.    IMS alleges and incorporates the allegations of paragraphs 1 through 150 as if fully set forth herein.

152.    IMS, sometimes through local subsidiaries, has contractual relationships with its clients, including those in New Jersey and with the Client, under which, among other things, IMS clients are prohibited from disclosing IMS Market Research Offerings to any third party absent IMS's express written consent, including the requirement that any such third party enter into a TPA Agreement.

153.    Veeva, through its extensive discussions with IMS, as well as the fact that it has entered into TPA Agreements with IMS, was fully aware of IMS's contractual relationships with the Client and other clients and was fully aware that any IMS Market Research Offering is subject to the restrictions contained in IMS's agreements with its clients, including the requirement that, for it to obtain access to a IMS Market Research Offering, it was required to first obtain IMS's express written permission through a TPA Agreement.

154.    IMS clients all over the world, including in New Jersey, were induced by Veeva to provide Veeva with IMS Market Research Offerings without first obtaining a TPA

Agreement with IMS, and as result of that inducement these clients violated their agreements with IMS.

155.    Veeva's conduct in obtaining IMS Market Research Offerings constitutes intentional interference with IMS's rights under its contracts with IMS clients.

156.    IMS has suffered and will continue to suffer damages, in an amount to be determined at trial, as a result of Veeva's conduct.

## COUNT IV
### FEDERAL FALSE AND MISLEADING ADVERTISING
### (SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A))

157.    IMS alleges and incorporates the allegations of paragraphs 1 through 156 as if fully set forth herein.

158.    Veeva has made false or misleading descriptions of fact, false or misleading representations of fact, and/or false designations of origin of its goods by making public statements on its website and elsewhere about the quality and capability of the Veeva MDM Application, including that it is wholly segregated from Veeva OpenData, as well as the quality and nature of its OpenData products.

159.    Veeva's representations of material facts were false and misleading, made in commercial, interstate advertising or promotion, and misrepresent the nature, characteristics and qualities of Veeva's MDM Application.

160.    Veeva's false and misleading representations of fact have caused and are likely to cause customer confusion, mistake or deception, as well as loss of customer confidences, sales, profits, and goodwill, and were made with the intent and purpose of deceiving customers, and causing them both to do business with Veeva and not to do business with IMS.

161.    Veeva's acts are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

162.    Veeva's conduct has caused and is causing irreparable injury to IMS and, unless enjoined by this Court, will continue to both damage IMS and to deceive the public.  IMS has no adequate remedy at law.

## COUNT V
## UNFAIR TRADE PRACTICES
## (COMMON LAW)

163.    IMS alleges and incorporates the allegations of paragraphs 1 through 162 as if fully set forth herein.

164.    Veeva has engaged in business practices as described herein, which are unlawful, offend public policy as established by statutes and the common law, are unethical, oppressive and unscrupulous and further caused substantial injury to IMS.

165.    These unfair trade practices include, but are not limited to, (i) Veeva's theft and misappropriation of IMS Market Research Offerings in New Jersey and all over the world, (ii) Veeva's misrepresentations to global clients, headquartered in New Jersey and other places, regarding the nature of its goods and services, including but not limited to the international reach of its OpenData products, and (iii) its intentional interference with the contracts IMS has with its clients.

166.    IMS has and will suffer losses as a result of Veeva's unlawful conduct. These losses were reasonably foreseeable, in that Veeva knew or should have known that its conduct would place IMS at a competitive disadvantage, would result in misappropriation of IMS's confidential and proprietary information and would otherwise cause harm to IMS's business.

167.   Veeva's actions constitute unfair competition and/or unfair business practices contrary to the common laws of New Jersey.

168.   As a result of Veeva's conduct, Veeva has obtained an unfair competitive advantage and all revenues Veeva has obtained as a result of its wrongful conduct should be disgorged.   IMS has also suffered an ascertainable loss of money in its trade and business and is entitled to punitive damages and attorneys' fees.

## COUNT VI
## UNJUST ENRICHMENT

169.   IMS alleges and incorporates the allegations of paragraphs 1 through 168 as if fully set forth herein.

170.   Veeva has obtained the significant financial benefit of IMS's investments in its Market Research Offerings to which it is not entitled through its misconduct, as it did not have to invest in developing, managing, or maintaining its own technology or data products.

171.   As Veeva acquired these benefits intentionally, at IMS's expense, and with full knowledge of its wrongdoing, equity and good conscience require restitution to IMS.

172.   Veeva has retained these benefits under circumstances that make it unjust and inequitable for Veeva to retain those benefits without paying IMS the value of the benefits Veeva acquired.

173.   As a result, IMS is entitled to recover the significant financial benefits that Veeva has obtained through its misconduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request this Court to enter judgment against Defendant, as follows:

(a) That Defendant, its officers, directors, agents, servants, affiliates, employees, successors, assigns, parent, and subsidiary companies and representatives, and all those acting in privity or in concern or participation with Defendant be permanently enjoined and restrained from directly or indirectly:

  (i) Using Plaintiffs' intellectual property to enhance, improve, update, validate, create, develop, benchmark, or perform any similar service or action on Defendant's technology or data and/or any derivative therefrom in Defendant's possession, custody, or control;

  (ii) Using, selling, disseminating, or otherwise deriving any benefit from any technology or dataset in Defendant's possession, custody, or control which was at any time enhanced, improved, updated, validated, created, developed, benchmarked, enriched, or otherwise caused to incorporate Plaintiffs' intellectual property;

  (iii) Taking any action or making any statement that falsely states, suggests, or implies that Plaintiffs are improperly withholding its consent from allowing its intellectual property to be stored in Defendant's MDM Application based on anticompetitive motives;

  (iv) Engaging in any trade practices, including those complained of herein, which unfairly compete with or injure Plaintiffs, their business, or the goodwill appertaining thereto;

  (v) Assisting any third party or requesting any third party to undertake any actions prohibited in subparagraphs (i)-(iv) above.

(b) That Defendant be ordered to take affirmative actions to protect Plaintiffs' trade secrets, including a seizure of all documents or information in Defendant's possession concerning or relating to Plaintiffs' trade secrets;

(c) Appointment of a monitor at Defendant's expense to assure that Defendant,

  (i) obtains the requisite licenses from IMS to access and use any IMS Market Research Offerings in Defendant's possession or control, or otherwise refrains from accessing and using such IMS Market Research Offerings, and

  (ii) complies with the terms of any licenses granted by IMS to access and use any IMS Market Research Offerings in Defendant's possession and control

with the monitor having all such rights, powers and authorities necessary to perform her duties and responsibilities including full and complete access to Defendant's personnel, books, documents, records kept in the normal course of business, facilities, systems and technical information, and such other relevant information as the monitor may reasonably request; and the monitor shall have authority to employ, at Defendant's expense, such consultants, accountants, attorneys and other representatives and assistants as are reasonably necessary to carry out the monitor's duties and responsibilities; and such other rights and responsibilities as the Court deems just and proper.

(d)     That an accounting and disgorgement be ordered, and that Plaintiffs be awarded all gains, profits, revenues, and advantages derived by Defendant from its wrongful acts, and that the amount of any accounting be trebled to the extent allowed by law, and that Plaintiffs be made whole from any lost profits and reduction in the value to its intellectual property due to Defendant's wrongful acts;

(e)     That Defendant be required to compensate Plaintiffs for all litigation expenses, including reasonable attorneys' fees and costs;

(f)     That Plaintiffs be awarded compensatory and punitive damages; and

(g)     That the Court grant Plaintiffs such other and further relief as it deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiffs hereby

demand a trial by jury.

Respectfully submitted,

By: _____

KELLEY DRYE & WARREN LLP
Robert I. Steiner
One Jefferson Road
2nd Floor
Parsippany, New Jersey 07054
Tel: (973) 503-5900
Fax: (973) 503-5950

*Attorneys for Plaintiffs Quintiles IMS*
*Incorporated and IMS Software Services,*
*Ltd.*

Of Counsel:    Jonathan K. Cooperman (*pro hac vice* to be submitted)
Monica Hanna (admission pending)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897