Tonia Ouellette Klausner
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800

Attorney for Defendant Veeva Systems Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| QUINTILES IMS INCORPORATED and IMS SOFTWARE SERVICES, LTD., | Case No.:  2:17-cv-00177-CCC-MF |
| Plaintiffs – Counterclaim Defendants, | Honorable Claire C. Cecchi |
| | **ANSWER AND COUNTERCLAIMS** |
| v. | *Document Electronically Filed* |
| VEEVA SYSTEMS INC., | |
| Defendant – Counterclaim Plaintiff. | |

Defendant Veeva Systems Inc. ("Veeva"), by way of Answer to the Complaint of Quintiles IMS Incorporated and IMS Software Services, Ltd. (collectively, "IMS"), say:

### INTRODUCTION

1.    Veeva denies the allegations set forth in paragraph 1.

2.    Veeva denies the allegations set forth in paragraph 2.

3.    Veeva denies the allegations set forth in paragraph 3.

4.    Veeva admits that IMS has issued more than 50 licenses to Veeva to access IMS provided information used by common clients of Veeva and IMS, but otherwise denies the allegations set forth in paragraph 4.

5.    Veeva admits that a mutual client of IMS and Veeva alerted IMS to a potential data breach concerning IMS confidential information.  Veeva otherwise denies the allegations set forth in paragraph 5.

6.    Veeva denies the allegations set forth in paragraph 6.

7.      The allegations set forth in paragraph 7 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 7 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that IMS has filed an action to obtain certain relief and damages.

## JURISDICTION AND VENUE

8.      The allegations set forth in paragraph 8 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 8 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that IMS has filed an action to obtain certain relief and damages.

9.      The allegations set forth in paragraph 9 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 9 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that it is registered to conduct business within the State of New Jersey, and has or had business contact, transacted business in, or solicited business within the State of New Jersey.

10.      The allegations set forth in paragraph 10 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 10 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that IMS has filed an action to obtain certain relief and damages.

## FACTS RELEVANT TO ALL CLAIMS

### The Parties

11.      Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11.

12.      Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12.

13.      Veeva admits that IMS provides market research, analytics, technology, and services.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13.

14.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14.

15.     Veeva admits the allegations set forth in paragraph 15.

16.     Paragraph 16 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 16 may be deemed to require a response from Veeva, Veeva admits that Veeva and IMS compete in the markets for reference data, Customer Relationship Management ("CRM") solutions, and Master Data Management ("MDM") solutions, but otherwise denies the allegations.

**IMS "Market Research Offerings"**

17.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17.

18.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.

19.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19.

*IMS's "Healthcare Professional Data Offerings"*

20.     Veeva admits that the Complaint uses the term "Healthcare Professional Data Offerings" to refer to a subset of IMS's data products, but is unfamiliar with that designation. Veeva believes that what the Complaint refers to as "Healthcare Professional Data" is known in the industry as reference data.  To the extent "Healthcare Professional Data" is reference data as that term is used in the industry, Veeva admits that IMS sells reference data.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20.

21.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21.

22.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 22.

23.     Veeva admits that accurate data on healthcare professionals and organizations is important to Veeva's life sciences clients.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23.

24.     Veeva admits that the allegations set forth in paragraph 24 are approximate statements made in a marketing video hosted on Veeva's website at https://www.veeva.com/resources/veeva-asks-what-is-the-cost-of-bad-data/.  Veeva directs the Court to the video for a full and complete copy of its contents.

25.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25.

26.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.

*IMS's "Sub-National Information Offerings"*

27.     Veeva admits that the Complaint uses the term "Sub-National Information" to refer to a subset of IMS's data products, but is unfamiliar with that designation.  Veeva believes that what the Complaint refers to as "Sub-National Information" is known in the industry as sales data.  To the extent "Sub-National Information" is sales data as that term is used in the industry, Veeva admits that IMS sells sales data.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27.

28.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 28.

29.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 29.

30.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 30.

31.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 31.

32.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 32.

33.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33.

34.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 34.

35.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 35.

36.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 36.

37.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 37.

**IMS's "Technology Offerings"**

38.     Veeva admits that IMS offers CRM and MDM solutions in addition to other products, but is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38.

39.     Veeva admits the allegations set forth in paragraph 39.

40.     Veeva admits that reference data and sales data are frequently used by life sciences companies in CRM Applications.

41.     Veeva admits the allegations set forth in paragraph 41.

42.     Veeva admits that reference data and sales data are frequently used by life sciences companies in MDM Applications.

43.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43.

44.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44.

45.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 45.

46.     Veeva admits that IMS sometimes makes an Application Program Interface ("API") available so its customers may use competitor's products for their CRM and MDM needs subject to Third Party Access ("TPA") Agreements.  Veeva is without knowledge or information sufficient to form a belief as to the frequency with which IMS makes such APIs available.

**IMS Carefully Protects "IMS Market Research Offerings"**

47.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 47.

48.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 48.

49.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 49.

50.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 50.

51.     Veeva admits that IMS licenses its data products to its customers to allow the use of IMS's reference data and sales data by customers.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 51.

52.     Veeva admits that IMS uses TPA Limited License Agreements, in various forms and by various names, to allow the use of IMS's reference data and sales data by customers in conjunction with their third-party vendors such as Veeva.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva is otherwise without

knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 52.

53.     Veeva admits that IMS has used TPA Limited License Agreements, in various forms and by various names, to allow the use of IMS's reference data and sales data by customers in conjunction with their vendors such as Veeva.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53.

54.      Paragraph 54 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 54 may be deemed to require a response from Veeva, Veeva denies these allegations.

55.     Paragraph 55 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 55 may be deemed to require a response from Veeva, Veeva denies these allegations.

56.     Paragraph 56 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 56 may be deemed to require a response from Veeva, Veeva denies these allegations.

57.     Paragraph 57 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 57 may be deemed to require a response from Veeva, Veeva denies these allegations.

58.     Paragraph 58 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 58 may be deemed to require a response from Veeva, Veeva denies these allegations.

**Veeva's Competing Products**

59.     Paragraph 59 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 59 may be deemed to require a response from Veeva, Veeva admits that Veeva and

IMS compete in the markets for reference data, CRM solutions, and MDM solutions, among others.

60.     Veeva admits that it initially offered a CRM solution in the United States. Veeva also admits that it subsequently began development of an MDM solution in 2012, and began offering that MDM solution commercially in 2013.  Veeva denies the remaining allegations set forth in paragraph 60.

61.     Veeva admits the allegations set forth in paragraph 61.

62.     Veeva admits that, at the time of Network's launch, Veeva used the word "crowdsourcing" in some marketing materials.  Veeva otherwise denies the allegations set forth in paragraph 62.

63.     Paragraph 63 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 63 may be deemed to require a response from Veeva, Veeva denies these allegations.

64.     Veeva denies the allegations set forth in paragraph 64.

65.     Veeva admits that, in 2016, the CEO of Veeva wrote to the CEO of IMS that:

> All IMS data customers have access to IMS data.  They put it on their servers. And many of their employees have access to that data of course.  They need it to do their jobs.  End users, analysts, DBAs, etc.  So, that is thousands of people across hundreds of IMS customers with access to IMS reference data in many hundreds of computer systems.  You do not investigate end customer systems/processes for these type of security controls, especially for malicious activity.  You sign a TPA, and then get after that end customer if they fail.  We are not talking about military secrets.  We are talking about reference data. . . .
> [L]ooking at [the] big picture, many of the [security] tests [IMS requested] do not make sense.  Why [is] Veeva singled out in this way that is so different than IMS end customers who access IMS data?  I just don't understand that.

Veeva otherwise denies the allegations set forth in paragraph 65.

66.     Veeva admits that on March 24, 2015, Veeva announced it had reference data offerings available in Australia, China, the United Kingdom, and the United States.  Veeva further admits that it intended to and did further expand its international offerings, and now

offers reference data offerings in approximately 38 countries, many of which are in direct competition with IMS's offerings in those countries.  Veeva otherwise denies the allegations set forth in paragraph 66.

**"Veeva is Well Aware of the Confidential and Proprietary Nature of IMS Market Research Offerings"**

67.     Veeva admits the allegations set forth in paragraph 67.

68.     Veeva admits the allegations set forth in paragraph 68.

69.     Veeva admits that once a TPA Agreement is in place, IMS allows its clients to upload IMS reference data, and some elements of IMS sales data, to Veeva's CRM Application, and some elements of IMS sales data for use in Veeva's MDM Application. These TPA Agreements vary from country to country and project to project.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva admits that IMS sometimes offers to sell access to an API, client-by-client.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 69.

70.     Veeva denies the allegations set forth in paragraph 70.

71.     Veeva denies the allegations set forth in paragraph 71.

72.     Veeva denies the allegations set forth in paragraph 72.

**"Veeva's Admitted Theft and Misuse of 'IMS Market Research Offerings' to Improve Its Products"**

73.     Veeva denies the allegations set forth in paragraph 73.

1.     *"Veeva Used 'IMS Research Offerings' to Improve Its CRM and MDM Applications"*

74.     Veeva admits that it regularly updates its CRM and MDM solutions.  Veeva otherwise denies the allegations set forth in paragraph 74.

75.     Veeva denies the allegations set forth in paragraph 75.

76.     Veeva admits that, in compliance with applicable IMS TPAs, certain of its personnel sometimes access Veeva CRM and MDM instances in order to resolve technology support issues reported by its customers.  Veeva otherwise denies the allegations set forth in paragraph 76.

77.     Veeva admits the allegations set forth in paragraph 77.

78.     Veeva admits the allegations set forth in paragraph 78.

79.     Veeva admits that Veeva's engineers will sometimes access, pursuant to a TPA with IMS, IMS reference data in order to design and implement a software remedy for a customer problem.  Veeva otherwise denies the allegations set forth in paragraph 79.

80.     Veeva denies the allegations set forth in paragraph 80.

81.     Veeva denies the allegations set forth in paragraph 81.

82.     Veeva denies the allegations set forth in paragraph 82.

83.     Veeva denies the allegations set forth in paragraph 83.

84.     Paragraph 84 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 84 may be deemed to require a response from Veeva, Veeva denies these allegations.

85.     Paragraph 85 contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 85 may be deemed to require a response from Veeva, Veeva denies these allegations

86.     Veeva denies the allegations set forth in paragraph 86.

   2.   *"Veeva Used 'IMS Healthcare Professional Data' and 'Sub-National Information'*
        *to Improve Its Data Product"*

87.     Veeva states that it first entered the healthcare professional data business in 2013.  Paragraph 87 otherwise contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 87 may be deemed to require a response from Veeva, Veeva denies these allegations.

88.     Veeva admits that its first healthcare professional data product, OpenData, was originally named OpenKey, and that IMS offers a product named IMS OneKey.  Paragraph 88 otherwise contains IMS's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 88 may be deemed to require a response from Veeva, Veeva denies these allegations.

89.     Veeva admits that IMS filed a lawsuit against Veeva in the United States District Court for the Southern District of New York on April 30, 2015.  Veeva otherwise denies the allegations set forth in paragraph 89.

90.     Veeva admits that it changed the name of its data product from OpenKey to OpenData in or around July 2015.  Veeva further admits that in or around July 2015, IMS voluntarily dismissed the litigation it had initiated against Veeva on April 30, 2015, and completely and irrevocably released Veeva regarding that dispute, such that IMS cannot attempt to bolster its allegations in this lawsuit by relying upon accusations it has previously released.  Veeva otherwise denies the allegations set forth in paragraph 90.

91.     Veeva denies the allegations set forth in paragraph 91.

92.     Veeva denies the allegations set forth in paragraph 92.

93.     Veeva admits the allegations set forth in the first two sentences of paragraph 93. Veeva denies the allegations set forth in the last sentence of paragraph 93.

94.     Veeva admits it has, for the benefit of clients seeking to purchase Veeva's MDM solution, Network, sought TPA Agreements with IMS to allow Veeva Network customers to use IMS reference data in conjunction with their Network instances.  Veeva otherwise denies the allegations set forth in paragraph 94.

95.     Veeva denies the allegations set forth in paragraph 95.

96.     Veeva denies the allegations set forth in paragraph 96.

97.     Veeva denies the allegations set forth in paragraph 97.

98.     Veeva admits that a limited number of employees with responsibilities to Veeva OpenData are co-located within the same offices as employees with responsibilities to Veeva Network.  Veeva otherwise denies the allegations set forth in paragraph 98.

99.     Veeva denies the allegations set forth in paragraph 99.

100.    Veeva denies the allegations set forth in paragraph 100.

101.    Veeva denies the allegations set forth in paragraph 101.

102.    Veeva denies the allegations set forth in paragraph 102.

103.    Veeva directs the Court to its website for a full and complete statement of its contents.  Veeva otherwise denies the allegations set forth in paragraph 103.

104.    Veeva admits that the presentation slides incorporated into the Complaint in this paragraph were published to its website.  Veeva directs the Court to its website for a full and complete statement of its contents.  Veeva otherwise denies the allegations set forth in paragraph 104.

105.    Veeva admits the allegations set forth in paragraph 105.

106.    Veeva denies the allegations set forth in paragraph 106.

107.    Veeva admits that Jim Cushman is currently the sole General Manager for OpenData and Network, and has served in that role since February 2016.  Veeva further states that prior to Jim Cushman's assumption of that role, Tim Slevin served as General Manager of OpenData, and Brian Longo served as General Manager of Network.  Veeva otherwise denies the allegations set forth in paragraph 107.

108.    Veeva admits that Private Mode in Veeva MDM protects IMS Healthcare Professional Data from being added into the Veeva environment where OpenData is stored and from being misused to improve OpenData.  Veeva otherwise denies the allegations set forth in paragraph 108.

109.    Veeva admits that the referenced statements in paragraph 109 were published to its website.  Veeva directs the Court to its website for a full and complete statement of its contents.  Veeva otherwise denies the allegations set forth in paragraph 109.

110.    Veeva denies the allegations set forth in paragraph 110.

111.    Veeva admits that it consented to an independent assessment of its data security in September 2015, in the course of attempting to negotiate a TPA Agreement with IMS for the benefit of a joint customer.  Veeva further admits that IMS was the party to propose the independent assessment.  Veeva otherwise denies the allegations set forth in paragraph 111.

112.    Veeva admits that it twice requested deferments of the beginning of the security assessment in order to prepare staff to properly participate in the intensive audit procedures. Veeva otherwise denies the allegations set forth in paragraph 112.

113.    Veeva denies the allegations set forth in paragraph 113.

114.    Veeva admits the allegations set forth in paragraph 114.

115.    Veeva denies the allegations set forth in paragraph 115.

116.    Veeva denies the allegations set forth in paragraph 116.

117.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 117.

118.    Veeva denies the allegations set forth in paragraph 118.

3.    *"Veeva Used 'IMS Healthcare Professional Data' to Improve Its Sales Methods"*

119.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 119.  Veeva otherwise denies the allegations set forth in the second and third sentences of paragraph 119.

120.    Veeva admits that on April 3, 2016, Veeva requested permission from a member of the customer's IT department to pull data from the customer's Veeva CRM instance.  Veeva further admits that the customer granted permission on April 4th and Veeva pulled the requested data shortly thereafter.  Veeva otherwise denies the allegations set forth in paragraph 120.

121.    Veeva admits that it prepared an analysis for its customer, after getting authorization from the customer to do so.  Veeva otherwise denies the allegations set forth in paragraph 121.

122.    Veeva denies the allegations set forth in paragraph 122.

123.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 123.

124.    Veeva denies the allegations set forth in paragraph 124.

125.    Veeva denies the allegations set forth in paragraph 125.

126.    Veeva denies the allegations set forth in paragraph 126.

127.    Veeva denies the allegations set forth in paragraph 127.

128.    Veeva denies the allegations set forth in paragraph 128.

129.    Veeva denies the allegations set forth in paragraph 129.

## LEGAL CLAIMS

### COUNT I
### FEDERAL THEFT OF TRADE SECRETS
### (THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq.*)

130.    Veeva incorporates its responses to paragraphs 1 through 129 as if fully set forth herein.

131.    The allegations set forth in paragraph 131 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 131.

132.    The allegations set forth in paragraph 132 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 132.

133.     The allegations set forth in paragraph 133 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 133.

134.     The allegations set forth in paragraph 134 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 134.

135.     The allegations set forth in paragraph 135 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 135.

136.     The allegations set forth in paragraph 136 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 136.

137.     Veeva denies the allegations set forth in paragraph 137.

138.     The allegations set forth in paragraph 138 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 138.

## COUNT II
### THEFT OF TRADE SECRETS
### (N.J. STAT. ANN. § 56:15)

139.     Veeva incorporates its responses to paragraphs 1 through 138 as if fully set forth herein.

140.     Veeva denies the allegations set forth in paragraph 140.

141.     Veeva denies the allegations set forth in paragraph 141.

142.     Veeva denies the allegations set forth in paragraph 142.

143.     Veeva denies the allegations set forth in paragraph 143.

144.    Veeva denies the allegations set forth in paragraph 144.

145.    The allegations set forth in paragraph 145 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 145.

146.    The allegations set forth in paragraph 146 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 146.

147.    The allegations set forth in paragraph 147 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 147.

148.    The allegations set forth in paragraph 148 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 148.

149.    The allegations set forth in paragraph 149 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 149.

150.    The allegations set forth in paragraph 150 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 150.

<u>COUNT III</u>
**TORTIOUS INTERFERENCE WITH CONTRACT**

151.    Veeva incorporates its responses to paragraphs 1 through 150 as if fully set forth herein.

152.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 152.

153.    The allegations set forth in paragraph 153 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 153.

154.    Veeva denies the allegations set forth in paragraph 154.

155.    The allegations set forth in paragraph 155 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 155.

156.    The allegations set forth in paragraph 156 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 156.

<u>COUNT IV</u>
**FEDERAL FALSE AND MISLEADING ADVERTISING
(SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A))**

157.    Veeva incorporates its responses to paragraphs 1 through 156 as if fully set forth herein.

158.    Veeva denies the allegations set forth in paragraph 158.

159.    The allegations set forth in paragraph 159 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 159.

160.    The allegations set forth in paragraph 160 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 160.

161.    The allegations set forth in paragraph 161 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 161.

162.     The allegations set forth in paragraph 162 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 162.

## COUNT V
## UNFAIR TRADE PRACTICES
## (COMMON LAW)

163.     Veeva incorporates its responses to paragraphs 1 through 162 as if fully set forth herein.

164.     The allegations set forth in paragraph 164 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 164.

165.     The allegations set forth in paragraph 165 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 165.

166.     The allegations set forth in paragraph 166 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 166.

167.     The allegations set forth in paragraph 167 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 167.

168.     The allegations set forth in paragraph 168 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 168.

## COUNT VI
## UNJUST ENRICHMENT

169.     Veeva incorporates its responses to paragraphs 1 through 168 as if fully set forth herein.

170.     Veeva denies the allegations set forth in paragraph 170.

171.    The allegations set forth in paragraph 171 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 171.

172.    The allegations set forth in paragraph 172 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 172.

173.    The allegations set forth in paragraph 173 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 173.

## FIRST DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiffs' claims are barred by the doctrine of laches, waiver, and estoppel.

## THIRD DEFENSE

Plaintiffs' claims are barred by the doctrine of unclean hands.  The unclean hands doctrine bars Plaintiffs from bringing this suit to allege that Veeva engaged in unlawful activity based on the manner in which Veeva has organized its corporate infrastructure, facilities, personnel, job responsibilities, and computer systems, because Veeva is informed and believes that Plaintiffs  have themselves made similar decisions and engage in similar practices to those alleged by Plaintiffs, including with regard to access and use of Veeva's industry-leading Veeva CRM software application by IMS personnel.  The unclean hands doctrine demands that a plaintiff act fairly in the matter for which it seeks a remedy.  The plaintiff must come into court with clean hands, and keep them clean, or it will be denied relief, regardless of the merits of its claim.  The defense applies to bar legal and equitable claims, and need not involve criminal or tortious activity – simply conduct that violates conscience, good faith, and equitable standards of conduct.  To the extent Plaintiffs seek to contend that Veeva engaged in unlawful activity by allegedly performing the same or similar acts as Plaintiffs, within the same nexus of common customers and common sources of data regarding the healthcare market or classes of software, its claims are barred because such conduct infects its claims and renders pursuing this action inequitable.

## FOURTH DEFENSE

Plaintiffs' claims are unenforceable because the statements made by Veeva were literally true, and/or were not misleading or material at the time they were made.

## FIFTH DEFENSE

Plaintiffs' claims are barred because Plaintiffs have failed to take reasonable steps to mitigate their asserted damages.

## SIXTH DEFENSE

There is no basis in law or fact for Plaintiffs' demands for punitive damages.

**SEVENTH DEFENSE**

The statute of limitations bars Plaintiffs from pursuing their claims for relief, including but not limited to their claims of trade secret misappropriation.

**EIGHTH DEFENSE**

To the extent that ready ascertainability is deemed an affirmative defense rather than an element on which Plaintiffs bear the burden of proof (and Veeva contends that the latter applies), Plaintiffs are barred from claiming trade secret misappropriation as to any items of information that were readily ascertainable within the meaning of that defense at the time of the alleged misappropriation.

**NINTH DEFENSE**

To the extent that independent derivation is deemed an affirmative defense rather than an element on which Plaintiffs bear the burden of proof (and Veeva contends that the latter applies), Plaintiffs are barred from claiming trade secret misappropriation as to any items of information that it independently derived within the meaning of that defense.

**TENTH DEFENSE**

The privilege of competition bars Plaintiffs from pursuing their claims for relief.

**ELEVENTH DEFENSE**

The doctrine of implied license bars Plaintiffs from pursing their claims for relief.

**TWELFTH DEFENSE**

To the extent reliance upon a release is deemed an affirmative defense rather than an element on which Plaintiffs bear the burden of proof (and Veeva contends that the latter applies), Plaintiffs are barred from pursing any claims, or otherwise submitting evidence to support a claim, based on claims previously released.

## STATEMENT OF INTENTION TO PURSUE UNIFORM TRADE SECRETS ACT AND DEFEND TRADE SECRETS ACT BAD FAITH REMEDIES

Because Veeva believes that Plaintiffs have acted in bad faith within the meaning of the Uniform Trade Secrets Act (including, but not limited to, California Civil Code § 3426.4) and the Defend Trade Secrets Act of 2016, Veeva will seek all fees and costs permitted by statute.

## COUNTERCLAIMS

COUNTERCLAIMS OF VEEVA SYSTEMS INC. ................................................................ 23

THE PARTIES ................................................................................................................ 26

JURISDICTION .............................................................................................................. 28

FACTUAL BACKGROUND ............................................................................................. 29

    Industry Background .............................................................................................. 29

    Relevant Product Markets ..................................................................................... 31

        Healthcare Reference Data Market ................................................................ 31

        Pharmaceutical Sales and Performance Data ................................................ 33

        Life Sciences Customer Relationship Management (CRM) Software ............... 35

        Life Sciences Master Data Management (MDM) Software ............................... 36

IMS AND CEGEDIM'S HISTORY OF ANTICOMPETITIVE CONDUCT ........................... 38

    Anticompetitive Conduct in Europe – Data ........................................................... 38

    Anticompetitive Conduct in Europe – CRM Software Solutions ............................ 39

    Anticompetitive Conduct in the United States – Data ........................................... 40

CURRENT ANTICOMPETITIVE CONDUCT IN THE UNITED STATES AND EUROPE – DATA AND MDM SOFTWARE SOLUTIONS ................................................................... 40

    IMS and Cegedim's Pre-Merger Boycott of Veeva ............................................... 40

    IMS Abuses MDM TPA Agreement Process To Slow and Block Veeva MDM ............ 43

IMS IS IMPEDING AND PREVENTING CUSTOMERS FROM SWITCHING TO COMPETITIVE REFERENCE DATA AND MDM SOFTWARE SOLUTIONS .................... 47

    Delays and Refusals To Deal Through "Contracting Friction" ......................... 47

    Denials of National Provider Numbers ................................................................. 48

    Denials of "Brick" Data ....................................................................................... 49

    Denial of IMS Software Applications ..................................................................... 50

    Threats of Retaliation ........................................................................................... 52

    Injury to Competition ............................................................................................ 52

FIRST CLAIM FOR RELIEF .......................................................................................... 53

    Monopoly Maintenance – Reference Data (15 U.S.C. § 2) .................................... 53

SECOND CLAIM FOR RELIEF ...................................................................................... 54

    Attempted Monopolization – MDM Software Solutions (15 U.S.C. § 2) ................. 54

THIRD CLAIM FOR RELIEF ....................................................................... 55
    *Per Se* Violation of Section 1 of the Sherman Act – Reltio............................ 55
    (Agreement in Restraint of Trade) (15 U.S.C. § 1) ...................................... 55
FOURTH CLAIM FOR RELIEF ................................................................... 56
    *Per Se* Violation of Section 1 of the Sherman Act – Cegedim ...................... 56
    (Group Boycott) (15 U.S.C. § 1).................................................................. 56
FIFTH CLAIM FOR RELIEF ........................................................................ 57
    Monopoly Leveraging of Reference and Sales Data (15 U.S.C. § 2)............. 57
SIXTH CLAIM FOR RELIEF ....................................................................... 58
    Intentional Interference with Contractual Relations ..................................... 58
SEVENTH CLAIM FOR RELIEF .................................................................. 59
    Intentional Interference with Prospective Economic Advantage.................... 59
EIGHTH CLAIM FOR RELIEF ..................................................................... 59
    Violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)..... 59
NINTH CLAIM FOR RELIEF ....................................................................... 60
    Violation of the Unfair Practices Act (Cal. Bus. & Prof. Code § 17200, *et seq.*) ........... 60
PRAYER FOR RELIEF ................................................................................ 61
JURY TRIAL DEMAND ............................................................................... 62

## COUNTERCLAIMS OF VEEVA SYSTEMS INC.

Defendant and Counterclaim Plaintiff Veeva Systems Inc. ("Veeva") asserts counterclaims against Plaintiffs and Counterclaim Defendants Quintiles IMS Incorporated ("Quintiles IMS") and IMS Software Services, Ltd. ("IMS Software") (collectively, "IMS"), and by and for their Counterclaims allege as follows:

1.      IMS is abusing its monopoly power as the dominant provider of data products for life sciences companies by preventing Veeva and other competitors from providing data products and software applications to life sciences companies, which includes primarily pharmaceutical and biotechnology companies.  Life sciences companies have been and continue to be able to achieve the benefits of Veeva's Customer Relationship Management ("CRM") software with IMS data through long-standing agreements without genuine data security issues.  Yet, when Veeva began to offer its own data products and Master Data Management ("MDM") software to

life sciences companies in direct competition with IMS, IMS began a campaign of anticompetitive conduct designed to preclude Veeva from offering data products and MDM software to life sciences companies.

2.      Rather than seeking to compete legitimately with Veeva, IMS began its crusade to crush Veeva's new lines of business using its monopoly power as the dominant provider of data products for life sciences companies.  At a company-wide sales meeting in 2014, IMS launched "Project Orange Crush," part of IMS's company-wide plan to impede and prevent life sciences companies from using Veeva's data and software products in a "surround and destroy" strategy. Orange is a reference to Veeva's distinctive logo and marketing color.  To underscore the point, IMS handed out cans of Orange Crush soda.  IMS has engaged in a global campaign to prevent customers from using Veeva's MDM software and Healthcare Reference Data ("Reference Data") by, among other practices discussed herein, refusing customer requests to use IMS's Reference Data products with Veeva's MDM software product, and by creating barriers to prevent customers from switching from IMS Reference Data to Veeva Reference Data.

3.      IMS has prevented life sciences companies from using IMS data products with Veeva's MDM software via its license agreements with life sciences customers which allow IMS to abuse the well-established practice of requiring limited license agreements in order for third party software providers, like Veeva, to host and process IMS data on behalf of life sciences customers.  In its effort to prevent Veeva from offering its competitive products, IMS has intentionally delayed and complicated negotiations requested by customers for these third party agreements, flatly refused to enter into such agreements to allow life sciences companies to use IMS's Reference Data products with Veeva's MDM, and now has baselessly accused Veeva of stealing IMS intellectual property and of maintaining inadequate security, while simultaneously

refusing to provide any input or suggestion as to how Veeva could satisfactorily demonstrate security.  Indeed, the IMS Complaint is merely a continuation of IMS's pretextual justification of its attempts to abuse its market power in data products for life sciences companies.

4.      The intent and effect of IMS's campaign is to strangle Veeva's data and software products in their infancy.  IMS has harmed competition by preventing Veeva from providing its MDM software solution to life sciences companies; has impeded the growth of Veeva's Reference Data product, thereby damaging the quality of the product by preventing Veeva and its customers from realizing the benefit of further legitimate network effects; and has prevented and discouraged customers from switching from IMS to Veeva products by substantially raising the technical burden and costs of such transitions.  This conduct, along with other unlawful acts meant to prevent Veeva from offering its data products and software solutions to life sciences companies, are harming life sciences companies and harming competition by raising costs and reducing choice of data products and software applications.

5.      IMS's refusals to allow life sciences companies to use IMS data products with Veeva's MDM software have no legitimate business justification.  IMS's purported justifications to the contrary are pretextual.

6.      IMS's actions constitute, among other things, monopolization, attempted monopolization, unlawful tying of goods or services, unfair competition, unfair trade practices, and tortious interference with contract.  Life sciences companies have been injured by having to pay higher prices, for inferior products, and with fewer choices, and are often forced to contract with IMS, despite their dissatisfaction with IMS's data products, software solutions, services, and prices.

7.     Veeva seeks damages that have resulted from IMS's anticompetitive conduct and a permanent injunction preventing IMS from continuing its improper abuse of its dominant position in the markets for Healthcare Reference Data and life sciences Pharmaceutical Sales and Performance Data ("Sales Data").

## THE PARTIES

8.     Counterclaim Plaintiff Veeva is a publicly traded information and technology services company, organized and existing under the laws of the State of Delaware, with its principal place of business at 4280 Hacienda Drive, Pleasanton, California 94588.

9.     Founded in 2007, through the quality and innovation of its product offerings, Veeva has rapidly grown from a Silicon Valley startup to a leading global provider of industry-specific, cloud-based software solutions for the life sciences industry.  Veeva provides cloud based solutions for CRM, Reference Data, enterprise content management, and MDM to life sciences customers around the world.

10.     Life sciences companies rely on Veeva's products to realize the benefits of modern cloud-based architectures and mobile applications for their most critical business functions, without compromising industry-specific functionality or regulatory compliance.

11.     Veeva CRM, Veeva's Customer Relationship Management software for sales representatives, enables a broad range of industry-specific functions such as drug sample tracking with electronic signature capture, healthcare affiliations management, and the ability to conduct interactive, rich media demonstrations with physicians on a mobile device, with or without an Internet connection.  Veeva's CRM enables customers to increase the productivity and ensure regulatory compliance of their sales and marketing functions.

12.     Veeva Network, Veeva's MDM software, enables life sciences companies to create, consolidate, maintain, steward, and share data that drives life sciences companies' sales

and marketing operations.  Veeva Network enables life sciences companies to more effectively manage complex healthcare provider, healthcare organization, and healthcare product data, and the relationships within and across these data domains.  Veeva Network is a first-of-a-kind MDM solution that takes an approach that is tailored for life sciences customers; connecting to end-users to get their real-time feedback on the data which, in turn, results in the highest data quality and data trustworthiness in the life sciences marketplace.  Network was the first cloud-based MDM solution built as a "fit-for-purpose" (*i.e.*, specific for the life sciences industry) MDM solution.  Among other features, Veeva Network offers a data model that is pre-built for the requirements of life sciences companies, an intuitive and modern user interface, and advanced reporting, tracking, and audit capabilities.  Veeva Network's features result in a software solution that has the lowest cost of ownership for Veeva Network customers and the industry's lowest service/implementation-to-software cost ratio.

13.     Veeva OpenData is Veeva's proprietary Reference Data product that includes healthcare professionals, healthcare organizations, and other supplemental data that can be used with Veeva's CRM or MDM solutions or with third-party CRM or MDM solutions.

14.     As a relatively recent entrant to the life sciences technology space, Veeva is focused on being an innovator and adding more value for customers (and thus is a disruptive competitive influence on incumbent firms).  As a result, its technology solutions have consistently demonstrated that legacy solutions do not effectively and efficiently satisfy the needs of life sciences companies today and in the evolving future.  Veeva's innovations directly benefit customers by helping to reduce total cost of ownership for technology solutions, improving the efficieny of new drug development processes, improving analytical insights, and improving and easing regulatory compliance.

15.     Counterclaim Defendant Quintiles IMS is the largest pharmaceutical data and analytics company both in the United States and the world.  It has grown to its dominant position by aggressively absorbing every major competitor in the United States and the world, such as by its April 1, 2015 acquisition of the data and CRM businesses of Cegedim, its main competitor in Europe.  By acquiring Cegedim's data business, which included the dominant life sciences reference data product in the European Union ("EU"), and Cegedim's CRM business, IMS Quintiles consolidated its status as the world leader in Reference Data with its already world leading status in Sales Data.

16.     Quintiles IMS is organized and existing under the laws of the State of Delaware with dual corporate headquarters at 83 Wooster Heights Road, Danbury, Connecticut 06810, and 4820 Emperor Boulevard, Durham, North Carolina 27703.  Quintiles IMS has offices at 435 Market Street, 7th Floor, San Francisco, California 94105, and 777 Mariners Island Boulevard, Suite 700, San Mateo, California 94404, and is registered to do business in the State of California.  Upon information and belief, Quintiles IMS in fact conducts a significant portion of its business in California, and/or derives substantial revenue from services rendered within the Northern District of California.

17.     Counterclaim Defendant IMS Software is a corporation organized and existing under the laws of the State of Delaware with headquarters at 83 Wooster Heights Road, Danbury, Connecticut 06810.

18.     IMS and Veeva are competitors in the relevant markets of CRM software for life sciences, MDM software for life sciences, and Reference Data.

## JURISDICTION

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question jurisdiction), as this action arises under

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and §§ 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26.

20.     This Court has supplemental jurisdiction to adjudicate the related state law claims under 28 U.S.C. § 1367.

21.     Although justice would be better served by alternative venues, venue is technically proper here as provided in 28 U.S.C. § 1391(b)(1) and (c), and as provided in §§ 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and because Counterclaim Defendants have subjected themselves to jurisdiction in this forum by bringing suit here.

## FACTUAL BACKGROUND

### Industry Background

22.     IMS and Veeva provide data to life sciences companies, as well as software that enables life sciences companies to utilize that data.

23.     The development and proliferation of new and advanced drugs in the 20th and 21st centuries has been a direct, substantial cause of a worldwide increase in health and well-being.  Prescription drugs directly promote human health, significantly increasing life expectancy and quality of life in developed and developing nations.  In no small part because of this, pharmaceutical, life sciences, and healthcare companies have become a growing and important part of the world economy, as people live longer and expect better care.

24.     As prescription drugs have proliferated, demand for new and better drugs has increased.  This crucible of demand has forged the prescription drug industry into one of the largest, most complex, and most innovative industries in the world.  Those same conditions create fierce competition within the industry, such that even a marginal advantage can represent billions of dollars in additional revenue.

25.     Because of the high level of regulation within the healthcare and life sciences markets, as prescription drugs and other healthcare products are distributed, prescribed, and consumed, customers and intermediaries for those products create enormous amounts of data at each step in the stream of commerce, from manufacturer to consumer.  Life sciences companies need this data in various forms – including Reference Data and Sales Data, described in more detail at paragraphs 29-46 herein – for commercial and regulatory compliance purposes.  Typically, however, life sciences companies do not have the expertise and technology to compile, analyze, validate, maintain, and update such vast datasets in-house.

26.     Healthcare data providers, such as IMS and Veeva, provide data to life sciences companies through subscription license arrangements that allow life sciences companies to use the relevant data for a defined term.  Because the underlying facts that make up these data sets change regularly, the subscription licenses purchased by life sciences companies typically include updates to the databases to ensure that the data is accurate, compliant, and usable by life sciences companies.

27.     The subscription license agreements issued by data providers to life sciences customers typically prohibit the distribution of the licensed data to third parties unless the third party has entered into a limited license agreement allowing the third party to use the data for the benefit of the life sciences end customer.  These agreements—often entered into by data providers and Software-as-a-Service providers for the benefit of joint customers—are called Third Party Access ("TPA") Agreements, or "TPAs."  The parties to the TPAs are the data provider, such as IMS, and companies who provide services to the life sciences company that require the use of the data, such as Veeva.  TPAs set out the terms under which third-parties (including the providers of software solutions – like CRM software and MDM software that are

delivered via a Software-as-a-Service model) may access and use a data provider's data for the benefit of the life sciences company.  Data suppliers typically maintain a form TPA that specifies the purposes for which the software solution provider may use the data for the benefit of the life sciences customer.  For instance, a TPA may specify, as many IMS TPAs do, that use is allowed in a CRM solution, but not in an MDM solution.  The TPAs also specify terms regarding confidentiality, access rights, audit rights, and other limitations with respect to a software solutions provider's access to the data.  The TPA is typically provided by the data provider to the software solutions provider upon the request of the life sciences company.  The TPA is then signed by the data provider and the software solutions provider.  In a typical scenario prior to Veeva's entering the MDM and Reference Data businesses, including in the past when IMS and Veeva have entered into a TPA for Veeva CRM, the TPA process was often completed in less than two weeks.

28.     IMS and, before IMS acquired its businesses, Cegedim, have been using form TPAs since at least 2007.

## Relevant Product Markets

### *Healthcare Reference Data Market*

29.     Reference Data is information regarding doctors, hospitals, and other medical professionals and organizations.  Reference Data datasets generally include the names and contact information for professionals as well as complex, overlapping affiliations of those professionals to clinics, hospitals, and other organizations.  Building a dataset of this type requires using computer algorithms to compile and match information from a variety of public sources, obtaining and compiling information through licensing of private sources, and collecting information through a manual process that may include phone calls and other direct outreach.

30.     Numerous life sciences companies worldwide buy and rely on such information for compliance purposes, as well as for sales and marketing.  Generally, for various reasons, this information is purchased on a country-by-country basis, though in some parts of the world, such as parts of the EU, companies will buy Reference Data simultaneously for multiple countries.

31.     In light of the ferocious competition in the life sciences and pharmaceutical industries worldwide, companies have come to rely on this data as mission critical for sales and marketing purposes.  These companies generally gain access to Reference Data on a subscription basis, relying on suppliers such as Veeva and IMS to obtain, validate, and maintain the data.

32.     Continuous validation of Reference Data is necessary because the underlying real world facts constantly evolve and change.  Doctors retire, move offices, change employers, or change hospital affiliations, and healthcare organizations change names or practice areas, among many other possible drivers of change.  As a result of this constant churn, almost one-fifth of all records will have some change each year, and an entire database may be effectively out of date in five years.

33.     Reference Data is critical to the sales and marketing operations of life sciences companies, and even a small error rate or discontinuity of access to updated Reference Data can result in millions of dollars in lost revenue as well as potential fines or penalties for regulatory noncompliance.

34.     Although Veeva has offered a competing product, OpenData, since 2013, IMS remains the dominant supplier of Reference Data worldwide under its OneKey brand, with substantial market power both in the United States and around the world constituting monopoly or near-monopoly positions.  Upon information and belief, IMS maintains at least a 70% market

share of the Reference Data market in the United States, and despite some regional and national variance, IMS maintains a similar dominance worldwide.

35.     Because of the volume of data needed to have a useable set, it generally takes substantial capital and multiple years to build a commercially viable Reference Data set. Moreover, because customers can assist in notifying a provider of out-of-date data, established providers with a preexisting customer base gain the advantage of network effects, further raising the barriers to entry for new competitors.

36.     While IMS and Veeva compete for sales of Reference Data worldwide, Reference Data is region and country specific.

### *Pharmaceutical Sales and Performance Data*

37.     Sales Data is another distinct data product derived from valuable commercial information harvested by companies like IMS, and subsequently sold to and utilized by life sciences companies.  Whereas Reference Data generally contains contact and relevant biographical information about doctors and intermediate drug purchasers such as pharmacists, Sales Data tracks the actual prescriptions written and volumes of each drug sold in a given geographic region.  As a result, Sales Data can serve a role both in planning and marketing.

38.     Sales Data enables a pharmaceutical company to monitor and analyze the sales performance of its products in order to improve its sales and marketing activities, and serves as the basis for sales representative compensation.  Sales Data can relate both to prescription and over-the-counter drugs and healthcare products.

39.     IMS markets various types of Sales Data under different trade names, which may or may not be used together.  One product, known as DDD or DD Outlet, represents actual flow of prescription drugs at retail (*e.g.*, pharmacies) and non-retail (*e.g.*, hospitals) outlets.

40.     Another Sales Data product, known as Xponent, is prescriber prescription data which tells the total number of prescriptions written in a therapeutic class.  Whereas Xponent can show the number of prescriptions written for a particular drug by region or doctor, it does not quantify sales by dollar amounts or number of doses.

41.     Developing a marketable Sales Data set poses substantial hurdles.  A market entrant must expend tens of millions of dollars per year in fixed data acquisition costs, and generally must operate for years to build up sufficient historical data to offer a competitive product.  As a general matter, Sales Data is highly regulated around the world, and subject to stringent and constantly shifting requirements for storage security and anonymization.  Understanding and dealing with the numerous and varied regulations across countries raises costs for data providers and the risk of civil and enforcement liability for regulatory noncompliance.  All of these factors, and others, create barriers that must be overcome by any potential new entrants into the market.

42.     A result of these strict regulations is that the raw information that data providers gather must be partially anonymized before being made available to life sciences companies, rendering the final product difficult to use on its own.  When paired with advanced analytics and sufficiently detailed sets of Reference Data, however, life sciences companies can leverage this anonymized data to create highly useful analytical and marketing tools.

43.     IMS's dominance of this market worldwide led the European Commission, as part of the terms for approval of IMS's purchase of Cegedim, to mandate that IMS make its regional anonymized data segments, known as "Bricks," available to competitors.

44.     As noted by the European Commission, "the overwhelming majority of pharmaceutical companies buy and use IMS's sales tracking data."  IMS has a monopoly over

Sales Data in the United States, holding at least an 80% share of the U.S. market. IMS has a similarly dominant position worldwide, facing no serious competition in the Sales Data market. IMS has achieved and maintains this monopoly primarily through the use of exclusive, long-term contracts with Sales Data sources.

45.      Veeva has never offered Sales Data.

46.      While IMS sells Sales Data worldwide, Sales Data is region and country specific.

### Life Sciences Customer Relationship Management (CRM) Software

47.      Raw Reference Data and Sales Data, provided in database form, are not themselves directly useful products. Both products require the use of software applications to be rendered into a useful form for life sciences companies.

48.      Life Sciences Customer Relationship Management Software ("CRM Software") is one type of software product used by life sciences companies to harness Reference Data and Sales Data. CRM Software helps pharmaceutical companies manage their customer interactions by organizing, automating, and synchronizing data from sales, marketing, customer database, customer service, and technical functions. CRM Software, either offered as locally installed software or as Software-as-a-Service accessed via the internet, collates sets of data and displays them in a user-friendly manner. With these capabilities, CRM Software enables companies to improve customer relationships, to enhance sales effectiveness, to optimize data quality, and to mitigate regulatory compliance risks.

49.      Reference Data are a necessary input for the functioning of CRM Software, as customers require the underlying contact information in order to make sales calls. Because of the potentially proprietary nature of Reference Data or Sales Data, when the provider of CRM Software is different from the supplier of the Reference Data or Sales Data to be organized in the CRM Software, the customer must request a TPA Agreement between the data provider(s) and

the CRM provider so that the data may be uploaded on the CRM system.  IMS requires that a

TPA be entered into for every use case and every country for which a third-party solution

provider may receive IMS data, with each TPA running a distinct one-year term.  As a result, the

entire TPA process must be reinitiated in the event of any change or expansion of the customer's

use of a software solution.  For any single life sciences customer's use of any single third party

software provider, IMS may require numerous TPAs to document the use of IMS's data globally,

each of which may be renewed, rejected, or changed at IMS's discretion annually.

50.     In contrast to IMS's TPA practices, Veeva has issued a master TPA to IMS that

allows IMS to use Veeva's data in any IMS Application and for any IMS customer that IMS

chooses to list on a simple, one-page enrollment form.  Through similar agreements for software

access, many IMS employees also have direct access to Veeva's industry-leading CRM product

to provide complementary services, such as support and training, to mutual end customers.

51.     Veeva and IMS both offer CRM Software solutions in the United States, Europe,

and Australia, among other locations.

### *Life Sciences Master Data Management (MDM) Software*

52.     Life Sciences Master Data Management Software ("MDM Software") helps life

sciences companies organize information from disparate sources within their business by

tracking, managing, and analyzing data to inform and support decision-making.  MDM Software

accomplishes this by identifying data sources within a customer's business, collecting the data in

a central repository, and integrating that data in a structure that facilitates consistent extraction

for analysis.

53.     MDM Software is used to integrate one dataset with another dataset, or to input

datasets for software applications.  For instance, if a customer was to license Reference Data

from Veeva and Sales Data from IMS, MDM Software would analyze the two different types of

data and pair related data points (such as anonymized total prescription information and related Reference Data for the likely prescribing doctor).  This data could be further combined with the customer's own proprietary internal data, such as sales projections or manufacturing forecasts.

54.     Data are an input for the functioning of MDM Software:  just as raw data is largely useless without the tools to analyze it, MDM Software is useless without data for it to analyze.  As with CRM Software, when the provider of the MDM Software is different from the supplier of the Reference Data or Sales Data to be analyzed by the MDM Software, the customer requests a TPA Agreement between the data provider(s) and the MDM provider so that the data may be used by the life sciences company with the third-party's MDM Application.

55.     According to IMS marketing materials, by 2018, "40% of CRM and [Enterprise Resource Planning] customers will demand solutions that embed master data management capabilities."

56.     Although IMS previously offered an MDM solution of its own, Nucleus360, which it still supports for some existing customers, upon information and belief, it has ceased entering into new contracts for that product.  Instead, on or about June 14, 2016, IMS entered into an exclusive partnership with another MDM provider, Reltio Inc. ("Reltio"), and now offers Reltio's MDM software as part of IMS's so-called integrated software suite, IMS One.

57.     Upon information and belief, IMS had intended to acquire Reltio, but chose to contract with Reltio – in effect a "de facto" merger – in order to avoid the antitrust scrutiny such an acquisition would bring.  IMS's contractual relationship with Reltio is part of IMS's anticompetitive scheme to prevent Veeva and other bona fide competitors from offering MDM software solutions to life sciences companies.

58.     Although life sciences companies sometimes purchase MDM software on a country-by-country basis, life sciences companies often standardize MDM company-wide. Company-wide purchases often follow test runs in specific countries, making toehold positions critically important to the growth of an MDM Software product.

59.     Because the data life sciences MDM Software is intended to handle is highly regulated around the world, understanding and dealing with the numerous and varied regulations across countries for the underlying data's storage and handling, and ensuring that the MDM Software complies with those regulations, raises costs for MDM Software developers and creates barriers that must be overcome by any potential new entrants into the market.

60.     Veeva competes directly with the IMS-Reltio joint venture with its MDM product, Veeva Network, worldwide.

## IMS AND CEGEDIM'S HISTORY OF ANTICOMPETITIVE CONDUCT

61.     IMS has used its dominant position in the markets for Reference Data and Sales Data, stamping out and restraining competition, removing or reducing customer choice, raising prices, and hobbling competitors through an interconnected web of anticompetitive conduct. IMS's own customers recognize that IMS does not innovate and that its technology is dated and overpriced.  Indeed, IMS rarely invests in leading edge solutions, operating on aging legacy systems or, when that fails to give it a competitive edge, by buying out major competitors.

62.     Both IMS and Cegedim, a company IMS acquired, have a long history of avoiding fair competition, either by buying competitors, abusing a dominant position, or both.

### Anticompetitive Conduct in Europe – Data

63.     As early as 2001, European regulators intervened when IMS attempted to block its competitors' access to key data in an attempt to force them from the market.  The European Commission found that IMS's refusal to license its industry standard Brick definitions,

predefined geographical segmentations for anonymized Sales Data, to a competitor was an abuse of its dominant market position, and compelled IMS to license the definitions.  *See* Commission Decision Relating to a Proceeding Pursuant to Article 82 of the EC Treaty (EC) No. COMP D3/38.044 (July 3, 2001).

64.     Despite this censure by the European Commission, IMS continued its anticompetitive behavior.  For instance, after IMS acquired SDI Health LLC ("SDI Health"), another data firm, in October 2011, IMS tried to raise the price for its data to SDI Health's rival Decision Resources Group ("DRG") from $700,000, before the acquisition, to $5,000,000 plus royalties.  When DRG then attempted to source their U.S. data from Symphony Health Solutions Corporation ("Symphony"), IMS's then-current main competitor in the U.S. Reference Data and Sales Data markets, and sought an EU only quote from IMS, IMS responded with the same $5,000,000 plus royalties price for just the EU data.

### Anticompetitive Conduct in Europe – CRM Software Solutions

65.     In 2008, Cegedim was sued in France by Gruppo Euris S.p.a. ("Euris"), a CRM provider.  Euris accused Cegedim, among other things, of abusing its dominant position by refusing to sell its database to life sciences companies that were using or intending to use it with Euris CRM software.  Cegedim refused to sell its OneKey Reference Data product to customers that were using Euris CRM, although it had agreed to sell it to customers that were using other competing software.  Several customers, as well as Cegedim's management, confirmed the situation during the proceedings.  Cegedim justified its refusal because it claimed to be suing Euris for violating its intellectual property.  The French Competition Authority found Cegedim had abused its dominant position, and imposed a fine of €5.7 million.  The authority also enjoined Cegedim from discriminating among its competitors for CRM.  *See* République

Française Autorité de la Concurrence [French Competition Authority], civ., July 8, 2014, Case No. 14-D-06.

### Anticompetitive Conduct in the United States – Data

66.     In 2013, IMS was sued in the United States District Court for the Eastern District of Pennsylvania by Symphony. *Symphony Health Solutions Corp. v. IMS Health Inc.*, 2:13-cv-04290-GAM (filed July 24, 2013). Symphony alleged that IMS had used an unsavory broth of anticompetitive tactics in an attempt to weaken and ultimately drive Symphony from the data market. Among those tactics were long term, exclusive contracts with critical sources of Sales Data meant to choke off Symphony's access to the data sources necessary to offer competing data. After more than two and a half years of fierce litigation, IMS chose to settle the case for an undisclosed sum of money and agreed to purchase one of Symphony's affiliates.

### CURRENT ANTICOMPETITIVE CONDUCT IN THE UNITED STATES AND EUROPE – DATA AND MDM SOFTWARE SOLUTIONS

### IMS and Cegedim's Pre-Merger Boycott of Veeva

67.     After IMS recognized the competitive threat Veeva posed in the MDM market, it began a campaign to exploit its monopoly position in the Reference Data and Sales Data markets and cripple Veeva's ability to successfully sell its MDM software solution to life sciences companies. IMS realized that by refusing to allow its customers to load this critical resource into Veeva's new product, it could effectively preclude Veeva from selling its MDM software solution to life sciences companies.

68.     In late 2013 through early 2014, over a period of six months, IMS and Veeva negotiated and came to agreement on a form of TPA Agreement that Veeva understood and expected to cover the use of both IMS Reference Data and Sales Data to be used with Veeva's fledgling MDM product. After entering into such TPA Agreements for IMS Sales Data, IMS

abruptly informed Veeva it would not honor the newly negotiated form TPA for IMS Reference Data and that IMS refused to allow any of its Reference Data to be loaded into Veeva's MDM product.

69.     Simultaneously, despite the fact that the merger had only just been announced and was not yet completed, Cegedim began an identical course of conduct in concert with IMS. While Cegedim had previously routinely entered into TPA Agreements with Veeva with general language contemplating both CRM and MDM uses, as soon as the merger was announced Cegedim explicitly changed positions, refusing to sign any TPA Agreement that did not explicitly exclude Veeva MDM products and sending letters to customers informing them of Cegedim's new position.

70.     Cegedim and IMS's pre-merger coordination went further, as Cegedim began to coerce existing customers, already covered by multiproduct TPA Agreements, to sign amendments to their valid existing TPA Agreements to preclude Veeva MDM access.  Upon information and belief, Cegedim began this process of pre-merger coordination as part of an agreement with IMS to begin boycotting Veeva products to exclude them from the MDM market.

71.     In June and July of 2014, a top 25 pharmaceutical company executed TPA Agreements allowing the use of Cegedim Reference Data in any Veeva system.  After the merger with IMS was announced, Cegedim reversed its position and refused to supply the required data and demanded that the customer execute a new TPA Agreement that explicitly prohibits using the data with Veeva's MDM.  This led one executive of the company to write on October 10, 2014 that "[t]hey [Cegedim] are basically putting a block to prevent a big competitor from advancing – at our and other manufacturers' expense."

72.     Similarly, on June 18, 2014, a different major pharmaceutical company entered into a TPA Agreement allowing use of Cegedim Reference Data in any Veeva solution. Cegedim knew that the customer intended to use the data in conjunction with Veeva MDM when it signed this TPA Agreement, and the TPA Agreement clearly covers that anticipated use.  In September, after the merger was announced, Cegedim once again reversed its position and refused to supply the required data and demanded that that customer execute a new TPA that explicitly prohibits using the data with Veeva's MDM.

73.     On July 2, 2014, a top 15 pharmaceutical company entered into a TPA Agreement allowing the use of Cegedim reference data in any Veeva system.  As with the companies described in paragraphs 71 and 72, after the IMS merger was announced, Cegedim abruptly changed positions and refused to supply the vital data to this customer, as Cegedim was contractually obligated to do, unless the customer executed a new TPA Agreement that explicitly prohibits using the data with Veeva's MDM.

74.     Cegedim followed the same course of conduct described above in paragraphs 71, 72, and 73, with a top 10 pharmaceutical company, that time interrupting an in-progress MDM implementation project, costing that company and Veeva time and expense and breaching the January 2014 TPA Agreement between the company, Cegedim, and Veeva, and Cegedim's contractual obligations.

75.     These represent only a few of the dozens of customers who were directly frustrated in their attempts to secure TPA Agreements for use of IMS data in Veeva software.

76.     This coordinated campaign by Cegedim and IMS to categorically deny Veeva access to the MDM market functioned as a group boycott and *per se* violation of United States federal and state antitrust laws.

77.     Although the European Commission ultimately approved the Cegedim-IMS merger, it mandated that IMS continue to make available so-called Brick definitions, an industry standard definition of anonymized regional Sales Data in Europe controlled by IMS to prevent IMS from blocking competitors in the EU. *See* Commission Decision Pursuant to Article 6(1)(b) in Conjunction with Article 6(2) of Council Regulation No. 139/2004 and Article 57 of the Agreement on the European Economic Area (EC) No. COMP/M.7337 (Dec. 19, 2014).

**IMS Abuses MDM TPA Agreement Process To Slow and Block Veeva MDM**

78.     Both before and after its merger with Cegedim, IMS has aggressively leveraged its market power; after the merger with Cegedim was completed, the combined entity began aggressively leveraging its newly enhanced market power to continue its anticompetitive scheme.

79.     With Veeva's first MDM customer, a top 15 pharmaceutical company, in 2014, IMS dragged out for six months negotiations for a TPA Agreement to allow some IMS Sales Data and some Reference Data to be used with Veeva MDM. Since that original TPA was signed, IMS has continuously restricted which data is allowed to be used with Veeva Network and made it increasingly difficult to negotiate each new TPA Agreement. This conduct has only gotten worse since the IMS-Cegedim merger.

80.     Similarly, in 2015 Veeva had signed a multimillion dollar contract with a top 5 pharmaceutical company to implement Veeva's MDM solution, conditionally on grant of a TPA Agreement by IMS. IMS initially agreed to engage in a good faith process to complete a TPA Agreement to allow the use of its data with Veeva's MDM solution. In an attempt to move the negotiations forward, Veeva agreed to submit its products and California headquarters to a third-party security audit with an auditor of IMS's choosing. After participation in the audit, Veeva

remediated the areas of concern and approached IMS about allowing the company's project to go forward.

81.    IMS, however, did not enter these negotiations in good faith, and after months of further discussions, refused to sign a TPA, citing vague "security concerns."

82.    In a further attempt to help assuage IMS's alleged concerns, Veeva agreed to a pilot program in France whereby Veeva provided IMS a fully operational sample of Veeva's MDM product to allow IMS to conduct further security and vulnerability testing.  Even after Veeva addressed IMS's further identified concerns, IMS, without citing any specific deficiency, continued to refuse to sign the TPA, a position which it maintains to this day.

83.    Because IMS's alleged security concerns were not genuine, however, IMS refused to agree, or to provide suggestions for other reasonable remediation.  IMS eventually stopped negotiating entirely, and now has stated to multiple customers that it categorically refuses to allow its data to be used with Veeva's Network MDM.  IMS has since repeatedly raised baseless, third-party security audit "issues" to customers as a pretext for its unjustified refusal to enter into TPAs to allow customers to use IMS reference data with Veeva's Network MDM.

84.    As a result of this years-long campaign of delay and obstruction, that company cancelled its contract for Veeva's MDM solution.  The company subsequently rolled out Veeva MDM in only a single country where it subscribes to non-IMS Reference Data.

85.    On another occasion, a top 20 pharmaceutical company had decided to implement Veeva's MDM solution, conditionally on grant of a TPA Agreement by IMS.  After prolonged negotiations, IMS stated it would allow neither Reference Data nor critical components of Sales Data to be loaded into Veeva MDM.  As a direct result of this refusal by IMS, the company

cancelled a signed contract to implement Veeva's MDM, and discontinued discussions to switch to Veeva Reference Data in the United States.

86.     Many other life sciences companies around the world have now been blocked entirely from using Veeva's MDM solution, while others are blocked in significant portions of the world, by IMS's refusal to enter into TPA Agreements.

87.     IMS's purported justifications are pretextual.

88.     Despite the pretextual nature of IMS's claims, Veeva sought to address IMS's concerns.  Rather than respond in good faith, IMS no longer responds with specific concerns, instead falling back on claims of "general discomfort" while offering to engage in future discussions.

89.     IMS now says to its customers that it has never authorized customers to use IMS data in Veeva MDM and will not do so until Veeva addresses unspecified "security" concerns.

90.     IMS's alleged security concerns are, and have always been, mere pretexts to provide cover for its anticompetitive scheme to prevent Veeva and other competitors from providing data and software applications to life sciences companies.

91.     For example, since Veeva's founding through the present day, Veeva and IMS have signed TPA Agreements allowing life sciences companies to use IMS's Reference Data and Sales Data with Veeva's CRM software solution.  As IMS is aware, Veeva's CRM has substantially the same security protections as Veeva's MDM.  IMS has continued allowing the same data to be used with Veeva's CRM because Veeva's CRM is popular among IMS's customers, whereas Veeva's MDM is a young product with comparatively few early subscribers, and is thus more vulnerable to IMS's predatory behavior.

92.     No matter what efforts Veeva has undertaken and no matter what expense Veeva has incurred, IMS has refused to negotiate in good faith or provide adequate explanation of the basis for their concerns.  In order to address IMS's stated concerns, Veeva has designed and implemented a proprietary secure data connection, Data Bridge.  Veeva has segregated operations of its personnel with access to IMS data and Veeva data.  And Veeva has undergone an intensive audit and remediated all material areas of concern.  Nevertheless, IMS continues to cite nonspecific "discomfort" and refused to deal in good faith.  That none of these good faith measures have proved adequate to meet IMS's ever moving concerns underscores their pretextual nature.

93.     IMS has itself admitted, albeit accidentally, that its concerns were meant only to delay and impose costs on Veeva.  After the audit was completed, IMS requested as a remediation point that Veeva physically segregate the servers that would house Veeva's Reference Data product from the servers housing Veeva's software products that might have IMS data loaded in them.  Veeva complied with this request even though the physical location of servers is largely irrelevant to any legitimate data security concern.  When Veeva reported it had completed that request, an IMS in-house attorney responded asking why Veeva had taken such a meaningless step.  That IMS itself admitted a point of remediation it had specifically requested was meaningless shows that it had not engaged in good faith with Veeva.

94.     Veeva predicted exactly this course of conduct to the European Commission, noting that "IMS simply can and will cite pretextual intellectual property concerns and refuse to enter into any or many" TPA Agreements.  This lawsuit is simply the logical result of IMS's campaign of pretextual justifications for refusing to fairly deal with Veeva and allow IMS customers to use Veeva's superior products.

95.     IMS's claims that Veeva's data security is insufficient or that Veeva has been stealing IMS's intellectual property are baseless.  Indeed, shortly after the filing of the Complaint in this action, one life sciences company asked IMS if it had any evidence whatsoever that Veeva has misappropriated IMS intellectual property.  IMS admitted that it had none.

## IMS IS IMPEDING AND PREVENTING CUSTOMERS FROM SWITCHING TO COMPETITIVE REFERENCE DATA AND MDM SOFTWARE SOLUTIONS

### Delays and Refusals To Deal Through "Contracting Friction"

96.     IMS has a pattern and practice of acting in bad faith to prevent life sciences companies from switching to competitor's Reference Data and software solutions.

97.     When customers inform IMS of their intent not to renew contracts or to voluntarily terminate them, IMS has refused to comply or deliberately dragged out the termination period.  IMS has engaged in such conduct with at least two major pharmaceutical companies.  For instance, when one top 50 pharmaceutical company informed IMS they were switching to Veeva and wanted only a six month term renewal of their contract, IMS refused to sign a term of less than a year.

98.     More insidiously, IMS has abused the TPA Agreement process for customers who seek to switch from IMS Reference Data to Veeva.  When a customer switches Reference Data providers, in order to ensure their own proprietary records linked to their Reference Data set are not lost, a life sciences customer must "match," as much as possible, each record in the prior data set to each corresponding record in the new Reference Data dataset.  IMS has twice previously allowed mapping of IMS Reference Data linked records to Veeva Reference Data.  Other than those two instances outside of the U.S. and EU, however, IMS has categorically refused to allow mapping of Reference Data linked records to Veeva Reference Data.

99.     As one example of this practice, IMS blocked one life sciences company from transitioning from IMS's Reference Data to Veeva's Reference Data by refusing to sign a TPA Agreement to allow mapping.  IMS threatened that customer would be sued for "unlimited liability" if the customer ever attempted to match their own records to Veeva data, even if the matching was conducted by customer personnel without the involvement of Veeva or Veeva software solutions.

100.    To further hinder those customers who persist in attempting to switch from IMS to Veeva despite IMS's refusal to allow simple matching necessary for continuity of service, IMS has begun to further restrict which fields of Sales Data are allowed to be loaded in Veeva MDM.

**Denials of National Provider Numbers**

101.    In the second half of 2016, IMS stopped allowing National Provider Identifier ("NPI") numbers from Sales Data to be used with Veeva's MDM.  NPI numbers are part of the Health Insurance Portability and Accountability Act (HIPAA) standard, and are government issued unique identifiers for all health care providers in the United States.  Because NPI numbers are universal and unique, they are of particular value in pairing datasets.

102.     Despite the fact that NPI numbers are created by the government and their use is mandated by statute, IMS claims that NPI numbers are IMS intellectual property and are "premium" attributes of IMS data which are no longer allowed to be used with Veeva's MDM solution.  IMS knows that these claims are entirely baseless; IMS's intent is to increase the time and expense associated with life sciences customers' purchasing Veeva MDM and to damage the continuity of service for those customers switching to Veeva Reference Data or MDM.

**Denials of "Brick" Data**

103.    In a similar pattern, starting in 2016, IMS has delayed signing TPA Agreements allowing its Brick definitions to be loaded into Veeva MDM, as it did with one top 5 pharmaceutical company which subscribes to Veeva's Reference Data, CRM, and Veeva's MDM solution, but relies on IMS Sales Data, paired to Veeva's Reference Data through IMS Brick definitions.  Because Brick definitions change regularly and IMS requires a new TPA for each update, each IMS delay in signing compounds, substantially raising contracting costs and impeding customer use of current data.  Although IMS is compelled by the European Commission's decision allowing its merger with Cegedim to provide the Brick definition to MDM software providers upon customer request, that compulsion is useless if constantly out of date.

104.    With another major pharmaceutical customer that used Veeva Open Data, IMS stated in November 2016 that it would not allow Brick data into Veeva CRM or MDM, stating that being able to do so is "the benefit of staying on OneKey."  When the customer responded that such requests had been approved by IMS in other countries and was compelled by the European Commission decision approving the IMS-Cegedim merger, IMS simply stopped responding.  IMS has not responded to that customer's request as of the filing of this pleading.

105.    By delaying each TPA Agreement allowing the use of Brick definitions in Veeva MDM, IMS is deliberately skirting the intent of the European Commission decision, and abusing its monopoly over those definitions to prevent customers from using competing MDM solutions.

106.    IMS's behavior in delaying Brick data approval for use in Veeva MDM is shown to be pretextual because it diverges from the behavior of similarly situated competitors.  For instance, GERS France, a former Cegedim entity not acquired in the merger, regularly grants

TPA Agreements to Veeva for general use, without excluding Veeva's MDM and without the requirement of a new TPA for each definition update.

107.    Because of the IMS monopoly on Sales Data, customers that switch from IMS Reference Data to Veeva Reference Data typically continue to purchase IMS Sales Data.  As a result, customers generally must match and merge their own records, records in Veeva Reference Data, and records in IMS Sales Data.

108.    By refusing to grant either a TPA to allow full data matching, or to allow NPI numbers or regular Brick definition updates into Veeva's systems, IMS substantially hinders Veeva's ability to help customers switching to Veeva Reference Data or MDM match their Reference Data, either Veeva, proprietary, or from a third-party, with IMS Sales Data. Customers are forced to rely on fuzzy matching techniques that are demonstrably and substantially inferior to deterministic, identifier-based matching, with resulting higher costs and lower quality.

**Denial of IMS Software Applications**

109.    IMS also discourages life sciences companies from switching to Veeva's data offerings in other ways.

110.    In October 2016, a major pharmaceutical company that was an IMS Reference Data and software customer in France decided to switch from IMS to Veeva Reference Data, but wanted to continue using IMS's AggSpend360 software.  When informed of that company's intent to switch data providers, IMS told the company that if the company switched to Veeva Reference Data, they would not be permitted to load that data into AggSpend360.  IMS claimed this prohibition was because IMS could not protect Veeva's intellectual property.

111.    When the pharmaceutical company communicated on Veeva's behalf that Veeva had no concern with IMS's ability to protect Veeva's intellectual property, IMS changed its

position, instead threatening the pharmaceutical company that if it did switch to Veeva's Reference Data that IMS would deliberately make it difficult for the company to use AggSpend360.  And as with many other victims of IMS's anticompetitive behavior, IMS also refused to allow the company to match their IMS Reference Data linked records to their new Veeva Reference Data under a TPA Agreement.

112.     Similarly, in the summer of 2016, a top 25 pharmaceutical company decided to switch to Veeva's Reference Data and MDM Software in the United States, but elected to continue using IMS's software AggSpend360.  Like the company described in paragraphs 110 and 111, IMS told this company, unprompted by any concern from Veeva, that Veeva's Reference Data could not be used with AggSpend360 because IMS could not protect Veeva's intellectual property.  Unlike the company in paragraphs 110 and 111, however, this company had already been using non-Veeva, non-IMS Reference Data and Sales Data with IMS's CRM and MDM.  IMS did not provide an explanation for the disparate treatment of Veeva's Reference Data versus other non-IMS Reference Data.

113.     As shown by the inconsistencies and disparate treatment of Veeva and other competitors, IMS's claim they could not adequately protect Veeva's intellectual property was in fact a lie; a pretextual justification invented by IMS to justify punishing those customers who chose Veeva's products over their own.

114.     This pattern continues to this day.  In 2016, a major pharmaceutical company purchased Veeva CRM and continued to use IMS Reference Data pursuant to a signed TPA Agreement.  In February 2017, that company decided to change from IMS Reference Data to Veeva Reference Data, and informed IMS of their intent.  After prolonged negotiations where IMS denigrated Veeva's product and attempted to persuade the company to reconsider, the

company still insisted on their intention to switch.  At that point, IMS flatly refused to sign a

TPA Agreement, necessary to allow Veeva to assist the company in the transition by mapping its

IMS Reference Data linked records to Veeva's Reference Data.  IMS later threatened to sue this

customer if it later did perform the match on its own, even if the matching was conducted by

customer personnel without the involvement of Veeva or Veeva software solutions.

### Threats of Retaliation

115.    IMS has also made it clear that it would retaliate against any company that sought

to switch away from any of its products.  As a result, many major life sciences companies are

reluctant to switch away from IMS products even when they are inferior and/or more expensive

than those of competitors.

116.    Due to IMS's market power in Sales Data and Reference Data, even large

companies fear angering IMS by switching away from its products.  Major life sciences

companies have expressed reluctance to switch away from IMS products for fear of retaliation.

117.    Upon information and belief, these fears are inspired and encouraged by IMS

sales teams.  IMS routinely conveys to customers that, should they switch, they will face all of

the substantial burdens IMS has placed, as alleged in more detail above.  IMS communicates

these burdens as an implicit threat to customers that switching data providers will be made costly

and difficult by IMS.

### Injury to Competition

118.    To date, IMS's illegal conduct has directly harmed competition in multiple ways.

119.    By refusing to sign TPA Agreements allowing the use of IMS Reference Data in

Veeva MDM, IMS has impeded Veeva's ability to compete in those relevant markets and

interfered with multiple life sciences companies' decisions to purchase Veeva's superior MDM

software products.  Life sciences companies are forced to use inferior and/or more expensive solutions, suffering losses of efficiency and other business harms.

120.    By refusing to sign TPA Agreements allowing NPI, "premium attributes," and Brick definition attributes to be loaded into Veeva's MDM software application, IMS has harmed competition in the MDM software solution, restricting customers' choices and increasing prices of MDM and Reference Data paid by life sciences companies.

121.    By refusing to sign TPA Agreements allowing mapping of IMS Reference Data linked records to Veeva Reference Data, IMS has substantially increased the cost and difficulty of life sciences companies seeking to change data suppliers from IMS to Veeva.  This has directly increased the costs and time taken by life sciences companies in such transitions, and reduced the ability to have a seamless continuation of service and damaged those companies' business operations.

122.    Through its various other anticompetitive activities and tactics, IMS has discouraged other competitors from providing competing Reference Data, Sales Data, and MDM software solutions, thereby reducing the quality of the available solutions in each market and driving up costs for customers.

## FIRST CLAIM FOR RELIEF
### Monopoly Maintenance – Reference Data (15 U.S.C. § 2)

123.    Counterclaim Plaintiff repeats and realleges paragraphs 1-122.

124.    IMS has monopolized the relevant market for the sale of Reference Data around the world in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.    IMS has willfully acquired or maintained market power in this relevant market. This market power is protected by high barriers to competitive entry and expansion.

126.     IMS's artificial creation of barriers and other conduct enhancing competitive exclusion, taken as a whole, have unlawfully excluded or suppressed competition.

127.     As a direct and proximate result of IMS's unlawful conduct, Veeva has suffered injury to its business or property.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

### SECOND CLAIM FOR RELIEF
### Attempted Monopolization – MDM Software Solutions (15 U.S.C. § 2)

128.     Counterclaim Plaintiff repeats and realleges paragraphs 1-127.

129.     IMS has unlawfully attempted to monopolize the worldwide market for Life Sciences MDM Software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

130.     IMS maintains market power in the related Healthcare Reference Data and Life Sciences Sales Data markets.

131.     IMS has entered into an exclusive agreement with Reltio, which sells a Life Sciences MDM Software product.

132.     IMS and Reltio specifically intend to monopolize the global Life Sciences MDM Software market.  Their specific intent to monopolize is apparent from their array of anticompetitive conduct that lacks any legitimate business justification.  IMS sought to block Veeva from any third-party access to IMS's Sales Data or Reference Data for use in Veeva's MDM product, and sought to cut off the ability of Veeva to provide MDM Software services by other means.

133.     IMS and Reltio have a dangerous probability of achieving monopoly power in the worldwide Life Sciences MDM Software market.  Most importantly, IMS is using its market power in the related Life Sciences Sales Data and Reference Data markets to block IMS from competing in the Life Sciences MDM Software market.  Moreover, the worldwide Life Sciences

MDM Software market is concentrated, and potential new entrants to the market face extensive technological and regulatory compliance requirements and high capital costs, among other barriers to entry.

134.    Through their attempted monopolization of the worldwide Life Sciences MDM Software market, IMS and Reltio have harmed competition.

135.    As a direct and proximate result of IMS's unlawful conduct, Veeva has suffered injury to its business or property.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

## THIRD CLAIM FOR RELIEF
### *Per Se* Violation of Section 1 of the Sherman Act – Reltio
### (Agreement in Restraint of Trade) (15 U.S.C. § 1)

136.    Counterclaim Plaintiff repeats and realleges paragraphs 1-135.

137.    IMS and Reltio have entered into an agreement whereby IMS effectively discontinued its own MDM line and agreed to unlawfully leverage its monopoly power in the Healthcare Reference Data and Life Sciences Sales Data markets to facilitate Reltio's monopolization of the worldwide market for Life Sciences MDM Software in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

138.    IMS maintains market power in the related Healthcare Reference Data and Life Sciences Sales Data markets.

139.    IMS has entered into an exclusive agreement with Reltio, which sells a Life Sciences MDM Software product.

140.    IMS and Reltio have agreed to, and specifically intend to, monopolize the global Life Sciences MDM Software market and otherwise restrain fair competition therein.  Their specific intent to monopolize is apparent from their array of anticompetitive conduct that lacks any legitimate business justification.  IMS has sought to block Veeva from any third-party access

to IMS's Sales Data or Reference Data for use in Veeva's MDM product, and sought to cut off

the ability of Veeva to provide MDM Software services by other means.  At the same time, IMS

and Reltio entered into an exclusive agreement whereby IMS would steer data customers to

Reltio MDM Software.

141.    As a result of IMS's abuse of its market power in the Reference Data and Sales

Data markets to influence the MDM Software market, IMS and Reltio have a dangerous

probability of achieving monopoly power in the worldwide Life Sciences MDM Software

market.  Most importantly, IMS is using its market power in the related Life Sciences Sales Data

and Reference Data markets to block Veeva from competing in the Life Sciences MDM

Software market.  Moreover, the worldwide Life Sciences MDM Software market is

concentrated, and potential new entrants to the market face extensive technological and

regulatory compliance requirements and high capital costs.

142.    Through their agreement to restrain trade in the worldwide Life Sciences MDM

Software market, IMS and Reltio have harmed competition.

143.    As a direct and proximate result of IMS's unlawful conduct, Veeva has suffered

injury to its business or property.  Veeva is entitled to damages for the violations of the Sherman

Act alleged herein.

**FOURTH CLAIM FOR RELIEF**
***Per Se* Violation of Section 1 of the Sherman Act – Cegedim**
**(Group Boycott) (15 U.S.C. § 1)**

144.    Counterclaim Plaintiff repeats and realleges paragraphs 1-143.

145.    IMS and Cegedim refused to deal with Veeva by refusing to sign TPA

Agreements allowing joint customers to use IMS data in Veeva MDM software.

146.    IMS and Cegedim's refusal to deal with Veeva was pursuant to an agreement

between IMS and Cegedim.

147.    IMS and Cegedim were direct competitors.

148.    IMS and Cegedim's refusal to deal disadvantaged Veeva by denying Veeva access to a supply of product, a facility, or a market or a service necessary for Counterclaim Plaintiff to compete effectively.

149.    IMS and Cegedim's refusal to deal occurred in international commerce.

150.    As a direct and proximate result of IMS and Cegedim's unlawful conduct, Veeva has suffered injury to its business or property.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

## FIFTH CLAIM FOR RELIEF
### Monopoly Leveraging of Reference and Sales Data (15 U.S.C. § 2)

151.    Counterclaim Plaintiff repeats and realleges paragraphs 1-150.

152.    IMS has unlawfully leveraged its monopoly power in the worldwide markets for Healthcare Reference Data and Life Sciences Sales Data to gain dominance for its partner Reltio in the Life Sciences MDM market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

153.    IMS maintains market power in the Healthcare Reference Data and Life Sciences Sales Data markets.

154.    IMS has entered into an exclusive agreement with Reltio, which sells a Life Sciences MDM Software product.

155.    IMS has sought to block Veeva from any third-party access to IMS's Sales Data or Reference Data for use in Veeva's MDM product, and sought to cut off the ability of Veeva to provide MDM Software services by other means.

156.    As a result of IMS's abuse of its market power in the Reference Data and Sales Data markets to influence the MDM Software market, IMS and Reltio have a dangerous probability of achieving monopoly power in the worldwide Life Sciences MDM Software

market.  Most importantly, IMS is using its market power in the related Life Sciences Sales Data and Reference Data markets to block Veeva from competing in the Life Sciences MDM Software market.  Moreover, the worldwide Life Sciences MDM Software market is concentrated, and potential new entrants to the market face extensive technological and regulatory compliance requirements and high capital costs.

157.    Through its leveraging of its monopoly power in the worldwide Healthcare Reference Data and Sales Data markets, IMS has harmed competition in the MDM Software market.

158.    As a direct and proximate result of IMS's unlawful conduct, Veeva has suffered injury to its business or property.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

## SIXTH CLAIM FOR RELIEF
### Intentional Interference with Contractual Relations

159.    Counterclaim Plaintiff repeats and realleges paragraphs 1-158.

160.    Veeva and multiple major life sciences companies were in ongoing contracts that would have benefitted Veeva.

161.    IMS knew of these contracts.

162.    IMS intended to disrupt these contracts by negotiating TPA Agreements in bad faith and refusing to execute them without valid reason, in an attempt to monopolize the MDM and Reference Data markets.

163.    Veeva was harmed by losing millions in revenue that would have flowed from those contracts.

164.    IMS's conduct was a substantial factor in these losses.

165.     As a direct and proximate result of IMS's unlawful conduct, Veeva has suffered

injury to its business or property.

## SEVENTH CLAIM FOR RELIEF
### Intentional Interference with Prospective Economic Advantage

166.     Counterclaim Plaintiff repeats and realleges paragraphs 1-165.

167.     Veeva and multiple major life sciences companies were in ongoing contracts that

would have benefitted Veeva.

168.     IMS knew of these contracts.

169.     IMS engaged in wrongful conduct through leveraging its monopoly power in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

170.     The relationships were disrupted because the companies did not purchase Veeva

Network.

171.     Veeva was harmed by the companies declining to purchase Veeva Network.

172.     IMS's conduct was a substantial factor in Veeva's harm.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)

173.     Counterclaim Plaintiff repeats and realleges paragraphs 1-172.

174.     IMS, along with Cegedim prior to their merger, entered into and engaged in a

conspiracy in unreasonable restraint of trade in violation of the California Cartwright Act, Cal.

Bus. & Prof. Code § 16700 *et seq.*, for all the reasons set forth in the preceding allegations.

IMS's conspiracy is a *per se* violation of the Cartwright Act and is, in any event, an unreasonable

and unlawful restraint of trade and commerce.

175.     As a direct and proximate result of IMS's unlawful conduct, Veeva has suffered

injury to its business or property.  Veeva is entitled to damages for the violations of the

Cartwright Act alleged herein.

## NINTH CLAIM FOR RELIEF
### Violation of the Unfair Practices Act (Cal. Bus. & Prof. Code § 17200, *et seq.*)

176.    Counterclaim Plaintiff repeats and realleges paragraphs 1-175.

177.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include any "unlawful, unfair or fraudulent business act or practice."

178.    IMS has engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and California common law, including the torts of interference with contract and prospective economic advantage.

179.    IMS's acts and practices as alleged herein have also been "unfair" under the UCL. IMS's conduct has threatened an incipient violation of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720), violated the policy and spirit of those laws (resulting in an effect comparable to an antitrust violation), and significantly threatened and harmed competition in the Healthcare Reference Data and Life Sciences MDM Software markets.  Furthermore, any utility from IMS's conduct does not outweigh the harm it causes to competitors and life sciences companies.

180.    A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California and the harm to Veeva and many life sciences customers was inflicted in California, for all the reasons set forth in the preceding allegations.

181.    As a direct and proximate result of IMS's unlawful and unfair conduct, Veeva has suffered injury to its business or property.  Veeva is entitled to restitution in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff prays that this Court enter judgment in its favor and enter an order:

A.    Dismissing Counterclaim Defendants' claims with prejudice;

B.    Denying all relief requested in the Complaint;

C.    Declaring that Counterclaim Defendants' conduct constitutes:

    (1)    Violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 3 of the Clayton Act, 15 U.S.C. § 14; and

    (2)    Violations of Section 16720 of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*.; and

    (3)    Violations of Section 17200 of the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17200 *et seq.*

D.    Permanently enjoin Counterclaim Defendants and their agents and employees from continuing their unlawful actions set forth herein;

E.    Awarding Counterclaim Plaintiff damages, including its actual current and prospective damages for Counterclaim Defendants' violation of state and federal antitrust laws, which are in excess of $200 million;

F.    Awarding Counterclaim Plaintiff punitive damages for Counterclaim Defendants' Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Advantage and the California UCL;

G.    Awarding Counterclaim Plaintiff costs of suit, including reasonable attorneys' fees;

H.    Awarding pre-judgment and post-judgment interest at the highest rate allowed by law; and

I.      Awarding such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Counterclaim Plaintiff hereby

demands a trial by jury of all issues so triable.

Dated:  March 13, 2017

Steven F. Benz, *pro hac vice pending*
Benjamin L. Rudofsky, *pro hac vice pending*
Stefan J. Hasselblad, *pro hac vice pending*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
sbenz@kellogghansen.com
brudofsky@kellogghansen.com
shasselblad@kellogghansen.com

By   *s/ Tonia Ouellette Klausner*
           Tonia Ouellette Klausner
Charles Tait Graves, admitted *pro hac vice*
WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
tklausner@wsgr.com
tgraves@wsgr.com

*Attorneys for Defendant Veeva Systems Inc.*

## CERTIFICATE OF SERVICE

I, Tonia Ouellette Klausner, hereby certify that on March 13, 2017, the foregoing document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


By:  *s/ Tonia Ouellette Klausner*
        Tonia Ouellette Klausner