Robert I. Steiner
Monica Hanna
KELLEY DRYE & WARREN LLP
One Jefferson Road, 2nd Floor
Parsippany, New Jersey 07054
Tel: (973) 503-5900

Michael Critchley
Amy Luria
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 422-9200

*Attorneys for Plaintiffs-Counterclaim Defendants Quintiles IMS Inc. and IMS Software Services, Ltd.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| QUINTILES IMS INC. and IMS SOFTWARE SERVICES, LTD., <br><br> Plaintiffs-Counterclaim Defendants, <br><br> v. <br><br> VEEVA SYSTEMS INC., <br><br> Defendant-Counterclaim Plaintiff. | Case No.: 2:17-cv-00177-CCC-MF <br><br> Return Date: June 5, 2017 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS <u>MOTION TO DISMISS COUNTERCLAIMS</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

SUMMARY OF ALLEGATIONS .........................................................................2

LEGAL STANDARDS .........................................................................................7

ARGUMENT ......................................................................................................11

I.  VEEVA'S CLAIMS UNDER SECTION TWO OF THE SHERMAN ACT
    ARE WITHOUT MERIT..............................................................................11

   A.  Veeva's claim for attempted monopolization of MDM (Claim Two) is
    unsupported because the alleged conduct is not prohibited and Veeva
    does not plead a dangerous probability of success ...............................11

   B.  Veeva's claim that IMS leveraged its Reference and Sales Data to
    monopolize MDM (Claim Five) is insufficient for similar reasons .......18

   C.  Veeva's claim for monopoly maintenance of Reference Data (Claim
    One) lacks merit because IMS had no duty to assist Veeva by providing
    access to its data ..................................................................................20

II.  VEEVA'S CLAIMS UNDER SECTION ONE OF THE SHERMAN ACT
    ARE WITHOUT MERIT..............................................................................22

   A.  Because Veeva has no plausible claim that IMS and Cegedim reached an
    agreement, its group boycott claim (Claim Four) is baseless ...............22

   B.  Veeva's claim based on IMS's commercial agreement with Reltio (Claim
    Three) is also without merit ..................................................................24

III.  VEEVA'S STATE LAW CLAIMS ARE WITHOUT MERIT ....................28

   A.  Veeva's claims under the Cartwright Act (Claim Eight) and California
    Unfair Competition Law (Claim Nine) depend on a viable Sherman Act
    claim, which Veeva does not have .........................................................29

   B.  Veeva's claim for intentional interference with prospective economic
    advantage (Claim Seven) is insufficient because Veeva does not plead
    that IMS engaged in any independently wrongful act ...........................31

   C.  Veeva cannot support its claim for intentional interference with
    contractual relations (Claim Six) because its allegedly existing contracts
    were unenforceable................................................................................32

i

IV. IF THE COURT APPLIES CALIFORNIA LAW, VEEVA'S COMMON
    LAW CLAIMS (CLAIMS SIX AND SEVEN) ARE TIME-BARRED ......34

CONCLUSION ..................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Animal Science Prods., Inc. v. China Minmetals Corp.*,
  654 F.3d 462 (3d Cir. 2011) ............................................................................24

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*,
  137 F. App'x 694 (5th Cir. 2005) .......................................................... 12, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ......................................................................................13

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006) ................................................................... 25-26

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992) .........................................................................9, 16

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture
  Partners*,
  52 Cal. App. 4th 867 (Cal. Ct. App. 1997) ............................................. 31-33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................2, 8, 22

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) .........................................................................16

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ..................................................................passim

*Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*,
  613 F.2d 727 (9th Cir. 1979) .........................................................................20

*Cel-Tech Commc'ns, Inc. v. L. A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ............................................................ 29-30

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (Cal. Ct. App. 2001) .....................................29

*Christiansen v. Gross*,
    No. B256668, 2016 WL 110001 (Cal. Ct. App. Jan. 8, 2016) .........................34

*Christy Sports, LLC v. Deer Valley Resort Co.*,
    555 F.3d 1188 (10th Cir. 2009).........................................12, 14-15, 20

*Compliance Marketing, Inc. v. Drugtest, Inc.*,
    No. 09–cv–01241–JLK, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ...............13

*Crestron Elecs., Inc. v. Cyber Sound & Sec. Inc.*,
    No. 11–3492 (FSH)(MAH), 2012 WL 426282 (D.N.J. Feb. 9, 2012) .............27

*Davis v. HSBC Bank Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012).........................................................30

*Davis v. Md. Bank, N.A.*,
    No. 00-04191, 2002 WL 32713429 (N.D. Cal. June 19, 2002).......................34

*Della Penna v. Toyota Motor Sales, USA, Inc.*,
    11 Cal. 4th 376 (1995) ............................................................ 31-32

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)....................................................................9

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001)..........................................................25

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016)..........................................................25

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*,
    582 F.3d 1216 (10th Cir. 2009).......................................................19

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2005)............................................................................8

*Gutierrez v. Mofid*,
    39 Cal. 3d 892 (1985) ............................................................................ 34-35

*Hsu v. OZ Optics Ltd.*,
    211 F.R.D. 615 (N.D. Cal. 2002) ..............................................................32

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
    146 F. Supp. 3d 1217, 1234-35 (S.D. Cal. 2015)..................................... 13-14

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014) .......................................................................12

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) .......................................................................10

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015)........................................................................10

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades
7-12 Litig.*,
    429 F. Supp. 2d 752 (E.D. La. 2005).........................................................13

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)....................................................................12, 15

*In re Indep. Serv. Orgs. Antitrust Litig.*,
    203 F.3d 1322 (Fed. Cir. 2000) .................................................................12

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010).................................................................<u>passim</u>

*Integrated Storage Consulting Servs., Inc. v. Netapp, Inc.*,
    No. 5:12-CV-06209-EJD, 2016 WL 3648716 (N.D. Cal. July 7, 2016) ...........33

*InterVest, Inc. v. Bloomberg, LP*,
    340 F.3d 144 (3d Cir. 2003)........................................................................23

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ............................................................. 30-32

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ..................................................................... 24-25

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F. App'x 554 (9th Cir. 2008) ............................................... 12, 29

*Loren Data Corp. v. GXS, Inc.*,
   501 F. App'x 275 (4th Cir. 2012) ..................................................... 12

*Martinez v. TD Bank USA, N.A.*,
   No. CV 15-7712(JBS/AMD), 2016 WL 7391034 (D.N.J. Dec. 21, 2016) ........ 31

*McDermott v. Cummins, Inc.*,
   No. 14-4209(WHW)(CLW), 2016 WL 3287335 (D.N.J. June 7, 2016) .......... 30

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997) ....................................................... 7, 23

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
   202 F.3d 1088 (9th Cir. 2000) ........................................................ 29

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ...................................................... 12

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,
   485 F. Supp. 2d 387 (S.D.N.Y. 2009) .............................................. 19

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
   797 F.2d 370 (7th Cir. 1986) .................................................... 13, 20

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*,
   926 F. Supp. 2d 36 (D.D.C. 2013) .................................................. 13

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009) ........................................................................ 8

*Pastore v. Bell Tel. Co. of Pa.*,
  24 F.3d 508 (3d Cir. 1994)..........................................................................8, 16

*Pittsburgh v. W. Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998)..............................................................................27

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)....................................................................8-10, 20

*Schor v. Abbott Labs.*,
  457 F.3d 608 (7th Cir. 2006)..............................................................................18

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,
  113 F.3d 405 (3d Cir. 1997)................................................................................7

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
  841 F.3d 827 (10th Cir. 2016)...........................................................................12

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)..............................................................................8, 16, 18

*Stearns v. Select Comfort Retail Corp.*,
  No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009).................... 29-30

*Stein v. Pac. Bell*,
  172 F. App'x 192 (9th Cir. 2006).......................................................................19

*Storis, Inc. v. GERS Retail Sys., Inc.*,
  No. 94–4400, 1995 WL 337100 (D.N.J. May 31, 1995)...................................16

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008).................................................................... 29-30

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006)..................................................................................... 25-26

*TKO Energy Servs., LLC v. M-I LLC*,
  No. 12–cv–108–GKF–PJC, 2013 WL 789458 (N.D. Ok. Mar. 4, 2013) ..........13

*Transcription Commc'ns Corp. v. John Muir Health*,
    No. C 08-4418 TEH, 2009 WL 666943 (N.D. Cal. Mar. 13, 2009)..................33

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,
    117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015) ...................................................32

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993)........................................................................... 25-26

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)...................................................................................9

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)..................................................................................25

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...........................................................................<u>passim</u>

*Weber-Stephen Prods. LLC v Sears Holding Corp.*,
    No. 1:13–cv–01686, 2014 WL 656753 (N.D. Ill. Feb. 20, 2014) ....................13

*WHDH-TV v. Comcast Corp.*,
    186 F. Supp. 3d 107, 114-16 (D. Mass. 2016)..................................................13

*Whitehurst v. Showtime Networks, Inc.*,
    No. 1:08–CV–47, 2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) ....................13

**Statutes**

Cal. Code Civ. P. § 339(1) ....................................................................................34

N.J. Stat. Ann. § 2A:14-1 .....................................................................................34

**Other Authorities**

Fed. R. Civ. P. 12.......................................................................................... 1-2, 7

Quintiles IMS Inc. and IMS Software Services, Ltd. (together, "IMS")

respectfully move, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss all counterclaims asserted by Veeva Systems Inc. ("Veeva") in this case.

## INTRODUCTION

Veeva's counterclaims are based largely on its complaint that IMS has not

entered into agreements that would allow Veeva to have unfettered access to IMS's

proprietary market research whenever Veeva wants it.  This is the same proprietary

information that Veeva is alleged to have misappropriated in this case.  Veeva now

asks the Court to give it what it previously took unlawfully.

As the Supreme Court has made clear, however, the antitrust laws impose no

obligation on a defendant to assist its rivals.  *Verizon Commc'ns Inc. v. Law

Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-11 (2004).  IMS is free to deny

access to its protected intellectual property for any reason or for no reason at all.

Accordingly, each of Veeva's counterclaims should be dismissed to the extent they

rely on an alleged refusal by IMS to grant Veeva access to its intellectual property.

Veeva's counterclaims suffer from other fatal flaws as well.  For example,

Veeva alleges that IMS is attempting to monopolize a product known as master

data management software, or MDM, but Veeva alleges no facts showing that IMS

has a "dangerous probability of success" in monopolizing MDM, which is a

required element of its claim.  Veeva also claims that IMS entered into two

1

separate conspiracies with third parties to violate the antitrust laws, but provides only conclusory allegations that fall far short of the pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

Last, Veeva tacks on state law claims. Its California law claims are brought under the wrong law and in any event lack merit for the same reasons as its federal antitrust claims. And its tortious interference claims are based on the same allegation that IMS declined to give Veeva unlimited access to IMS's intellectual property – innocent conduct that is not tortious as a matter of law.

In sum, Veeva attempts to distract from the central issue in this case – Veeva's theft of IMS's intellectual property – by asserting a hodgepodge of baseless counterclaims that fall far short of stating any valid claim. They should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

## <u>SUMMARY OF ALLEGATIONS</u>

IMS is a leading provider of market research and analytics to life sciences companies, primarily in the pharmaceutical and biotechnology industries. Answer and Counterclaims, ECF No. 12 ¶¶ 1, 15 (hereafter referred to as "¶" or "¶¶").[1] IMS has attained that position by meticulously providing value to its customers

---

[1] IMS summarizes here the facts alleged in Veeva's counterclaims. Pursuant to Federal Rule of Civil Procedure 12(b)(6), IMS treats these allegations as true for the purposes of this motion, and only this motion. IMS makes no concession as to the accuracy of Veeva's assertions.

over a period of many years, and IMS has made substantial and sustained investments to create, maintain, and deliver its market research offerings.  ¶¶ 35, 41.  Of IMS's many offerings, four types are relevant here.  ¶¶ 29-60.  Veeva makes no allegation, nor could it, that IMS lacks valid intellectual property rights in each of the offerings described below.

_Healthcare Reference Data_ ("Reference Data") includes, among other things, contact, biographical, and affiliation information about doctors, hospitals, and other medical professionals and organizations.  ¶ 29.[2]  Life sciences companies worldwide rely on IMS Reference Data for critical compliance, sales, and marketing purposes.  ¶ 30.  Creating this type of market research offering is an expensive, labor intensive process, which requires, among many other things, proprietary computer algorithms to collect and match information from a variety of public sources and licensed private sources; this is augmented with manual research such as telephone calls and direct outreach to validate information.  ¶ 29.  IMS constantly invests in its market research offerings to maximize value to customers; this includes constantly improving and validating the Reference Data to keep up with the continuously changing real world facts that underpin it.  ¶¶ 31-32.

---

[2] "Healthcare Professional Data" is the closest ordinary-course term that IMS uses to describe the offering Veeva appears to refer to here.  Nonetheless, to avoid confusion, IMS adopts Veeva's phrasing for the purposes of this motion.

Veeva also has a Reference Data offering.  ¶ 34.

*Pharmaceutical Sales and Performance Data* ("Sales Data") reports IMS's proprietary estimates of, among other things, prescriptions dispensed in specific geographic regions.  ¶ 37.[3]  As with Reference Data, IMS invests substantial time, energy, and capital in developing and continuously updating its Sales Data offering.  ¶ 41.  The data acquisition costs alone run to the tens of millions of dollars per year.  *Id.*  Veeva has not invested to develop its own Sales Data offering and compete in this space.  ¶¶ 44-45.

*Customer Relationship Management Software* ("CRM") is a software offering that organizes and displays data to help life sciences companies manage interactions with their customers.  ¶ 48.  CRM accesses information from various sources, including Reference Data and Sales Data, and integrates and displays it with information that a life sciences company may have generated in the ordinary course of its business.  ¶¶ 48-49.  IMS and Veeva both have CRM offerings.  ¶ 51.

*Master Data Management Software* ("MDM") is a software offering that assists life sciences companies by tracking, managing, and analyzing information.  ¶¶ 52-53.  Companies use MDM to analyze and integrate information from a

---

[3] Again, IMS's ordinary-course term that appears to be closest to what Veeva describes is "Sub-National Information Offerings," but IMS adopts Veeva's phrasing for the purposes of this motion.

4

variety of sources, including Reference and Sales Data, as well as information generated in the ordinary course of a customer's business. ¶ 52. IMS and Veeva both have MDM offerings. ¶¶ 56, 60. A third company referenced in the counterclaims, Reltio, Inc., has its own MDM offering that it distributes through IMS. ¶ 56.

Due to the proprietary nature of Reference and Sales Data, license arrangements between data providers and life sciences companies prohibit the distribution of the market research to third parties, including software providers like Veeva. ¶¶ 27, 49. A CRM or MDM provider wishing to upload another company's data into its software for a particular customer's use typically requests a license pursuant to the terms of a Third Party Access ("TPA") agreement with the market research provider, and these are often granted. *Id.*

Consistent with this practice, IMS requires any third party software provider desiring to use information from IMS Reference or Sales Data in its CRM or MDM software applications to obtain a TPA license for each distinct use case. ¶¶ 49, 54. For example, the license terms in TPAs for CRM use permit IMS data to be uploaded into a third party's CRM. ¶ 27. Veeva makes no allegations, nor could it, that IMS earns any licensing fees or other income in exchange for granting any TPA license.

IMS and Veeva have entered into various TPA agreements over the years for

5

the use of information from IMS Reference and Sales Data in Veeva CRM and for the use of information from IMS Sales Data in Veeva MDM. ¶¶ 27, 68, 91. In contrast, IMS and Veeva have not entered into TPA agreements permitting the use of information from IMS Reference Data in Veeva MDM (other than one alleged instance for specific information), though IMS has considered requests for such agreements and there have been negotiations between the parties. ¶¶ 79, 80, 89. Except for two alleged instances outside the United States, IMS and Veeva have also never entered TPA agreements granting Veeva access to IMS Reference Data for the purpose of mapping the data onto Veeva's own Reference Data. ¶¶ 98, 111, 114.

In April 2015, IMS acquired various market research offerings (including Reference Data) and technology offerings (including CRM) of Cegedim S.A. ("Cegedim"), a Europe-based provider. ¶ 15. Prior to that acquisition, Cegedim had from time to time entered into TPA agreements with Veeva licensing the use of Cegedim's Reference Data in connection with Veeva's CRM. ¶¶ 71-74. On four occasions between the announcement and completion of the merger between Cegedim and IMS, Cegedim allegedly sought to replace the "general language" in its TPA agreements with more specific language that did not permit Cegedim's Reference Data to be used in Veeva's MDM. ¶¶ 69-74. Veeva alleges in conclusory fashion that IMS entered into an unlawful agreement with its merger

6

partner Cegedim to boycott Veeva, but offers no facts to support this allegation.

In 2016, IMS contracted with Reltio to provide MDM services for resale in IMS's software suite for life sciences customers. ¶ 56. Veeva alleges in conclusory fashion that this agreement was unlawful but there are no factual allegations in the counterclaims from which the Court can conclude that the agreement was anything other than an ordinary reseller arrangement between two commercial actors at arm's length.

## LEGAL STANDARDS

*Motion to Dismiss.* To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the facts alleged in a complaint are generally taken as true when assessing a motion to dismiss, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' . . . ." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Similarly, a court is "not . . . required to accept as true unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221, 224-25 (3d Cir. 2011) (similar).

7

The Supreme Court has instructed that "when the allegations in a Complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 558.

*Attempted Monopolization under Section Two of the Sherman Act.* To state a claim for attempted monopolization, plaintiffs must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997). A refusal to deal such as Veeva alleges here almost never satisfies the conduct element. *See, e.g.*, *Trinko*, 540 U.S. at 408-10; *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 444, 449-51 (2009) (explaining *Trinko's* holding that a monopolist has no duty to deal). Specific intent to monopolize requires more than an "intention to prevail over [a competitor] or to protect . . . market position," and predatory intent "cannot be inferred from anticompetitive practices." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 214-15 (3d Cir. 2005).

A dangerous probability of monopolizing requires the plaintiff to plead that the defendant has a high market share, or other facts that show the defendant has a strong position in the market. *See Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 513

8

(3d Cir. 1994) (holding that the "most significant" factor in assessing the dangerous probability requirement is the defendant's market share).  Even high market share may not be enough, however, where other factors undercut the inference of a dangerous probability of monopolizing the relevant market.  *See, e.g.*, *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992) (finding no monopoly power in spite of defendant's 50% market share).

> *Monopolization under Section Two of the Sherman Act.*  To state a claim for monopolization, a plaintiff must allege both "(1) the possession of monopoly power . . . and (2) . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992); *Queen City Pizza*, 124 F.3d at 437.  Monopoly power is the "power to control prices or exclude competition."  *E.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  Refusals to deal such as Veeva alleges here rarely satisfy the conduct element for monopolization.  *See, e.g.*, *Trinko*, 540 U.S. at 408-10.

> *Monopoly Leveraging under Section Two of the Sherman Act.*  The Supreme Court has clarified that the elements of "monopoly leveraging" are the same as for attempted monopolization.  *See Trinko*, 540 U.S. at 415 n.4.  Plaintiffs must plead both anticompetitive conduct and a dangerous probability of achieving monopoly power, under the same standards as attempted monopolization.  *Id.*

*Agreement in Restraint of Trade under Section One of the Sherman Act.*

Section One of the Sherman Act prohibits unreasonable restraints of trade. To state a violation of Section One, a plaintiff must plead "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." *E.g.*, *Queen City Pizza*, 124 F.3d at 442. "Section 1 claims always require the existence of an agreement." *Burtch*, 662 F.3d at 221 (citation omitted). Where there is no direct evidence of an agreement, one can be inferred, but "evidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010). Even consciously parallel conduct, without more, cannot support the inference of a conspiracy. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397-98 (3d Cir. 2015) (explaining that conscious parallelism, without an agreement, is not a Section One violation); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122-24 (3d Cir. 1999) (same).

Courts generally analyze whether an agreement unreasonably restrains trade using the "Rule of Reason," *Brokerage*, 618 F.3d at 315, though very limited categories of agreements, such as naked price fixing, are considered *per se* violations of the antitrust laws, *id.* at 316. Under the default Rule of Reason, a

10

plaintiff must plead that the anticompetitive effects of an agreement outweigh any procompetitive benefits. *Id.* at 315-16.

<u>**ARGUMENT**</u>

**I.      VEEVA'S CLAIMS UNDER SECTION TWO OF THE SHERMAN ACT ARE WITHOUT MERIT**

**A.      Veeva's claim for attempted monopolization of MDM (Claim Two) is unsupported because the alleged conduct is not prohibited and Veeva does not plead a dangerous probability of success**

The heart of Veeva's counterclaims is its complaint that IMS does not allow Veeva to access proprietary information from certain IMS offerings for use with Veeva's MDM software. ¶ 2; *see also* ¶¶ 3, 78-95.  Veeva would prefer to have its MDM  rely on IMS's proprietary Reference Data anytime it wishes, free of charge. Such free riding on IMS's intellectual property would allow Veeva to exploit IMS's proprietary market research information – which IMS has invested tens of millions of dollars building – to gain an advantage in the markets for MDM and Veeva's own Reference Data.  According to Veeva, IMS's refusal to permit this free ride is "predatory" or "anticompetitive conduct" that furthers IMS's attempt to monopolize MDM. *E.g.*, ¶¶ 91, 132 (describing IMS's refusal to allow Veeva's MDM to access IMS data as anticompetitive).

The law is clear, however, that "alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim . . . ." *Trinko*, 540 U.S. at 410.  Under *Trinko*, IMS has no duty to deal with Veeva, as "the Sherman

11

Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Id.* at 408 (citation omitted). Thus, IMS has no duty to allow Veeva to access its propriety information. *See, e.g.*, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (finding no duty to share internal software protocols). Nor does IMS have a duty to allow Veeva to license its intellectual property. *See, e.g.*, *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 842-43 (10th Cir. 2016) (finding no duty to license intellectual property); *see also In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327 (Fed. Cir. 2000) (pre-*Trinko* case reaching similar result). The Court should deny Veeva's request to twist the antitrust laws to force IMS to give Veeva free access to the data and trade secrets that it previously misappropriated.

Because of the clear guidance from *Trinko*, courts have often dismissed Section Two claims at the pleading stage where the alleged conduct is that a monopolist refused to deal with the plaintiff. *See, e.g.*, *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134-36 (2d Cir. 2014); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 282-83 (4th Cir. 2012); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007); *ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694,

12

698 (5th Cir. 2005) (all affirming dismissals of Section Two claims based on refusals to deal).[4]

There is a narrow exception to this principle – though its vitality has been questioned – that derives from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). That narrow exception may permit a monopolization claim to go forward in unusual circumstances where a defendant terminates an ongoing, profitable business relationship without any economic justification such that the plaintiff can demonstrate "a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409. The *Aspen Skiing* exception, however, is "at or near the outer boundary of § 2 liability," *id.*,[5] and in any event does not apply here as a matter of law.

---

[4] *See also, e.g.*, *WHDH-TV v. Comcast Corp.*, 186 F. Supp. 3d 107, 114-16 (D. Mass. 2016); *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1234-35 (S.D. Cal. 2015); *Weber-Stephen Prods. LLC v Sears Holding Corp.*, No. 1:13–cv–01686, 2014 WL 656753, at *7 (N.D. Ill. Feb. 20, 2014); *TKO Energy Servs., LLC v. M-I LLC*, No. 12–cv–108–GKF–PJC, 2013 WL 789458, at *5-8 (N.D. Ok. Mar. 4, 2013); *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 48 (D.D.C. 2013); *Compliance Marketing, Inc. v. Drugtest, Inc.*, No. 09–cv–01241–JLK, 2010 WL 1416823, at *15 (D. Colo. Apr. 7, 2010); *Whitehurst v. Showtime Networks, Inc.*, No. 1:08–CV–47, 2009 WL 3052663, at *13 (E.D. Tex. Sept. 22, 2009); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 429 F. Supp. 2d 752, 758-59 (E.D. La. 2005) (all granting motions to dismiss Section Two claims based on refusals to deal).

[5] *See also, e.g.*, *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) (Posner, J.) (questioning whether *Aspen Skiing* "stands for any principle that goes beyond its unusual facts").

13

It is obvious on the face of Veeva's pleading that IMS is not forsaking short-term profits by declining to give Veeva access to its information.  Veeva does not allege, nor could it, that IMS earns income from granting TPA licenses.  *See, e.g.*, *Christy Sports*, 555 F.3d at 1197; *ASAP Paging*, 137 F. App'x at 698 (both affirming dismissal where complaint failed to allege that defendant was giving up short-term profits); *Imperial Irrigation*, 146 F. Supp. 3d at 1235 (similar). Moreover, while the obvious reason for IMS's reluctance to grant certain TPA licenses to Veeva as alleged in the counterclaims is to prevent further misuse of its intellectual property, this issue need not be resolved because IMS would be well within its rights to deny access simply to protect its own interests in selling MDM offerings.[6]  *See Christy Sports*, 555 F.3d at 1197.

The *Christy Sports* case is instructive.  There, a ski resort permitted a sports company to rent skis on its property in competition with its own resort-run rental shop for almost 15 years.  555 F.3d at 1196-98.  The resort then decided to revoke

---

[6] Veeva attempts to obfuscate the issues by claiming that IMS's stated reasons for declining Veeva's TPA requests were "mere pretext" and "not genuine."  ¶¶ 83, 90; *see also* ¶¶ 5, 81, 87.  But IMS owes no legal duty to Veeva to explain its reasoning.  Additionally, Veeva's reference to IMS's "security" concerns may leave the misleading impression that the "security" threat was some external party, such as a computer hacker, as opposed to Veeva itself.  As explained in IMS's Complaint, Veeva was stealing IMS's data and had had no systems in place to prevent inadvertent misuse of IMS's data.  ECF No. 1 ¶¶ 1-6.  This is entirely consistent with the "security" concerns alleged in the counterclaims.

that permission, so as to become the sole provider of ski rentals on the resort property.  *Id.*  After being terminated, the sports company sued, claiming violations of Section Two of the Sherman Act based on *Aspen Skiing*.  The district court dismissed on a Rule 12(b)(6) motion and the Tenth Circuit Court of Appeals affirmed, holding that "[t]he Sherman Act does not force [a Defendant] to assist a competitor in eating away its own customer base . . . ."  *Id.* at 1197.  Even assuming all of Veeva's allegations are true, like the ski resort in *Christy Sports*, IMS has no duty to deal with its competitor.  *Id.*

*Aspen Skiing* is also inapposite because there is no allegation of a "course of conduct" that has suddenly been discontinued.  IMS has not historically allowed Veeva to use information from IMS Reference Data in Veeva MDM.  Veeva alleges that IMS has allowed Veeva's CRM software to access IMS Reference Data, but Veeva pleads no ongoing course of conduct in which IMS has granted Veeva's MDM software unrestricted access to Reference Data.  *See* ¶ 89 (IMS "says to its customers that it has never authorized customers to use IMS data in Veeva MDM and will not do so.").  *Aspen Skiing* involved no such switch from one product to another and should not be read to permit a Section Two claim for monopolization here.  *See, e.g.*, *Elevator*, 502 F.3d at 52 (dismissing for failure to allege prior course of dealing).  Put differently, Veeva had no reasonable expectation of long-term access to IMS's Reference Data for all applications –

15

including MDM – based on prior TPA licenses for CRM.

Veeva has also failed to plead a dangerous probability of achieving monopoly power, which independently defeats its claim for attempted monopolization of MDM. *Spectrum Sports*, 506 U.S. at 456 (dangerous probability required). If IMS does not have a high market share in MDM and/or is not growing toward monopoly, it is implausible to conclude that it has a dangerous probability of successfully monopolizing MDM. *See Pastore*, 24 F.3d at 513 (holding that the "most significant" factor in assessing the dangerous probability requirement is the defendant's market share); *Barr*, 978 F.2d at 112 ("A dangerous probability of monopoly may exist where the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct."); *Storis, Inc. v. GERS Retail Sys., Inc.*, No. 94–4400, 1995 WL 337100, at *4 (D.N.J. May 31, 1995) (dismissing for failure to plead dangerous probability where plaintiff claimed defendant would control a 40% share). *But see Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 319 (3d Cir. 2007) (permitting claim in spite of no market share allegation where conduct and intent elements were clearly met and consideration of all of the allegations plausibly suggested a dangerous probability of monopolizing a nascent, rapidly growing market where the only new entrant was "effectively foreclosed" from entering).

Veeva has alleged nothing about the position in the market held by the

MDM offerings distributed by IMS.  There are no allegations of market share or any developments in the market since the alleged violation began – such as growth in IMS's MDM share or increased IMS MDM sales – or even a single instance of IMS making a sale of MDM to a customer that Veeva expected to capture.  *See* ¶¶ 52-60 (describing MDM without market share allegations); ¶ 133 (describing worldwide market for MDM as "concentrated" without making any allegations as to IMS's share in the United States); ¶¶ 56-57, 131-132 (describing the IMS-Reltio agreement to supply MDM without any allegation of Reltio's strength in MDM). Simply alleging a "dangerous probability" of success in a conclusory fashion, ¶ 133, without providing any basis on which the Court can assess whether the facts alleged in the complaint plausibly support that conclusion, does not satisfy *Twombly*'s pleading standard.

    *Twombly* requires Veeva to plead enough facts to state a plausible claim. Far from being plausible, Veeva's theory that IMS is attempting to monopolize MDM is nonsensical.  Veeva itself alleges that IMS has chosen to "discontinue" its own MDM.  ¶ 137; *see also* ¶ 56 ("upon information and belief, [IMS] has ceased entering into new contracts" for MDM).  While Veeva alleges that IMS has an agreement to distribute MDM supplied by Reltio, Veeva does not assert that IMS has a long-term right to that product, but nonetheless alleges that IMS is trying to "facilitate Reltio's monopolization" of MDM and "steer data customers to Reltio."

17

¶¶ 137, 140 (emphasis added).  So according to Veeva, IMS is helping its supplier, with whom it would have to negotiate in the future, obtain a monopoly in an offering IMS has decided to discontinue.  Such a theory is not only implausible, it defies logic.

### B. Veeva's claim that IMS leveraged its Reference and Sales Data to monopolize MDM (Claim Five) is insufficient for similar reasons

Veeva's monopoly leveraging theory seems to be that IMS "leverages" an allegedly high market share in Reference and Sales Data to force customers to buy its (or Reltio's) MDM offering.  *See* ¶¶ 152, 156.  The existence of a separate "monopoly leveraging" claim distinct from attempted monopolization is doubtful after *Trinko*, which established that "monopoly leveraging" requires both "anticompetitive conduct" and a "dangerous probability of success."  *Trinko*, 540 U.S. at 415 n.4; *see also Spectrum Sports*, 506 U.S. at 456 (same elements for attempted monopolization).[7]  Veeva fails to plead either element.

As explained above, a refusal to deal does not satisfy the conduct requirement.  "Where, as here, the only possible candidate for anticompetitive conduct could be the 'the refusal-to-deal claim we have rejected,' denominating one's claim as sounding in 'monopoly leveraging' won't do anything to save it."

---

[7] *See, e.g.*, *Schor v. Abbott Labs.*, 457 F.3d 608, 611-12 (7th Cir. 2006) (Easterbrook, J.) (criticizing "monopoly leveraging" as a distinct theory of antitrust liability).

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1222 (10th Cir. 2009) (Gorsuch, J.) (citing *Trinko*, 540 U.S. at 415 n.4); *accord, e.g.*, *Stein v. Pac. Bell*, 172 F. App'x 192, 194 (9th Cir. 2006) (noting that "leveraging presupposes anticompetitive conduct," citing *Trinko*, 540 U.S. at 415 n.4, and affirming summary judgment because where "[plaintiff]'s other anticompetitive claims have been rejected, there is nothing upon which to base this claim").

As with attempted monopolization, Veeva's failure to plead a dangerous probability of success separately defeats Veeva's "monopoly leveraging" claim. *See, e.g.*, *Four Corners Nephrology*, 582 F.3d at 1222 (noting that *Trinko* explained that "there [must at least] be a dangerous probability of success in monopolizing a second market" for a monopoly leveraging claim); *Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 395-97 (S.D.N.Y. 2009) (dismissing "monopoly leveraging" claim for failure to allege dangerous probability of monopolization). Veeva relies on the same thin factual allegations as for its attempted monopolization claim, providing no insight into IMS's or Reltio's market position in MDM. Thus, the same failure to plead anticompetitive conduct and dangerous probability of monopolizing the MDM market is fatal to Veeva's monopoly leveraging claim.

19

**C.    Veeva's claim for monopoly maintenance of Reference Data (Claim One) lacks merit because IMS had no duty to assist Veeva by providing access to its data**

Failure to allege monopolization conduct also defeats Veeva's claim for monopoly maintenance of Reference Data.  To sustain a monopolization claim under Section Two of the Sherman Act, Veeva must allege both "(1) the possession of monopoly power . . . and (2) . . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Queen City Pizza*, 124 F.3d at 437.  The gravamen of this claim is that IMS, which has an allegedly high market share in Reference Data, engages in anticompetitive conduct when it does not provide sufficient assistance to allow rival Reference Data, such as Veeva's, to displace IMS.  ¶¶ 96-98 (describing "refusals to deal" through "contracting friction" and reticence to allow IMS data to be "mapped" onto Veeva's data).

This is a non-starter.  IMS has no duty under the antitrust laws to facilitate customers' switching to a Veeva product or to otherwise act to assist its competitor's growth.  *See, e.g.*, *Christy Sports*, 555 F.3d at 1197 ("[t]he Sherman Act does not force [a Defendant] to assist a competitor in eating away its own customer base…"); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) (Posner, J.) (antitrust laws impose "no duty to extend a helping hand to new entrants"); *Cal. Computer Prods., Inc. v. Int'l Bus. Machs.*

*Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (even a monopolist is "under no duty to help [rivals] survive or expand."). Additionally, many of Veeva's allegations relating to alleged monopoly maintenance of Reference Data relate to conduct affecting the market in Europe, which should not be considered. *See* ¶¶ 103-06, 110-11.[8]

To the extent that Veeva's Reference Data monopolization claim is based on a refusal to deal because of the allegation that "IMS has categorically refused to allow mapping of Reference Data linked records to Veeva Reference Data," ¶ 98, it is similarly unsustainable. Just as IMS has no duty to allow Veeva's MDM to access IMS Reference Data, IMS has no duty to allow Veeva's Reference Data to access IMS Reference Data for mapping purposes. *See Trinko*, 540 U.S. at 410 ("[A]lleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim . . . ."); *see also supra* Section I.A (explaining that a monopolist has no duty to interoperate).

---

[8] Veeva also references a European Commission decision requiring IMS to license certain Brick definitions, described as predefined geographical segmentations for anonymized Sales Data. ¶ 63. Though that matter is not relevant to Veeva's U.S. claims here and had no place in a well-pled claim relating to the United States, we note that this decision was withdrawn in 2003. *See* Comm'n of the European Communities, Commission Decision Relating to a Proceeding Under Article 82 of the EC Treaty, (EC) No. COMP D3/38.044 (Aug. 13, 2003).

## II.    VEEVA'S CLAIMS UNDER SECTION ONE OF THE SHERMAN ACT ARE WITHOUT MERIT

### A.    Because Veeva has no plausible claim that IMS and Cegedim reached an agreement, its group boycott claim (Claim Four) is baseless

Veeva's first Section One claim is that, during the months preceding the April 1, 2015 completion of their merger, Cegedim and IMS allegedly agreed to refuse to offer TPA licenses to Veeva for use of IMS and Cegedim Reference Data in Veeva MDM.  ¶¶ 67-76.  Veeva has no substantive allegation of an <u>agreement</u> between IMS and Cegedim to boycott Veeva, however.  Instead, it relies on allegations that IMS and Cegedim engaged in "an identical course of conduct" with respect to TPA licenses around the same time.  ¶ 69; *see also* ¶¶ 68, 71-75.  This is not enough under the pleading standard.

"[T]he existence of an agreement is the hallmark of a Section 1 claim." *Brokerage*, 618 F.3d at 315 (citation omitted).  And "evidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement."  *Brokerage*, 618 F.3d at 321 (affirming dismissal of complaint that failed to allege an agreement even though it alleged parallel conduct); *see also, e.g.*, *Burtch*, 662 F.3d at 229-30 (affirming dismissal where there were no allegations of an agreement, as opposed to common responses to a business situation).  Instead, a plaintiff must also allege facts that "rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554.

22

At most, Veeva pleads parallel conduct.  But "one cannot plausibly infer a horizontal agreement among [competitors] from the mere fact that each . . . entered into a similar . . . agreement" with other industry participants.  *Brokerage*, 618 F.3d at 327.  The "refusals" here are consistent with any number of legitimate business decisions, such as the security concerns that Veeva would have the Court ignore or business strategies to work with different MDM providers.  *See, e.g.*, *Burtch*, 662 F.3d at 229-30 (dismissing complaint after refusing to infer agreement where parallel actions were not against business interest); *see also InterVest, Inc. v. Bloomberg, LP*, 340 F.3d 144, 166 (3d Cir. 2003) (finding no conspiracy where defendants "simply chose not to partner with a new company with unproven technology").

Veeva cannot fill the hole in its pleading with a single bare-bones "information and belief" allegation that IMS and Cegedim acted pursuant to an "agreement . . . to begin boycotting Veeva products to exclude them from the MDM market."  ¶ 70 (pointing to no factual details about the alleged agreement itself); *see, e.g.*, *Morse*, 132 F.3d at 906 (court must ignore "bald assertions" and "legal conclusions"); *Burtch*, 662 F.3d at 225 (rejecting "bare statements" of conspiracy).

Finally, the allegations relating to conduct by Cegedim or IMS in Europe, ¶¶ 63-65, 77, cannot support its claim in the United States, particularly given that

23

there is no allegation that the European conduct had any impact in the United States.  Related allegations of TPA license denials by Cegedim, ¶¶ 69-75, are conspicuously silent as to where the conduct occurred or what countries it affected, raising the possibility that this is all European conduct as well.  Veeva has the burden of pleading and proving an effect on interstate commerce in the United States.  *See Animal Science Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 466, 471 n.12 (3d Cir. 2011).

### B.   Veeva's claim based on IMS's commercial agreement with Reltio (Claim Three) is also without merit

Veeva's Section One claim based on an alleged agreement between IMS and Reltio is insufficient for the simple reason that Veeva has not raised a plausible inference that there is a Section One violation.  Veeva merely alleges that IMS "entered into an exclusive partnership with [Reltio], and now offers Reltio's MDM software as part of" an "integrated software suite" offered to life sciences companies.  ¶ 56.  On its face, this is a normal and perfectly lawful commercial arrangement.  Veeva's attempt to turn it into a *per se* violation of the antitrust laws is without merit.

"Resort to *per se* rules is confined to restraints . . . 'that would always or almost always tend to restrict competition and decrease output.'"  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citation omitted).  "To justify a *per se* prohibition a restraint must have manifestly anticompetitive

effects," and "lack . . . any redeeming virtue." *Id.* Accordingly, the Supreme Court has ruled, for example, that horizontal agreements among competitors to fix prices or divide markets are *per se* unlawful. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (explaining that horizontal price fixing is analyzed as a *per se* violation); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972) (explaining that market allocation is analyzed as a *per se* violation). Other types of agreements are analyzed under the presumptive Rule of Reason framework. *See, e.g.*, *Texaco*, 547 U.S. at 6 (rejecting application of *per se* rule to legitimate joint venture); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where [the parties] have some form of horizontal relationship"); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) (exclusive deals are "judged under the rule of reason"); *see also United States v. Brown Univ.*, 5 F.3d 658, 670 (3d Cir. 1993) (explaining *per se* versus Rule of Reason frameworks). Moreover, as the Third Circuit has observed, the "Supreme Court has been cautious in extending the per se approach." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001).

The IMS-Reltio agreement alleged in Veeva's counterclaims does not come close to fitting within the narrow band of conduct that would be analyzed as a *per se* violation. It neither fits one of the Supreme Court's enumerated categories, such

25

as price fixing or bid-rigging, nor has attributes that should cause the Court to create a new category of *per se* illegality, certainly not on the basis of the bare-bones conclusory allegations in Veeva's counterclaims.  Indeed, the IMS-Reltio agreement has obvious procompetitive benefits such as allowing IMS to market a better, more integrated offering to customers through closer collaboration.  *See, e.g.*, *Brown Univ.*, 5 F.3d at 674 (rejecting *per se* treatment in part because "[t]he Supreme Court has recognized improvement in the quality of a product or service that enhances the public's desire for that product or service as one possible procompetitive virtue."); *see also* ¶ 56 (describing the joint IMS-Reltio offering as an "integrated software suite" offered to customers).

As the Third Circuit has warned, "[w]hile pleading exclusively per se violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy. If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed."  *Brokerage*, 618 F.3d at 317; *see also Texaco*, 547 U.S. at 7 n.2 (declining to conduct a rule of reason analysis where plaintiffs "ha[d] not put forth a rule of reason claim"); *AT & T Corp.*, 470 F.3d at 531 (dismissing where plaintiff could have plead a rule of reason claim, but opted for a faulty *per se* claim).  The Court's analysis should end there.

But even if the Court ignores Veeva's "*per se*" labeling of this complaint

and proceeds with a Rule of Reason analysis, Veeva's claim should be dismissed. Under the Rule of Reason, Veeva must plead that the agreement "produced an adverse, anticompetitive effect within the relevant geographic market" which "typically includes a demonstration of defendants' market power." *Burch*, 662 F.3d at 222 (citation omitted). Veeva fails to meet these requirements. Veeva has not pled market power in MDM; on the contrary, Veeva states that IMS has <u>exited</u> MDM, ¶ 137, and makes no allegations as to Reltio's market position. And Veeva does not explain how the IMS-Reltio agreement "harm[s] competition." ¶ 142; *see, e.g.*, *Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 267 (3d Cir. 1998) (finding no allegation of harm to competition); *Crestron Elecs., Inc. v. Cyber Sound & Sec. Inc.*, No. 11–3492 (FSH)(MAH), 2012 WL 426282, at *4 (D.N.J. Feb. 9, 2012) (dismissing Section One claim for failure to allege actual anticompetitive effect).

Even taking Veeva's factual allegations as true, the IMS-Reltio agreement is an ordinary course arrangement to provide an integrated offering to IMS customers. The Court cannot conclude from Veeva's naked assertion of "harm to competition" that a violation of the antitrust laws is plausible. Much more has to be pled.

In fact, while Veeva asserts that IMS and Veeva "agreed to . . . monopolize" MDM, ¶ 140, factual allegations of <u>any</u> action taken by Reltio are completely

27

absent.  Reltio is not even alleged to have been aware of, much less involved in, the alleged refusal by IMS to license its intellectual property, which is the centerpiece of Veeva's monopolization claim.

Because Veeva makes no allegation that IMS and Reltio agreed to do anything other than afford IMS an opportunity to distribute Reltio's MDM software, and because its counterclaims are devoid of any factual allegations suggesting that Reltio agreed with IMS to monopolize a market or engage in any misconduct, the claim fails to meet *Twombly*'s pleading standard and should be dismissed.

## III.     VEEVA'S STATE LAW CLAIMS ARE WITHOUT MERIT

Veeva premises its Sixth, Seventh, Eighth, and Ninth Claims on California law based on the allegation that "[a] substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California and the harm to Veeva and many life sciences customers was inflicted in California[.]"  ¶ 180; *see also id.* at ¶¶ 159-179, 181.  Other than that entirely conclusory statement, Veeva does not allege any basis to support a choice of law selection of California over its claims. *See also* IMS's Mem. of Law in Opp'n to Veeva's Partial Mot. to Dismiss, ECF No. 23, at 24-32.  Even if Veeva's state law counterclaims are analyzed under California law for purposes of this motion, however, the Court should dismiss them.

28

## A. Veeva's claims under the Cartwright Act (Claim Eight) and California Unfair Competition Law (Claim Nine) depend on a viable Sherman Act claim, which Veeva does not have

Veeva's Cartwright Act claim should be dismissed with its Sherman Act claims. *See, e.g.*, *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) (holding that disposal of Sherman Act claims disposes of claims under the California Cartwright Act).

Veeva's claim under § 17200 of California's Unfair Competition Law ("UCL") should also be dismissed with its federal antitrust claims. With respect to the theory that IMS has engaged in "unfair" competition, ¶ 179, courts following *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999), have held that, when a competitor brings a claim under § 17200, the dismissal of concurrent Sherman Act claims "precludes a finding of unfair competition."[9] *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008); *accord Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008) (dismissing UCL claim because the plaintiff failed to "ple[a]d an

---

[9] This application of *Cel-Tech* is in contrast to its application in the context of § 17200 claims brought by a consumer on behalf of the general public, wherein the court permits a more expansive definition of "unfair" conduct. *See, e.g.*, *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *16 (N.D. Cal. June 5, 2009); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal. Ct. App. 2001) ("*Cel-Tech* involved an action by sellers of cellular telephones against a competitor, and the court stated that its discussion was limited to an action by a competitor, as opposed to an action by a consumer.").

act that would be an incipient violation of antitrust law, as required under *Cel-Tech*

for claims against competitors").

Veeva also offers no viable explanation as to how IMS engaged in "unlawful"

conduct.  ¶ 178.  Without such an explanation, the claim cannot go forward

because a "violation of another law is a predicate for stating a cause of action

under the UCL's unlawful prong."  *McDermott v. Cummins, Inc.*, No. 14-

4209(WHW)(CLW), 2016 WL 3287335, at *4 (D.N.J. June 7, 2016) (quoting

*Graham v. Bank of America, N.A.*, 226 Cal. App. 4th 594 (Cal. Ct. App. 2014));

*see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)

(quoting *Cel-Tech*, 20 Cal. 4th at 539-40); *accord Sybersound*, 517 F.3d at 1151;

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).  In

*Stearns*, for example, the court dismissed the plaintiff's UCL claim because the

elements of a violation of any of the specific statutes cited or any "other" law were

not pled.  2009 WL 1635931 at *16.  Veeva's claim under the unlawful prong must

therefore be dismissed because Veeva does not plead a violation of another law,

other than an antitrust law, *see supra*, or a state tort law, *see infra*.

Veeva's UCL claim fails for the independent reason that no relief can be

granted.  Veeva pleads no basis for the limited monetary or equitable relief

available under the UCL.  *See Cel-Tech*, 20 Cal. 4th at 179; *see also* Counterclaims

p. 61.  Restitution is limited to the "return [of] money obtained through an unfair

business practice to those persons in interest from whom the property was taken."[10]

*Korea Supply Co.*, 29 Cal. 4th at 1144-45, 1149; *see also* Counterclaims p. 61.

Veeva does not bring such a claim. Veeva alleges no instance in which IMS

allegedly obtained money or property from it.

> **B.    Veeva's claim for intentional interference with prospective economic advantage (Claim Seven) is insufficient because Veeva does not plead that IMS engaged in any independently wrongful act**

The only violation of law or wrongful act cited by Veeva to support its

intentional interference with prospective economic advantage claim is IMS's

alleged violation of Section Two of the Sherman Act, premised on IMS's alleged

refusal to allow its Reference Data to be used in Veeva's MDM. As explained

above, this is a valid business decision.

"To establish a claim for interference with prospective economic

advantage . . . a plaintiff must plead that the defendant engaged in an

independently wrongful act." *Korea Supply Co.*, 29 Cal. 4th at 1158; *accord Bed,*

*Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52

---

[10] The disgorgement of profits, compensation for the diminution-of-value, and punitive damages are not available remedies under the UCL. *Korea Supply Co.*, 29 Cal. 4th at 1144-45, 1148-49; *Martinez v. TD Bank USA, N.A.*, No. CV 15-7712(JBS/AMD), 2016 WL 7391034, at *7 (D.N.J. Dec. 21, 2016) (quoting *Smit v. Charles Schwab & Co.*, No. 10-CV-03971-LHK, 2011 WL 846697, at *9 (N.D. Cal. Mar. 8, 2011)).

Cal. App. 4th 867, 881 (Cal. Ct. App. 1997); *Della Penna v. Toyota Motor Sales, USA, Inc.*, 11 Cal. 4th 376, 393 (1995).  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Korea Supply Co.*, 29 Cal. 4th at 1159;  *see also Bed, Bath & Beyond*, 52 Cal. App. 4th at 881; *Hsu v. OZ Optics Ltd.*, 211 F.R.D. 615, 620 (N.D. Cal. 2002); *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1116 (C.D. Cal. 2015).

In *Della Penna*, the Supreme Court of California ruled that the burden affirmatively fell on the plaintiff to plead that the defendant's interference was wrongful "as an element of the cause of action itself."  *Bed, Bath & Beyond*, 52 Cal. App. 4th at 881; *accord Della Penna*, 11 Cal. 4th at 392–93.  Veeva has not met that burden here and the claim should be dismissed.

### C.    Veeva cannot support its claim for intentional interference with contractual relations (Claim Six) because its allegedly existing contracts were unenforceable

In addition to its failure to allege facts from which a plausible inference can be drawn that any refusal to provide licenses to Veeva was intended to disrupt contracts, Veeva's claim for intentional interference with contractual relations has no merit because it does not identify any valid, enforceable contract that IMS allegedly interfered with.  "To state a claim for intentional interference with contractual relations, a plaintiff must allege . . . a valid contract between plaintiff

32

and a third party." *UMG*, 117 F. Supp. 3d at 1115 (internal quotations omitted).

"[A] cause of action for intentional interference with contractual relations requires an underlying enforceable contract, and where the underlying contract is unenforceable, only a claim for interference with prospective economic advantage lies." *Bed, Bath & Beyond*, 52 Cal. App. 4th at 879.

Though Veeva pleads that it executed "multimillion dollar contract[s]," those contracts were "conditional[] on grant of a TPA agreement by IMS." ¶¶ 80, 85.  That condition was, by Veeva's own allegation, never met and thus no enforceable contract was formed.

Moreover, Veeva does not plead a breach by any common life sciences customer.  Rather, Veeva states that the agreements were "cancelled" at the election of the life sciences customer. ¶¶ 84-85.  There is no intentional interference with contractual relations claim when the alleged contract is subject to being cancelled by the parties or only relates to anticipated future benefits. *See Transcription Commc'ns Corp. v. John Muir Health*, No. C 08-4418 TEH, 2009 WL 666943, at *9 (N.D. Cal. Mar. 13, 2009); *Integrated Storage Consulting Servs., Inc. v. Netapp, Inc.*, No. 5:12-CV-06209-EJD, 2016 WL 3648716, at *6 (N.D. Cal. July 7, 2016).  Accordingly, none of the alleged contracts can form the basis of Veeva's claim.

**IV.    IF THE COURT APPLIES CALIFORNIA LAW, VEEVA'S COMMON LAW CLAIMS (CLAIMS SIX AND SEVEN) ARE TIME-BARRED**

If the Court were to apply California law to Veeva's counterclaims, as Veeva insists, Veeva's common law claims are time-barred.  Under California law, Veeva's intentional interference with contractual relations and intentional interference with prospective economic advantage claims are subject to a two-year statute of limitations.  *See* Cal. Code Civ. P. § 339(1); *Christiansen v. Gross*, No. B256668, 2016 WL 110001, at *12 (Cal. Ct. App. Jan. 8, 2016) (barring a claim for intentional interference with contractual relationship because it was outside the two year statute of limitations); *Davis v. Md. Bank, N.A.*, No. 00-04191, 2002 WL 32713429, at *5 (N.D. Cal. June 19, 2002) (barring a claim for intentional interference with prospective economic advantage because it was outside the two year statute of limitations).[11]  "[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the facts essential to his claim." *Gutierrez v. Mofid*, 39 Cal. 3d 892, 897 (1985) (original emphasis omitted).

Here, Veeva pleads that "[i]n late 2013 through early 2014," IMS first agreed to allow the use of information from IMS Reference Data, but then

---

[11] The corresponding statute of limitations under New Jersey law is six years.  *See* N.J. Stat. Ann. § 2A:14-1.

rescinded its consent and "informed Veeva it would not honor the newly negotiated form TPA." ¶ 68.  Veeva alleges that IMS has continued that blanket refusal since that time.  ¶¶ 67-93, 114.  Thus, by Veeva's own allegations, it had knowledge of IMS's refusal sometime in 2014.  Moreover, Veeva alleges that Cegedim "[s]imultaneously…began an identical course of conduct in concert with IMS." ¶ 69.  Veeva goes on to allege five specific instances, and generally reference "dozens" of others, in which it alleges IMS and Cegedim colluded to interfere with Veeva's MDM business.  ¶¶ 71-75.  None of these instances are alleged to have occurred any later than September 2014.  *See id.*  To the extent any common law claim exists based on California law, it arose over two years ago and is now time-barred.

## CONCLUSION

For the foregoing reasons, IMS requests that the Court dismiss Veeva's counterclaims in their entirety.

Dated:  May 3, 2017

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: _s/ Robert I. Steiner_____

Michael Critchley
Amy Luria
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 422-9200
Fax: (973) 422-9700

Robert I. Steiner
Monica Hanna
One Jefferson Road, 2nd Floor
Parsippany, New Jersey 07054
Tel: (973) 503-5900
Fax: (973) 503-5950

David I. Gelfand
Carl Lawrence Malm
Kelly Bahlke
(*pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON
LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 974-1500
Fax: (202) 974-1999

Jonathan K. Cooperman
(*pro hac vice*)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

*Attorneys for Plaintiffs-Counterclaim Defendants Quintiles IMS Inc. and IMS
Software Services, Ltd.*

36

## <u>CERTIFICATE OF SERVICE</u>

I, Robert I. Steiner, hereby certify that on May 3, 2017, the foregoing document was filed through the Court's CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


By: _s/ Robert I. Steiner_____
Robert I. Steiner

37