# Exhibit 1

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**     **1215**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

ceeds from the foreclosure sale that took place:

> No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property or an estate for years therein hereafter executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust.

Cal.Civ.Proc.Code § 580d. But Mr. Jara's claim is still deficient. Like he did in his Third Amended Complaint, he again implies that there is something nefarious about dividing a mortgage into two loans, but he again provides only speculation why this would be true. Moreover, he still does not allege how dividing a mortgage loan into two loans violates § 580d; § 580d, after all, says nothing about that.

In addition, Mr. Jara's allegation that Aurora divided the loan into two is belied by the relevant documents, which identify Pacific as the lender and First Priority Financial, Inc. as the mortgage broker. RJN, ECF No. 62, Exs. 1 (adjustable rate note for $648,750 identifying Pacific as lender), 2 (note for $216,250 identifying Pacific as lender), 3 (deed of trust identifying Pacific as lender), 5 (fee disclosure identifying First Priority Financial, Inc. as mortgage broker). In light of these documents, Mr. Jara's allegations that Aurora was responsible for the structure of the loans does not "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

Because Mr. Jara has had multiple attempts to sufficiently allege a claim for a declaratory judgment with respect to his split-the-loans theory but has yet to do so, his claim is DISMISSED WITH PREJUDICE. *See Ferdik,* 963 F.2d at 1261.

**V. CONCLUSION**

Based on the foregoing, the court GRANTS Defendants' motion to dismiss Mr. Jara's Fourth Amended Complaint. All of his claims are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**



**REALPAGE, INC., Counter–Claimant,**

**v.**

**YARDI SYSTEMS, INC., Counter–Defendant.**

**Case No. CV 11–00690–ODW (JEMx).**

United States District Court, C.D. California, Western Division.

Feb. 13, 2012.

**Background:** Provider of vertical cloud hosting services filed suit against its competitor alleging violation of Sherman Act, intentional interference with contract, intentional interference with prospective economic advantage, and unfair competition in violation of California's Unfair Competition Law (UCL). Defendant moved to dismiss.

**Holdings:** The District Court, Otis D. Wright, II, J., held that:

(1) complaint sufficiently alleged existence of relevant market, as required to state claim under Sherman Act for restraint of trade based on tying arrangement;

(2) complaint sufficiently alleged defendant's market power for purposes of claim for tying arrangement;

(3) complaint stated claim against competitor for monopolization under Sherman Act;

(4) complaint stated claim against competitor for exclusive dealing;

(5) complaint stated claim for intentional interference with contractual relations with one client; but

(6) allegations that a breach or disruption of another of plaintiff's contracts "could" occur were too speculative to state claim.

Motion granted in part and denied in part.

**1. Federal Civil Procedure ⚖1838**

Although leave to amend a complaint which has been dismissed should be freely granted prior to trial, leave to amend may be denied when court determines that allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency. Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**2. Antitrust and Trade Regulation ⚖569**

Pleading requirements for illegal tying arrangements under the Sherman Act's restraint of trade provision mirror those of California's Cartwright Act. Sherman Act, § 1, 15 U.S.C.A. § 1; West's Ann.Cal.Bus. & Prof.Code § 16720 et seq.

**3. Antitrust and Trade Regulation ⚖569, 570, 571**

Tying arrangements will be condemned as illegal per se upon a showing of: (1) a tie-in between two products or services sold in separately defined product markets; (2) sufficient market power in the tying product market to affect the tied product market; and (3) an effect on a not insubstantial volume of commerce. Sherman Act, § 1, 15 U.S.C.A. § 1.

**4. Antitrust and Trade Regulation ⚖557**

A product market, for purposes of restraint of trade claim under Sherman Act, comprises products that have reasonable interchangeability for the purposes for which they are produced; price, use and qualities considered. Sherman Act, § 1, 15 U.S.C.A. § 1.

**5. Antitrust and Trade Regulation ⚖554, 556**

A Sherman Act complaint for illegal tying arrangement should be dismissed for failure to state a claim if complaint's relevant market definition is facially unsustainable; facially unsustainable relevant market definition results when plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products, even when all factual inferences are granted in plaintiff's favor. Sherman Act, § 1, 15 U.S.C.A. § 1; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**6. Antitrust and Trade Regulation ⚖577**

Provider of vertical cloud hosting services sufficiently pled existence of relevant market, as required to state claim against competitor under Sherman Act for restraint of trade based on tying arrangement; proposed vertical services market definition in complaint considered and rejected multiple interchangeable substitute products, such as self-hosting and generic cloud computing services, with reference to the rule of reasonable interchangeability. Sherman Act, § 1, 15 U.S.C.A. § 1.

**7. Antitrust and Trade Regulation ⚖571**

"Market power," for purposes of demonstrating tying arrangement under Sher-

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**      **1217**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

man Act, is the power to force a purchaser to do something that he would not do in a competitive market. Sherman Act, § 1, 15 U.S.C.A. § 1.

> See publication Words and Phrases for other judicial constructions and definitions.

**8. Antitrust and Trade Regulation** ⚷571

In determining whether an antitrust defendant has market power in the tying product, court must focus on whether seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market. Sherman Act, § 1, 15 U.S.C.A. § 1.

**9. Antitrust and Trade Regulation** ⚷571

"Market power," for purposes of demonstrating tying arrangement under Sherman Act, is something less than monopoly power, but something more than the mere possibility of collusion or anticompetitive effects in the market. Sherman Act, § 1, 15 U.S.C.A. § 1.

**10. Antitrust and Trade Regulation** ⚷577

Provider of vertical cloud hosting services sufficiently pled competitor's market power, as required to state claim under Sherman Act for restraint of trade based on illegal tying arrangement; complaint alleged that competitor wielded its economic advantage by effectively stopping its existing customers from migrating their data to plaintiff's cloud hosting services. Sherman Act, § 1, 15 U.S.C.A. § 1.

**11. Antitrust and Trade Regulation** ⚷713, 714, 715

To state a claim for attempted monopolization under Sherman Act, plaintiff must allege: (1) that defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. Sherman Act, § 2, 15 U.S.C.A. § 2.

**12. Antitrust and Trade Regulation** ⚷641, 644, 647

A plaintiff may establish market power, for purposes of claim for monopolization in violation of Sherman Act, directly by presenting evidence of injurious exercise of market power, or circumstantially by: (1) defining the relevant market; (2) showing that defendant owns a dominant share of that market; and (3) showing that there are significant barriers to entry and that existing competitors lack capacity to increase their output in the short run. Sherman Act, § 2, 15 U.S.C.A. § 2.

**13. Antitrust and Trade Regulation** ⚷672

Provider of vertical cloud hosting services sufficiently stated claim against competitor for monopolization under Sherman Act; complaint alleged that competitor was using its power in the software market to foreclose and monopolize in the vertical cloud market, that competitor's power over its customers, derived from the high switching costs attendant to abandoning its software after adopting it, gave competitor a substantial market power in the vertical cloud market, that competitor's customers represented a substantial share of potential vertical cloud services customers, and that competitor intended to steal trade secrets, coerce agreements with its customers not to use plaintiff's services, and block new competitors from entry into the market. Sherman Act, § 2, 15 U.S.C.A. § 2.

**14. Antitrust and Trade Regulation** ⚷564

Under the antitrust rule of reason, an exclusive dealing arrangement violates Sherman Act's restraint of trade provision only if its effect is to foreclose competition in a substantial share of the line of com-

merce affected. Sherman Act, § 1, 15 U.S.C.A. § 1.

**15. Antitrust and Trade Regulation ⇐577**

Provider of vertical cloud hosting services sufficiently stated claim against competitor for exclusive dealing, in violation of Sherman Act's restraint of trade provision; complaint alleged that competitor's software license agreements precluded its customers from hosting the software on any cloud service other than competitors, and that such restriction foreclosed a substantial share of the vertical cloud market by significantly limiting the opportunities for other cloud service providers to enter into or remain in the market. Sherman Act, § 1, 15 U.S.C.A. § 1.

**16. Torts ⇐212**

Under California law, to establish a claim for intentional interference with a contract plaintiff must allege: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

**17. Torts ⇐212**

Under California law, a plaintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations; rather, unlike the tort of inducing breach of contract, intentional interference with contractual relations requires only proof of interference.

**18. Torts ⇐242, 255**

Provider of vertical cloud hosting services stated claim, under California law, against competitor for intentional interference with contractual relations by alleging an "executed, valid and enforceable agreement" with software client for cloud hosting services, and that due to competitor's interference, client had canceled agreement, thus depriving plaintiff of substantial revenue.

**19. Torts ⇐242, 255**

Under California law, vertical cloud hosting services provider's allegations that a breach or disruption of its contract with a current client "could" occur, based on competitor's threats to client, was insufficient to state claim against competitor for intentional interference with contractual relations, since claim was contingent on client's decision to migrate its storage services, which had not yet occurred.

———

Chad Russell, Bingham McCutchen LLP, San Francisco, CA, Chad Russell, Gabrielle Daneeka Hann, Geoffrey M. Howard, Bingham McCutchen LLP, San Francisco, CA, James B. Lewis, Bingham McCutchen, East Palo Alto, CA, Jessica Mahon Scoles, Bingham McCutchen LLP, Santa Monica, CA, for Counter–Defendant.

David R. Eberhart, James Michael Pearl, Sharon M. Bunzel, Mark Alan Samuels, O'Melveny and Myers LLP, San Francisco, CA, Allan Gabriel, Sidney Christopher Winter, Dykema Gossett LLP, Los Angeles, CA, for Counter–Claimant,

Order **GRANTING IN PART** and **DENYING IN PART** Counter–Defendant's Motion to Dismiss [141]

OTIS D. WRIGHT, II, District Judge.

## I. INTRODUCTION

Pending before the Court is Counter–Defendant Yardi Systems, Inc.'s ("Yardi") Motion to Dismiss Counter–Claimant RealPage, Inc.'s ("RealPage") Second Amended Counterclaims ("SACC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**     **1219**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

(Dkt. No. 141.) RealPage filed an Opposition to the instant Motion, to which Yardi filed a Reply. (Dkt. Nos. 146, 148.) Having carefully considered the papers filed in support of and in opposition to the instant Motion, the Court deems the matter appropriate for decision without oral argument. *See* Fed.R.Civ.P. 78; C.D. Cal. L.R. 7–15. For the following reasons, Yardi's Motion to Dismiss is **GRANTED in PART** and **DENIED in PART.**

### II. FACTUAL BACKGROUND

RealPage and Yardi are competitors in the real property management business. (*See* SACC [1] ¶ 2.) Perhaps Yardi's greatest success has been its popular property management back office accounting software, Voyager—a computer accounting program especially designed to meet the needs of property managers. (SACC ¶¶ 4, 17.) Yardi tailors its Voyager software to property managers that manage 1,000 or more individual apartment units, who typically have more complex and specialized needs. (SACC ¶¶ 21.) Once a property management customer adopts the Voyager software, it becomes especially difficult—and in some cases prohibitively expensive—for that customer to switch to an alternative back office accounting software because of the high switching costs associated with moving the customer's data to a new system, the cost of new licensing fees, and the disruption of day-to-day business attendant to re-aligning IT systems and transferring data. (SACC ¶ 4.)

Yardi and RealPage are currently the only two competitors in the market for supplying vertically integrated cloud computing services specifically designed to meet the needs of real property owners and managers. (SACC ¶ 1.) Vertically integrated cloud computing services ("vertical cloud services") enable customers with multiple software applications—such as back office accounting (including Yardi's Voyager), maintenance, leasing, revenue management, payment processing, and background screening applications—to have those applications hosted and managed in an off-site data center. (SACC ¶ 2.) These applications are then accessible to the customer remotely via the Internet. (*Id.*) Yardi and RealPage's cloud services differ from more generic cloud services in that their services are industry-specific. (*Id.*)

RealPage was the first company to offer vertical cloud services (the "RealPage Cloud"). (SACC ¶ 3.) RealPage contends that Yardi was only able to offer its competing Yardi Cloud Services by misappropriating RealPage's trade secrets. (SACC ¶ 3.) RealPage further alleges that rather than innovate and invest in a superior cloud system, Yardi embarked on a campaign to leverage its powerful position in the property management back office accounting software market (the "Software Market")—attained via its industry-leading Voyager software—to stifle competition in the vertical cloud market (the "Vertical Cloud Market") through customer interference and intimidation. (SACC ¶¶ 39–42.)

Specifically, RealPage avers that Yardi began forcing its Voyager clients, through express and implied threats, into anti-competitive exclusionary amendments to their Voyager licensing agreements. (SACC ¶ 40.) The amendments to the licensing

---

[1]. Yardi notes in its Motion that RealPage's SACC, as initially filed, was improper under Federal Rules of Civil Procedure 7 and 13. (Mot. at 5 n. 2.) The parties stipulated that RealPage would re-file its SACC consolidated with its Answer, and that Yardi would move to dismiss that version of RealPage's SACC.

(*Id.;* Dkt. Nos. 139–40.) Accordingly, all references to RealPage's SACC are to RealPage's September 30, 2011 Consolidated Second Amended Counterclaims and Answer to Yardi's First Amended Complaint. (Dkt. No. 142.)

agreements prohibited Yardi's Voyager licensees from using any "contractor" to implement or host the Yardi software, and defined "contractor" broadly to include both the RealPage Cloud and any other potential vertical cloud services providers. (SACC ¶ 47.) While many Voyager customers either already hosted their Voyager software in the RealPage Cloud or desired to do so, Yardi coerced customer acquiescence to the prohibitive amendments by threatening to terminate its customers' Voyager software licenses. (SACC ¶¶ 40–41.) Because of the prohibitively high costs associated with switching away from the Voyager software, Yardi's Voyager customers were effectively locked into the software and faced no choice but to succumb to Yardi's threats. (SACC ¶ 41.) Examples of this misconduct were allegedly manifested in relation to five RealPage clients, three of which—Client 1, Client 2, and Client 3—are relevant for the purposes of Yardi's instant Motion.

Client 1, a large property management firm and user of Voyager, entered into a Letter Agreement for Interim Services with RealPage (the "Letter Agreement"). (SACC ¶ 49.) The Letter Agreement indicated that RealPage would provide transition and migration services, as well as hosting and other services, during an interim term for all non-Yardi applications until RealPage and Client 1 entered into an additional agreement at a later date. (*Id.*) RealPage alleges that when Yardi learned of the Letter Agreement, it set out to interfere with RealPage's new client relationship by advising Client 1 that Client 1 could not continue to work with RealPage under this agreement. (*Id.*) Yardi further amended Client 1's Voyager software license agreement to prohibit Client 1 from hosting its Yardi Voyager software in the RealPage Cloud, as contemplated by an existing but unexecuted plan. (SACC ¶ 50.) As a result, RealPage was deprived of over $100,000 annually. (SACC ¶ 51.)

Client 2, a top-ten property management firm and user of Voyager, entered into a five-year agreement with RealPage for RealPage to host Client 2's software applications—including Voyager. (FACC ¶ 55.) As a result of the agreement, several Client 2 employees transitioned to RealPage to help facilitate the hosting of Client 2's software on the RealPage Cloud. (*Id.*) At that time, Yardi assured Client 2 that so long as Client 2 allowed Yardi to compete for Client 2's vertical cloud services business, Yardi would respect Client 2's decision. (*Id.*) When Client 2 ultimately chose to host its applications in the RealPage Cloud following head-to-head competition between Yardi and RealPage, Yardi again indicated that it would respect Client 2's decision. (*Id.*) More than a year later, however, Yardi repudiated its prior representations and informed Client 2 that its hosting of the Voyager software in the RealPage Cloud violated Client 2's Voyager license agreement. (*Id.*) As a result of Yardi's continued assertions that Client 2 is in breach of its Voyager license agreement and will therefore forfeit its license to use the Voyager software, Client 2 is left with no option other than to recall its employees who migrated to RealPage. (*Id.*) This will result in a significant cost to RealPage. (*Id.*)

Client 3, a multifamily and commercial real estate owner, had agreed with RealPage to move its data center to the RealPage Cloud and was in the process of doing so. (SACC ¶ 57.) During the data-transfer process, however, Yardi demanded that Client 3 not use the RealPage Cloud or even publicly associate itself with RealPage. (*Id.*) As a result of Yardi's interference, Client 3 decided not to use the RealPage Cloud to host its Voyager software, thereby causing damages to RealPage in the form of lost revenue and

reputational benefit associated with Client 3's business. (*Id.*)

On January 24, 2011, Yardi filed a Complaint against RealPage. (Dkt. No. 1.) In response, RealPage filed a Counterclaim on March 28, 2011 (Dkt. No. 23), followed by its First Amended Counterclaims ("FACC") on May 18, 2011 (Dkt. No. 34). On August 11, 2011, 2011 WL 3565112, this Court granted in part and denied in part Yardi's June 16, 2011 Motion to Dismiss RealPage's FACC. (Dkt. No. 83.) The Court granted RealPage leave to amend, and RealPage filed its SACC on September 2, 2011. (Dkt. No. 114.) The SACC proceeds on six counterclaims: (1) misappropriation of trade secrets; (2) violation of Section 1 of the Sherman Antitrust Act; (3) violation of Section 2 of the Sherman Antitrust Act; (4) violation of the California Cartwright Act, Cal. Bus. & Prof.Code §§ 16720, 16722, 16726 & 16727; (5) intentional interference with contract; (6) intentional interference with prospective economic advantage; and (7) unfair competition in violation of the California Business and Professions Code section 17200, also known as the Unfair Competition Law ("UCL"). Subsequently, Yardi filed the instant Motion to Dismiss on September 30, 2011. (Dkt. No. 141.)

### III. LEGAL STANDARD

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)." *Porter v. Jones,* 319 F.3d 483, 494 (9th Cir.2003). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). For a complaint to sufficiently state a claim, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). While specific facts are not necessary so long as the complaint gives the defendant fair notice of the claim and the grounds upon which the claim rests, *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), a complaint must nevertheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief." *Id.* (internal citation and quotation marks omitted). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

When considering a Rule 12(b)(6) motion, a court is generally limited to considering material within the pleadings and must construe "[a]ll factual allegations set forth in the complaint ... as true and ... in the light most favorable to [the plaintiff]." *Lee v. City of L.A.,* 250 F.3d 668, 688 (9th Cir.2001) (citing *Epstein v. Wash. Energy Co.,* 83 F.3d 1136, 1140 (9th Cir. 1996)). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001).

[1] As a general rule, leave to amend a complaint which has been dismissed should

**1222**        **852 FEDERAL SUPPLEMENT, 2d SERIES**

be freely granted. Fed.R.Civ.P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986); *see Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000).

### IV. DISCUSSION

Yardi moves to dismiss all of RealPage's antitrust counterclaims, as well as RealPage's counterclaims for intentional interference with contract, intentional interference with prospective economic advantage, and violation of California's UCL. The Court first considers RealPage's antitrust counterclaims, followed by the RealPage's intentional interference with contract counterclaim. Because RealPage's counterclaims for interference with prospective economic advantage and violation of the UCL both hinge in part upon the viability of RealPage's other counterclaims, the Court concludes by considering these counterclaims together.

#### A. REALPAGE'S ANTITRUST COUNTERCLAIMS

RealPage brings antitrust counterclaims alleging (1) an illegal tying arrangement in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("Section 1"), and the California Cartwright Act, Cal. Bus. & Prof.Code §§ 16720, 16722, 16726 & 16727 (the "Cartwright Act"); (2) attempted monopolization in violation of Section 2 of the Sherman Antitrust Act ("Section 2"); and (3) exclusive dealing in violation of Section 1. The Court considers each in turn.

#### 1. Tying Counterclaims

**[2, 3]** Both Section 1 and the Cartwright Act prohibit illegal tying arrangements. *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1088 (9th Cir.2009); *Nicolosi Distrib., Inc. v. BMW of N. Am.*, No. 10–03256, 2011 WL 1483424, at *2 (N.D.Cal. Apr. 19, 2011). The pleading requirements under the Sherman Act mirror that of the Cartwright Act. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir.2001). "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agree that he will not purchase that product from any other supplier.'" *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615 (9th Cir.1990) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)), *aff'd*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Blough*, 574 F.3d at 1088 (a tying arrangement is where a party ties "two products or services together, whereby 'the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)'") (quoting *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir.2008)). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *PeaceHealth*, 515 F.3d at 912. Accordingly, tying arrangements will be condemned as illegal per se [2] upon a showing of (1) a tie-

---

2. While Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," the Supreme Court has narrowed Section 1 to prohibit only unreasonable restraints of trade. *See State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). "Certain types of contractual arrangements are deemed unreasonable as a matter of law" and are condemned as per se illegal. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9, 104 S.Ct. 1551, 80

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**    **1223**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

in between two products or services sold in separately defined product markets; (2) sufficient market power in the tying product market to affect the tied product market; and (3) an effect on a not insubstantial volume of commerce. *Datagate, Inc. v. Hewlett–Packard Co.*, 60 F.3d 1421, 1423–24 (9th Cir.1995). Yardi contends that RealPage's tying counterclaims under Section 1 and the Cartwright Act are insufficient to withstand a motion to dismiss because RealPage has failed to allege the existence of a tying arrangement, define a proper product market as a matter of law, or establish that Yardi has market power in the product market for the tying product such that it could affect competition in the tied product market. (Mot. at 6.)

*a. Existence of a Tying Arrangement*

Yardi begins its attack on RealPage's tying counterclaims on grounds that Real-Page cannot establish the existence of a tying arrangement at all because "Yardi's Voyager software need not be used with *any* cloud computing services." (Mot. at 6.)

In its August 11, 2011 Order dismissing RealPage's tying counterclaim as pleaded in RealPage's FACC, this Court noted,

[F]or an illegal tying arrangement to exist, the sale of the Voyager software must be conditioned upon the purchase of cloud computing, or at least the non-purchase of cloud computing from Real-Page. Yet, the facts indicate that Voyager software does not have to be used with *any* cloud computing services.... Thus, because Yardi does not tie the sale of Voyager with a tied product, *i.e.* the purchase of cloud computing or the non-purchase of cloud computing from Real-Page, the facts as pleaded do not fit the definition of a tying arrangement.

(Dkt. No. 83, at 7–8.) With respect to RealPage's SACC, Yardi contends that "RealPage has failed to cure the flaw that led to the Court's dismissal of the prior antitrust counterclaims." (Mot. at 6.) RealPage responds Yardi's position is plainly foreclosed by the Ninth Circuit's opinion in *Kodak*, 903 F.2d 612. (Opp'n at 4.) Upon careful reconsideration, and particularly in light of the close factual parallels between this case and *Kodak*, the Court finds that RealPage has sufficiently pleaded the existence of an illegal tying arrangement.

In *Kodak*, plaintiffs alleged that Kodak's refusal to sell spare parts to Kodak equipment owners unless those equipment owners agreed not to use the services of independent service operators ("ISOs") constituted a per se illegal tying arrangement. *Id.* at 615. The Ninth Circuit rejected Kodak's contention that this policy failed to constitute a negative tying arrangement because Kodak would still sell parts to equipment owners who agreed to *self-service* their machines and allowed the case to proceed to trial. *Id.* (emphasis added). The Supreme Court affirmed. *Eastman Kodak Co. v. Image Technical*

---

L.Ed.2d 2 (1984), *rev'd on other grounds, Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).

Tying arrangements have traditionally been designated as *per se* illegal under Section 1 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C. § 14. *Int'l Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947). However, while true per se illegality eschews any analysis of actual market conditions, the Supreme Court has recognized that not every tying arrangement can be said to restrain competition. *See id.* at 11, 118 S.Ct. 275. Accordingly, the per se analysis as applied to tying arrangements entails some inquiry into relevant market conditions, particularly with regards to the seller's ability to exploit its control over the tying product to force the buyer into purchasing another unwanted—or in the case of a negative tie, foregoing purchase of a desired—tied product. *See id.*

**1224**  852 FEDERAL SUPPLEMENT, 2d SERIES

*Serv., Inc.,* 504 U.S. 451, 463, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

Here, RealPage alleges that "Yardi's newly amended software license agreements condition licensees' use of Yardi's Voyager Back Office Accounting Software (the tying product) on an agreement not to use the Vertical Cloud Services (the tied product) of competing property management software companies, the only one of which today belongs to RealPage." (SACC ¶ 61.) Yardi argues that there can be no negative tie in this case because licensees of Yardi's Voyager software are not required to host the software with *any* Vertical Cloud Service, as licensees could host the software on-premises ("self-hosting"). However, this argument merely mirrors the argument the Ninth Circuit and Supreme Court found unavailing *Kodak*, *i.e.*, that no negative tie existed because Kodak equipment owners seeking to purchase spare parts were not required to use *any* outside service providers—including ISOs—as equipment owners could simply self-repair their equipment. The Court therefore rejects Yardi's argument and finds that the facts as pleaded do in fact fit the definition of a negative tying arrangement. Accordingly, the Court proceeds to consider whether RealPage has pleaded a relevant market sufficient to withstand a motion to dismiss.

### b. *Relevant Market*

Yardi next contends that RealPage's product market definition for Vertical Cloud Services ("Vertical Cloud Market")—on which all of RealPage's antitrust counterclaims hinge in some way—fails as a matter of law for the definition's failure to include self-hosting of management software. (Mot. at 8–9.) RealPage counters that Yardi's argument impermissibly asks the Court "to summarily resolve the 'fact intensive' question of reasonable substitutability at the pleading stage." (Opp'n at 8.) The Court agrees.

**[4, 5]** "The definition of an antitrust 'relevant market' is typically a factual rather than a legal inquiry, but certain legal principals govern the definition." *Apple Inc. v. Psystar Corp.,* 586 F.Supp.2d 1190, 1196 (N.D.Cal.2008) (citing *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1045 (9th Cir.2008)). A product market comprises "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 406, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see also Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). Pursuant to these guidelines, "the relevant market must include 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Newcal Indus.,* 513 F.3d at 1045 (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989)). Accordingly, a complaint should be dismissed under Rule 12(b)(6) only where "the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus.,* 513 F.3d at 1045. Such a "facially unsustainable" relevant market definition may be found in cases where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Colonial Med. Group, Inc. v. Catholic Healthcare W.,* No. 09–2192 MMC, 2010 WL 2108123, at *3 (N.D.Cal. May 25, 2010) (quoting *Queen*

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**     **1225**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

*City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997)).

**[6]** Taking the allegations in RealPage's SACC as true and resolving all factual inferences in RealPage's favor, RealPage's Vertical Cloud Market definition is not facially unsustainable. RealPage defines this market as "the market for vertically-integrated [sic] cloud computing services specialized to the needs of real estate owners and property managers," which includes only Yardi and RealPage. (SACC ¶ 28.) Viewed alone, this definition appears quite narrow. However, RealPage proceeds to consider and reject multiple conceivably interchangeable substitutes in great factual detail. Specifically, RealPage distinguishes "generic cloud computing services, such as those offered by Amazon and Rackspace," as insufficiently specialized to tailor to real estate owners and property managers. (SACC ¶ 30). RealPage further explains that "single-application hosting services, in which a client accesses its own individual copy of a software program (such as Voyager) remotely via the internet," are not reasonable substitutes because such services, by definition, do not constitute Vertical Cloud Services. (SACC ¶ 33.) Finally, RealPage rejects self-hosting as a reasonably interchangeable substitute in the Vertical Cloud Market. (SACC ¶ 35.) RealPage avers that self-hosting is not reasonably interchangeable with Vertical Cloud Services because "a [small but significant increase in price] in the Vertical Cloud Market would not cause cloud customers to switch to on premise hosting because the small price increase in the cost of Vertical Cloud Services would be offset by the much higher costs to the customer of hiring IT personnel, purchasing hardware, and managing and maintaining the infrastructure necessary for on premise hosting," among other reasons. (*Id.*)

The specificity with which RealPage pleaded the relevant market in this case contrasts starkly with the paucity of facts courts have found fails to withstand a motion to dismiss for failure to plead a relevant market as a matter of law. *E.g., Tanaka v. Univ. of S. Calif.,* 252 F.3d 1059, 1063 (9th Cir.2001) ("[Plaintiff's] conclusory assertion that the 'UCLA women's soccer program' is 'unique' and hence 'not interchangeable with any other program in Los Angeles' is insufficient."); *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1105 (9th Cir.1999) (finding plaintiff's product market definition of "lodging accommodation and ski packages" insufficient for failure to allege that there were no other goods or services reasonable interchangeable with such accommodations or packages); *Davies v. Genesis Med. Ctr. & Anesthesia & Analgesia, P. C.,* 994 F.Supp. 1078, 1099 (S.D.Iowa 1998) (finding a narrow market for cardiac anesthesiology insufficient as a matter of law for, *inter alia*, failure to include any allegations distinguishing the cardiac anesthesiology market from the broader anesthesiology market). To the contrary, RealPage's proposed Vertical Services Market definition conscientiously considers and rejects multiple interchangeable substitute products with reference to the rule of reasonable interchangeability. While Yardi vigorously contests RealPage's exclusion of self-hosting from the relevant market in this case, Yardi's protestations turn on issues of fact inappropriate for resolution at this stage of the litigation. Accordingly, the Court finds that RealPage's definition of the relevant product and geographic markets in this case withstand scrutiny for the purposes of Rule 12(b)(6).

*c. Market Power*

Finally, Yardi contends that RealPage's tying counterclaim is subject to dismissal

**1226**         **852 FEDERAL SUPPLEMENT, 2d SERIES**

because RealPage has failed to allege adequately that Yardi possesses market power in the Property Management Back Office Accounting Software Market. Specifically, Yardi argues that RealPage has failed to establish that Yardi played a "significant role" in the relevant market. The Court finds, however, that market power allegations at the pleading stage do not demand such an exacting standard.

**[7, 8]** "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works,* 547 U.S. at 46, 126 S.Ct. 1281. Market power for purposes of tying arrangements "is the power to 'to force a purchaser to do something that he would not do in a competitive market.'" *Kodak,* 504 U.S. at 464, 112 S.Ct. 2072 (quoting *Jefferson Parish,* 466 U.S. at 14, 104 S.Ct. 1551). In determining whether an antitrust defendant has market power in the tying product, the Court must focus on "whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *Fortner Enters., Inc. v. U.S. Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

**[9]** It stands to reason that market power needs be something less than monopoly power, but something more than the mere possibility of collusion or anticompetitive effects in the market. *See Fortner Enters., Inc. v. U.S. Steel Corp.,* 394 U.S. 495, 502, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) ("The standard of 'sufficient economic power' does not ... require that the defendant have a monopoly or even dominant position throughout the market for the tying product"); *Sheridan v. Marathon Petroleum Co.,* 530 F.3d 590, 595–96 (7th Cir.2008). Moreover, "economic power over the tying product can be sufficient ... *even though the power exists only with respect to some of the buyers in the market.*" *Fortner,* 394 U.S. at 502–03, 89 S.Ct. 1252 (emphasis added). The standard rejecting the need for proof of truly dominant power over the tying product recognizes that "because tying arrangements generally serve[ ] no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of *any appreciable restraint* on competition provides a sufficient reason for invalidating the tie." *Id.* at 503, 89 S.Ct. 1252 (emphasis added).

**[10]** Here, RealPage alleges that the proper product market definition for the tying product is property management back office accounting software ("Property Management Back Office Accounting Software Market" or "Software Market"). (SACC ¶ 20.) RealPage supports this definition by claiming that the Property Management Back Office Accounting Software Market "is recognized as a distinct product market in the property management industry" (*id.*) and properly excludes industry-neutral or generic back office accounting software because such software "is not an adequate substitute for Property Management Back Office Accounting Software" (*id.* ¶ 22). Yardi does not appear to contest RealPage's definition of the tying product market.

Yardi does contest, however, RealPage's assertions of Yardi's market power in the Software Market. As a threshold matter, the Court agrees with Yardi that Yardi's own promotional materials touting itself as "the industry-leading asset and property management software solution" and independent industry analysts' assessments that Yardi has a "competitive advantage[ ]" or particular strength in its back office accounting capabilities are insufficient alone to establish a plausible assertion of market power in the Software Market. (SACC ¶ 24.) Similarly lacking are RealPage's bald contentions that "Yardi offers

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**            **1227**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

the market-leading Property Management Back Office Accounting Software" and that Yardi derives market power from Voyager's "high penetration among Property Management Back Office Accounting Software customers." (SACC ¶ 4.) Absent *some* data to support these assertions,[3] RealPage offers nothing more than generic conclusions that do not suffice to support any contention of market power.

More persuasive, however, are RealPage's allegations that Yardi has "recently changed its software license agreements to illegally counter the RealPage competitive threat and lock its installed base of Voyager Back Office Accounting Software clients out of the RealPage Cloud." (SACC ¶ 46.) RealPage asserts that Yardi has coerced its Voyager customer base—which is locked into the Voyager software due to prohibitively high switching costs and the threat of significant business interruption attendant to abandoning the Yardi software—into signing anticompetitive amendments to their Voyager software licensing agreements by threatening to terminate the licenses of those who refuse to accede to the amendments. (*E.g.*, SACC ¶ 42.) RealPage specifically cites Clients 1 and 3 as two such customers whose existing plans to migrate their data into the RealPage Cloud were thwarted by Yardi's anticompetitive tactics. (SACC ¶¶ 51–53, 57.) RealPage's SACC thus pleads with some particularity two discrete examples in which Yardi has wielded its economic advantage in its Voyager software to the competitive detriment to the RealPage Cloud. These allegations suffice to demonstrate that Yardi has market exerted power over at least some buyers in the market to effect at least an appreciable restraint on competition. *See Fortner*, 394 U.S. at 502–03, 89 S.Ct. 1252. While RealPage may be presented with some difficulty *proving* that Yardi has sufficient market power to invalidate the tying arrangement alleged in this case, the Court nevertheless finds that RealPage's allegations are sufficient to make a finding of market power for tying-arrangement purposes plausible at this stage in the proceedings.

In sum, the Court finds that RealPage has pleaded sufficient facts to establish the existence of an illegal tying arrangement, properly defined a relevant market for the tied product, and adequately established for the purposes of a motion to dismiss that Yardi has market power in the product market for the tying product to affect competition in the tied product market. Accordingly, the Court **DENIES** Yardi's Motion to Dismiss RealPage's counterclaims alleging illegal tying arrangements under Section 1 and the Cartwright Act.

### 2. Attempted Monopolization Counterclaim

RealPage's third counterclaim alleges that Yardi has attempted to monopolize the Vertical Cloud Market in violation of Section 2. Yardi argues that RealPage's

---

3. RealPage does offer some data, although its reliance on the data it provides is misplaced. RealPage avers that "when looking at the total number of apartment units managed by the top 50 property managers, over 75% of those that are fee managed (over 1.1 million units) are managed using Yardi's Voyager Back Office Accounting Software. Yardi's dominance is even more apparent when looking at the total number of apartment units managed by the top 25 property managers . . . : among that subset, *over 90% of those units that are fee managed* are managed using Yardi's" Voyager software. (SACC ¶ 26 (emphasis in original).) However, individual apartment *units* do not use Yardi's software; property managers do. Thus, absent additional context, the number of *units* that are fee-managed by property managers employing Yardi's software says nothing of the number *property managers* actually using Yardi's software. Indeed, it is conceivable that only one property manager using Yardi's Voyager software accounts for all of the units RealPage cites.

attempted monopolization counterclaim fails because RealPage has insufficiently alleged a dangerous probability of successful monopolization.

[11] To state a claim for attempted monopolization, a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). The Ninth Circuit "has noted that while the three elements are discrete, they are often interdependent; i.e., proof of one of the three elements may provide circumstantial evidence or permissible inferences of the other elements." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1308 (9th Cir.1982).

"In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.* This necessarily requires plaintiffs to adequately plead that the defendant has market power in the relevant market. *Digital Sun v. The Toro Co.*, No. 10–CV–4567–LHK, 2011 WL 1044502, at *3 (N.D.Cal. Mar. 22, 2011) (citing *Newcal Indus.*, 513 F.3d at 1044 n. 3 (9th Cir.2008)).

[12] A plaintiff may establish market power for Section 2 purposes directly by presenting evidence of injurious exercise of market power or circumstantially by (1) defining the relevant market; (2) showing that the defendant owns a dominant share of that market; and (3) showing that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995). "No single factor is dispositive." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir.2007). However, "although market share does not alone determine monopoly power, market share is perhaps the most important factor to consider in determining the presence or absence of monopoly power." *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245 (9th Cir. 1990).

As explained above, the Court finds that RealPage has adequately defined the relevant markets for the purposes of a Rule 12(b)(6) motion. With respect to market power, RealPage contends that "[t]here is a dangerous probability that Yardi will achieve monopoly power in the Vertical Cloud Market." (SACC ¶ 102.) Therefore, RealPage must allege that Yardi has market power in the Vertical Cloud Market.

[13] RealPage's allegations regarding Yardi's market power in the Vertical Cloud Market are anchored solely in the market power Yardi is alleged to hold in the Software Market. (*See* SACC ¶ 103; *see also* Opp'n at 16 ("[T]he *entire* theme of RealPage's SACC is that Yardi is using its power in the . . . Software Market to foreclose and monopolize in the Vertical Cloud Market.").) Specifically, RealPage contends that Yardi's power over its Voyager customers—derived from the high switching costs attendant to abandoning the Voyager software after adopting it—"gives Yardi a substantial market power in the Vertical Cloud Market." (*Id.*) In addition, RealPage avers that Yardi's Voyager customers "represent a substantial share of *potential* Vertical Cloud Services customers." (SACC ¶¶ 9, 75 (emphasis added).) However, as Yardi points out, "such allegations say nothing about market size, market share, or market power in the Software Market as a whole, *much less* in the Vertical Cloud Market that Yardi is purportedly attempting to monopolize." (Mot.

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**     **1229**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

at 15.) Instead, RealPage's contentions create only a tenuous inference that any market share it has in the Software Market can be imputed to its market share in the Vertical Cloud Market.

Nevertheless, "determining whether a defendant has a 'dangerous probability' of successful monopolization is a fact-sensitive inquiry, in which market share is simply one factor." *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 319 (3d Cir. 2007). Despite RealPage's flimsy contentions regarding market share, the Court finds significant RealPage's allegation that "Yardi and RealPage are the only competitors" in the Vertical Cloud Market. (SACC ¶ 105.) Moreover, RealPage has alleged multiple barriers to entry precluding other competitors from entering the market: industry-specific software expertise; trade secret information in the form of the knowledge, expertise, and technology necessary for cloud hosting specific to the property management industry, which requires substantial financial investment; market acceptance, premised on customers' trust in Vertical Cloud Service providers' knowledge and expertise; and the market's preference for established vendors. (SACC ¶¶ 31–32.) Coupled with RealPage's contentions regarding Yardi's market share in the Software Market, the Court finds that these allegations state sufficient facts to plausibly suggest a dangerous probability of success.

In addition, "dangerous probability of success" is but one element required to state an attempted monopolization claim under Section 2. As discussed above, the Court has determined that Yardi's Voyager license amendments constitute anticompetitive conduct. Thus, the Court is left to consider the "specific intent to monopolize" prong of RealPage's attempted monopolization claim. *See Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884. RealPage avers that Yardi's intent to monopolize the Vertical Cloud Market is manifested in its

> campaign of stealing trade secrets, communicating with Wall Street analysts to try and drive down the RealPage stock price, forcing changes to contract terms threatening to terminate existing license agreements threatening to communicate with its licensee's customers, conditioning its clients' ability to use [the Voyager software] on their coerced agreement not to use the RealPage Cloud, and interfering with RealPage's client relationships.

(SACC ¶ 70.) Viewed in light of RealPage's allegations that RealPage and Yardi are the only competitors to date in the Vertical Cloud Market and that significant entry barriers block new competitors from the market, the Court finds RealPage's specific intent contentions particularly compelling. Accordingly, the Court finds that RealPage has stated sufficient facts to state an attempted monopolization claim. Yardi's Motion to Dismiss RealPage's third claim is therefore **DENIED.**

**3. Exclusive Dealing Counterclaim**

Finally, Yardi contends that RealPage has failed to state a claim for exclusive dealing under Section 1 because RealPage fails to adequately allege that Yardi's amended Voyager license agreements foreclose substantial competition in the Vertical Cloud Market. Specifically, Yardi argues that RealPage's exclusive dealing claim fails as a matter of law because it "rests on the faulty premise that whatever degree of control Yardi possesses over its purportedly 'locked-in' [Voyager] software customers somehow translates into a substantial foreclosure of the Vertical Cloud Market." (Mot. at 18–19.)

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a giv-

**1230**           **852 FEDERAL SUPPLEMENT, 2d SERIES**

en good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,* 592 F.3d 991, 996 (9th Cir.2010). Because "[t]here are well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition[,] . . . an exclusive-dealing arrangement does not constitute a per se violation of section 1." *Id.* Rather, exclusive dealing arrangements are assessed under the rule of reason.

**[14]** "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to foreclose competition in a substantial share of the line of commerce affected." *Id.* (quoting *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). Substantial foreclosure of the relevant requires a showing that "the opportunities for other traders to enter into or remain in that market [are] significantly limited." *Tampa Elec. Co.,* 365 U.S. at 327, 81 S.Ct. 623.

**[15]** Thus, to state a claim for exclusive dealing in this case, RealPage must show that Yardi's Voyager license agreements precluding Voyager customers from hosting the Voyager software on any cloud service other than Yardi's Cloud Services forecloses a substantial share of the Vertical Cloud Market by significantly limiting the opportunities for other cloud service providers to enter into or remain in the Vertical Cloud Market. For the reasons discussed with respect to RealPage's attempted monopolization claim, the Court finds that RealPage has alleged sufficient facts to show that Yardi's amended Voyager license agreements could significantly limit not only RealPage's ability to remain in the Vertical Cloud Market, but also opportunities for other traders to enter the Vertical Cloud Market. While RealPage's allegations tying Yardi's market share in the Vertical Cloud Market to Yardi's market share in the Software Market alone are insufficient to establish an exclusive dealing claim, RealPage has also asserted that Yardi and RealPage are the only two participants in the Vertical Cloud Market and that several entry barriers inhibit entry into the Vertical Cloud Market. These facts are sufficient to render plausible RealPage's contention that Yardi's amended Voyager license agreements foreclose competition in a substantial share of vertical cloud services commerce. Accordingly, the Court **DENIES** Yardi's Motion with respect to RealPage's exclusive dealing claim under Section 1.

**B. INTENTIONAL INTERFERENCE WITH CONTRACT COUNTERCLAIM**

**[16, 17]** RealPage's fifth counterclaim alleges that Yardi intentionally interfered with valid contracts RealPage had with Client 1, Client 2, and other unnamed third parties. To establish a claim for intentional interference with a contract, RealPage must allege (1) a valid contract between RealPage and a third party; (2) Yardi's knowledge of this contract; (3) Yardi's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage to RealPage. *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.,* 531 F.3d 767, 774 (9th Cir.2008); *Pac. Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990). "A plaintiff need not allege an actual or inevitable *breach* of contract in order to state a claim for disruption of contractual relations"; rather, unlike the tort of inducing breach of contract, intentional interference with contractual relations requires only proof of *interference*. *Pac. Gas & Electric Co.,* 50 Cal.3d at 1129, 270 Cal.Rptr. 1, 791 P.2d 587.

**[18]** With respect to Client 1, RealPage alleges that it had an "executed, valid

**REALPAGE, INC. v. YARDI SYSTEMS, INC.**   **1231**
Cite as 852 F.Supp.2d 1215 (C.D.Cal. 2012)

and enforceable agreement" with Client 1 (the Letter Agreement); that Yardi set out to interfere with this Letter Agreement upon learning of its existence by "advising Client 1 that [Client 1] could not continue to work with RealPage ... under its existing Letter Agreement" with RealPage; that, as a result of such advisement, "Client 1 was forced to cancel the services that RealPage was providing ... under the Letter Agreement"; that "[a]bsent Yardi's interference and disruption of the contractual relationship, RealPage would have continued to perform [services for Client 1] pursuant to the Letter Agreement"; and that Yardi's interference and disruption "depriv[ed] RealPage of substantial revenue." (SACC ¶ 49.) These facts are more than sufficient to state a plausible claim for intentional interference with contractual relations as to Client 1.

[19] RealPage's assertions regarding Client 2, however, fail to meet the elements required to establish an intentional interference with contractual relations. RealPage does successfully allege that it had a "five year agreement for RealPage to host Client 2's software applications," of which Yardi was aware and attempted to interfere with by claiming that Client 2's hosting with RealPage violates Client 2's Voyager license agreement and by "mak[ing] threats to Client 2 and Client 2's customers that they will no longer be able to use Yardi's applications if they host with the RealPage Cloud." (SACC ¶ 55.) It is not so clear from RealPage's SACC, however, that there has been actual breach or actual disruption of Client 2's contractual relationship with RealPage. RealPage merely contends that, as a result of Yardi's threats, Client 2 employees that had shifted to RealPage pursuant to the five-year hosting agreement "*will need* to move back to Client 2—at great financial cost to RealPage." (*Id.* (emphasis added).) As alleged, this statement does not suggest that any actual breach or disruption already occurred, but that breach or disruption *could* occur should Yardi continue with its alleged threats. Moreover, any resulting damage at this point appears to be contingent on the Client 2 employees *actual* migration back to Client 2. Accordingly, RealPage's SACC has failed to allege sufficient facts to show that Yardi has intentionally interfered with RealPage's contractual relations with Client 2.

Finally, with respect to any as-of-yet unidentified third parties, RealPage as not pleaded sufficient facts to raise anything more than the sheer possibility that a Yardi has acted unlawfully. *See Iqbal*, 129 S.Ct. at 1949 Indeed, "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Accordingly, Yardi's Motion is **GRANTED WITH PREJUDICE** with respect to Client 2 and all unnamed third parties. However, Yardi's Motion is **DENIED** with respect to Client 1.

### C. Intentional Interference with Prospective Economic Advantage and Unfair Competition Counterclaims

Finally, Yardi urges that the Court must dismiss RealPage's sixth counterclaim for intentional interference with prospective economic advantage and seventh counterclaim for violation of California's Unfair Competition Law insofar as they rely on RealPage's insufficiently pleaded antitrust claims.[4] However, the Court has found

---

4. Yardi also contends that these counterclaims should be dismissed to the extent that they are predicated on RealPage's misappropriation of trade secrets counterclaim because the California Uniform Trade Secrets Act ("UTSA") provides the exclusive remedy for misappropriation of trade secrets and preempts other tort claims based on trade secret misappropriation. (Mot. at 24.) Because the Court finds that RealPage's tying

**1232**  852 FEDERAL SUPPLEMENT, 2d SERIES

that RealPage sufficiently pleaded a tying claim under Section 1 and the Cartwright Act. Accordingly, the Court **DENIES** Yardi's Motion to dismiss RealPage's sixth and seventh counterclaims.

### V. CONCLUSION

For the foregoing reasons, Yardi's Motion to Dismiss RealPage's Second Amended Counterclaims is **GRANTED in PART** and **DENIED in PART.** Specifically, the Court **DENIES** Yardi's Motion with respect to RealPage's second counterclaim for violation of Section 1; third counterclaim for violation of Section 2; fourth counterclaim for violation of the Cartwright Act; fifth counterclaim for intentional interference with contract, insofar as that counterclaim pertains to Client 1; sixth counterclaim for intentional interference with prospective economic advantage; and seventh counterclaim for violation of the UCL. However, the Court **GRANTS** Yardi's Motion with respect to RealPage's fifth counterclaim for intentional interference with contract, which is **DISMISSED WITH PREJUDICE** insofar as it pertains to clients other than Client 1.

**IT IS SO ORDERED.**



claims under Section 1 and the Cartwright Act survive Yardi's Motion to Dismiss, the Court does not reach the issue whether the UTSA preemption applies in this case.

Jaco VAN MAANEN, Plaintiff,

v.

**YOUTH WITH A MISSION–BISHOP; Youth With a Mission International, Inc. d/b/a YWAM Office of the Founders; University of the Nations, Inc. d/b/a YWAM–University of the Nations, and Does 1–10, Defendants.**

No. 1:10–CV–00493 AWI–JLT.

United States District Court, E.D. California.

Feb. 14, 2012.

**Background:** Plaintiff brought action against university to recover for personal injuries he sustained while using zip line during wilderness leadership training course. Plaintiff moved to strike, and university moved for summary judgment.

**Holdings:** The District Court, Anthony W. Ishii, Chief Judge, held that:

(1) university's failure to include witness in its initial disclosures was harmless;

(2) corporation that offered course was not common carrier;

(3) no university-student relationship existed between plaintiff and university;

(4) no agency relationship existed between university and non-profit corporation that offered course; and

(5) corporation that offered course was not university's ostensible agent.

Motion to strike denied; motion for summary judgment granted.

**1. Federal Civil Procedure** ⚖1278

Defendant's failure to include witness in its initial disclosures was harmless, where witness's identity, position, location,