**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| QUINTILES IMS INC. AND IMS SOFTWARE SERVICES, LTD., <br><br> Plaintiffs - Counterclaim Defendants, <br><br> v. <br><br> VEEVA SYSTEMS INC., <br><br> Defendant - Counterclaim Plaintiff. | Civil Action No.: 17-00177 (CCC) <br><br> **OPINION** |

**CECCHI, District Judge.**

### I. INTRODUCTION

This matter comes before the Court on the motion of Defendant Veeva Systems, Inc. ("Defendant") to dismiss the Complaint of Plaintiffs Quintiles IMS Inc. and IMS Software Services, Ltd. ("Plaintiffs") pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 9). The Court has given careful consideration to the submissions from each party. Pursuant to Fed. R. Civ. P. 78(b), no oral argument was heard. For the reasons that follow, Defendant's Partial Motion to Dismiss is denied.

### II. BACKGROUND

Plaintiffs describe themselves as a company that provides market research, analytics, technology, and services to life sciences, medical devices, and diagnostics and healthcare industries. (ECF No. 1 ("Cmpl.") ¶ 13). More specifically, Plaintiffs "provide clients with market research products that combine healthcare data, market research and proprietary analytics ('[Plaintiffs'] Market Research Offerings')." (*Id.* ¶ 17). Plaintiffs' Market Research Offerings are

the product of proprietary intellectual property and technology. (*Id.* ¶¶ 17-19).

One subset of Plaintiffs' Market Research Offerings is "Healthcare Professional Data" services, which gathers information from tens of thousands of sources and maintains records. (*Id.* ¶¶ 20-23). Additionally, other life sciences companies use Plaintiffs' Healthcare Professional Data for various purposes. (*Id.* ¶ 25). Because of this, Plaintiffs have "proprietary processes in place to develop and maintain the accuracy of [their] Healthcare Professional Data." (*Id.* ¶ 26).

Another subset of Plaintiffs' Market Research Offerings is "Sub-National Information" services, which includes both sales information services and prescription information services. (*Id.* ¶¶ 27-29). Plaintiffs use various specialized technologies to maintain, secure, and deliver the information provided. (*Id.* ¶¶ 34-36). Plaintiffs' Sub-National Information is also used by other life sciences companies for various purposes. (*Id.* ¶ 37).

Plaintiffs further offer "a variety of technology solutions to [their] life sciences clients," including Client Relationship Management ("CRM Application") and Master Data Management ("MDM Application"). (*Id.* ¶ 38).

> A CRM Application is a computer-based application-whether installed on client computers, third-party hosted, or available through Software-as-a-Service ("SaaS")-that helps a sales force gather and organize information about its clients to help facilitate or improve relationships and interactions with each of those clients. Companies in the life sciences industry with sales forces generally use a CRM Application . . . . An MDM Application refers to software developed to reconcile or link various records of demographic or other reference information relating to individuals, organizations, plans or products, which may have been obtained from different sources or at different times or pre-existing in a given database. An MDM Application is generally used to link information and records relating to an individual (*e.g.*, a physician) or an organization (*e.g.*, a hospital) to one client master file.

(*Id.* ¶¶ 39, 41).

Plaintiffs use confidential and proprietary information to improve their CRM and MDM Applications. (*Id.* ¶¶ 44-45). For life sciences clients who want to use Plaintiffs' Healthcare

Professional Data without these applications, Plaintiffs use third party access agreements ("TPA Agreements") to protect Plaintiffs confidential information. (*Id.* ¶ 46).

To protect Plaintiffs' Market Research Offerings around the world, Plaintiffs utilize applicable trademark, copyright, and trade secret protections, secure patent protections, use employment agreements such as non-disclosure and confidentiality agreements, employ technical restrictions to prevent theft of data, and license their Market Research Offerings to life sciences clients, subject to certain requirements and restrictions. (*Id.* ¶¶ 47-58). Additionally, Plaintiffs use TPA Agreements in order to accommodate client's requests that third parties access Plaintiffs' Market Research Offerings. (*Id.* ¶¶ 52-53). A TPA Agreement "requires the vendor to understand and acknowledge the proprietary nature of [Plaintiffs'] Market Research Offerings." (*Id.* ¶ 54).

Defendant is a competitor of Plaintiffs. (*Id.* ¶¶ 16, 59). Plaintiffs note that "[u]ntil relatively recently, [Defendant] was solely a CRM Application provider to the pharmaceutical industry in the United States . . . [but] began developing its own MDM Application technology offering in or around 2012 and began offering an MDM Application to life sciences companies in or around 2013." (*Id.* ¶ 60). Plaintiffs claim that in or around June 2013, Defendant announced:

> [I]t would . . . rely[] on a "crowdsourcing" network architecture to improve the accuracy and completeness of its healthcare professional data . . . [meaning] it would (a) obtain healthcare professional data and healthcare organizational data from life sciences clients for MDM Application services, and (b) use the data received from clients to improve its own healthcare professional data and healthcare organizational data and share the improved data with [Defendant's] clients.

(*Id.* ¶¶ 61-62).

Plaintiffs note that the aforementioned "crowdsourcing" proposal was Defendant's way of "[not] respecting the confidential and proprietary information of [Plaintiffs,]" since other life science clients relied on Plaintiffs' data. (*Id.* ¶¶ 63-64). Plaintiffs further note that the "crowdsourcing" model was "eventually" dropped; however, Defendant "maintained its cavalier

3

attitude through 2016 with regard to the proprietary nature of [Plaintiffs'] Health Care Professional Data." (*Id.* ¶ 65). Defendant made an official announcement about its own healthcare professional data offerings on or about March 24, 2015, and since that date, Defendant has added healthcare professional data offerings in multiple countries. (*Id.* ¶ 66).

Plaintiffs and Defendant have entered into more than 50 TPA Agreements since 2011. (*Id.* ¶ 68). As such, Defendant had full knowledge of the proprietary and trade secret nature of Plaintiffs' Market Research Offerings, and further knew the information was not to be used for Defendant's benefit. (*Id.* ¶¶ 70-71).

Plaintiffs claim, however, that Defendant:

> First . . . uses IMS Market Research Offerings to regularly improve and enhance its CRM and MDM Applications to gain a competitive edge over [Plaintiffs]. Second, [Defendant] uses [Plaintiffs] Healthcare Professional Data and Sub-National Information to shortcut development and maintenance of its own healthcare professional data products offered around the world. Third, [Defendant] uses [Plaintiffs'] Healthcare Professional Data and Sub-National Information to gain insight into the proprietary features and accuracy of [Plaintiffs'] Healthcare Professional Data in order to aggressively tailor its own sales and marketing tactics.

(*Id.* ¶ 73).

More specifically, Plaintiffs contend that that Defendant's engineers use Plaintiffs' Market Research Offerings to solve Defendant's own technological issues and to test Defendant's own updates and enhancements. (*Id.* ¶¶ 74-86).

Plaintiffs further contend that Defendant created its own localized healthcare professional databases around the world of strikingly similar qualities and characteristics to [Plaintiffs'] Healthcare Professional Data. (*Id.* ¶¶ 93-97). Plaintiffs note that Defendant's personnel use Plaintiffs' Healthcare Professional Data to improve Defendant's own applications and competing products. (*Id.* ¶ 99).

Additionally, Plaintiffs state that Defendant made and continues to make false and

misleading public statements about Defendant's products and Defendant's agreements with Plaintiffs. (*Id.* ¶¶ 102-18).

On May 18, 2016, one of Plaintiffs' clients informed Plaintiffs that Defendant obtained Plaintiffs' Healthcare Professional Data from the client's CRM Application. (*Id.* ¶ 119). On April 3, 2016, Defendant allegedly pulled data from that client's application. (*Id.* ¶ 120). Plaintiffs contend that Defendant "engaged in substantially similar unauthorized access . . . on multiple occasions" both before and after the aforementioned date, which damaged Plaintiffs. (*Id.* ¶¶ 124-29).

Plaintiffs argue that Defendant's actions violated the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (Count I). (*Id.* ¶¶ 130-38). Additionally, Plaintiffs maintain that Defendant's actions violated the New Jersey Trade Secrets Act, N.J.S.A. § 56:15 (Count II). (*Id.* ¶¶ 139-50). Plaintiffs claim that Defendant's actions constitute tortious interference with contract (Count III). (*Id.* ¶¶ 151-62). Plaintiffs also claim that Defendant's actions violate Section 43(A) of the Lanham Act, 15 U.S.C. § 1125(A) (Count IV).[1] Plaintiffs further contend that Defendant's actions constitute common law unfair trade practices (Count V). (*Id.* ¶¶ 163-68). Finally, Plaintiffs argue that Defendant's actions establish unjust enrichment (Count VI). (*Id.* ¶¶ 169-173).

## III.  LEGAL STANDARD

### A.  Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)

For a complaint to survive dismissal pursuant to Fed. R. Civ. P. 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, the Court must accept all well-pleaded

---

[1] Defendant does not seek to move for dismissal of Count IV.

factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Furthermore, "[a] pleading that offers 'labels and conclusions' . . . will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations omitted).

## IV. DISCUSSION

### A. Count I

Defendant contends that Count I should be dismissed because the Defend Trade Secrets Act of 2016 ("DTSA") ". . . does not have retroactive effect[,] and . . . Plaintiffs failed to plead facts that any 'act' of alleged misappropriation took place after [the] DTSA's enactment date.'" (ECF No. 10 at 4).

"[T]he DTSA, by its own terms, applies only to an act of misappropriation that 'occurs on or after the date of the enactment of this Act[,]' . . . May 11, 2016." *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 338 (D. Del. 2017) (quoting Pub. L. No. 114-153, § 2(e)). "Thus, a plaintiff states a plausible claim for relief only if [the claim] 'sufficiently alleges a prohibited 'act' occurring after May 11, 2016.'" *Id.* When a plaintiff "does not allege any acts on or after May 11, 2016 other than a conclusory allegation of continuing use and disclosure," a claim will be dismissed. *See id; c.f. Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (upholding a DTSA claim where allegations of continued use were factually specific and "contain[ed] details regarding who continued to use the trade secrets, what the trade secrets were, and under what circumstances they are continuing to be used.").

Here, Plaintiffs assert that the violations relating to this claim are ongoing and thus continued after the enactment of the DTSA. (Cmpl. ¶¶ 74-76, 79, 84, 86-87, 92, 96-99, 106-08, 118-24, 135). Plaintiffs assert that Defendant used and continues to use Plaintiffs' Market Research Offerings, Healthcare Professional Data, and Sub-National Information, and describes in detail the circumstances under which such material is used. (*See id.*). For instance, Plaintiffs proclaim that Defendant has and is still trying "to expand [its] unauthorized access to [Plaintiffs'] Healthcare Professional Data and continue its scheme of misappropriating [Plaintiffs'] Healthcare Professional Data and exploiting permissible uses under . . . TPA Agreements to improperly build [its own applications and healthcare professional data products] from country to country." (*Id.* at ¶ 97). "[New Jersey] [c]ourts have held that allegations of pre-enactment acquisition of a trade secret coupled with post-enactment continued use are sufficient to sustain a claim under the Defend Trade Secrets Act at the motion to dismiss phase." *Marimar Textiles, Inc. v. Jude Clothing & Accessories Corp.*, No. 17-2900, 2017 WL 4391748, at *6 (D.N.J. Oct. 2, 2017). Accordingly, dismissal of Count I is not warranted based on a non-retroactivity argument, and the Court will not dismiss Plaintiffs' claim.

**B.    Counts II, III, V, and VI**

    **1.    Choice of Law Argument**

Defendant contends that Counts II, III, V, and VI should be dismissed because choice of law rules in this case maintain that California law governs over New Jersey law. (ECF No. 10 at 6).

At the motion to dismiss stage, "it can be inappropriate or impossible for a court to conduct [a choice of law] analysis . . . when little or no discovery has taken place." *In re Samsung DLP Television Class Action Litig.*, No. 07-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009).

However, "[s]ome choice of law issues may not require a full factual record and may be amenable to resolution on a motion to dismiss." *Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 491 (D.N.J. 2009). Courts' threshold inquiry in determining whether a choice of law analysis is appropriate at the motion to dismiss stage is therefore "whether the choice of law issues require a full factual record or not. The factual record may be sufficient for certain choice of law determinations but not others. As such, the Court will conduct a threshold choice of law analysis for each issue, and determine whether additional discovery is necessary to conclude the analysis." *Rapid Models & Prototypes, Inc. v. Innovated Solutions*, 71 F. Supp. 3d 492, 499 (D.N.J. 2014) (citations omitted).

Here, California enacted different language than New Jersey did in its version of the Uniform Trade Secrets Act ("UTSA"). (ECF No. 10 at 10; Cal. Civ. Code § 3426; N.J.S.A. § 56:15). Plaintiffs, however, do not appear to contest that there is a conflict. Rather, Plaintiffs argue that the Court's choice of law analysis is premature at the motion to dismiss stage because Plaintiffs need discovery to determine "the location of the full extent of [Defendant's] illicit conduct." (ECF No. 23 at 27). In determining the choice of law for trade secret cases, the place of alleged misappropriation is controlling. *See* Restatement (Second) of Conflict of Laws § 145 (1971). Therefore, information such as that requested by Plaintiffs is relevant to a choice of law analysis for which discovery is required. Accordingly, dismissal of Counts II, III, V, and VI is not warranted based on a choice of law argument, and the Court will not dismiss Plaintiffs' claims.[2]

### 2. Statute of Limitations Argument

Defendant additionally contends that Plaintiffs' claim under the New Jersey Trade Secrets

---

[2] Because Defendant's "inevitable disclosure" argument is dependent on a choice of law analysis, the Court need not analyze the argument at this stage.

8

Act is time barred pursuant to the statute of limitations set forth for misappropriation claims under the UTSA. (ECF No. 10 at 13).

Under the UTSA as adopted in New Jersey, "an action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." N.J.S.A. § 56:15-8. For statute of limitation purposes, "continuing misappropriation constitutes a single claim." *See id.* Courts have held that a misappropriation claim will not be time-barred based on public statements a defendant made when a defendant cannot "show how the public statements related to [the] proprietary technology" that is the ultimate subject of the claim. *See Capricorn Pharma, Inc. v. Matrixx Initiatives, Inc.*, No. 08-873, 2009 WL 2567022, at *5 (D. Del. Aug. 19, 2009) (citations omitted).

Here, Plaintiffs filed the Complaint on January 10, 2017. (Cmpl.). Defendant argues that Plaintiffs, however, were on "inquiry notice" in mid-2013, more than three years before the claim was brought. (ECF No. 10 at 17). Defendant contends that the inquiry notice was based on Plaintiffs' admission in the Complaint itself[3] that Defendant publicly announced a proposal to gather data through a "crowdsourcing" method. (*See id.*; *see also* Cmpl. ¶ 61-62).

Ultimately, Plaintiffs allege that Defendant misappropriated Plaintiffs' trade secrets in three materially different ways: (1) Defendant used Plaintiffs' Market Research Offerings to improve Defendant's own applications; (2) Defendant used Plaintiffs' Healthcare Professional

---

[3] "[A] limitations defense [may] be raised by a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Perez v. JPMorgan Chase Bank, N.A.*, No. 14-2279, 2016 WL 816752, at *3 (D.N.J. Feb. 29, 2016), *appeal dismissed* (June 6, 2016) (quoting *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002)). A court will "consider[] . . . limitations defenses only where the bar is apparent on the face of the Complaint and the documents attached thereto." *Id.* Therefore, because here the bar is based on allegations pled by Plaintiffs' in the Complaint, the Court considers the defense.

Data and Sub-National Information to bypass the typical timeline and process for developing Defendant's own healthcare professional data products; and (3) Defendant used Plaintiffs' Healthcare Professional Data and Sub-National Information to style Defendant's own advertising and sales techniques. (Cmpl. ¶ 73, 76, 80-87, 93, 118-24). These three methods of misappropriation differ from what Plaintiffs claim the "crowdsourcing" method was meant to do. Plaintiffs note that the "crowdsourcing" plan was not implemented, that they did not assert that "crowdsourcing" was a misappropriation, and that their "claims are based on materially different improper conduct." (ECF No. 23 at 3). Thus, at this stage of the proceeding, Plaintiffs have sufficiently alleged a claim under the New Jersey Trade Secrets Act. Accordingly, dismissal of Count II is not warranted based on a statute of limitations argument, and the Court will not dismiss Plaintiffs' claim.

### 3. Failure to Plead Argument

Defendant further contends that "Plaintiffs fail to plead plausible facts to support" Plaintiffs' claim under the New Jersey Trade Secrets Act. (ECF No. 10 at 18).

"A misappropriation of trade secrets claim is not subject to a heightened pleading requirement." *IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *7 (D.N.J. Sept. 13, 2012). For such a claim to go forward at the motion to dismiss stage, "[p]laintiffs 'need not make specific allegations as to exactly how [d]efendants used or disclosed [p]laintiff's trade secrets . . . and [p]laintiff[s are] entitled to seek discovery to support [their] allegations setting forth a prima facie claim.'" *See Chubb Ina Holdings Inc. v. Chang*, No. 16-2354, 2017 WL 499682, at *10 (D.N.J. Feb. 7, 2017) (quoting *Osteotech, Inc. v. Biologic*, 2008 WL 686318, at *5 (D.N.J. Mar. 7, 2008)). Under New Jersey law, a claim for trade secret misappropriation simply

requires pleading the existence of a trade secret and misappropriation of the trade secret. *See* N.J.S.A. § 56:15.

Here, as aforementioned, Plaintiffs note that their Market Research Offerings, Healthcare Professional Data, and Sub-National Information are proprietary, and Plaintiffs describe how Defendant allegedly used and continues to use such information for Defendant's own benefit. (Cmpl. ¶¶ 47-58, 74-129, 135). The Court therefore finds that Plaintiffs pled plausible facts to support a theft of trade secrets claim. Accordingly, dismissal of Count II is not warranted based on a failure to plead argument, and the Court will not dismiss Plaintiffs' claim.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Partial Motion to Dismiss is denied. An appropriate Order follows this Opinion.

DATED: October 25, 2017

_____
**CLAIRE C. CECCHI, U.S.D.J.**