NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IQVIA INC., et al.,<br><br>        Plaintiffs - Counterclaim Defendants,<br><br>v.<br><br>VEEVA SYSTEMS INC.,<br><br>        Defendant - Counterclaim Plaintiff. | Civil Action No.: 17-00177 (CCC)<br><br>OPINION |

**CECCHI, District Judge.**

## I. INTRODUCTION

This matter comes before the Court on Plaintiff and Counterclaim Defendant IQVIA Inc.'s ("IQVIA") Motion to Dismiss Defendant and Counterclaim Plaintiff Veeva Systems Inc.'s ("Veeva") Counterclaims pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 44). The Court has given careful consideration to the submissions from each party. Oral Argument was heard on April 20, 2018. (ECF No. 140 ("Tr.")). For the reasons that follow, IQVIA's Motion to Dismiss is denied.

## II. BACKGROUND

Veeva is a publicly traded information and technology services company that provides software solutions for the life sciences industry. (ECF No. 12 at 26). More specifically, Veeva offers software related to customer relationship management ("CRM"), reference data ("Reference Data"), enterprise content management, and master data management ("MDM"). (*Id.*).

IQVIA is a large pharmaceutical data and analytics company. (*Id.* at 28). IQVIA and Veeva compete in the relevant markets for CRM, Reference Data, and MDM, which each provide different services and benefits to customers. (*Id.*). More specifically, CRM "enables a broad range of industry-specific functions such as drug sample tracking with electronic signature capture, healthcare affiliations management, and the ability to conduct interactive, rich media demonstrations with physicians on a mobile device, with or without an Internet connection." (*Id.*

at 26). Reference Data consists of "information regarding doctors, hospitals, and other medical professionals and organizations. Reference Data datasets generally include the names and contact information for professionals as well as complex, overlapping affiliations of those professionals to clinics, hospitals, and other organizations." (*Id.* at 31). MDM "enables life sciences companies to create, consolidate, maintain, steward, and share data that drives life sciences companies' sales and marketing operations." (*Id.* at 26-27).

According to Veeva, IQVIA is the largest company of its kind in the world. (*Id.* at 28). With respect to Reference Data, Veeva maintains that IQVIA has substantial market power and that it maintains at least 70% market share in the United States. (*Id.* at 32-33). Veeva does not indicate the strength of IQVIA's market power or the percentage of IQVIA's market share with respect to CRM or MDM, but does allege that IQVIA maintains a monopoly of sales data ("Sales Data")[1] in holding an 80% share of the U.S. market. (*Id.* at 33-35). Reference Data and Sales Data are utilized by IQVIA and Veeva's software, which organizes, automates, and synchronizes such data in a way that is useful for its customers. (*Id.* at 33-38). Veeva does not generate its own Sales Data. (*Id.* at 35).

Veeva alleges that IQVIA has "used mergers and anticompetitive conduct" to gain its dominant position in the aforementioned markets. (ECF No. 51 at 2). For instance, in 2014, IQVIA acquired Cegedim, a former competitor of IQVIA. (ECF No. 12 at 38). Additionally, Veeva contends that IQVIA has a partnership with Reltio, Inc., and "offers Reltio's MDM software as part of [IQVIA]'s . . . integrated software suite[.]" (*Id.* at 37). Veeva therefore also "competes directly with the [IQVIA]-Reltio joint venture with [Veeva's] MDM product[.]" (*Id.* at 38).

---

[1] *See supra* n.1.

Although IQVIA and Veeva are competitors, they have engaged in a professional relationship in the past. That is, in 2013-2014, IQVIA and Veeva entered into a Third-Party Access Agreement (the "TPA Agreement"), which gave Veeva's software access to IQVIA's Sales Data and Reference Data. (*Id.* at 40-41). Thereafter, Veeva alleges that IQVIA abruptly terminated the TPA Agreement. (*Id.*). According to Veeva, Cegedim subsequently followed suit, "refusing to sign any TPA Agreement that did not explicitly exclude Veeva MDM products and sending letters to customers informing them of Cegedim's new position." (*Id.* at 41). Veeva describes Cegedim's actions as "the beginning of [IQVIA]'s strategy to maintain its [R]eference [D]ata monopoly and monopolize MDM by using increasingly restrictive TPA [Agreement] policies to block customers from using Veeva Reference Data and MDM." (ECF No. 51 at 4).

Veeva contends that IQVIA continues to refuse to sign TPA Agreements with Veeva, which: (1) impedes Veeva's ability to compete in the CRM, Reference Data, and MDM markets; (2) interferes with life science companies' decisions to purchase Veeva's software; (3) inhibits Veeva's customers from using Veeva's software; and (4) otherwise negatively impacts the market and its participants. (ECF No. 12 at 52-53). Veeva also asserts that IQVIA hinders customers from using Veeva's MDM solution in other manners, (*id.* at 48-49), and that IQVIA threatens life sciences companies that try to switch to Veeva's MDM software. (*Id.* at 50-52).

On March 13, 2017, Veeva brought nine Counterclaims against IQVIA alleging violations of the Sherman Act, California statutory law, and common law. On May 3, 2017, IQVIA filed the pending Motion to Dismiss Veeva's Counterclaims.

## III. LEGAL STANDARD

### A. IQVIA's Motion to Dismiss Pursuant to Rule 12(b)(6)

For a complaint to survive dismissal pursuant to Fed. R. Civ. P. 12(b)(6), it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

3

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Furthermore, "[a] pleading that offers 'labels and conclusions' . . . will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations omitted).

## IV. DISCUSSION

### A. Veeva's Claims Under Section II of the Sherman Act (15 U.S.C. § 2)

#### 1. Count II

IQVIA asserts that Count II for attempted monopolization should be dismissed because the conduct that Veeva alleges is not prohibited under the Sherman Act, and because Veeva does not plead a dangerous probability of success. (ECF No. 45 at 11). Section II of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

At the motion to dismiss stage for an attempted monopolization claim, a party must plead: "(1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power." *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010). To show anticompetitive conduct, a plaintiff must allege that a defendant "exclude[d] rivals on some basis other than efficiency . . . or [that] it compete[d] 'on some basis other than the merits.'" *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *see*

4

also *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003). "To show a dangerous probability of achieving monopoly power, a plaintiff must define 'the relevant market and examin[e] . . . market power.'" *Fid. Eatontown, LLC v. Excellency Enter., LLC*, No. 16-3899, 2017 WL 2691417, at *3 (D.N.J. June 22, 2017) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

Here, Veeva claims that IQVIA "specifically intend[s] to monopolize the global Life Sciences MDM Software market." (ECF No. 12 at 54). Veeva also contends that IQVIA carries out an "array of anticompetitive conduct that lacks any legitimate business justification." (*Id.*). For instance, Veeva alleges that IQVIA "leverages its data licenses to prevent customers from using products made by [Veeva]," that IQVIA's "licensing terms reduce choice, raise customer costs, and exclude [Veeva] from the market . . . [and that IQVIA] also avoids competition on the merits by 'preventing [customers] from taking actions that could increase [Veeva's] . . . usage.'" (ECF No. 51 at 10). Moreover, Veeva claims that IQVIA "abruptly" terminated a TPA Agreement with Veeva that "Veeva understood and expected to cover . . . Veeva's fledgling MDM product." (ECF No. 12 at 40-41). While IQVIA argues that a "refusal to deal" with rivals is not prohibited under the Sherman Act, courts have held that it is anticompetitive when there is an "inference that [a] monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *See Aspen Skiing Co.*, 472 U.S. at 610; *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004). Such an inference has been found where there is a "unilateral termination of a voluntary (and thus presumably profitable) course of dealing [which] suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *See Mylan Pharm. v. Celgene Corp.*, No. 14-2094, 2014 WL 12810322, at *4 (D.N.J. Dec. 23, 2014) (citing *Trinko*, 540 U.S. at 409); *see also BroadCom Corp. v. Qualcomm Incorp.*, 501 F.3d 297, 316 (3d Cir. 2007) ("[T]he decision of a defendant . . . to terminate a voluntary agreement

with a small rival evidenced the defendant's willingness to forego short-run profits for anticompetitive purposes.").

While IQVIA argues that it does not charge for TPA Agreements, and that therefore any TPA Agreement that IQVIA terminates cannot result in the relinquishment of short-term profits, (Tr. at 53-55), as noted above, courts have held that voluntary agreements are presumably profitable. *See Trinko*, 540 U.S. at 409; *see also In Re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2007). Moreover, IQVIA does charge for subscriptions to its MDM software, and TPA Agreements are prerequisites to such subscriptions. (Tr. at 55-56, 59-60). In addition, termination of a voluntary agreement and the willingness to forsake short-term profits are not necessary elements of proving anticompetitive conduct. *See Mylan Pharm.*, 2014 WL 12810322 at *6. Such conduct may be proved using other factors, such as by showing that a defendant was "in the business of providing a service to certain customers . . . and refused to provide the same service to certain other customers." *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 371, 377-79 (1973); *see also Mylan Pharm.*, 2014 WL 12810322 at *6 (allowing the case to proceed to discovery when the plaintiff pleaded that the defendant provided its product to certain "organizations, but refuse[d] to sell to [the plaintiff] because of its anticompetitive goals"). Here, Veeva notes that IQVIA executes TPA Agreements to be used with life sciences companies, but "has stated to multiple customers that it categorically refuses to allow its data to be used with Veeva's Network MDM." (ECF No. 12 at 30-31, 44, 48). As such, Veeva has sufficiently pleaded that IQVIA has engaged in anticompetitive conduct.

Veeva further asserts that "[IQVIA] ha[s] a dangerous probability of achieving monopoly power in the worldwide Life Sciences MDM Software market." (*Id.* at 54-55). While IQVIA argues that Veeva's claim should be dismissed because it ignores market share, a plaintiff need

not identify a defendant's specific market share in order for an attempted monopolization claim to go forward. *See Fid. Eatontown, LLC*, 2017 WL 2691417 at *4. Instead, a plaintiff can demonstrate a dangerous probability of achieving monopoly power by showing "anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand . . . ." *See id.* (internal citations omitted). Veeva notes a variety of these factors. Specifically, Veeva alleges that IQVIA "has impeded Veeva's ability to compete in . . . relevant markets and interfered with multiple life sciences companies' decisions to purchase Veeva's . . . products." (ECF No. 12 at 52-53). Veeva also contends that IQVIA "reduce[d] the quality of the available solutions in [the MDM] market" and that "potential new entrants to the market face extensive technological and regulatory compliance requirements and high capital costs, among other barriers to entry." (*Id.* at 53-55). Additionally, Veeva asserts that "by 2018, 40% of . . . customers will demand solutions that embed master data management capabilities." (*Id.* at 37). As such, at this stage of the proceedings, Veeva has sufficiently alleged an attempted monopolization claim. Accordingly, dismissal of Count II is not warranted.

    2.    **Count V**

IQVIA contends that Count V for monopoly leveraging in violation of Section II of the Sherman Act should be dismissed for the same aforementioned reasons that IQVIA contends Count II for attempted monopolization should be dismissed. (ECF No. 45 at 18).

"[I]n order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206 (3d Cir. 1992). The necessary elements of a leveraged monopoly claim are that a party has a monopoly in one area, uses unlawful acts to leverage that monopoly into another area, and achieves or is likely to achieve that second monopoly. *See Hewlett-Packard Co. v. Arch Assocs. Corp.*, 908 F. Supp. 265, 272 (E.D. Pa. 1995).

7

First, Veeva notes that IQVIA holds "at least an 80% share of the US [Sales Data] market," and "at least a 70% market share of the Reference Data market in the United States." (ECF No. 12 at 32-35). Second, Veeva asserts that IQVIA uses "its market power in the related Life Science Sales Data and Reference Data markets to block Veeva from competing in the Life Sciences MDM Software market." (*Id.* at 57-58). Veeva describes the acts that IQVIA undertakes to leverage its Sales Data and Reference Data monopoly into the MDM market, such as refusing to negotiate in good faith, abusing "the TPA Agreement process for customers who seek to switch from [IQVIA] Reference Data to Veeva," and generally deterring customers who attempt to switch from IQVIA to Veeva. (*Id.* at 44, 46, 48). Veeva further alleges that "[m]any other life sciences companies around the world [are] blocked entirely from using Veeva's MDM solution [due to IQVIA's actions]." (*Id.* at 45). For the reasons enumerated above, Veeva has sufficiently pleaded a dangerous probability of success in monopolizing the MDM market. As such, at this stage of the proceedings, Veeva has sufficiently alleged a monopoly leveraging claim. Accordingly, dismissal of Count V is not warranted.

### 3. Count I

IQVIA asserts that Count I for monopoly maintenance should be dismissed because IQVIA had no duty to assist Veeva by providing access to its data. (ECF No. 45 at 20).

At the motion to dismiss stage for a monopoly maintenance claim, a party must plead: "(1) possession of monopoly power and (2) '. . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *See United States v. Dentsply Int'l*, 399 F.3d 181, 186 (3d Cir.2005) (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992)).

Here, as aforementioned, Veeva has alleged that IQVIA possesses monopoly power, and has also asserted that IQVIA maintains that power via unlawful means. As such, at this stage of

8

the proceedings, Veeva has sufficiently alleged a monopoly maintenance claim. Accordingly, dismissal of Count I is not warranted.

### B. Veeva's Claims Under Section I of the Sherman Act (15 U.S.C. § 1)

#### 1. Count IV

IQVIA asserts that Count IV asserting a group boycott claim should be dismissed because Veeva did not plead a substantive allegation of an agreement to boycott. (ECF No. 45 at 22).

Section I of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared illegal." 15 U.S.C. § 1. An antitrust plaintiff must meet two essential requirements. "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (quoting *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008)). Second, "'the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.'" *Id.*

Certain types of restraints on trade, such as group boycotts, are analyzed using a *per se* standard. *See Ins. Brokerage*, 618 F.3d at 316 ("[A] *per se* rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.' In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found."); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 222 (3d Cir. 2011) (noting that "group boycotts are *per se* violations of the Sherman Act") (internal citations omitted)). "*[P]er se* boycott cases usually contain three elements: 'denial of something a competitor needs to compete effectively, defendants with a dominant position in the relevant market, and the absence of any plausible contention that the challenged behavior would 'enhance overall efficiency and make markets more competitive.'"" *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 463 (3d Cir. 1998).

9

A Section I group boycott claim "need not necessarily possess all of these traits to merit *per se* treatment;" it may be based on circumstantial evidence such as "descriptions of parallel conduct[,] and not on any independent allegation of actual agreement." *See id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). Plaintiffs, however, "must allege additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" *Twombly*, 550 U.S. at 552. Such additional facts, known as "plus factors," include: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *See Ins. Brokerage*, 618 F.3d at 322 (internal citations omitted).

Here, Veeva alleges that IQVIA was a party to a group boycott conspiracy with Cegedim. (ECF No. 12 at 42). Veeva declares that the group boycott "den[ied] Veeva access to a supply of product, a facility, or a market or service necessary for [Veeva] to compete effectively," and that IQVIA had a dominant position. (*Id.* at 28, 57). Veeva further asserts that IQVIA and Cegedim engaged in parallel conduct. Veeva contends that IQVIA and Cegedim had a "coordinated campaign . . . to categorically deny Veeva access to the MDM market." (*Id.* at 42). For instance, Veeva notes that after the IQVIA-Cegedim merger was announced, but before it transpired, IQVIA "abruptly renounced the negotiated form TPA Agreement, and refused to allow any future customer to use [IQVIA] Reference Data in Veeva's MDM." (*Id.* at 40-41; ECF No. 51 at 26). Additionally, Veeva states that though "IQVIA and Cegedim were direct competitors," prior to merging, "Cegedim began an identical course of conduct in concert with [IQVIA]." (ECF No. 12 at 41, 57). Specifically, "Cegedim explicitly changed positions, refus[ed] to sign any TPA Agreement that did not explicitly exclude Veeva MDM products . . . [and] coerce[d] existing customers . . . to sign amendments to their valid existing TPA Agreements to preclude Veeva

10

MDM access." (ECF No. 12 at 41). It does not appear to the Court that a pending merger establishes either a motive to enter a price fixing conspiracy or a conspiracy itself, as a merger can constitute rational business conduct. It does, however, appear to the Court that pre-merger coordination between companies that were previously "direct competitors," involving a dramatic and simultaneous change in conduct, may be evidence of behavior against interest. As such, at this stage of the proceedings, Veeva has sufficiently alleged a *per se* group boycott claim. Accordingly, dismissal of Count IV is not warranted.

### 2. Count III

Furthermore, IQVIA proclaims that Count III for an agreement in restraint of trade in violation of Section I of the Sherman Act should be dismissed because "Veeva [did] not raise a plausible inference that there is a Section I violation." (ECF No. 45 at 24).

Horizontal agreements in restraint of trade are analyzed using a *per se* standard. *See Ins. Brokerage*, 618 F.3d at 316 (citing *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)) (noting that "horizontal agreements among competitors to fix prices or to divide markets" are subject to the *per se* standard). "A horizontal restraint stems from an agreement 'among competitors at the same level of distribution.'" *Brunson Comm'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 567 (E.D. Pa. 2002) (quoting *Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617, 654 (E.D. Pa. 1997)). Courts have considered horizontal agreements resulting in "price fixing, tying arrangements, reciprocal dealing agreements and resale price maintenance to be *per se* unreasonable restraints of trade." *See Brunson Commc'ns, Inc.*, 239 F. Supp. 2d at 565 (citing *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 (3d Cir.1979)). A *per se* standard should not be used to analyze conduct that does not fall into one of these enumerated categories. *See Brunson Commc'ns, Inc.*, 239 F. Supp. 2d at 565 (noting that where challenged action does

not fall into one of these categories, the court's inquiry must instead be guided by the rule of reason standard).

Here, Veeva alleges that the IQVIA-Reltio partnership is a *per se* illegal horizontal agreement. (ECF No. 51 at 30). Veeva contends that the IQVIA-Reltio partnership is part of IQVIA's "anticompetitive scheme to prevent Veeva and other bona fide competitors from offering MDM software solutions to life sciences companies." (ECF No. 12 at 37). Veeva further alleges that IQVIA's "anticompetitive conduct . . . lacks any legitimate business justification" and that IQVIA "and Reltio have agreed to, and specifically intend to, monopolize the global Life Sciences MDM Software market and otherwise restrain fair competition therein." (*Id.* at 55-56). More specifically, Veeva maintains that IQVIA:

> has sought to block Veeva from any third-party access to [IQVIA's] Sales Data or Reference Data for use in Veeva's MDM product, and sought to cut off the ability of Veeva to provide MDM Software services by other means. At the same time, [IQVIA] and Reltio have entered into an exclusive agreement whereby [IQVIA] would steer data customers to Reltio MDM Software.

(*Id.*). As such, at this stage of the proceedings, Veeva has sufficiently alleged a *per se* agreement in restraint of trade claim. Accordingly, dismissal of Count III is not warranted.

### C. Veeva's State Law and Common Law Claims

IQVIA contends that Counts VI, VII, VIII, and IX require the Court to preliminarily engage in a choice of law analysis. (ECF No. 45 at 28). As stated in this Court's October 26, 2017 opinion, "[a]t the motion to dismiss stage, it can be inappropriate or impossible for a court to conduct [a choice of law] analysis . . . when little or no discovery has taken place." *In re Samsung DLP Television Class Action Litig.*, No. 07-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009). (ECF No. 90 at 7-8). Here, as in the Court's prior opinion, the Court finds that discovery is required

in order to engage in a choice of law analysis. Accordingly, dismissal of Counts VI, VII, VIII, and IX is not warranted.[2]

## V. CONCLUSION

For the foregoing reasons, IQVIA's Motion to Dismiss is denied. An appropriate Order follows this Opinion.

DATED: October 3, 2018

Claire C. Cecchi, U.S.D.J.

---

[2] The Court will defer ruling on the substance of Veeva's state and common law claims pending a decision on whether California law applies.