## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IQVIA, INC. and IMS SOFTWARE
SERVICES, LTD,

        Plaintiffs/ Counterclaim Defendants,

vs.

VEEVA SYSTEMS, INC.,

        Defendant/ Counterclaim Plaintiff.

Case No.: 2:17-CV-00177-CCC-MF

**ORDER & OPINION OF THE SPECIAL
MASTER**

This matter comes before the Special Master on Plaintiffs-Counterclaim Defendants
IQVIA, Inc. and IMS Software Services, LTD, (collectively "IQVIA") motion to compel
Defendant-Counterclaim Plaintiff Veeva Systems, Inc. ("Veeva") to provide responses to
IQVIA's second set of document requests and Veeva's cross-motion for a protective order. After
considering the submissions of the parties, based upon the following, it is the opinion of the
Special Master that IQVIA's motion to compel Veeva to provide responses to IQVIA's second
set of document requests in **GRANTED in part** and **DENIED in part** and that Veeva's cross-
motion for a protective order in **DENIED**.

## DISCUSSION

**I.**    **Veeva's Cross-Motion For A Discovery Protective Order**

    **A. Discovery Protective Order Standard**

Federal Rule of Civil Procedure 26(c) governs motions seeking the entry of a protective
order. Pursuant to Rule 26(c), "[a] party or person from whom discovery is sought may move for
a protective order in the court where the action is pending" and [t]he court may, for good cause,

1

issue an order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense[.]" For example, where good cause is shown, the court may forbid the disclosure or discovery, see Rule 26(c)(1)(A), or forbid inquiry into certain matters or limit the scope of disclosure or discovery to certain matters. See Rule 26(c)(1)(D).

It is well established that the party seeking entry of a protective order bears the burden of demonstrating that good cause exists for the order of protection. *Pansy v. Borough of Stroudsburg*, 22 F.3d 772, 786 (3d Cir. 1994). "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984). Further, the injury claimed "must be shown with specificity." *Id.*; *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001) (finding that [i]n delineating the injury to be prevented, specificity is essential.") "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning," are insufficient to establish good cause. *Cipollone v. Ligget Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986), cert. denied, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987).

"In considering whether good cause exists for a protective order, the federal courts have generally adopted a balancing process." *Pansy*, 23 F.3d at 787. Under this process, the court "must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled. When the risk of harm ... outweighs the need for discovery, disclosure [through discovery] cannot be compelled[.]" *Id.* (internal quotation marks and citation omitted). Nondisclosure in total is an "infrequent result." *Id.* (internal quotation marks and citation omitted). Instead, the issue usually becomes whether disclosure should be made in a specified way. In determining whether good cause exists to limit disclosure, as permitted by Rule 26(c)(1)(D) and other provisions of Rule 26(c)(1), the court again balances the harm to the party

or third persons seeking protection against the importance of disclosure to the public or the party seeking same. *Id.* The Court always has discretion to issue a protective order limiting discovery under Rule 26(c) when there is good cause to do so.

### B. The Parties' Arguments

IQVIA argues that the best evidence of how Veeva's technology applications and data have been improved through use of IQVIA's trade secrets is a review of certain digital evidence or fingerprints contained within relevant Veeva computer programs and applications or in shared file repositories. IQVIA believes a review of the technology applications such as source code repository and forensic artifacts will show the development of Veeva's software, changes made to Veeva's software, when those changes were made, who made those changes, and why the changes were made. IQVIA believes this information will allow a judge and jury to see the changes made as compared with Veeva's alleged acts of theft. IQVIA argues that Veeva's assertion that it will search custodial files for the requested information is meaningless as 23 of the 25 custodians are clearly not involved in software development and not the individuals who worked on creating or changing Veeva software. IQVIA argues that the best direct evidence of what Veeva has done to its software products will be found in the tools that are specifically designed to track software development.

IQVIA also argues that its requests are relevant and proportional to its claims of misappropriation. IQVIA argues that Veeva cannot block legitimate discovery by arguing that IQVIA must first prove what it will obtain through discovery. IQVIA argues that Judge Cecchi found that IQVIA stated a valid claim for trade secret misappropriation and that it need not specify the exact information it believes it will find in order to obtain discovery.

IQVIA further argues that any burden argument propounded by Veeva is of its own making and that Veeva's sincerity of intention should be judged in light of its actions over the past year of attempting to avoid producing relevant documents. IQVIA further argues that Veeva has refused to meet and confer with IQVIA on the deficiencies raised.

Veeva argues that IQVIA's requests for production are too extreme, disproportionate, invasive, and burdensome and it cross-moves for a protective order so that discovery boundaries can be determined. Veeva argues that it needs a protective order to prevent IQVIA from reviewing Veeva's entire software development history and thousands of employees' technical files without any basis. Veeva argues that it needs a detailed identification of specific, discrete, asserted trade secrets that the parties and court can use to set discovery boundaries. Thus Veeva argues that it is time for IQVIA to respond to Veeva's July 2017 interrogatories and identify discrete and specific asserted trade secrets. Therefore, Veeva requests that as part of the protective order, the Special Master require IQVIA to (1) answer Veeva's Interrogatory 14, served in July 2017, thereby reestablishing rational discovery boundaries tied thereto; and (2) preclude discovery on three of IQVIA's extremely overbroad and unduly burdensome RFPs and limit 24 to custodial sources. Veeva argues it is time for the proportion Rule 26 requires. Veeva argues that without a protective order, the problem that so many courts have identified will come true: IQVIA seeks a fishing expedition into Veeva's entire business operations, with no identification of specific, discrete asserted trade secrets to provide proper discovery boundaries.

In response to Veeva's motion for a protective order, IQVIA argues that Veeva is now, for the seventh time, asking that IQVIA's discovery be blocked until IQVIA further identifies its trade secrets. IQVIA argues that Veeva well knows that its Market Research Offerings are its trade secrets at issue. IQVIA also argues that the case law cited by Veeva concern situations

where a plaintiff seeks discovery of the defendant's trade secrets. IQVIA argues that it is seeking information on how Veeva, the defendant, used IQVIA's trade secrets. IQVIA argues that courts have recognized that how a defendant used a plaintiff's trade secrets is information uniquely within a defendant's possession.

### C.  Special Master's Opinion

The Special Master finds that good cause does not exist to support entry of Veeva's requested protective order. In reaching this conclusion, the Special Master notes that while several district courts around the country have required that alleged trade secrets be identified with reasonable particularity, there is no such prerequisite in this District. Unless there is a heightened pleading requirement, the Federal Rules of Civil Procedure do not require a plaintiff to plead all relevant facts in detail and generally do not require a plaintiff to provide specific information about trade secrets at the outset of litigation. See *Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. CIV 09-3125 FLW (D.N.J. Feb. 28, 2011) *Floorgraphics, Inc. v. New Am. Mktg. In-Store Servs., Inc.*, No. CIV 04-3500 AET, 2006 WL 2846268, at *1 (D.N.J. Sept. 29, 2006), *modified on reconsideration sub nom. Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, No. CIV.04 3500 AET, 2007 WL 1101445 (D.N.J. Apr. 11, 2007). Here, Judge Checci has already determined that IQVIA pled plausible facts to support a theft of trade secret claim. See *Quintiles IMS Inc. v. Veeva Systems Inc.*, No. CIV 17-00177 CCC (October 26, 2017). Thus Veeva cannot impede relevant discovery by first requiring IQVIA to identify with precision and specificity each and every alleged trade secret of IQVIA that IQVIA alleges Veeva misappropriated.

Furthermore, the Special Master finds that Veeva has not shown with specificity that disclosure of the information sought by IQVIA will cause Veeva a clearly defined and serious injury as needed for the issuance of a broad protective order. The Special Master has reviewed

IQVIA's second set of document requests and has modified those requests described herein as necessary for the protection of Veeva pursuant to the rules of discovery.

## II.  Objections to the Declarations of Jeff C. Parmet and Hunter McMahon

### A. The Parties' Arguments

In support of its motion to compel, IQVIA submitted Declarations from Jeff Parmet and Hunter McMahon to help explain why forensic computer discovery it relevant to assessing Veeva's use of IQVIA data. Veeva objects to these Declarations arguing that the opinions expressed therein lack the methodological rigor required for expert opinions. Veeva argues that Mr. Parmet and Mr. McMachon speculate about what discovery could possibly show if IQVIA is allowed to review vast sets of technical discovery from Veeva.

Veeva argues that the Declarations do not meet the requirements of Federal Rule of Evidence 702, which governs the admissibility of expert opinion. Veeva also argues that both Mr. Parmet and Mr. McMachon assume facts not in evidence in violation of Rule 703. Veeva further argues that Mr. Parmet and Mr. McMachon do not qualify as fact witnesses under Rule 602 or lay witnesses under Rule 701. In sum, Veeva argues that Mr. Parmet and Mr. McMachon lack personal knowledge, assume facts that have not been established, and fail to consider highly pertinent information, each of which it argues is grounds to reject consideration of their testimony. Veeva therefore requests that the Special Master sustain Veeva's objections and decline to consider the Declarations of Mr. Parmet and Mr. McMachon.

IQVIA argues that the Declarations of Mr. Parmet and Mr. McMachon are relevant to help explain why forensic computer discovery is needed to assess Veeva's use of IQVIA data. IQVIA argues that Mr. Parmet and Mr. McMachon have not submitted expert reports but rather explained the type of discovery they need in order to formulate opinions and then draft expert

reports. IQVIA argues that the use of experts to assist in explaining the relevancy of discovery is not subject to *Daubert* like scrutiny.

### B. Special Master's Opinion

Federal Rule of Evidence 702 governs the admissibility of expert testimony, providing:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, expert testimony will be admissible only if it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "[T]he main purpose of Daubert exclusion is to protect juries from being swayed by dubious expert testimony." *In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, No. CV 2:11-07382, 2017 WL 2362848, at *2 (D.N.J. May 31, 2017)(quoting *In re Zurn Pex Plumbing Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). "The trial court's 'gatekeeping function' is, therefore, reduced 'when the gatekeeper is keeping the gate only for himself.'" See *id.* (quoting I*n re Zurn Pex Plumbing Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011))(quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)); see also *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (noting that the "usual concerns" of Daubert—i.e., "keeping unreliable expert testimony from the jury"—are not present during a bench trial).

The Declarations of Mr. Parmet and Mr. McMachon are not providing expert opinion to the fact-finder and are thus not properly subject to Federal Rule of Evidence 702 or the *Daubert* standard. The Declarations of Mr. Parmet and Mr. McMachon explain the need for certain discovery from Veeva so that Mr. Parmet and Mr. McMachon may obtain the data necessary to

formulate their expert opinions. The Special Master therefore denies Veeva's request that the Special Master sustain Veeva's objections and decline to consider the Declarations of Mr. Parmet and Mr. McMachon. However, the Special Master notes that Veeva is not foreclosed from raising any issues with the substance or methodology of any future expert reports of Mr. Parmet and Mr. McMachon in the context of a *Daubert* motion if appropriate. See *Bell v. Lockheed Martin Corp.*, No. CIV. 08-6292, 2010 WL 3724271, at *9 (D.N.J. Sept. 15, 2010).

### III.   IQVIA's Motion To Compel Responses To Its Second Set Of Document Requests

#### A. Discovery Standard

Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, parties may obtain discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1). Discoverable material is not limited to that which would be admissible at trial, but also includes any non-privileged information that "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Relevance has been construed liberally under Rule 26(b)(1), to "encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). While relevant information need not be admissible at trial in order to grant disclosure, the burden remains on the party seeking discovery to "show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). "Discovery is not a fishing expedition." *Arena v. RiverSource Life Ins. Co.*, No. 2:16-CV-5063-JLL-SCM, 2017 WL 6513056, at *2 (D.N.J. Dec. 19, 2017). A party seeking to compel discovery bears the initial "burden of showing that the information sought is relevant to the

subject matter of the action." *Arena v. RiverSource Life Ins. Co.*, No. 16–5063, 2017 WL 6513056, at *2 (D.N.J. Dec. 19, 2017).

In this Circuit, "[i]t is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's*, 193 F.3d 766, 777–78 (3d Cir.1999) (citation omitted). Nevertheless, "this right is not unlimited and may be circumscribed." *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir.1999). Pursuant to Rule 26(b)(2)(C)(3), "the court must limit the ... extent of discovery otherwise allowed by these rules ... if it determines that ... the burden [ ] of the proposed discovery outweighs its likely benefit." Fed.R.Civ.P. 26(b)(2)(C)(3). Courts consider "the importance of the discovery in resolving the issues" at stake in the case in determining whether the burden of the discovery outweighs its likely benefit. *Id.*

## B. Requests for Production Involving the Source Code Repository and Other Technical Documents

**RFP 128**
Copies of the source code repository or repositories that contain all versions of (a) Veeva's MDM application and Veeva's CRM application that process and store any Healthcare Professional Data, Sub-National Information, Reference Data or Sales Data originating or deriving from IQVIA or any other party, and (b) all instances of Veeva's Healthcare Professional Data pressed by or stored in such applications.

**RFP 129**
Any records maintained in any system utilized by Veeva to log errors, defects, or bugs in Veeva's Healthcare Professional Data, MDM application, and/or CRM application and the resolution of the same, whether or not commercially available.

**RFP 130**
All documents and databases relating to any pre- or post-deployment testing (including functional and performance testing) of Veeva's Healthcare Professional Data, MDM application, and/or CRM application, including documents and databases reflecting testing strategy, design or test cases and scenarios (including the technical architecture of test environments), execution of test cases, results of test cases, and evaluation of the results of test cases.

**RFP 131**
For all documents produced in response to IQVIA Requests for Production Nos. 128, 129, and 130, all documentation relating Veeva's use of such documents.

**RFP 132**

All documents, including technical documentation, trouble ticketing system databases, and development notes, in the native format in which they are kept in the ordinary course of business, created in connection with the development process of Veeva's Healthcare Professional Data, MDM application, and/or CRM application.

IQVIA argues that these requests seek the source code repositories and other technical data, which the Parmet Declaration states is the best evidence for a forensic examiner to trace the development history of Veeva's software to determine how Veeva used IQVIA trade secrets to improve Veeva's software and data products. IQVIA explains that the source code is the set of instructions that a programmer writes and is later compiled or assembled into an executable computer program. IQVIA states that Mr. Parmet's Declaration explains how data is used to enhance software development and that these changes are best viewed through examining the source code repository. According to IQVIA, source code files are typically stored and accessed through a portion of a computer application or development environment known as the source code repository. The source code repository contains a historical record of every version of each source code file. The historical record shows all additions, changes, and deletions to any feature or function in the source code, who made those changes, and when those changes were made. According to IQVIA, the source code repository is important because it provides the most complete, accurate, and reliable record of all product improvements.

IQVIA further explains that an audit log keeps track of each occasion that a user logs onto the source code repository system, every time a source code file is accessed, and changes made to the file. By examining a source code repository, its metadata, and its audit logs, a forensic expert can sufficiently trace that development history of a software product. IQVIA believes that the repository will provide a timeline of Veeva's development and changes to its relevant software programs. For example, IQVIA believes that changes to Veeva's code made

10

shortly after Veeva improperly accessed IQVIA Market Research Offerings would provide strong evidence in support of IQVIA's trade secret misappropriation claim. IQVIA believes that Veeva's source code repositories for its CRM and MDM applications will contain key evidence to support IQVIA's claim that Veeva misappropriated IQVIA's Market Research Offerings to enhance its OpenData product and CRM and MDM applications.

IQVIA argues that this request builds upon plausible facts in the Complaint, the EY Assessment, and discovery to date. IQVIA argues that case law supports the production of source code when it is relevant to the prosecution of the case and points to *Vesta Corp. v. Amdocs Mgmt. Ltd.*, No. 3:14-CV-01142-HZ, 2017 WL 714354 (D. Or. Feb. 21, 2017) and *Metavante Corp. v. Emigrant Sav. Bank*, No. 05-CV-1221, 2008 WL 1969596 (E.D. Wis. May 5, 2008). IQVIA further argues that Veeva does not challenge Mr. Parmet's statement that all that is generally required is a standard database backup of the applicable database, which can typically be backed up, unattended, in no longer than three hours. IQVIA argues that Veeva's proposal to produce technical logs from custodial sources is misleading, as computer technical logs will not be found in custodian sources.

IQVIA further argues that its forensic expert can examine the source code repository with respect to Veeva's claims regarding the switches to its data bridge. IQVIA explains that Veeva claims that its data bridge ensures that third party data does not move between a customer's Veeva MDM instance and Veeva's OpenData master database, and that Veeva's data stewards cannot access a customer's Veeva MDM instance, unless both the customer and Veeva "flip the switch" allowing the data to flow in. IQVIA argues that its forensic expert can examine the source code repository for the presence of such functionality, the timing of when it was

implemented, the identification of Veeva employees who developed the data bridge or connector, and the Veeva employees authorized to "flip the switch" allowing for the flow of data.

IQVIA also believes that the source code repository will show whether the Veeva personnel responsible for maintenance and development of Veeva technology were separated from the Veeva personnel responsible for working with IQVIA data hosted on Veeva customer CRM and MDM applications. IQVIA also argues that audit logs may show, for example, whether IQVIA Market Research Offerings were loaded from a particular customer's CRM or MDM application into Veeva's software development environment. With respect to Veeva's objection that the source code is sensitive, proprietary, and highly confidential, IQVIA argues that the parties have negotiated a Protective Order to govern production of documents. IQVIA further argues that it is willing to meet and confer with Veeva to address any additional concerns about confidentiality not covered by the Protective Order.

With respect to RFPs 129 and 130, IQVIA argues that Veeva's offer to produce responsive documents from Veeva's 25 custodians is meaningless since the type of information requested is not ordinarily found in custodian emails and documents. IQVIA further points out that 23 of Veeva's 25 custodians are not involved in software development. With respect to RFP 131, IQVIA argues that Veeva's position that it does not understand what the request seeks is difficult to believe. IQVIA points out that its deficiency letter stated that the request seeks explanatory documents related to the use of Veeva's source code repository and other technical documentation. IQVIA argues that despite its explanation, Veeva has not responded.

With respect to RFP 132, IQVIA explains that this request seeks forensic information regarding Veeva's systems and databases. IQVIA maintains that documents in response to these requests can allow a forensic expert to reach determinations regarding the timing and nature of

improvements made to Veeva's CRM and MDM applications, including whether the timing of these improvements parallel the times Veeva improperly accessed IQVIA data. Veeva has agreed to produce documents from custodians responsive to this request. However, IQVIA argues that the information sought is not ordinarily found in custodial files.

With respect to RFP 128, Veeva argues that IQVIA's demand for all Veeva source code is overbroad because it is unrooted to any asserted IQVIA trade secret. Veeva argues that IQVIA has never asserted any trade secret in this case in any IQVIA source code, algorithm, software design, or any other IQVIA technology. Veeva argues that IQVIA cannot assert vague trade secret claims involving data and then ask for totally irrelevant information about source code. Veeva argues that the cases cited by IQVIA are inapposite, for they concern identified technology asserted as trade secrets that are nothing like IQVIA's asserted trade secrets in its data product content in this case. Veeva further argues that IQVIA misunderstands the technologies at issue, making the information it seeks irrelevant. Veeva asserts that it makes software that houses data, but that source code of the software is agnostic to the content of the data housed in the program when the software is later used by a Veeva customer. Veeva explains that saying that reading software code could tell the reader which company's data is housed within a software product is like claiming that looking at empty bookstore shelves can tell someone what book titles have been stored there. Veeva argues that similarly, records of its source code cannot show what data was later housed in some instance of that software, in the same way that the source code used to create Microsoft Word software would not identify the author of a brief. Veeva argues that source code shows the design of security control, but it does not record whose data is or is not used when software is up and running.

Veeva further argues that IQVIA does not point to any particular source code about any particular security feature; it just demands all of Veeva's source code. Veeva argues that IQVIA's double layer of speculation that if Veeva improperly accessed IQVIA data then subsequent changes to code might show such improper access, is insufficient to show that the request will produce relevant information. Veeva further argues that IQVIA has provided no basis for its assumption that the content of IQVIA data might lead to a change in Veeva source code. Veeva also argues that IQVIA's apparent allegation that Veeva misused IQVIA data to improve its data is technically erroneous because the content of data does not improve the software that houses the data. Veeva argues that IQVIA's contention that source code would show it Veeva improperly used IQVIA data for testing or maintenance is likewise incorrect as code does not show what data is used in testing a software product and Veeva does not use IQVIA data for testing or maintenance.

With respect to the data bridge, Veeva argues that source code concerns the design of the switch, and does not record any subsequent act of flipping or not flipping that switch. Veeva further argues that source code will not show if employees who handle IQVIA data under TPA agreements are separated from those who work on source code. Moreover, Veeva argues that engineers do not write confessions of their theft within the source code and that IQVIA's assertions as such are ridiculous.

Veeva further argues that RFP 128 is overbroad and disproportionate.  Veeva explains that it has two different software products, which are distinct from its data comparison marketing exercises. Veeva started its CRM code development in 2007. It started its Network software code development in 2012. Veeva believes IQVIA is asking for all versions, meaning every release, change, troubleshooting ticket, and more dating back to 2012. Veeva says that this includes

14

several million lines of code. Veeva objects because IQVIA has not asserted trade secrets in software or in technology. Thus Veeva argues the demand is beyond the scope of the case. Veeva also objects because all versions means every possible version of two different software products over many years, with no clear connection to any specific allegation in the case, making the request unduly burdensome and costly. Veeva also objects to subpart(b) because it is unclear what else is in the source code repository IQVIA seeks. In sum, Veeva argues that IQVIA has not linked a discrete, identified trade secret with a corresponding defined item of software.

With respect to RFPs 128 and 130, Veeva argues that it cannot fairly defend itself without knowing what it is specifically accused of misappropriating. It argues that IQVIA's demand is massively overbroad on its face and that no case law supports what IQVIA demands. Veeva argues that it has no idea what, if any, alleged trade secrets are at issues with respect to its code and technical documentation.

With respect to RFP 131, Veeva argues that the request is extraordinarily overbroad with respect to all of Veeva's software, which includes two different products which have been on the market for years, and all technical documentation regarding such software. Veeva argues that virtually every document at Veeva would fall within this request. Thus Veeva objects to this request while agreeing to produce technical logs from custodial sources. Veeva notes that IQVIA's motion characterizes RFP 131 as requesting "explanatory documents related to the use of Veeva's source code repository and other technical documentation." However, Veeva argues that this is still vague and overbroad for all the same reasons as RFP 128.

Veeva argues that RFPs 129-132 were written for maximum overbreadth, heedless of the cost to Veeva, without the identification of anything specific sought. Veeva points out that IQVIA does not even accuse it of misappropriating any IQVIA technology. Veeva argues that it

has thousands of employees who work on three major product lines, and numerous related systems with records pertaining thereto. Veeva further argues that IQVIA does not point to any particular need for any specific document—it simply demands to see everything. Thus Veeva argues that these requests are not proportional under Rule 26(b) and that documents from custodial sources is adequate.

### Opinion

It is the opinion of the Special Master that RFP 128 seeks relevant information as IQVIA alleges that the source code repositories will provide the best evidence for a forensic examiner to trace the development history of Veeva's software to determine if any changes or improvements to Veeva's software were made shortly after Veeva improperly accessed IQVIA data and therefore provide strong evidence in support of IQVIA's trade secret misappropriation claim. While the Special Master acknowledges Veeva's argument that IQVIA has never asserted any trade secret in this case in any IQVIA source code, algorithm, software design, or any other IQVIA technology, that does not foreclose IQVIA from obtaining evidence of its alleged trade secret misappropriation claim from IQVIA source code repositories and other technical documents. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Thus considering the nature of IQVIA's claims and the fact that the source code repository and other technical documents may be the best evidence to help a forensic examiner to determine whether Veeva improved its software after improperly accessing IQVIA data, IQVIA has demonstrated a need for the data. The Special Master acknowledges the sensitive nature of this information; however, the parties have entered into a Discovery

Confidentiality Order that provides for the protection of confidential information. IQVIA has agreed to meet and confer with Veeva to address any additional concerns about confidentiality not covered by the Discovery Confidentiality Order. Accordingly, the Special Master will order Veeva to provide copies of its source code repository that contain all versions of Veeva's MDM application and Veeva's CRM application that process and store any Healthcare Professional Data, Sub-National Information, Reference Data or Sales Data originating or deriving from IQVIA and all instances of Veeva's Healthcare Professional Data pressed by or stored in such applications for the relevant time period, 2012-2017, within thirty days of the date of this order. The parties are to meet and confer to address any additional concerns about confidentiality not covered by the Discovery Confidentiality Order within 15 days of the date of this order.

RFP 129 seeks any records maintained in any system utilized by Veeva to log errors, defects, or bugs in Veeva's Healthcare Professional Data, MDM application, and/or CRM application and the resolution of the same, whether or not commercially available. Veeva has agreed to produce responsive documents from Veeva's 25 agreed upon custodians. IQVIA argues that Veeva's offer to produce responsive documents from custodians is meaningless since the type of information requested is not ordinarily found in custodian emails and documents and 23 of the custodians are not involved in software development. It is the opinion of the Special Master that RFP 129 seeks relevant information that will allow a forensic examiner to trace the development history of Veeva's software to determine if there is evidence in support of IQVIA's trade secret misappropriation claim. Accordingly, the Special Master will compel Veeva to respond to RFP 129 within 30 days of the date of this order. Veeva's response shall be limited to the relevant time period, 2012-2017, but shall not be limited to documents in possession of the 25 agreed custodians.

17

RFP 130 seeks all documents and databases relating to any pre- or post-deployment testing (including functional and performance testing) of Veeva's Healthcare Professional Data, MDM application, and/or CRM application, including documents and databases reflecting testing strategy, design or test cases and scenarios (including the technical architecture of test environments), execution of test cases, results of test cases, and evaluation of the results of test cases. It is the opinion of the Special Master that RFP 130 seeks relevant information that will aid a forensic examiner in tracing the development history of Veeva's software to determine if there is evidence in support of IQVIA's trade secret misappropriation claim. Accordingly, the Special Master will compel Veeva to respond to RFP 130 within 30 days of the date of this order. Veeva's response shall be limited to the relevant time period, 2012-2017, but shall not be limited to documents in possession of the 25 agreed custodians.

RFP 131 seeks for all documents produced in response to IQVIA Requests for Production Nos. 128, 129, and 130, all documentation relating to Veeva's use of such documents. IQVIA has clarified that this request seeks explanatory documents related to the use of Veeva's source code repository and other technical documentation. It is the opinion of the Special Master that RFP 131 seeks relevant information that will aid a forensic examiner in tracing the development history of Veeva's software to determine if there is evidence in support of IQVIA's trade secret misappropriation claim. Accordingly, the Special Master will compel Veeva to respond to RFP 131 by producing explanatory documents related to the use of Veeva's source code repository and other technical documentation within 30 days of the date of this order. Veeva's response shall be limited to the relevant time period, 2012-2017, but shall not be limited to documents in possession of the 25 agreed custodians.

### C.  Request for Production No. 162

**RFP 162**
All the following PC (Windows) forensic artifacts (or equivalent for Apple (Mac) Computers)
from the devices and/or storage locations accessible by any individuals identified by Veeva in
response to IQVIA's Interrogatory Nos. 7 and 8:

> A. File Listing: File Name; File Path; Dates (Created, Accessed, Modified); File Size
>    (Reserved, Used); Extension; Directory or File; MFT Entry; MFT Date; MFT Parent
> B. Lnk File Listing: Lnk File Name, Lnk File Dates (Created, Accessed, Modified);
>    Target File Dates (Created, Accessed, Modified); Target Name; Volume Type,
>    Volume Label; Local Path; Common Path; Network/Device Info
> C. Shellbags: Full Path; Shellbag Dates (Created, Accessed, Modified)
> D. Jumplist: File Name; Change Type; MFT Status; MFT Entry; MFT Parent

IQVIA argues that Veeva identified over 2,000 employees in response to Interrogatory

Nos. 7 and 8 and that any burden argument is of Veeva's own making.  IQVIA argues that rather

than do an investigation to determine which Veeva employees were actually involved with

IQVIA Market Research Offerings, Veeva identified over 2,000 Veeva employees who "may

have" been involved. IQVIA argues that its current discovery request is a proper follow-up to

Interrogatories Nos. 7 and 8, to determine what the identified Veeva employees did with the

IQVIA and non-Veeva data they accessed. IQVIA explains that the digital fingerprints or

forensic artifacts sought in this request will provide information on each individual user's

computer activity. IQVIA further argues that Veeva abused the discovery process by refusing to

engage in a meet and confer regarding the request yet now argues that the request is burdensome.

IQVIA explains that it is not currently seeking all forensic artifacts for Veeva's computer

systems, only the forensic artifacts on computer devices of the individuals identified in

Interrogatories Nos. 7 and 8 as receiving non-Veeva data.

IQVIA submitted the Declaration of Mr. McMahon to explain why forensic artifacts are

relevant to IQVIA's claims. Mr. McMahon also states that forensic artifacts for each individual

can be extracted "in as quickly as 30-minutes but should not take more than 1 hour of examiner

time" using a tool called TZ Works, which allegedly is a widely adopted technology that can be used remotely without any business disruption. IQVIA does not seek the content of hard drives, such as emails and word documents, it seeks only the forensic artifacts. IQVIA further argues that nothing in the ESI or TAR orders address the type of information sought in this request.

Veeva argues that IQVIA cites no authority for its extreme request to send a forensic vendor into Veeva's facilities to create a forensic image, one by one, of all devices and storage locations used by some 2,000 Veeva personnel. Veeva argues that this could range from a cell phone to a USB drive and so on. Veeva further argues that obtaining a forensic artifact would take several hours per device and could take more time to transfer. Veeva argues that in order to comply it would have to shut down its ordinary business and disrupt the working day of thousands of employees. Veeva argues that it would cost millions just for vendor charges, and Veeva says it is not clear who would be responsible for these charges. Veeva argues that this request is thus wildly overbroad and burdensome. Veeva argues that it seeks information having nothing to do with the case and conflicts with the parties' agreed upon ESI and TAR protocols, which were intended to put rational limits on the collection of electronic files and which did not contemplate such forensic imaging.

Veeva argues that IQVIA's request is based upon a misreading of its interrogatory responses. Veeva argues that its responses to Interrogatories 7 and 8 referred to Interrogatory 1, which listed a small number of people who had roles in the Shire marketing comparison in April 2016, and a few other incidents where there were signs that customers mistakenly provided IQVIA data. It also listed a general roster of present and former Veeva employees or hired contractors by title or role. The latter response listed 2,000, but plainly did not say that 2,000 people accessed IQVIA data.

Veeva further argues that IQVIA's speculation that Veeva is lying and that forensic imaging may show Veeva's lies is utter nonsense. Veeva argues that there is no authority for the proposition that a party gets forensic imagining because it does not like the facts reported in discovery responses and wants to pretend they are untrue or because it does not want to accept counsel's representations that there is nothing else to report.

### Opinion

It is the opinion of the Special Master that RFP 162 seeks relevant information as IQVIA alleges that these forensic artifacts will allow a forensic examiner to determine if Veeva misappropriated any IQVIA Market Research Offerings to improve Veeva's own technology offerings. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery, however, the Special Master agrees with Veeva that its responses to Interrogatory Nos. 7 and 8 did not state that some 2,000 Veeva personnel accessed IQVIA data. Moreover, the Special Master is persuaded that it would create an undue burden on Veeva to compel the production of forensic artifacts from some 2,000 Veeva personnel. The Special Master will thus compel Veeva to provide forensic artifacts from the devices and/or storage locations accessible by individuals identified by Veeva in response to IQVIA's Interrogatory No. 1. Additionally, IQVIA may choose an additional one hundred individuals identified by Veeva in response to IQVIA's Interrogatory Nos. 4-6. IQVIA shall advise Veeva which additional one hundred individuals it seeks forensic artifacts from within 15 days of the date of this Order. Veeva shall produce the information sought in this request as modified by the Special Master within 60 days of the date of this Order. The Special Master does not foreclose IQVIA from seeking forensic

artifacts from specific individuals in the future; however, the Special Master will not permit untargeted requests.

### D.  Request for Production No. 163

**RFP 163**
For all audit logs and similar computer generated documentation produced in response to IQVIA Request for Production Nos. 1 and 2, documents sufficient to show the fields and/or information contained within each audit log and the standard retention policy for each log.

IQVIA argues that Request 163 seeks further information that will allow IQVIA to understand the information within the audit logs that Veeva has been ordered to produce. IQVIA argues that audit logs are relevant to its claims that Veeva misappropriated IQVIA's Market Research Offerings to improve its OpenData, MDM and CRM applications. IQVIA argues the request is particularly relevant to test Veeva's claims about the separation between Veeva's OpenData and Network divisions. IQVIA argues that Veeva does not challenge Mr. Parmet's Declaration that audit logs will test Veeva's claims that data cannot move between a customer's MDM instance and the Veeva OpenData master database, that its data stewards cannot access a customer's Veeva MDM instances, and that Veeva customer support personnel were separate from development personnel. IQVIA further argues that Veeva routinely told life science customers that audit logs were readily available to demonstrate its protection of IQVIA data from misuse and even published that claims on its website.

IQVIA further argues that Veeva has inaccurately characterized what Requests for Production Nos. 1 and 2 seek and thus incorrectly states that it cannot produce documents responsive to the request because the documents do not exist. IQVIA argues that Requests for Production Nos. 1 and 2 do not concern just audit logs reflecting "the copying of data received for a marketing comparison" but rather audit logs "reflecting any data copying, transfers or other computer-based actions" of data received for Veeva's "evaluation, analysis, discussion,

22

comparison or review. IQVIA argues that this excuse is based on a purposeful, improper, unilateral narrowing of the requests. IQVIA further argues that Veeva does not claim that audit logs do not exist for its OpenData offering and CRM and MDM applications.

Veeva argues that this request seeks documents about audit logs that do not exist because they concern activities that never happened. Veeva argues that it cannot produce documents that do not exist. Veeva also maintains that to the extent it identifies any audit logs for production, the fields and or information contained in each log will be self-evident.

### Opinion

It is the opinion of the Special Master that RFP 163 seeks relevant information. Accordingly, the Special Master will compel Veeva to respond to RFP 163 by providing for all audit logs and similar computer generated documentation produced in response to IQVIA Request for Production Nos. 1 and 2, documents sufficient to show the fields and/or information contained within each audit log and the standard retention policy for each log. The Special Master notes that Request for Production Nos. 1 and 2, sought in part: (1) All documents concerning any proposed, actual or contemplated evaluation, analysis, discussion, comparison or review of any Healthcare Professional Data, Reference Data, Sub-National Information or Sales Data obtained from a life sciences company, including but not limited to: All audit logs and similar computer generated documentation reflecting any data copying, transfers or other computer-based actions involving any such data and each individual machine and user accessing such data; and (2) All documents concerning any proposed, actual or contemplated evaluation, analysis, discussion, comparison or review of any IMS Market Research Offerings, including but not limited to: All audit logs and similar computer generated documentation reflecting any data copying, transfers or other computer-based actions involving any such data and each individual

machine and user accessing such data. However, the Special Master does not intend to order Veeva to produce information or documents that it does not possess or that does not exist. If Veeva does not maintain the requested information in the ordinary course of business, it is under no obligation to create it for discovery purposes. Consequently, Veeva shall respond to RFP 163 within 30 days of the date of this order by providing the requested information if such documents exist or by advising that the requested information does not exist. Veeva's response shall be limited to the relevant time period, 2012-2017, but shall not be limited to documents in possession of the 25 agreed custodians.

### E.  Requests for Production Involving Limitation to Custodians

#### i.  Request for Production No. 157

**RFP 157**
All "data report card[s]" prepared by Veeva, as referred to in Slide 36 of its presentation to The Hon. Dennis M. Cavanaugh, as well as all communication concerning the preparation of any such "data report card" both internal as well as with any customer or potential customer.

IQVIA argues that at the May 31, 2018 hearing the Special Master ordered Veeva to respond to discovery concerning the data report cards identified in a document produced by Veeva. Veeva's interrogatory responses subsequently identified 74 data report cards aside from Shire. RFP 157 seeks production of these data report cards as well as related communications. IQVIA argues that Veeva's interrogatories identify a total of 47 individuals involved with those data report cards, only 6 of whom are custodians. IQVIA argues that Veeva is seeking to avoid having to produce communications from 39 individuals involved in those 74 data report cards.

Separately, according to IQVIA, Veeva has agreed to produce the existing data extract files that potential customers provided to Veeva for such comparisons. IQVIA argues that this does not comply with the Special Master's May 31, 2018 order which required Veeva to produce the data report cards, not just the raw data extract files upon which those report cards were based.

24

Veeva argues that it has already produced the existing data extract files that potential customers provided to Veeva for such data comparisons. According to Veeva, IQVIA has requested additional communications from three additional custodians regarding the Shire incident, which Veeva agrees is reasonable and it will endeavor to produce such materials within 45 days. However, Veeva argues that IQVIA has not identified a non-speculative basis to believe that any other marketing comparisons involved IQVIA data. Furthermore, Veeva argues that this request would require it to collect documents from 39 additional custodians. Veeva says it has agreed to produce documents from the 25 agreed upon custodians but argues that IQVIA's request for information from the 39 additional individuals is not  proportional or within defined limits.

### Opinion

It is the opinion of the Special Master that RFP 157 is relevant. The request is targeted in nature as Veeva's interrogatory responses identified 74 data report cards and 47 individuals involved with those data report cards. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents.  The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Accordingly, the Special Master will order Veeva to produce the data report cards it prepared, as referred to in Slide 36 of its presentation to The Hon. Dennis M. Cavanaugh, as well as all communication concerning the preparation of any such data report cards from the 47 individuals involved with those data report cards.

### ii.   Request for Production Nos. 158 and 159

**RFP 158**
All marketing materials prepared by Veeva concerning or in response to any "data report card," as referred to in Slide 36 of its presentation to The Hon. Dennis M. Cavanaugh.

25

**RFP 159**

All documents concerning the source of any data received from any customer or prospective customer for use in preparing a "data report card," as referred to in Slide 36 of Veeva's presentation to The Hon. Dennis M. Cavanaugh.

IQVIA explains that these requests seek marketing materials concerning the data report cards and documents concerning the source of any data Veeva received for use in preparing a data report card. IQVIA argues that its Shire data report card targeted IQVIA and that at least three non-custodians were involved with the Shire incident. IQVIA further argues that Veeva cannot use an Interrogatory response to avoid producing non-custodial responsive documents.

Veeva argues that apart from Shire, IQVIA has not identified a non-speculative basis to believe that Veeva's other marketing comparisons involved IQVIA data. This again would require collecting documents from at least an additional 39 custodians. Veeva argues the requests are not proportional to the needs of the case.

**Opinion**

It is the opinion of the Special Master that RFPs 158 and 159 are relevant. The requests are targeted in nature as Veeva's interrogatory responses identified 74 data report cards and 47 individuals involved with those data report cards. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Accordingly, the Special Master will compel Veeva to respond to RFPs 158 and 159 within 30 days of the date of this order. Veeva's responses shall include information in the possession of the 47 individuals involved with data report cards previously identified by Veeva.

### iii.  Request for Production Nos. 133, 134, 135, and 137

**RFP 133**
All documents and databases concerning Veeva's business or technical requirements for Veeva's Healthcare Professional Data, MDM application, and/or CRM application, including but not limited to the architectural plan, functional or technical road maps, and/or other documents detailing the application architecture and infrastructure architecture.

**RFP 134**
All documents and databases concerning any modifications, changes, updates or revisions by Veeva and Veeva's Healthcare Professional Data, MDM application, and/or CRM application, including but not limited to, Veeva's change control process and all change requests submitted through that process and documents associated with those requests such as cost and time estimates for the requested change and documents reflecting the resolution of the request.

**RFP 135**
All reports and/or descriptions of updates, including release notes, by Veeva concerning its Healthcare Professional Data, MDM application, and/or CRM application development.

**RFP 137**
All documents, including operating manuals, system help files, technical documentation, help files (e.g., "CHM" or "HLP" files) or user documentation, in the native format in which they are kept in the ordinary course of business, concerning the use or operation of Veeva's Healthcare Professional Data, MDM application, and/or CRM application.

IQVIA explains that these requests seek information contained in Veeva's database. IQVIA argues that Veeva does not contest that these requests will allow a forensic expert to determine whether improvements made to Veeva's CRM, MDM, and OpenData application show evidence of being based on IQVIA Market Research Offerings or followed a timeline that paralleled Veeva's improper access to IQVIA's Market Research Offerings. Veeva has agreed to produce documents from custodians responsive to these requests. However, IQVIA argues that the information sought is not ordinarily found in custodial files.

Veeva argues that these requests are also wildly overbroad and would impose unfair costs on Veeva. Veeva argues that IQVIA does not point to any particular need for specific documents, it simply demands to see everything. Veeva argues that these requests are not

proportional under rule 26(b) and since IQVIA offers no rational limit, custodial documents should suffice.

### Opinion

It is the opinion of the Special Master that RFPs 133, 134, 135, and 137 seek relevant information as IQVIA alleges that this information will allow its forensic examiners to trace the development history of Veeva's software to determine if any changes or improvements to Veeva's software were made shortly after Veeva improperly accessed IQVIA data and therefore provide strong evidence in support of IQVIA's trade secret misappropriation claim. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Thus considering the nature of IQVIA's claims and the fact that this technical information will aid a forensic examiner in determining whether Veeva improved its software after improperly accessing IQVIA data, IQVIA has demonstrated a need for the data. Accordingly, the Special Master will order Veeva to respond to RFPs 133, 134, 135, and 137 within thirty days of the date of this order. Veeva's response shall be limited to the relevant time period, 2012-2017, but shall not be limited to documents in possession of the 25 agreed custodians.

#### iv. Requests for Production Nos. 138, 139 and 140

**RFP 138**
All documents concerning or describing the ability or functionality of any Veeva technology which allows for the flow of any Healthcare Professional Data, Sub-National Information, Reference Data or Sales Data originating or derived from IQVIA or any other party (excluding Veeva) into Veeva's CRM application or MDM application, including but not limited to, the flow of such data via a data bridge or connector or any other product, service, software or feature which allows data received from any such party to be used by Veeva to modify, upgrade, develop, test, document, validate, correct, improve, design, maintain, compile, quality check, or assemble any aspect of Veeva Healthcare Professional Data.

**RFP 139**
All documents concerning the development and design by Veeva of any data bridge or connector whose functionality includes the ability to access or control the transfer of Healthcare Professional Data, Sub-National Information, Reference Data or Sales Data originating or derived from IQVIA or any other party (excluding Veeva), including but not limited to any communications with any consultant or third party concerning the same.

**RFP 140**
Documents sufficient to identify all employees and agents whose responsibilities have included debugging, modifying, upgrading, developing, creating, testing, validating, improving, designing, maintaining, coding, programming or troubleshooting any data bridge or connector whose functionality includes whose the ability to access Healthcare Professional Data, Sub-National Information, Reference Data or Sales Data originating or derived from IQVIA or any other party (other than Veeva).

IQVIA explains that these requests seek documents concerning Veeva's data bridge. IQVIA argues that its Complaint alleges that the EY Assessment found that Veeva's data bridge was inadequate to prevent the misuse of IQVIA's Market Research Offerings. IQVIA argues that based on the EY Assessment, it determined that Veeva's systems lacked appropriate safeguards and controls to protect IQVIA data. IQVIA argues that the documents in these requests will allow it to determine the scope and consequence of Veeva's public statements that its data bridge protected IQVIA's Market Research Offerings.

Veeva argues that these requests are based entirely on speculation and are facially overbroad, with nothing specific identified, and without concern for the cost imposed on Veeva given the amount of material requested. Veeva also objects to the extent these requests are based on a hypothetical breach of a TPA agreement, which is not a cause of action asserted in the case and because IQVIA did not limit these requests to exclude documents concerning non-IQVIA third party data. Veeva argues that IQVIA has never alleged that any misappropriation occurred via the data bridge. Veeva therefore maintains that these requests are not proportional and that because IQVIA has offered no rational limit, custodial sources are sufficient.

**Opinion**

It is the opinion of the Special Master that RFPs 138, 139 and 140 seek relevant information as IQVIA alleges that this information will allow its forensic examiner to trace the development history of Veeva's software to determine if any changes or improvements to Veeva's software were made shortly after Veeva improperly accessed IQVIA data and therefore provide strong evidence in support of IQVIA's trade secret misappropriation claim. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Thus considering the nature of IQVIA's claims and the fact that this technical information will aid a forensic examiner in determining whether Veeva improved its software after improperly accessing IQVIA data, IQVIA has demonstrated a need for the data. Accordingly, the Special Master will order Veeva to respond to RFPs 138, 139 and 140 within thirty days of the date of this order. However, the Special Master modifies these requests to Healthcare Professional Data, Sub-National Information, Reference Data or Sales Data originating or derived from IQVIA as opposed to other third parties. Veeva's response shall be limited to the relevant time period, 2012-2017, but shall not be limited to documents in possession of the 25 agreed custodians.

### v. Requests for Production Nos. 141, 142, and 143

**RFP 141**
All documents reflecting any policy or procedure employed by Veeva to instruct clients or prospective clients of Veeva on how to designate any records as "Orange" or "Grey," as referred to in the January 2016 Assessment report, including but not limited to any instruction given to any such clients or prospective clients on the consequences of designating any record as "Orange" or "Grey."

**RFP 142**
All documents concerning any training done by Veeva of its employees and agents on what constitutes an "Orange" or "Grey" record, as referred to in the January 2016 Assessment report.

**RFP 143**
Any documents concerning any situation where Veeva learned that a client had incorrectly designated a record as "Orange," as referred to in the January 2016 Assessment report, and any actions taken by Veeva in response to such incorrect designation.

IQVIA explains that these requests seek policy, procedure and training documents concerning the designation of records as "Orange" or "Grey," as referred to in the EY Assessment. IQVIA believes these documents are likely to be found in shared file systems, and not custodial files. According to IQVIA, Veeva claims that its OpenData records stored within a customer's Veeva MDM instance are designated by Veeva as "Orange" records, and can be sent to Veeva's OpenData stewards, while non-Veeva records are designated as "Grey" records, and should remain solely in the customer instance of MDM. IQVIA argues this is directly relevant to the claim that Veeva misappropriated IQVIA's Market Research Offerings to improve its OpenData offering, because it would allow IQVIA to test whether Veeva's procedure of designating records as "Orange" or "Grey" functioned as Veeva claimed it did—that is, whether records were appropriately designated "Grey" and remained solely in a customer's instance of MDM.

Veeva argues that it objected to these requests as speculation that targets nothing in particular but demands everything, without concern for overbreadth and cost, and in the absence of any breach of contract claim. IQVIA also object because these requests were not limited to exclude documents concerning irrelevant third-party data. Veeva argues that a customer's designation of its data inside Veeva MDM software has nothing to do with any alleged misappropriation by Veeva. Veeva argues that custodial sources are proportional but all documents is not.

### Opinion

It is the opinion of the Special Master that RFPs 141, 142, and 143 are relevant. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Accordingly, the Special Master will compel Veeva to respond to RFPs 141, 142, and 143 within 30 days of the date of this order. Veeva's responses shall be limited to the relevant time period, 2012-2017, but shall not be limited to the 25 agreed upon custodians.

### vi.   Requests for Production Nos. 144 and 161

**RFP 144**
All documents concerning Veeva's process and/or procedures for matching Reference Data received from any customer with Veeva OpenData, including but not limited to any initial match made upon the inception of a business relationship between Veeva and any client.

**RFP 161**
All instances where Veeva engaged in "data mapping" of Veeva data and IQVIA data, as the term "data mapping" is used in Slide 44 of its presentation to The Hon. Dennis M. Cavanaugh.

IQVIA explains that these requests seek policy and procedure documents concerning data matching, as well as identification of instances where Veeva engaged in data matching and data mapping of Veeva data and IQVIA data. IQVIA argues that Veeva does not contest that these documents will likely be found in shared file systems and not in custodial files. Moreover, IQVIA argues that Veeva's admissions in its emails that it conducted "millions of matches" to the Shire IQVIA data, demonstrates that documents concerning these types of activities are directly relevant to IQVIA's claims.

Veeva argues that an instance of an activity is not a document. Veeva further argues that IQVIA has not offered any argument for relevance. Veeva objects based on speculation, inclusion of irrelevant third-party documents, overbreadth, and cost as these requests could cover

32

countless employees and systems. Veeva also objects to the extent these requests are based on a non-existant breach of contract claim and because IQVIA did not exclude documents concerning irrelevant non-IQVIA third-party data. Veeva argues these requests are not proportional and that since IQVIA offers no rational limit, custodial documents should suffice.

### Opinion

It is the opinion of the Special Master that RFPs 144 and 161 are relevant. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents.  The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Accordingly, the Special Master will compel Veeva to respond to RFPs 144 and 161 within 30 days of the date of this order. Veeva's responses shall be limited to the relevant time period, 2012-2017, but shall not be limited to the 25 agreed upon custodians.

### vii.  Request for Production 145

**RFP 145**
Documents sufficient to reflect the data fields included in Veeva's OpenData product and data dictionaries or other documents that describe the information to be included in any data fields, the field size of each data field, whether the data fields are structured data or unstructured data, and any limitations or restrictions relating to the content of a data field.

IQVIA argues that while it is not alleging misappropriation of data fields format in its Market Research Offerings, these documents are relevant to IQVIA's claim that Veeva misappropriated IQVIA's Market Research Offerings to improve its OpenData product.

Veeva argues that IQVIA does not explain the relevance of the documents it seeks and that it cannot given IQVIA's prior concession that data fields are not at issue. Thus Veeva believes that custodial sources should suffice.

### Opinion

It is the opinion of the Special Master that RFP 145 relevant. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. The Special Master also notes that this request is limited to documents "sufficient to reflect" and does not request all documents. Accordingly, the Special Master will compel Veeva to respond to RFP 145 within 30 days of the date of this order. Veeva's responses shall be limited to the relevant time period, 2012-2017, but shall not be limited to the 25 agreed upon custodians.

### viii.   Requests for Production Nos. 150 and 151

These are not at issue as Veeva has stated that it will produce non-custodial documents responsive to these Requests.

### ix.   Requests for Production Nos. 152 and 164

**RFP 152**
Documents sufficient to identify all current or former employees and agents of Veeva who at any point during their time at Veeva were authorized to "flip" the "switch" referred to in Slide 32 of its presentation to the Hon. Dennis M. Cavanaugh.

**RFP 164**
All documents concerning all role based access controls in place for any Healthcare Professional Data, Reference Data, Sub-National Information or Sales Data obtained from a life sciences company, including but not limited to all policies, processes, standard opening procedures, practices, guidance documents, training and security materials and documents related thereto.

IQVIA argues that these requests seek documents concerning "role based access controls," which are likely to be found in shared file systems, and not custodial files. IQVIA argues that the role based access controls determine which personnel have access to each part of the company's computer system or network and that such controls are relevant to IQVIA's clams that Veeva misappropriated Market Research Offerings to improve Veeva's offerings, as they would allow it to determine whether Veeva personnel responsible for maintenance and

development of Veeva technology were, as Veeva claims, separated from the Veeva personnel responsible for working with IQVIA data hosted on Veeva customer CRM and MDM applications. IQVIA argues that discovery has already shown that Veeva's claims about separation are untruthful. IQVIA further asserts that Veeva did not previously argue that these documents are not relevant.

Veeva objects to these requests as lacking of any non-speculative basis to establish relevance. It further objects to the alleged extreme facial overbreadth of these requests and the expense given the number of Veeva employees and systems implicated. Veeva further objects to the extent that these requests are based on a hypothetical breach of a TPA agreement, which is not a cause of action and because IQVIA did not limit these requests to exclude documents concerning irrelevant third party data. Veeva also argues that IQVIA has not pointed to any particular need for any specific documents and simply demands to see everything. Veeva argues this request is not proportional under Rule 26(b) and that because IQVIA offers no rational limit, custodial documents should suffice.

### Opinion

It is the opinion of the Special Master that RFPs 152 and 164 are relevant. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents.  The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case. Accordingly, the Special Master will compel Veeva to respond to RFPs 152 and 164 within 30 days of the date of this order. Veeva's responses shall be limited to the relevant time period, 2012-2017, but shall not be limited to the 25 agreed upon custodians.

### x.  Request for Production No. 165

**RFP 165**

All documents concerning Veeva's request to Veeva customers for information that will inform Veeva that the customer data that will be added to Veeva's MDM Application and/or CRM Application will include third party data.

IQVIA argues that this request seeks documents concerning Veeva's request to its customers about whether customer data that was to be added to Veeva's MDM and CRM applications would include any third party data. IQVIA argues that Veeva's assertion that when conducting marketing comparisons the potential customers expressly told Veeva that they were not providing IQVIA data to Veeva is false based on the cited Shire documents where Veeva knew it was obtaining IQVIA data in order to compare it to Veeva's OpenData. IQVIA also argues that Veeva did not previously raise a relevancy objection.

Veeva argues that IQVIA offers no explanation of relevance. Veeva objects to the lack of any non-speculative basis to establish relevance, and the extreme facial overbreadth and concomitant expense given the vast number of Veeva employees and associated systems implicated. Veeva objects again to the extent that this request is based on a hypothetical breach of a TPA agreement, which is not a cause of action and because IQVIA did not limit these requests to exclude documents concerning non-IQVIA irrelevant third party data. Veeva argues that IQVIA has not pointed to any particular need for any specific documents and simply demands to see everything. Veeva maintains that this request is not proportional under Rule 26(b) and that because IQVIA offers no rational limit, custodial documents should suffice.

**Opinion**

It is the opinion of the Special Master that RFP 165 is relevant. This is a complex trade secret and antitrust matter that has involved extensive discovery and the exchange of millions of documents. The federal rules allow broad and liberal discovery and the Special Master believes the information sought in this request is relevant and proportional to the needs of the case.

Accordingly, the Special Master will compel Veeva to respond to RFP 165 within 30 days of the date of this order. Veeva's responses shall be limited to the relevant time period, 2012-2017, but shall not be limited to the 25 agreed upon custodians.

**DENNIS M. CAVANAUGH, U.S.D.J. (Ret.)**
**Special Master**

Date: _Nov. 30, 2018_