Steven F. Benz
Benjamin L. Rudofsky
Stefan J. Hasselblad
Daniel S. Severson
Kylie C. Kim
**KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
sbenz@kellogghansen.com
brudofsky@kellogghansen.com
shasselblad@kellogghansen.com
dseverson@kellogghansen.com
kkim@kellogghansen.com

Arnold B. Calmann (abc@saiber.com)
Jeffrey Soos (js@saiber.com)
Jakob B. Halpern (jbh@saiber.com)
Katherine A. Escanlar (kae@saiber.com)
**SAIBER LLC**
One Gateway Center 10th Floor, Suite 1000
Newark, New Jersey 07102
Tel: (973) 622-3333
Fax: (973) 622-3349

Charles Tait Graves (tgraves@wsgr.com)
Joel C. Boehm (jboehm@wsgr.com)
Amit Gressel (agressel@wsgr.com)
Ziwei Xiao (zxiao@wsgr.com)
**WILSON SONSINI GOODRICH &
  ROSATI**
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Tel: (415) 947-2000
Fax: (415) 947-2099

*Attorneys for Defendant/ Counterclaim
Plaintiff Veeva Systems Inc.*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IQVIA INC. and IMS SOFTWARE SERVICES, LTD., | ) | Case No.: 2:17-cv-00177-CCC-MF |
| | ) | |
| Plaintiffs – | ) | Hon. Claire C. Cecchi |
| Counterclaim Defendants, | ) | |
| | ) | **FIRST AMENDED ANSWER AND** |
| v. | ) | **COUNTERCLAIMS** |
| | ) | |
| VEEVA SYSTEMS INC., | ) | |
| | ) | ***Document Electronically Filed*** |
| Defendant – | ) | |
| Counterclaim Plaintiff. | ) | |

---

### VEEVA SYSTEMS INC.'S FIRST AMENDED
### ANSWER AND COUNTERCLAIMS

---

Defendant Veeva Systems Inc. ("Veeva"), by way of Answer to the Complaint of IQVIA Inc. and IMS Software Services, Ltd. (collectively, "IQVIA"), say:

<u>**Response to "INTRODUCTION"**</u>

1.      Veeva denies the allegations set forth in paragraph 1.

2.      Veeva denies the allegations set forth in paragraph 2.

3.      Veeva denies the allegations set forth in paragraph 3.

4.      Veeva admits that IQVIA has issued more than 50 licenses to Veeva to access IQVIA provided information used by common clients of Veeva and IQVIA, but otherwise denies the allegations set forth in paragraph 4.

5.      Veeva admits that a mutual client of IQVIA and Veeva alerted IQVIA to a potential data breach concerning IQVIA confidential information.  Veeva otherwise denies the allegations set forth in paragraph 5.

6.      Veeva denies the allegations set forth in paragraph 6.

7.      The allegations set forth in paragraph 7 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 7 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that IQVIA has filed an action to obtain certain relief and damages.

<u>**Response to "JURISDICTION AND VENUE"**</u>

8.      The allegations set forth in paragraph 8 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 8 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that IQVIA has filed an action to obtain certain relief and damages.

9.      The allegations set forth in paragraph 9 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 9 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that it is registered to conduct business within the State of New Jersey, and has or had business contact, transacted business in, or solicited business within the State of New Jersey.

10.     The allegations set forth in paragraph 10 are legal conclusions for which no response is required.  To the extent that the allegations contained in paragraph 10 may be deemed to require a response from Veeva, Veeva denies these allegations, except admits that IQVIA has filed an action to obtain certain relief and damages.

## Response to "FACTS RELEVANT TO ALL CLAIMS"

### Response to "The Parties"

11.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11.

12.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12.

13.     Veeva admits that IQVIA provides market research, analytics, technology, and services.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13.

14.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14.

15.     Veeva admits the allegations set forth in paragraph 15.

16.     Paragraph 16 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 16 may be deemed to require a response from Veeva, Veeva admits that Veeva and IQVIA compete in the markets for reference data, Customer Relationship Management ("CRM") solutions, and Master Data Management ("MDM") solutions, but otherwise denies the allegations.

### Response to "IMS 'Market Research Offerings'"

17.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17.

18.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.

19.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19.

*Response to "IMS's 'Healthcare Professional Data Offerings'"*

20.     Veeva admits that the Complaint uses the term "Healthcare Professional Data Offerings" to refer to a subset of IQVIA's data products, but is unfamiliar with that designation.  Veeva believes that what the Complaint refers to as "Healthcare Professional Data" is known in the industry as reference data.  To the extent "Healthcare Professional Data" is reference data as that term is used in the industry, Veeva admits that IQVIA sells reference data.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20.

21.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21.

22.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 22.

23.     Veeva admits that accurate data on healthcare professionals and organizations is important to Veeva's life sciences clients.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23.

24.     Veeva admits that the allegations set forth in paragraph 24 are approximate statements made in a marketing video hosted on Veeva's website at https://www.veeva.com/resources/veeva-asks-what-is-the-cost-of-bad-data/.  Veeva directs the Court to the video for a full and complete copy of its contents.

25.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25.

26.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.

*Response to "IMS's 'Sub-National Information Offerings'"*

27.     Veeva admits that the Complaint uses the term "Sub-National Information" to refer to a subset of IQVIA's data products, but is unfamiliar with that designation. Veeva believes that what the Complaint refers to as "Sub-National Information" is known in the industry as sales data. To the extent "Sub-National Information" is sales data as that term is used in the industry, Veeva admits that IQVIA sells sales data. Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27.

28.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 28.

29.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 29.

30.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 30.

31.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 31.

32.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 32.

33.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33.

34.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 34.

35.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 35.

36.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 36.

37.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 37.

**Response to "IMS's 'Technology Offerings'"**

38.     Veeva admits that IQVIA offers CRM and MDM solutions in addition to other products, but is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38.

39.     Veeva admits the allegations set forth in paragraph 39.

40.     Veeva admits that reference data and sales data are frequently used by life sciences companies in CRM Applications.

41.     Veeva admits the allegations set forth in paragraph 41.

42.     Veeva admits that reference data and sales data are frequently used by life sciences companies in MDM Applications.

43.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43.

44.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44.

45.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 45.

46.     Veeva admits that IQVIA sometimes makes an Application Program Interface ("API") available so its customers may use competitor's products for their CRM and MDM needs subject to Third Party Access ("TPA") Agreements.  Veeva is without knowledge or information sufficient to form a belief as to the frequency with which IQVIA makes such APIs available.

**Response to "IMS Carefully Protects 'IMS Market Research Offerings'"**

47.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 47.

48.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 48.

49.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 49.

50.     Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 50.

51.     Veeva admits that IQVIA licenses its data products to its customers to allow the use of IQVIA's reference data and sales data by customers.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 51.

52.     Veeva admits that IQVIA uses TPA Limited License Agreements, in various forms and by various names, to allow the use of IQVIA's reference data and sales data by customers in conjunction with their third-party vendors such as Veeva.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 52.

53.     Veeva admits that IQVIA has used TPA Limited License Agreements, in various forms and by various names, to allow the use of IQVIA's reference data and sales data by customers in conjunction with their vendors such as Veeva.  Veeva directs the Court to the agreements for a full and complete copy of their contents.  Veeva is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53.

54.      Paragraph 54 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 54 may be deemed to require a response from Veeva, Veeva denies these allegations.

55.     Paragraph 55 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 55 may be deemed to require a response from Veeva, Veeva denies these allegations.

56.     Paragraph 56 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 56 may be deemed to require a response from Veeva, Veeva denies these allegations.

57.     Paragraph 57 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 57 may be deemed to require a response from Veeva, Veeva denies these allegations.

58.     Paragraph 58 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 58 may be deemed to require a response from Veeva, Veeva denies these allegations.

**Response to "Veeva's Competing Products"**

59.     Paragraph 59 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 59 may be deemed to require a response from Veeva, Veeva admits that Veeva and IQVIA compete in the markets for reference data, CRM solutions, and MDM solutions, among others.

60.     Veeva admits that it initially offered a CRM solution in the United States. Veeva also admits that it subsequently began development of an MDM solution in 2012, and began offering that MDM solution commercially in 2013.  Veeva denies the remaining allegations set forth in paragraph 60.

61.     Veeva admits the allegations set forth in paragraph 61.

62.     Veeva admits that, at the time of Network's launch, Veeva used the word "crowdsourcing" in some marketing materials.  Veeva otherwise denies the allegations set forth in paragraph 62.

63.     Paragraph 63 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 63 may be deemed to require a response from Veeva, Veeva denies these allegations.

64.     Veeva denies the allegations set forth in paragraph 64.

65.     Veeva admits that, in 2016, the CEO of Veeva wrote to the CEO of IQVIA that:

> All IQVIA data customers have access to IQVIA data.  They put it on their
> servers. And many of their employees have access to that data of course.  They
> need it to do their jobs.  End users, analysts, DBAs, etc.  So, that is thousands of
> people across hundreds of IQVIA customers with access to IQVIA reference
> data in many hundreds of computer systems.  You do not investigate end
> customer systems/processes for these type of security controls, especially for
> malicious activity.  You sign a TPA, and then get after that end customer if they
> fail.  We are not talking about military secrets.  We are talking about reference
> data.
> . . .
> [L]ooking at [the] big picture, many of the [security] tests [IQVIA requested] do
> not make sense.  Why [is] Veeva singled out in this way that is so different than
> IQVIA end customers who access IQVIA data?  I just don't understand that.

Veeva otherwise denies the allegations set forth in paragraph 65.

66.     Veeva admits that on March 24, 2015, Veeva announced it had reference data
offerings available in Australia, China, the United Kingdom, and the United States.  Veeva
further admits that it intended to and did further expand its international offerings, and now
offers reference data offerings in approximately 38 countries, many of which are in direct
competition with IQVIA's offerings in those countries.  Veeva otherwise denies the allegations
set forth in paragraph 66.

## Response to "Veeva is Well Aware of the Confidential and Proprietary Nature of IMS Market Research Offerings"

67.     Veeva admits the allegations set forth in paragraph 67.

68.     Veeva admits the allegations set forth in paragraph 68.

69.     Veeva admits that once a TPA Agreement is in place, IQVIA allows its clients
to upload IQVIA reference data, and some elements of IQVIA sales data, to Veeva's CRM
Application, and some elements of IQVIA sales data for use in Veeva's MDM Application.
These TPA Agreements vary from country to country and project to project.  Veeva directs the
Court to the agreements for a full and complete copy of their contents.  Veeva admits that
IQVIA sometimes offers to sell access to an API, client-by-client.  Veeva is otherwise without

knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 69.

70.     Veeva denies the allegations set forth in paragraph 70.

71.     Veeva denies the allegations set forth in paragraph 71.

72.     Veeva denies the allegations set forth in paragraph 72.

**Response to "Veeva's Admitted Theft and Misuse of 'IMS Market Research Offerings' to Improve Its Products"**

73.     Veeva denies the allegations set forth in paragraph 73.

1.     *Response to "Veeva Used 'IMS Research Offerings' to Improve Its CRM and MDM Applications"*

74.     Veeva admits that it regularly updates its CRM and MDM solutions.  Veeva otherwise denies the allegations set forth in paragraph 74.

75.     Veeva denies the allegations set forth in paragraph 75.

76.     Veeva admits that, in compliance with applicable IQVIA TPAs, certain of its personnel sometimes access Veeva CRM and MDM instances in order to resolve technology support issues reported by its customers.  Veeva otherwise denies the allegations set forth in paragraph 76.

77.     Veeva admits the allegations set forth in paragraph 77.

78.     Veeva admits the allegations set forth in paragraph 78.

79.     Veeva admits that Veeva's engineers will sometimes access, pursuant to a TPA with IQVIA, IQVIA reference data in order to design and implement a software remedy for a customer problem.  Veeva otherwise denies the allegations set forth in paragraph 79.

80.     Veeva denies the allegations set forth in paragraph 80.

81.     Veeva denies the allegations set forth in paragraph 81.

82.     Veeva denies the allegations set forth in paragraph 82.

83.     Veeva denies the allegations set forth in paragraph 83.

84.     Paragraph 84 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 84 may be deemed to require a response from Veeva, Veeva denies these allegations.

85.     Paragraph 85 contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 85 may be deemed to require a response from Veeva, Veeva denies these allegations

86.     Veeva denies the allegations set forth in paragraph 86.

2.   *Response to "Veeva Used 'IMS Healthcare Professional Data' and 'Sub-National Information' to Improve Its Data Product"*

87.     Veeva states that it first entered the healthcare professional data business in 2013.  Paragraph 87 otherwise contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 87 may be deemed to require a response from Veeva, Veeva denies these allegations.

88.     Veeva admits that its first healthcare professional data product, OpenData, was originally named OpenKey, and that IQVIA offers a product named IQVIA OneKey.  Paragraph 88 otherwise contains IQVIA's characterization of its claims and legal conclusions, to which no response is required.  To the extent that the allegations contained in paragraph 88 may be deemed to require a response from Veeva, Veeva denies these allegations.

89.     Veeva admits that IQVIA filed a lawsuit against Veeva in the United States District Court for the Southern District of New York on April 30, 2015.  Veeva otherwise denies the allegations set forth in paragraph 89.

90.     Veeva admits that it changed the name of its data product from OpenKey to OpenData in or around July 2015.  Veeva further admits that in or around July 2015, IQVIA voluntarily dismissed the litigation it had initiated against Veeva on April 30, 2015, and completely and irrevocably released Veeva regarding that dispute, such that IQVIA cannot attempt to bolster its allegations in this lawsuit by relying upon accusations it has previously released.  Veeva otherwise denies the allegations set forth in paragraph 90.

91.     Veeva denies the allegations set forth in paragraph 91.

92.     Veeva denies the allegations set forth in paragraph 92.

93.     Veeva admits the allegations set forth in the first two sentences of paragraph 93. Veeva denies the allegations set forth in the last sentence of paragraph 93.

94.     Veeva admits it has, for the benefit of clients seeking to purchase Veeva's MDM solution, Network, sought TPA Agreements with IQVIA to allow Veeva Network customers to use IQVIA reference data in conjunction with their Network instances.  Veeva otherwise denies the allegations set forth in paragraph 94.

95.     Veeva denies the allegations set forth in paragraph 95.

96.     Veeva denies the allegations set forth in paragraph 96.

97.     Veeva denies the allegations set forth in paragraph 97.

98.     Veeva admits that a limited number of employees with responsibilities to Veeva OpenData are co-located within the same offices as employees with responsibilities to Veeva Network.  Veeva otherwise denies the allegations set forth in paragraph 98.

99.     Veeva denies the allegations set forth in paragraph 99.

100.    Veeva denies the allegations set forth in paragraph 100.

101.    Veeva denies the allegations set forth in paragraph 101.

102.    Veeva denies the allegations set forth in paragraph 102.

103.    Veeva directs the Court to its website for a full and complete statement of its contents.  Veeva otherwise denies the allegations set forth in paragraph 103.

104.    Veeva admits that the presentation slides incorporated into the Complaint in this paragraph were published to its website.  Veeva directs the Court to its website for a full and complete statement of its contents.  Veeva otherwise denies the allegations set forth in paragraph 104.

105.    Veeva admits the allegations set forth in paragraph 105.

106.    Veeva denies the allegations set forth in paragraph 106.

107.    Veeva admits that Jim Cushman is currently the sole General Manager for OpenData and Network, and has served in that role since February 2016.  Veeva further states that prior to Jim Cushman's assumption of that role, Tim Slevin served as General Manager of OpenData, and Brian Longo served as General Manager of Network.  Veeva otherwise denies the allegations set forth in paragraph 107.

108.    Veeva admits that Private Mode in Veeva MDM protects IQVIA Healthcare Professional Data from being added into the Veeva environment where OpenData is stored and from being misused to improve OpenData.  Veeva otherwise denies the allegations set forth in paragraph 108.

109.    Veeva admits that the referenced statements in paragraph 109 were published to its website.  Veeva directs the Court to its website for a full and complete statement of its contents.  Veeva otherwise denies the allegations set forth in paragraph 109.

110.    Veeva denies the allegations set forth in paragraph 110.

111.    Veeva admits that it consented to an independent assessment of its data security in September 2015, in the course of attempting to negotiate a TPA Agreement with IQVIA for the benefit of a joint customer.  Veeva further admits that IQVIA was the party to propose the independent assessment.  Veeva otherwise denies the allegations set forth in paragraph 111.

112.    Veeva admits that it twice requested deferments of the beginning of the security assessment in order to prepare staff to properly participate in the intensive audit procedures.  Veeva otherwise denies the allegations set forth in paragraph 112.

113.    Veeva denies the allegations set forth in paragraph 113.

114.    Veeva admits the allegations set forth in paragraph 114.

115.    Veeva denies the allegations set forth in paragraph 115.

116.    Veeva denies the allegations set forth in paragraph 116.

117.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 117.

118.    Veeva denies the allegations set forth in paragraph 118.

3. *Response to "Veeva Used 'IMS Healthcare Professional Data' to Improve Its Sales Methods"*

119.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 119.  Veeva otherwise denies the allegations set forth in the second and third sentences of paragraph 119.

120.    Veeva admits that on April 3, 2016, Veeva requested permission from a member of the customer's IT department to pull data from the customer's Veeva CRM instance.  Veeva further admits that the customer granted permission on April 4th and Veeva pulled the requested data shortly thereafter.  Veeva otherwise denies the allegations set forth in paragraph 120.

121.    Veeva admits that it prepared an analysis for its customer, after getting authorization from the customer to do so.  Veeva otherwise denies the allegations set forth in paragraph 121.

122.    Veeva denies the allegations set forth in paragraph 122.

123.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 123.

124.    Veeva denies the allegations set forth in paragraph 124.

125.    Veeva denies the allegations set forth in paragraph 125.

126.    Veeva denies the allegations set forth in paragraph 126.

127.    Veeva denies the allegations set forth in paragraph 127.

128.    Veeva denies the allegations set forth in paragraph 128.

129.    Veeva denies the allegations set forth in paragraph 129.

### Response to "LEGAL CLAIMS"

### Response to "COUNT I"
### FEDERAL THEFT OF TRADE SECRETS
### (THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq.*)

130.    Veeva incorporates its responses to paragraphs 1 through 129 as if fully set forth herein.

131.    The allegations set forth in paragraph 131 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 131.

132.    The allegations set forth in paragraph 132 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 132.

133.    The allegations set forth in paragraph 133 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 133.

134.    The allegations set forth in paragraph 134 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 134.

135.    The allegations set forth in paragraph 135 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 135.

136.    The allegations set forth in paragraph 136 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 136.

137.    Veeva denies the allegations set forth in paragraph 137.

138.    The allegations set forth in paragraph 138 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 138.

**Response to "COUNT II"**

## THEFT OF TRADE SECRETS
## (N.J. STAT. ANN. § 56:15)

139.    Veeva incorporates its responses to paragraphs 1 through 138 as if fully set forth herein.

140.    Veeva denies the allegations set forth in paragraph 140.

141.    Veeva denies the allegations set forth in paragraph 141.

142.    Veeva denies the allegations set forth in paragraph 142.

143.    Veeva denies the allegations set forth in paragraph 143.

144.    Veeva denies the allegations set forth in paragraph 144.

145.    The allegations set forth in paragraph 145 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 145.

146.    The allegations set forth in paragraph 146 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 146.

147.    The allegations set forth in paragraph 147 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 147.

148.    The allegations set forth in paragraph 148 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 148.

149.    The allegations set forth in paragraph 149 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 149.

150.    The allegations set forth in paragraph 150 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 150.

**Response to "COUNT III"**
**TORTIOUS INTERFERENCE WITH CONTRACT**

151.    Veeva incorporates its responses to paragraphs 1 through 150 as if fully set forth herein.

152.    Veeva is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 152.

153.    The allegations set forth in paragraph 153 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 153.

154.    Veeva denies the allegations set forth in paragraph 154.

155.    The allegations set forth in paragraph 155 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 155.

156.    The allegations set forth in paragraph 156 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 156.

**Response to "COUNT IV"**
**FEDERAL FALSE AND MISLEADING ADVERTISING**
**(SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A))**

157.    Veeva incorporates its responses to paragraphs 1 through 156 as if fully set forth herein.

158.    Veeva denies the allegations set forth in paragraph 158.

159.    The allegations set forth in paragraph 159 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 159.

160.    The allegations set forth in paragraph 160 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 160.

161.    The allegations set forth in paragraph 161 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 161.

162.    The allegations set forth in paragraph 162 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 162.

**Response to "COUNT V"**
**UNFAIR TRADE PRACTICES**
**(COMMON LAW)**

163.    Veeva incorporates its responses to paragraphs 1 through 162 as if fully set forth herein.

164.    The allegations set forth in paragraph 164 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 164.

165.    The allegations set forth in paragraph 165 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 165.

166.    The allegations set forth in paragraph 166 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 166.

167.    The allegations set forth in paragraph 167 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 167.

168.    The allegations set forth in paragraph 168 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 168.

**Response to "COUNT VI"**
**UNJUST ENRICHMENT**

169.    Veeva incorporates its responses to paragraphs 1 through 168 as if fully set forth herein.

170.    Veeva denies the allegations set forth in paragraph 170.

171.    The allegations set forth in paragraph 171 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 171.

172.    The allegations set forth in paragraph 172 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 172.

173.    The allegations set forth in paragraph 173 are legal conclusions for which no response is required.  To the extent an answer is required, Veeva denies the allegations set forth in paragraph 173.

## FIRST DEFENSE

Plaintiffs have failed to state a claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiffs' claims are barred by the doctrine of laches, waiver, and estoppel.

## THIRD DEFENSE

Plaintiffs' claims are barred by the doctrine of unclean hands.  The unclean hands doctrine bars Plaintiffs from bringing this suit to allege that Veeva engaged in unlawful activity based on the manner in which Veeva has organized its corporate infrastructure, facilities, personnel, job responsibilities, and computer systems, because Plaintiffs have themselves made similar decisions and engaged in similar practices, to a degree far beyond what Plaintiffs allege as to Veeva.

IQVIA personnel repeatedly have engaged in unauthorized access to Veeva products, and, therefore, to non-IQVIA data.  IQVIA has allowed its employees and/or agents to log into or otherwise gain access to Veeva cloud software products, and data therein provided by Veeva, using common customer portals and/or at common customer locations, without Veeva's

authorization or knowledge.  IQVIA failed to execute an RSAA (Restricted Software Access Agreement) with Veeva that would permit such access.

Plaintiffs have permitted or allowed this to take place in bad faith, without providing appropriate training and security measures for its personnel, while they posture in this litigation about Veeva's supposed inferior security practices regarding common customers.  To the extent IQVIA makes such allegations regarding common customers with respect to Veeva, or otherwise alleges before this Court that mere access, without a mutual agreement, to data originating from the other is in and of itself an injurious act, or that access to data via a common customer is in and of itself an injurious act, IQVIA has unclean hands.

The unclean hands doctrine demands that a plaintiff act fairly in the matter for which it seeks a remedy.  The plaintiff must come into court with clean hands, and keep them clean, or it will be denied relief, regardless of the merits of its claim.  The defense applies to bar legal and equitable claims, and need not involve criminal or tortious activity – simply conduct that violates conscience, good faith, and equitable standards of conduct.  To the extent Plaintiffs seek to contend that Veeva engaged in unlawful activity by allegedly performing the same or similar acts as Plaintiffs, within the same nexus of common customers and common sources of data regarding the healthcare market or classes of software, its claims are barred because such conduct infects its claims and renders pursuing this action inequitable.

### FOURTH DEFENSE

Plaintiffs' claims are unenforceable because the statements made by Veeva were literally true, and/or were not misleading or material at the time they were made.

### FIFTH DEFENSE

Plaintiffs' claims are barred because Plaintiffs have failed to take reasonable steps to mitigate their asserted damages.

### SIXTH DEFENSE

There is no basis in law or fact for Plaintiffs' demands for punitive damages.

**SEVENTH DEFENSE**

The statute of limitations bars Plaintiffs from pursuing their claims for relief, including but not limited to their claims of trade secret misappropriation.

**EIGHTH DEFENSE**

To the extent that ready ascertainability is deemed an affirmative defense rather than an element on which Plaintiffs bear the burden of proof (and Veeva contends that the latter applies), Plaintiffs are barred from claiming trade secret misappropriation as to any items of information that were readily ascertainable within the meaning of that defense at the time of the alleged misappropriation.

**NINTH DEFENSE**

To the extent that independent derivation is deemed an affirmative defense rather than an element on which Plaintiffs bear the burden of proof (and Veeva contends that the latter applies), Plaintiffs are barred from claiming trade secret misappropriation as to any items of information that it independently derived within the meaning of that defense.

**TENTH DEFENSE**

The privilege of competition bars Plaintiffs from pursuing their claims for relief.

**ELEVENTH DEFENSE**

The doctrine of implied license bars Plaintiffs from pursing their claims for relief.

**TWELFTH DEFENSE**

To the extent reliance upon a release is deemed an affirmative defense rather than an element on which Plaintiffs bear the burden of proof (and Veeva contends that the latter applies), Plaintiffs are barred from pursing any claims, or otherwise submitting evidence to support a claim, based on claims previously released.

## STATEMENT OF INTENTION TO PURSUE UNIFORM TRADE SECRETS ACT AND DEFEND TRADE SECRETS ACT BAD FAITH REMEDIES

Because Veeva believes that Plaintiffs have acted in bad faith within the meaning of the Uniform Trade Secrets Act (including, but not limited to, California Civil Code § 3426.4) and the Defend Trade Secrets Act of 2016, Veeva will seek all fees and costs permitted by statute.

## FIRST AMENDED COUNTERCLAIMS

FIRST AMENDED COUNTERCLAIMS OF VEEVA SYSTEMS INC. ................................... 23

THE PARTIES ............................................................................................................................ 27

JURISDICTION ......................................................................................................................... 29

FACTUAL BACKGROUND ..................................................................................................... 30

    Industry Background ............................................................................................................ 30

    Relevant Product Markets ................................................................................................... 32

        Healthcare Reference Data Market ................................................................................ 32

        Pharmaceutical Sales and Performance Data ............................................................... 36

        Life Sciences Customer Relationship Management (CRM) Software ................ 38

        Life Sciences Master Data Management (MDM) Software ................................. 40

IQVIA AND CEGEDIM'S HISTORY OF ANTICOMPETITIVE CONDUCT ........................ 42

    Anticompetitive Conduct in Europe – Data ...................................................................... 43

    Anticompetitive Conduct in Europe – CRM Software Solutions ..................................... 43

    Anticompetitive Conduct in the United States – Data ...................................................... 44

CURRENT ANTICOMPETITIVE CONDUCT IN THE UNITED STATES AND EUROPE – DATA AND MDM SOFTWARE SOLUTIONS .......................................................................... 45

    IQVIA and Cegedim's Pre-Merger Boycott of Veeva ..................................................... 45

    IQVIA Abuses MDM TPA Agreement Process To Slow and Block Veeva MDM ......... 48

IQVIA COLLUDES WITH RELTIO TO SUPPORT AND FURTHER IQVIA'S ANTICOMPETITIVE CONDUCT ........................................................................................... 52

IQVIA IS IMPEDING AND PREVENTING CUSTOMERS FROM SWITCHING TO COMPETITIVE REFERENCE DATA AND MDM SOFTWARE SOLUTIONS .................... 55

    Exclusionary Conduct to Prevent Customers from Switching Away from IQVIA Products ............................................................................................................................... 55

    Denials of National Provider Numbers .............................................................................. 56

    Denials of "Brick" Data ...................................................................................................... 57

    Denial of IQVIA Software Applications ............................................................................ 59

    Threats of Retaliation .......................................................................................................... 60

IQVIA'S TRADE SECRET CLAIMS ARE OBJECTIVELY BASELESS AND WERE FILED WITH THE PURPOSE AND EFFECT OF IMPEDING COMPETITION ................................ 61

INJURY TO COMPETITION ................................................................................................... 63

FIRST CLAIM FOR RELIEF ................................................................... 65

    Monopoly Maintenance – Reference Data (15 U.S.C. § 2) ............................... 65

SECOND CLAIM FOR RELIEF ............................................................... 65

    Attempted Monopolization – MDM Software Solutions (15 U.S.C. § 2) ........ 65

THIRD CLAIM FOR RELIEF .................................................................. 67

    Conspiracy to Monopolize – MDM Software and Reference Data (15 U.S.C. § 2) ........ 67

FOURTH CLAIM FOR RELIEF ............................................................... 68

    Violation of Section 1 of the Sherman Act – IQVIA-Reltio Collusion ........... 68

    (Agreement in Restraint of Trade) (15 U.S.C. § 1) ....................................... 68

FIFTH CLAIM FOR RELIEF ................................................................... 70

    Violation of Section 1 of the Sherman Act – Cegedim .................................. 70

    (Group Boycott) (15 U.S.C. § 1) ................................................................ 70

SIXTH CLAIM FOR RELIEF ................................................................... 71

    Monopoly Leveraging of Reference and Sales Data (15 U.S.C. § 2) ............. 71

SEVENTH CLAIM FOR RELIEF .............................................................. 73

    Intentional Interference with Contractual Relations ..................................... 73

EIGHTH CLAIM FOR RELIEF ................................................................. 73

    Intentional Interference with Prospective Economic Advantage..................... 73

NINTH CLAIM FOR RELIEF ................................................................... 74

    Violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq*.) ..................... 74

TENTH CLAIM FOR RELIEF ................................................................... 75

    Violation of the Unfair Practices Act (Cal. Bus. & Prof. Code § 17200, *et seq*.) ............ 75

ELEVENTH CLAIM FOR RELIEF ............................................................. 76

    Negligent Misrepresentation .................................................................... 76

PRAYER FOR RELIEF ........................................................................... 76

JURY TRIAL DEMAND .......................................................................... 77

## FIRST AMENDED COUNTERCLAIMS OF VEEVA SYSTEMS INC.

Defendant and Counterclaim Plaintiff Veeva Systems Inc. ("Veeva") amends

Counterclaims against Plaintiffs and Counterclaim Defendants IQVIA Inc. ("IQVIA") and IMS

Software Services, Ltd. ("IMS Software") (collectively, "IQVIA"), and by and for its Amended

Counterclaims alleges as follows:

1.     By Order and Opinion dated October 3, 2018, United States District Judge Claire

C. Cecchi denied IQVIA's motion to dismiss Veeva's Counterclaims.

2.      Veeva now amends its Counterclaims because discovery has confirmed Veeva's initial allegations about IQVIA's anticompetitive conduct and revealed previously unknown details about IQVIA's overarching anticompetitive scheme to block Veeva from the Reference Data and Master Data Management ("MDM") software markets.  This anticompetitive scheme raises prices and reduces choice for IQVIA's and Veeva's customers, preventing them from dealing with Veeva, an innovative rival.

3.      Moreover, IQVIA's failure to support its trade secret claims with facts demonstrates that it is maintaining these objectively baseless claims, which were filed for an improper purpose, as an attempt to thwart Veeva from exposing its anticompetitive scheme.

4.      IQVIA is abusing its monopoly power as the dominant provider of data products for life sciences companies by preventing Veeva and other competitors from providing data products and software applications to life sciences companies, which includes primarily pharmaceutical and biotechnology companies.  Life sciences companies have been and continue to be able to achieve the benefits of Veeva's Customer Relationship Management ("CRM") software with IQVIA data through long-standing agreements without genuine data security issues.  Yet, when Veeva began to offer its own data products and MDM software to life sciences companies in direct competition with IQVIA, IQVIA began a campaign of anticompetitive conduct designed to preclude Veeva from offering data products and MDM software to life sciences companies.

5.      Rather than seeking to compete legitimately with Veeva, IQVIA began its crusade to crush Veeva's new lines of business using its monopoly power as the dominant provider of data products for life sciences companies.  At a company-wide sales meeting in 2014, IQVIA launched "Project Orange Crush," part of IQVIA's company-wide plan to impede and prevent

life sciences companies from using Veeva's data and software products in a "surround and destroy" strategy.  Orange is a reference to Veeva's distinctive logo and marketing color.  To underscore the point, IQVIA handed out cans of Orange Crush soda.  IQVIA has engaged in a global campaign to prevent customers from using Veeva's MDM and other software applications and Veeva's Healthcare Reference Data ("Reference Data") by, among other practices discussed herein, refusing customer requests to use IQVIA's Reference Data products with Veeva's MDM and other software products, creating barriers to prevent customers from switching from IQVIA Reference Data to Veeva Reference Data, and colluding with another MDM provider to prevent customers from adopting Veeva's data and software products.

6.      IQVIA has prevented life sciences companies from using IQVIA data products with Veeva's MDM and other software via its license agreements with life sciences customers. IQVIA has abused the well-established practice, as part of its license agreements with life sciences customers, of requiring Third Party Access (TPA) Agreements in order for third-party software providers, like Veeva, to host and process IQVIA data on behalf of life sciences customers.  In its effort to prevent Veeva from offering its competitive products, IQVIA has intentionally delayed and complicated negotiations requested by customers for these TPAs, flatly refused to enter into such agreements to allow life sciences companies to use IQVIA's Reference Data products with Veeva's MDM, and now has baselessly accused Veeva of stealing IQVIA intellectual property and of maintaining inadequate security, while simultaneously refusing to provide any input or suggestion as to how Veeva could satisfactorily demonstrate security. Indeed, the IQVIA Complaint is merely a continuation of IQVIA's pretextual justification of its attempts to abuse its market power in data products for life sciences companies.

7.      The intent and effect of IQVIA's campaign is to stunt the growth of Veeva's data and software products.  IQVIA has harmed competition by preventing Veeva from providing its MDM software solution to life sciences companies; has impeded the growth of Veeva's Reference Data product, thereby damaging the quality of the product by preventing Veeva and its customers from realizing the benefit of further legitimate network effects; and has prevented and discouraged customers from switching from IQVIA to Veeva products by substantially raising the technical burden and costs of such transitions.  This conduct, along with other unlawful acts meant to prevent Veeva from offering its data products and software solutions to life sciences companies, are harming life sciences companies and harming competition by raising costs and reducing choice of data products and software applications.

8.      IQVIA's refusals to allow life sciences companies to use IQVIA data products with Veeva's MDM software have no legitimate business justification.  IQVIA's purported justifications to the contrary are pretextual.

9.      IQVIA's overall anticompetitive scheme includes, among other things, a number of overt, anticompetitive, and predatory acts and practices, including monopolization, attempted monopolization, conspiracy to monopolize, group boycotts, agreements in restraint of trade, unlawful tying of goods or services, exclusive dealing, refusals to deal with customers and/or competitors, bringing the within litigation, unfair competition, unfair trade practices, and tortious interference with contract.  This exclusionary conduct harms customers.  Life sciences companies have been injured by having to pay higher prices, for inferior products, and with fewer choices, and are often forced to contract with IQVIA, despite their dissatisfaction with IQVIA's data products, software solutions, services, and prices.

10.     Veeva seeks damages that have resulted from IQVIA's anticompetitive conduct and a permanent injunction preventing IQVIA from continuing its improper abuse of its dominant position in the markets for Healthcare Reference Data and Life Sciences Pharmaceutical Sales and Performance Data ("Sales Data").

## THE PARTIES

11.     Counterclaim Plaintiff Veeva is a publicly traded information and technology services company, organized and existing under the laws of the State of Delaware, with its principal place of business at 4280 Hacienda Drive, Pleasanton, California 94588.

12.     Founded in 2007, through the quality and innovation of its product offerings, Veeva rapidly has grown from a Silicon Valley startup to a leading global provider of industry-specific, cloud-based software solutions for the life sciences industry.  Veeva provides cloud-based solutions for CRM, Reference Data, enterprise content management, and MDM to life sciences customers around the world.

13.     Life sciences companies rely on Veeva's products to realize the benefits of modern cloud-based architectures and mobile applications for their most critical business functions, without compromising industry-specific functionality or regulatory compliance.

14.     Veeva CRM, Veeva's Customer Relationship Management software for sales representatives, enables a broad range of industry-specific functions such as drug sample tracking with electronic signature capture, healthcare affiliations management, and the ability to conduct interactive, rich media demonstrations with physicians on a mobile device, with or without an Internet connection.  Veeva's CRM enables customers to increase the productivity and ensure regulatory compliance of their sales and marketing functions.

15.     Veeva Network, Veeva's MDM software, enables life sciences companies to create, consolidate, maintain, steward, and share data that drives life sciences companies' sales

and marketing operations.  Veeva Network enables life sciences companies to more effectively manage complex healthcare provider, healthcare organization, and healthcare product data, and the relationships within and across these data domains.  Veeva Network is a first-of-a-kind MDM solution that takes an approach that is tailored for life sciences customers; connecting to end-users to get their real-time feedback on the data which, in turn, results in the highest data quality and data trustworthiness in the Life Sciences marketplace.  Network was the first cloud-based MDM solution built as a "fit-for-purpose" (*i.e.*, specific for the life sciences industry) MDM solution.  Among other features, Veeva Network offers a data model that is pre-built for the requirements of life sciences companies, an intuitive and modern user interface, and advanced reporting, tracking, and audit capabilities.  Veeva Network's features result in a software solution that has the lowest cost of ownership for Veeva Network customers and the industry's lowest service/implementation-to-software cost ratio.

16.     Veeva OpenData is Veeva's proprietary Reference Data product that includes healthcare professionals, healthcare organizations, and other supplemental data that can be used with Veeva's CRM or MDM solutions or with third-party CRM or MDM solutions.

17.     As a relatively recent entrant to the life sciences technology space, Veeva is focused on being an innovator and adding more value for customers (and thus is a disruptive competitive influence on incumbent firms).  As a result, its technology solutions have consistently demonstrated that legacy solutions do not effectively and efficiently satisfy the needs of life sciences companies today and in the evolving future.  Veeva's innovations directly benefit customers by helping to reduce total cost of ownership for technology solutions, improving the efficiency of new drug development processes, improving analytical insights, and improving and easing regulatory compliance.

18.     Counterclaim Defendant IQVIA is the largest pharmaceutical data and analytics company both in the United States and the world.  It has grown to its dominant position by aggressively absorbing every major competitor in the United States and the world, such as by its April 1, 2015 acquisition of the data and CRM businesses of Cegedim, its main competitor in Europe.  By acquiring Cegedim's data business, which included the dominant life sciences reference data product in the European Union ("EU"), and Cegedim's CRM business, IQVIA consolidated its status as the world leader in Reference Data with its already world leading status in Sales Data.

19.     IQVIA is organized and existing under the laws of the State of Delaware with dual corporate headquarters at 83 Wooster Heights Road, Danbury, Connecticut 06810, and 4820 Emperor Boulevard, Durham, North Carolina 27703.  IQVIA has offices at 435 Market Street, 7th Floor, San Francisco, California 94105, and 777 Mariners Island Boulevard, Suite 700, San Mateo, California 94404, and is registered to do business in the State of California.  Upon information and belief, IQVIA in fact conducts a significant portion of its business in California, and/or derives substantial revenue from services rendered within the Northern District of California.

20.     Counterclaim Defendant IMS Software is a corporation organized and existing under the laws of the State of Delaware with headquarters at 83 Wooster Heights Road, Danbury, Connecticut 06810.

21.     IQVIA and Veeva are competitors in the relevant markets of CRM software for life sciences, MDM software for life sciences, and Reference Data.

## JURISDICTION

22.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question jurisdiction), as this action arises under

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and §§ 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26.

23.    This Court has supplemental jurisdiction to adjudicate the related state law claims under 28 U.S.C. § 1367.

24.    Although justice would be better served by alternative venues, venue is technically proper here as provided in 28 U.S.C. § 1391(b)(1) and (c), and as provided in §§ 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and because Counterclaim Defendants have subjected themselves to jurisdiction in this forum by bringing suit here.

**FACTUAL BACKGROUND**

**Industry Background**

25.    IQVIA and Veeva provide data to life sciences companies, as well as software that enables life sciences companies to utilize that data.  IQVIA and Veeva produce and standardize data and software products in the United States and sell them to companies domestically and around the world.  Veeva designs its CRM and MDM software in the United States and sells it across the world.

26.    The development and proliferation of new and advanced drugs in the 20th and 21st centuries has been a direct, substantial cause of a worldwide increase in health and well-being.  Prescription drugs directly promote human health, significantly increasing life expectancy and quality of life in developed and developing nations.  In no small part because of this, pharmaceutical, life sciences, and healthcare companies have become a growing and important part of the world economy, as people live longer and expect better care.

27.    As prescription drugs have proliferated, demand for new and better drugs has increased.  This crucible of demand has forged the prescription drug industry into one of the largest, most complex, and most innovative industries in the world.  Those same conditions

create fierce competition within the industry, such that even a marginal advantage can represent billions of dollars in additional revenue.

28.     Because of the high level of regulation within the healthcare and life sciences markets, as prescription drugs and other healthcare products are distributed, prescribed, and consumed, customers and intermediaries for those products create enormous amounts of data at each step in the stream of commerce, from manufacturer to consumer.  Life sciences companies need this data in various forms – including Reference Data and Sales Data, described in more detail at paragraphs 33-62 herein – for commercial and regulatory compliance purposes. Typically, however, life sciences companies do not have the expertise and technology to compile, analyze, validate, maintain, and update such vast datasets in-house.

29.     Healthcare data providers, such as IQVIA and Veeva, provide data to life sciences companies through subscription license arrangements that allow life sciences companies to use the relevant data for a defined term.  Because the underlying facts that make up these data sets change regularly, the subscription licenses purchased by life sciences companies typically include updates to the databases to ensure that the data is accurate, compliant, and usable by life sciences companies.

30.     The subscription license agreements issued by data providers to life sciences customers typically prohibit the customer's use of the licensed data in or with third-party products without permission of the data provider.  For instance, IQVIA's standard "Licensing and Services Agreement" for its monopoly data products allows customers to use the data product in third-party software only upon IQVIA's written consent.  Accordingly, IQVIA's Licensing and Services Agreement conditions use of IQVIA's monopoly data products in or with other companies' products on an exercise of IQVIA's discretion.

31.     Typically, a TPA Agreement defines the terms under which a customer may use one provider's data product in or with other providers' software or data products.  Customers request TPAs.  The parties to the TPAs are the data provider, such as IQVIA, companies who provide services to the life sciences company that require the use of the data, such as Veeva, and the customers themselves.  TPAs set out the terms under which third parties (including the providers of software solutions – like CRM software and MDM software that are delivered via a Software-as-a-Service model) may access a data provider's data for the benefit of the life sciences company.  Data suppliers typically maintain a form TPA that specifies the purposes for which the software solution provider may use the data for the benefit of the life sciences customer.  For instance, a TPA may specify, as many IQVIA TPAs do, that use is allowed in a CRM solution, but not in an MDM solution.  The TPAs also specify terms regarding confidentiality, access rights, audit rights, and other limitations with respect to a software solutions provider's access to the data.  The TPA is typically provided by the data provider to the software solutions provider upon the request of the life sciences company.  The TPA is then signed by the data provider and the software solutions provider.  In a typical scenario prior to Veeva's entering the MDM and Reference Data businesses, including in the past when IQVIA and Veeva have entered into a TPA for Veeva CRM, the TPA process was often completed in less than two weeks.

32.     IQVIA and, before IQVIA acquired its businesses, Cegedim, have been using form TPAs since at least 2007.

### Relevant Product Markets

### *Healthcare Reference Data Market*

33.     Reference Data is information regarding doctors, hospitals, and other medical professionals and organizations.  Reference Data datasets generally include the names and

contact information for professionals as well as complex, overlapping affiliations of those professionals to clinics, hospitals, and other organizations.  Building a dataset of this type requires using computer algorithms to compile and match information from a variety of public sources, obtaining and compiling information through licensing of private sources, and collecting information through a manual process that may include phone calls and other direct outreach.

34.     Numerous life sciences companies worldwide buy and rely on such information for compliance purposes, as well as for sales and marketing.  In light of the ferocious competition in the life sciences and pharmaceutical industries worldwide, companies have come to rely on this data as mission critical for sales and marketing purposes.  These companies generally gain access to Reference Data on a subscription basis, relying on suppliers such as Veeva and IQVIA to obtain, validate, and maintain the data.

35.     Continuous validation of Reference Data is necessary because the underlying real world facts constantly evolve and change.  Doctors retire, move offices, change employers, or change hospital affiliations, and healthcare organizations change names or practice areas, among many other possible drivers of change.  As a result of this constant churn, almost one-fifth of all records will have some change each year, and an entire database may be effectively out of date in five years.

36.     Reference Data is critical to the sales and marketing operations of life sciences companies, and even a small error rate or discontinuity of access to updated Reference Data can result in millions of dollars in lost revenue as well as potential fines or penalties for regulatory noncompliance.

37.     Although Veeva has offered a competing product, OpenData, since 2013, IQVIA remains the dominant supplier of Reference Data worldwide under its OneKey brand, with

substantial market power both in the United States and around the world constituting monopoly or near-monopoly positions.  Upon information and belief, IQVIA maintains at least a 70% market share of the Reference Data market in the United States, and despite some regional and national variance, IQVIA maintains a similar dominance worldwide.

38.     Because of the volume of data needed to have a useable set, it generally takes substantial capital and multiple years to build a commercially viable Reference Data set. Moreover, because customers can assist in notifying a provider of out-of-date data, established providers with a preexisting customer base gain the advantage of network effects, further raising the barriers to entry for new competitors.

39.     While IQVIA and Veeva compete for sales of Reference Data worldwide, Reference Data is region and country specific.

40.     The Reference Data geographic market is global.

41.     IQVIA and Veeva sell Reference Data throughout the world, and customers turn to IQVIA and Veeva for the supply of Reference Data globally.  Large multinational customers buy Reference Data throughout the world, and a Reference Data provider's ability to offer data in particular countries is one factor those customers consider when purchasing Reference Data.

42.     The price of Veeva's Reference Data product on a per-record basis is the same throughout the world.

43.     IQVIA has stated publicly that the Reference Data market is global.  For example, on its website, IQVIA advertises that its Reference Data product "OneKey is a trusted data source for HCPs and HCOs worldwide."  IQVIA has also explained its "OneKey solution" is "a global reference data" product and "a significant global, and frankly the gold standard, if you will, in reference data."  IQVIA has said its OneKey Reference Data product provides "names,

addresses, specialties, affiliations, [and] locations of all the stakeholders in healthcare on a global basis."   IQVIA has described OneKey product as its "widely used reference database that tracks more than 15 million healthcare professionals in approximately 100 countries, providing a comprehensive view of health care practitioners that is critical for the commercial success of our clients' marketing and sales initiatives."

44.     IQVIA has stated publicly that it performs data processing and data management activities in "global delivery centers."   IQVIA has stated that "[i]n Madrid, Spain, [IQVIA] experts code and manage core reference data worldwide."   IQVIA's "business activities are concentrated into global or regional hubs in one or more geographic areas" with "standardizing and cleaning of data in Manila, The Philippines" and "reference data management in Santiago, Chile."

45.     The Veeva and IQVIA executives in charge of each company's respective Reference Data products have the word "global" in their titles.

46.     In the alternative, Reference Data is defined by national markets, and IQVIA's anticompetitive conduct in those markets has a direct, substantial, and reasonably foreseeable effect on Veeva and in the United States.

*Pharmaceutical Sales and Performance Data*

47.     Sales Data is another distinct data product derived from valuable commercial information harvested by companies like IQVIA, and subsequently sold to and utilized by life sciences companies.  Whereas Reference Data generally contains contact and relevant biographical information about doctors and intermediate drug purchasers such as pharmacists, Sales Data tracks the actual prescriptions written and volumes of each drug sold in a given geographic region.  As a result, Sales Data can serve a role both in planning and marketing.

48.     Sales Data enables a pharmaceutical company to monitor and analyze the sales performance of its products in order to improve its sales and marketing activities, and serves as the basis for sales representative compensation.  Sales Data can relate both to prescription and over-the-counter drugs and healthcare products.

49.     IQVIA markets various types of Sales Data under different trade names, which may or may not be used together.  One product, known as DDD or DD Outlet, represents actual flow of prescription drugs at retail (*e.g.*, pharmacies) and non-retail (*e.g.*, hospitals) outlets.

50.     Another Sales Data product, known as Xponent, is prescriber prescription data which tells the total number of prescriptions written in a therapeutic class.  Whereas Xponent can show the number of prescriptions written for a particular drug by region or doctor, it does not quantify sales by dollar amounts or number of doses.

51.     Developing a marketable Sales Data set poses substantial hurdles.  A market entrant must expend tens of millions of dollars per year in fixed data acquisition costs, and generally must operate for years to build up sufficient historical data to offer a competitive product.  As a general matter, Sales Data is highly regulated around the world, and subject to stringent and constantly shifting requirements for storage security and anonymization.  Understanding and dealing with the numerous and varied regulations across countries raises

costs for data providers and the risk of civil and enforcement liability for regulatory noncompliance.  All of these factors, and others, create barriers that must be overcome by any potential new entrants into the market.

52.     A result of these strict regulations is that the raw information that data providers gather must be partially anonymized before being made available to life sciences companies, rendering the final product difficult to use on its own.  When paired with advanced analytics and sufficiently detailed sets of Reference Data, however, life sciences companies can leverage this anonymized data to create highly useful analytical and marketing tools.

53.     IQVIA's dominance of this market worldwide led the European Commission, as part of the terms for approval of IQVIA's purchase of Cegedim, to mandate that IQVIA make its regional anonymized data segments, known as "Bricks," available to competitors.

54.     As noted by the European Commission, "the overwhelming majority of pharmaceutical companies buy and use IQVIA's sales tracking data."  IQVIA has a monopoly over Sales Data in the United States, holding at least an 80% share of the U.S. market.  IQVIA has a similarly dominant position worldwide, facing no serious competition in the Sales Data market.  IQVIA has achieved and maintains this monopoly primarily through the use of exclusive, long-term contracts with Sales Data sources.

55.     Veeva has never offered Sales Data.

56.     While IQVIA sells Sales Data worldwide, Sales Data is region and country specific.

57.     The Sales Data geographic market is global.

58.     IQVIA sells Sales Data throughout the world, and customers turn to IQVIA for the supply of Sales Data globally.

59.     IQVIA has stated publicly that the Sales Data market is global.  For example, IQVIA's publicly available marketing materials indicate IQVIA offers its data in many countries around the world – from Azerbaijan to Vietnam, and everywhere in between.  IQVIA's Director of Information Offerings "focuses on developing, evolving and expanding IQVIA's information portfolio globally, including commercial sales and prescription data assets."  And on its website, IQVIA advertises that it offers "[i]ntegrated global sales activities" data.

60.     IQVIA has also stated publicly that its "leading healthcare-specific global IT infrastructure" is what allows it to offer data globally.  IQVIA builds its datasets about pharmaceutical consumption "to serve pharma across the globe," and IQVIA has "more than 85% coverage in global pharmaceutical sales . . . from over 100,000 suppliers worldwide."

61.     IQVIA has further stated publicly that its "pharma clients spend globally . . . well over $200 billion" on what IQVIA offers and that it is "the largest provider of these services by far across the board . . . versus [its] competitors in any of the segments that [IQVIA] compete[s] in. . . .  There's no one in the world of pharma that doesn't buy something from [IQVIA]."

62.     In the alternative, Sales Data is defined by national markets, and IQVIA's anticompetitive conduct in those markets has a direct, substantial, and reasonably foreseeable effect on Veeva and in the United States.

### *Life Sciences Customer Relationship Management (CRM) Software*

63.     Raw Reference Data and Sales Data, provided in database form, are not themselves directly useful products.  Both products require the use of software applications to be rendered into a useful form for life sciences companies.

64.     Life Sciences Customer Relationship Management Software ("CRM Software") is one type of software product used by life sciences companies to harness Reference Data and Sales Data.  CRM Software helps pharmaceutical companies manage their customer interactions by organizing, automating, and synchronizing data from sales, marketing, customer database, customer service, and technical functions.  CRM Software, either offered as locally installed software or as Software-as-a-Service accessed via the internet, collates sets of data and displays them in a user-friendly manner.  With these capabilities, CRM Software enables companies to improve customer relationships, to enhance sales effectiveness, to optimize data quality, and to mitigate regulatory compliance risks.

65.     Reference Data are a necessary input for the functioning of CRM Software, as customers require the underlying contact information in order to make sales calls.  Because of the potentially proprietary nature of Reference Data or Sales Data, when the provider of CRM Software is different from the supplier of the Reference Data or Sales Data to be organized in the CRM Software, the customer must request a TPA Agreement between the data provider(s) and the CRM provider so that the data may be uploaded on the CRM system.  IQVIA requires that a TPA be entered into for every use case and every country for which a third-party solution provider may receive IQVIA data, with each TPA running a distinct one-year term.  As a result, the entire TPA process must be reinitiated in the event of any change or expansion of the customer's use of a software solution.  For any single life sciences customer's use of any single third-party software provider, IQVIA may require numerous TPAs to document the use of IQVIA's data globally, each of which may be renewed, rejected, or changed at IQVIA's discretion annually.

66.     In contrast to IQVIA's TPA practices, Veeva has issued a master TPA to IQVIA that allows IQVIA to use Veeva's data in any IQVIA Application and for any IQVIA customer that IQVIA chooses to list on a simple, one-page enrollment form.  Through similar agreements for software access, many IQVIA employees also have direct access to Veeva's industry-leading CRM product to provide complementary services, such as support and training, to mutual end customers.

67.     Veeva and IQVIA both compete in the global market for CRM Software.

### Life Sciences Master Data Management (MDM) Software

68.     Life Sciences Master Data Management Software ("MDM Software") helps life sciences companies organize information from disparate sources within their business by tracking, managing, and analyzing data to inform and support decision making.  MDM Software accomplishes this by identifying data sources within a customer's business, collecting the data in a central repository, and integrating that data in a structure that facilitates consistent extraction for analysis.

69.     MDM Software is used to integrate one dataset with another dataset, or to input datasets for software applications.  For instance, if a customer was to license Reference Data from Veeva and Sales Data from IQVIA, MDM Software would analyze the two different types of data and pair related data points (such as anonymized total prescription information and related Reference Data for the likely prescribing doctor).  This data could be further combined with the customer's own proprietary internal data, such as sales projections or manufacturing forecasts.

70.     Data are an input for the functioning of MDM Software:  just as raw data is largely useless without the tools to analyze it, MDM Software is useless without data for it to analyze.  Accordingly, IQVIA's monopolies in the Sales and Reference Data markets give

IQVIA effective control over the life sciences MDM market.  As with CRM Software, when the provider of the MDM Software is different from the supplier of the Reference Data or Sales Data to be analyzed by the MDM Software, the customer requests a TPA Agreement between the data provider(s) and the MDM provider so that the data may be used by the life sciences company with the third party's MDM Application.

71.     According to IQVIA marketing materials, by 2018, "40% of CRM and [Enterprise Resource Planning] customers will demand solutions that embed master data management capabilities."

72.     Although IQVIA previously offered an MDM solution of its own, Nucleus360, which it still supports for some existing customers, upon information and belief, it has ceased entering into new contracts for that product.  Instead, on or about June 14, 2016, IQVIA entered into an exclusive partnership with another MDM provider, Reltio Inc. ("Reltio"), and now offers Reltio's MDM Software as part of IQVIA's so-called integrated software suite, IMS One.  IQVIA's contractual relationship with Reltio is part of IQVIA's anticompetitive scheme to prevent Veeva from offering MDM Software solutions to life sciences companies.

73.     Although life sciences companies sometimes purchase MDM Software on a country-by-country basis, life sciences companies often standardize MDM company-wide, on a global basis.  Company-wide purchases often follow test runs in specific countries, making toehold positions critically important to the growth of an MDM Software product.

74.     Because the data Life Sciences MDM Software is intended to handle is highly regulated around the world, understanding and dealing with the numerous and varied regulations across countries for the underlying data's storage and handling, and ensuring that the MDM

Software complies with those regulations, raises costs for MDM Software developers and creates barriers that must be overcome by any potential new entrants into the market.

75.     Due to healthcare and privacy regulations, MDM Software must be tailored specifically for Life Sciences.

76.     The Life Sciences MDM Software geographic market is global.

77.     When customers buy Life Sciences MDM Software, they prefer to standardize purchases across the world.

78.     IQVIA has stated publicly that the MDM Software market is global.  For instance, IQVIA has stated that its "clients will deploy [its] MDM Solution globally, benefiting from [its] global implemental services, which are unmatched by [its] competitors."

79.     Veeva frequently competes for global MDM contracts for large multinational pharmaceutical company customers.

## IQVIA AND CEGEDIM'S HISTORY OF ANTICOMPETITIVE CONDUCT

80.     IQVIA has used its dominant position in the markets for Reference Data and Sales Data, stamping out and restraining competition, removing or reducing customer choice, raising prices, and hobbling competitors through an interconnected web of anticompetitive conduct.  IQVIA's own customers believe that IQVIA charges supracompetitive prices for outdated technology.  IQVIA's own customers recognize that IMS does not innovate and that its technology is dated and overpriced.  Indeed, IQVIA rarely invests in leading edge solutions, operating on aging legacy systems or, when that fails to give it a competitive edge, by buying out major competitors.

81.     Both IQVIA and Cegedim, a company IQVIA acquired, have a long history of avoiding fair competition, either by buying competitors, abusing a dominant position, or both, as alleged herein.

**Anticompetitive Conduct in Europe – Data**

82.    As early as 2001, European regulators intervened when IQVIA attempted to block

its competitors' access to key data in an attempt to force them from the market.  The European

Commission found that IQVIA's refusal to license its industry standard Brick definitions,

predefined geographical segmentations for anonymized Sales Data, to a competitor was an abuse

of its dominant market position, and compelled IQVIA to license the definitions.  *See*

Commission Decision Relating to a Proceeding Pursuant to Article 82 of the EC Treaty (EC) No.

COMP D3/38.044 (July 3, 2001).

83.    Despite this censure by the European Commission, IQVIA continued its

anticompetitive behavior.  For instance, after IQVIA acquired SDI Health LLC ("SDI Health"),

another data firm, in October 2011, IQVIA tried to raise the price for its data to SDI Health's

rival Decision Resources Group ("DRG") from $700,000, before the acquisition, to $5,000,000

plus royalties.  When DRG then attempted to source its U.S. data from Symphony Health

Solutions Corporation ("Symphony"), IQVIA's then-current main competitor in the U.S.

Reference Data and Sales Data markets, and sought an EU only quote from IQVIA, IQVIA

responded with the same $5,000,000 plus royalties price for just the EU data.

**Anticompetitive Conduct in Europe – CRM Software Solutions**

84.    In 2008, Cegedim was sued in France by Gruppo Euris S.p.a. ("Euris"), a CRM

provider.  Euris accused Cegedim, among other things, of abusing its dominant position by

refusing to sell its database to life sciences companies that were using or intending to use it with

Euris CRM software.  Cegedim refused to sell its OneKey Reference Data product to customers

that were using Euris CRM, although it had agreed to sell it to customers that were using other

competing software.  Several customers, as well as Cegedim's management, confirmed the

situation during the proceedings.  Cegedim justified its refusal because it claimed to be suing

Euris for violating its intellectual property.  The French Competition Authority found Cegedim had abused its dominant position, and imposed a fine of €5.7 million.  The authority also enjoined Cegedim from discriminating among its competitors for CRM.  *See* République Française Autorité de la Concurrence [French Competition Authority], civ., July 8, 2014, Case No. 14-D-06.

### Anticompetitive Conduct in the United States – Data

85.     In 2013, IQVIA was sued in the United States District Court for the Eastern District of Pennsylvania by Symphony.  *Symphony Health Solutions Corp. v. IMS Health Inc.*, 2:13-cv-04290-GAM (filed July 24, 2013).  Symphony alleged that IQVIA had used an unsavory broth of anticompetitive tactics in an attempt to weaken and ultimately drive Symphony from the data market.  Among those tactics were long term, exclusive contracts with critical sources of Sales Data meant to choke off Symphony's access to the data sources necessary to offer competing data.  After more than two and a half years of fierce litigation, IQVIA chose to settle the case for an undisclosed sum of money and agreed to purchase one of Symphony's affiliates.

86.     Discovery has confirmed that IQVIA has engaged in a pattern and practice of anticompetitive conduct by abusing the TPA process.  ███████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

87.     ██████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

██████████

## CURRENT ANTICOMPETITIVE CONDUCT IN THE UNITED STATES AND EUROPE – DATA AND MDM SOFTWARE SOLUTIONS

### IQVIA and Cegedim's Pre-Merger Boycott of Veeva

88.     After IQVIA recognized the competitive threat Veeva posed in the MDM market, it began a campaign to exploit its monopoly position in the Reference Data and Sales Data markets and cripple Veeva's ability to successfully sell its MDM software solution to life sciences companies.  IQVIA realized that by refusing to allow its customers to load this critical resource into Veeva's new product, it could effectively preclude Veeva from selling its MDM software solution to life sciences companies.

89.     In late 2013 through early 2014, over a period of four months, IQVIA and Veeva negotiated and came to agreement on a form of TPA Agreement that Veeva understood and expected to cover the use of both IQVIA Reference Data and Sales Data to be used with Veeva's new MDM Software product.  After entering into such TPA Agreements for IQVIA Sales Data, IQVIA abruptly informed Veeva it would not honor the newly negotiated form TPA for IQVIA Reference Data and that IQVIA refused to allow any of its Reference Data to be loaded into Veeva's MDM Software product.

90.     Simultaneously, despite the fact that the merger had only just been announced and was not yet completed, Cegedim began an identical course of conduct in concert with IQVIA. While Cegedim had previously routinely entered into TPA Agreements with Veeva with general language contemplating both CRM and MDM uses, as soon as the merger was announced Cegedim explicitly changed positions, refusing to sign any TPA Agreement that did not

explicitly exclude Veeva MDM products and sending letters to customers informing them of Cegedim's new position.

91.     Cegedim and IQVIA's pre-merger coordination went further, as Cegedim began to coerce existing customers, already covered by multiproduct TPA Agreements, to sign amendments to their valid existing TPA Agreements to preclude Veeva MDM access.  Upon information and belief, Cegedim began this process of pre-merger coordination as part of an agreement with IQVIA to begin boycotting Veeva products to exclude them from the MDM market.

92.     In June and July of 2014, a top 25 pharmaceutical company executed TPA Agreements allowing the use of Cegedim Reference Data in any Veeva system.  After the merger with IQVIA was announced, Cegedim reversed its position and refused to supply the required data and demanded that the customer execute a new TPA Agreement that explicitly prohibits using the data with Veeva's MDM, despite having known all along that the company had always intended to load Cegedim Reference Data into MDM Software.  This led one executive of the company to write on October 10, 2014 that "[t]hey [Cegedim] are basically putting a block to prevent a big competitor from advancing – at our and other manufacturers' expense."

93.     Similarly, on June 18, 2014, a different major pharmaceutical company entered into a TPA Agreement allowing use of Cegedim Reference Data in any Veeva solution. Cegedim knew that the customer intended to use the data in conjunction with Veeva MDM when it signed this TPA Agreement, and the TPA Agreement clearly covers that anticipated use.  In September, after the merger was announced, Cegedim once again reversed its position and refused to supply the required data and demanded that that customer execute a new TPA that explicitly prohibits using the data with Veeva's MDM.

94.     On July 2, 2014, a top 15 pharmaceutical company entered into a TPA Agreement allowing the use of Cegedim Reference Data in any Veeva system.  As with the companies described in paragraphs 92-93, after the IQVIA merger was announced, Cegedim abruptly changed positions and refused to supply the vital data to this customer, as Cegedim was contractually obligated to do, unless the customer executed a new TPA Agreement that explicitly prohibits using the data with Veeva's MDM.

95.     Cegedim followed the same course of conduct described above in paragraphs 92-94 with a top 10 pharmaceutical company, that time interrupting an in-progress MDM implementation project, costing that company and Veeva time and expense and breaching the January 2014 TPA Agreement between the company, Cegedim, and Veeva, and Cegedim's contractual obligations.

96.     These represent only a few of the dozens of customers who were directly frustrated in their attempts to secure TPA Agreements for use of IQVIA data in Veeva software.

97.     This coordinated campaign by Cegedim and IQVIA categorically to deny customers the ability to use Veeva MDM and to deny Veeva access to the MDM Software market functioned as a group boycott and *per se* violation of United States federal and state antitrust laws.

98.     Although the European Commission ultimately approved the Cegedim-IQVIA merger, it mandated that IQVIA continue to make available so-called Brick definitions, an industry standard definition of anonymized regional Sales Data in Europe controlled by IQVIA to prevent IQVIA from blocking competitors in the EU.  *See* Commission Decision Pursuant to Article 6(1)(b) in Conjunction with Article 6(2) of Council Regulation No. 139/2004 and Article 57 of the Agreement on the European Economic Area (EC) No. COMP/M.7337 (Dec. 19, 2014).

**IQVIA Abuses MDM TPA Agreement Process To Slow and Block Veeva MDM**

99.     Both before and after its merger with Cegedim, IQVIA has aggressively leveraged its market power; after the merger with Cegedim was completed, the combined entity began aggressively leveraging its newly enhanced market power to continue its anticompetitive scheme.

100.     With Veeva's first MDM customer in the United States, a top 15 pharmaceutical company, in 2014, IQVIA dragged out for four months negotiations for a TPA Agreement to allow some IQVIA Sales Data and some Reference Data to be used with Veeva MDM.  Since that original TPA was signed, IQVIA has continuously restricted which data is allowed to be used with Veeva Network and made it increasingly difficult to negotiate each new TPA Agreement.  This conduct only worsened after the IQVIA-Cegedim merger.

101.     Similarly, in 2015 Veeva had signed a multimillion dollar contract with a top 5 pharmaceutical company to implement Veeva's MDM solution.  The contract provided the pharmaceutical company an option to terminate the contract if IQVIA refused to grant the pharmaceutical company a TPA Agreement to use IQVIA data in Veeva's MDM Software.  IQVIA initially agreed to engage in a good faith process to complete a TPA Agreement to allow the use of its data with Veeva's MDM solution.  In an attempt to move the negotiations forward, Veeva agreed to submit its products and California headquarters to a third-party security audit with an auditor of IQVIA's choosing.  After participation in the audit, Veeva remediated the areas of concern and approached IQVIA about allowing the company's project to go forward.

102.     IQVIA, however, did not enter these negotiations in good faith, and after months of further discussions, refused to sign a TPA, citing vague "security concerns."

103.     In a further attempt to help assuage IQVIA's alleged concerns, Veeva agreed to a pilot program in France whereby Veeva provided IQVIA a fully operational sample of Veeva's

MDM product to allow IQVIA to conduct further security and vulnerability testing. █████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ Even after Veeva addressed IQVIA's further identified concerns, IQVIA, without citing any specific deficiency, continued to refuse to sign the TPA, a position which it maintains to this day.

104.    Because IQVIA's alleged security concerns were not genuine, however, IQVIA refused to agree, or to provide suggestions for other reasonable remediation.  IQVIA eventually stopped negotiating entirely, and now has stated to multiple customers that it categorically refuses to allow its data to be used with Veeva's Network MDM.  IQVIA has since repeatedly raised baseless, third-party security audit "issues" to customers as a pretext for its unjustified refusal to enter into TPAs to allow customers to use IQVIA Reference Data with Veeva's Network MDM.

105.    As a result of this years-long campaign of delay and obstruction, that company terminated its contract for Veeva's MDM solution.  The company subsequently rolled out Veeva MDM in only a single country where it subscribes to non-IQVIA Reference Data.

106.    On another occasion, a top 20 pharmaceutical company decided to implement Veeva's MDM solution.  Again, the contract provided the pharmaceutical company an option to terminate the contract if IQVIA refused to grant the pharmaceutical company a TPA Agreement to use IQVIA data in Veeva's MDM Software.  After prolonged negotiations, IQVIA stated it would allow neither Reference Data nor critical components of Sales Data to be loaded into Veeva MDM.  As a direct result of this refusal by IQVIA, the company terminated its signed

contract to implement Veeva's MDM, and discontinued discussions to switch to Veeva Reference Data in the United States.

107.    Many other life sciences companies around the world have now been blocked entirely from using Veeva's MDM solution, while others are blocked in significant portions of the world, by IQVIA's refusal to enter into TPA Agreements.

108.    IQVIA's purported justifications are pretextual.

109.    Despite the pretextual nature of IQVIA's claims, Veeva sought to address IQVIA's concerns.  Rather than respond in good faith, IQVIA no longer responds with specific concerns, instead falling back on claims of "general discomfort" while offering to engage in future discussions.

110.    IQVIA now says to its customers that it has never authorized customers to use IQVIA data in Veeva MDM and will not do so until Veeva addresses unspecified "security" concerns.

111.    IQVIA's alleged security concerns are, and have always been, mere pretexts to provide cover for its anticompetitive scheme to prevent Veeva and other competitors from providing data and software applications to life sciences companies.

112.    For example, since Veeva's founding through the present day, Veeva and IQVIA have signed TPA Agreements allowing life sciences companies to use IQVIA's Reference Data and Sales Data with Veeva's CRM software solution.  As IQVIA is aware, Veeva's CRM has substantially the same security protections as Veeva's MDM.  IQVIA has continued allowing the same data to be used with Veeva's CRM because Veeva's CRM is popular among IQVIA's customers, whereas Veeva's MDM is a young product with comparatively few early subscribers, and is thus more vulnerable to IQVIA's predatory behavior.

113.     No matter what efforts Veeva has undertaken and no matter what expense Veeva has incurred, IQVIA has refused to negotiate in good faith or provide adequate explanation of the basis for its concerns.

114.     In order to address IQVIA's stated concerns, Veeva has designed and implemented a proprietary secure data connection, Data Bridge.  Veeva has segregated operations of its personnel with access to IQVIA data and Veeva data.  And Veeva has undergone an intensive audit and remediated all material areas of concern.  Nevertheless, IQVIA continues to cite nonspecific "discomfort" and refused to deal in good faith.  That none of these good faith measures have proved adequate to meet IQVIA's ever moving concerns underscores their pretextual nature.

115.     IQVIA has itself admitted, albeit accidentally, that its concerns were meant only to delay and impose costs on Veeva.  After the audit was completed, IQVIA requested as a remediation point that Veeva physically segregate the servers that would house Veeva's Reference Data product from the servers housing Veeva's software products that might have IQVIA data loaded in them.  Veeva complied with this request even though the physical location of servers is largely irrelevant to any legitimate data security concern.  When Veeva reported it had completed that request, an IQVIA in-house attorney responded asking why Veeva had taken such a meaningless step.  That IQVIA itself admitted a point of remediation it had specifically requested was meaningless shows that it had not engaged in good faith with Veeva.

116.     Veeva predicted exactly this course of conduct to the European Commission, noting that "IQVIA simply can and will cite pretextual intellectual property concerns and refuse to enter into any or many" TPA Agreements.  This lawsuit is simply the logical result of

IQVIA's campaign of pretextual justifications for refusing fairly to deal with Veeva and allow IQVIA customers to use Veeva's superior products.

117.    IQVIA's claims that Veeva's data security is insufficient or that Veeva has been stealing IQVIA's intellectual property are baseless.  Indeed, shortly after the filing of the Complaint in this action, one life sciences company asked IQVIA if it had any evidence whatsoever that Veeva has misappropriated IQVIA intellectual property.  IQVIA admitted that it had none.

118.    By conditioning the sale of its Reference Data product on the acceptance of a restrictive license that requires TPAs, and then denying TPAs, IQVIA effectively has prevented customers from using their preferred MDM Software and thereby foreclosed a threat to IQVIA's Reference Data monopoly.  In effect, IQVIA forces customers who use IQVIA's monopoly data products to avoid Veeva products.  If customers were free to use their preferred MDM Software with IQVIA's Reference Data, they would face lower switching costs if they later chose to change Reference Data providers.  But IQVIA's abuse of the TPA Agreement process has prevented Veeva from expanding in the MDM Software market and insulated IQVIA's Reference Data business from a potential challenger.  IQVIA recognizes that unless it blocks Veeva in the MDM Software market, Veeva will be able to offer superior pricing to customers in both the MDM Software and Reference Data markets over the long run.

## IQVIA COLLUDES WITH RELTIO TO SUPPORT AND FURTHER IQVIA'S ANTICOMPETITIVE CONDUCT

119.    Despite IQVIA's exclusionary conduct, some customers still strived to switch to Veeva's Network MDM product.  Rather than competing against Veeva on the merits by improving its own Nucleus360 MDM product, IQVIA decided to collude with another software

provider and MDM competitor – Reltio – to exclude Veeva from the market and maintain IQVIA's monopoly of the Healthcare Reference Data market.

120. In 2015, Veeva, IQVIA, and Reltio were the three major players in the Life Sciences MDM Software market and, at least ostensibly, all three companies competed against each other for several opportunities to sell MDM Software to global life sciences companies. But, in fact, IQVIA and Reltio colluded to block Veeva from winning these contracts, stunting Veeva's growth in the Life Sciences MDM Software market.

121. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

122. █████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

123.   ██████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

124.    As part of IQVIA and Reltio's continued anticompetitive scheme to prevent Veeva from offering MDM Software to life sciences companies, IQVIA and Reltio entered into an exclusive partnership on or about June 14, 2016.  Under the companies' agreement, IQVIA would sunset its own MDM product – Nucleus 360 – and re-sell Reltio's MDM Software.  █

███████████████████████████████████████████████

██████

125.   ████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

126.   █████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

54

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███

## IQVIA IS IMPEDING AND PREVENTING CUSTOMERS FROM SWITCHING TO COMPETITIVE REFERENCE DATA AND MDM SOFTWARE SOLUTIONS

**Exclusionary Conduct to Prevent Customers from Switching Away from IQVIA Products**

127.    IQVIA has a pattern and practice of acting in bad faith to prevent life sciences companies from switching to competitor Reference Data and software solutions.

128.    When customers inform IQVIA of their intent not to renew contracts or to terminate them voluntarily, IQVIA has refused to comply or deliberately dragged out the termination period.  IQVIA has engaged in such conduct with at least two major pharmaceutical companies.  For instance, when one top 50 pharmaceutical company informed IQVIA the company was switching to Veeva and wanted only a six-month term renewal of its contract, IQVIA refused to sign a term of less than a year.

129.    More insidiously, IQVIA has abused the TPA Agreement process for customers who seek to switch from IQVIA Reference Data to Veeva.  When a customer switches Reference Data providers, in order to ensure its own proprietary records linked to its Reference Data set are not lost, a life sciences customer must "match," as much as possible, each record in the prior data set to each corresponding record in the new Reference Data dataset.  IQVIA has twice previously allowed mapping of IQVIA Reference Data linked records to Veeva Reference Data.  Other than

those two instances outside of the U.S. and EU, however, IQVIA has categorically refused to allow mapping of Reference Data linked records to Veeva Reference Data.

130.    As part of its overarching anticompetitive scheme, through its abuse of the license and TPA Agreement process, IQVIA has forced customers in continuing to purchase only its Reference Data.  By denying customers the ability to map their proprietary data records to a new Reference Data set, customers are unable to migrate away from IQVIA's monopoly data without incurring prohibitively high switching costs.

131.    As one example of this practice, IQVIA blocked one life sciences company from transitioning from IQVIA's Reference Data to Veeva's Reference Data by refusing to sign a TPA Agreement to allow mapping.  IQVIA threatened that customer would be sued for "unlimited liability" if the customer ever attempted to match its own records to Veeva data, even if the matching were conducted by customer personnel without the involvement of Veeva or Veeva software solutions.

132.    To further hinder those customers who persist in attempting to switch from IQVIA to Veeva despite IQVIA's refusal to allow simple matching necessary for continuity of service, IQVIA has begun to further restrict which fields of Sales Data are allowed to be loaded in Veeva MDM.

133.    Switching away from IQVIA data in order to use Veeva's MDM product is time-intensive and costly.  One top pharmaceutical company estimated that it would take more than a year and cost more than one million dollars to transition away from IQVIA data.

### Denials of National Provider Numbers

134.    In the second half of 2016, IQVIA stopped allowing National Provider Identifier ("NPI") numbers from Sales Data to be used with Veeva's MDM.  NPI numbers are part of the Health Insurance Portability and Accountability Act (HIPAA) standard, and are government

issued unique identifiers for all health care providers in the United States.  A federal government agency, the Centers for Medicare & Medicaid Services (CMS), distributes NPI data publicly online at http://download.cms.gov/nppes/NPI_Files.html.  Because NPI numbers are universal and unique, they are of particular value in pairing datasets.

135.     Despite the fact that NPI numbers are created by the government and their use is mandated by statute, IQVIA claims that NPI numbers are IQVIA intellectual property and are "premium" attributes of IQVIA data which are no longer allowed to be used with Veeva's MDM solution.  IQVIA knows that these claims are entirely baseless; IQVIA's intent is to increase the time and expense associated with life sciences customers purchasing Veeva MDM and to damage the continuity of service for those customers switching to Veeva Reference Data or MDM.

### Denials of "Brick" Data

136.     In a similar pattern, starting in 2016, IQVIA has delayed signing TPA Agreements allowing its Brick definitions to be loaded into Veeva MDM, as it did with one top 5 pharmaceutical company which subscribes to Veeva's Reference Data, CRM, and Veeva's MDM solution, but relies on IQVIA Sales Data, paired to Veeva's Reference Data through IQVIA Brick definitions.  Because Brick definitions change regularly and IQVIA requires a new TPA for each update, each IQVIA delay in signing compounds, substantially raising contracting costs and impeding customer use of current data.  Although IQVIA is compelled by the European Commission's decision allowing its merger with Cegedim to provide the Brick definition to MDM software providers upon customer request, that compulsion is useless if constantly out of date.

137.     With another major pharmaceutical customer that used Veeva OpenData, IQVIA stated in November 2016 that it would not allow Brick data into Veeva CRM or MDM, stating

that being able to do so is "the benefit of staying on OneKey."  When the customer responded that such requests had been approved by IQVIA in other countries and was compelled by the European Commission decision approving the IQVIA-Cegedim merger, IQVIA simply stopped responding.

138.    By delaying each TPA Agreement allowing the use of Brick definitions in Veeva MDM, IQVIA is deliberately skirting the intent of the European Commission decision, and abusing its monopoly over those definitions to prevent customers from using competing MDM solutions.

139.    IQVIA's behavior in delaying Brick data approval for use in Veeva MDM is pretextual because it diverges from the behavior of similarly situated competitors.  For instance, GERS France, a former Cegedim entity not acquired in the merger, regularly grants TPA Agreements to Veeva for general use, without excluding Veeva's MDM and without the requirement of a new TPA for each definition update.

140.    Because of the IQVIA monopoly on Sales Data, customers that switch from IQVIA Reference Data to Veeva Reference Data typically continue to purchase IQVIA Sales Data.  As a result, customers generally must match and merge their own records, records in Veeva Reference Data, and records in IQVIA Sales Data.

141.    By refusing to grant either a TPA to allow full data matching, or to allow NPI numbers or regular Brick definition updates into Veeva's systems, IQVIA substantially hinders Veeva's ability to help customers switching to Veeva Reference Data or MDM match their Reference Data, either Veeva, proprietary, or from a third party, with IQVIA Sales Data. Customers are forced to rely on fuzzy matching techniques that are demonstrably and

substantially inferior to deterministic, identifier-based matching, with resulting higher costs and lower quality.

### Denial of IQVIA Software Applications

142.    IQVIA also discourages life sciences companies from switching to Veeva's data offerings in other ways.

143.    In October 2016, a major pharmaceutical company that was an IQVIA Reference Data and software customer in France decided to switch from IQVIA to Veeva Reference Data, but wanted to continue using IQVIA's AggSpend360 software.  When informed of that company's intent to switch data providers, IQVIA told the company that if the company switched to Veeva Reference Data, they would not be permitted to load that data into AggSpend360.  IQVIA claimed this prohibition was because IQVIA could not protect Veeva's intellectual property.

144.    When the pharmaceutical company communicated on Veeva's behalf that Veeva had no concern with IQVIA's ability to protect Veeva's intellectual property, IQVIA changed its position, instead threatening the pharmaceutical company that if it did switch to Veeva's Reference Data that IQVIA would deliberately make it difficult for the company to use AggSpend360.  And as with many other victims of IQVIA's anticompetitive behavior, IQVIA also refused to allow the company to match its IQVIA Reference Data linked records to the company's new Veeva Reference Data under a TPA Agreement.

145.    Similarly, in the summer of 2016, a top 25 pharmaceutical company decided to switch to Veeva's Reference Data and MDM Software in the United States, but elected to continue using IQVIA's software AggSpend360.  Like the company described in paragraphs 143-144, IQVIA told this company, unprompted by any concern from Veeva, that Veeva's Reference Data could not be used with AggSpend360 because IQVIA could not protect Veeva's

intellectual property.  Unlike the company in paragraphs 143-144, however, this company had already been using non-Veeva, non-IQVIA Reference Data and Sales Data with IQVIA's CRM and MDM.  IQVIA did not provide an explanation for the disparate treatment of Veeva's Reference Data versus other non-IQVIA Reference Data.

146.    As shown by the inconsistencies and disparate treatment of Veeva and other competitors, IQVIA's claim it could not adequately protect Veeva's intellectual property was in fact a lie; a pretextual justification IQVIA invented to justify punishing those customers who chose Veeva's products over IQVIA's products.

147.    This pattern continues to this day.  In 2016, a major pharmaceutical company purchased Veeva CRM and continued to use IQVIA Reference Data pursuant to a signed TPA Agreement.  In February 2017, that company decided to change from IQVIA Reference Data to Veeva Reference Data, and informed IQVIA of its intent.  After prolonged negotiations where IQVIA denigrated Veeva's product and attempted to persuade the company to reconsider, the company still insisted on its intention to switch.  At that point, IQVIA flatly refused to sign a TPA Agreement, necessary to allow Veeva to assist the company in the transition by mapping its IQVIA Reference Data linked records to Veeva's Reference Data.  IQVIA later threatened to sue this customer if it later did perform the match on its own, even if the matching was conducted by customer personnel without the involvement of Veeva or Veeva software solutions.

**Threats of Retaliation**

148.    IQVIA has also made it clear that it would retaliate against any company that sought to switch away from any of its products.  As a result, many major life sciences companies

60

are reluctant to switch away from IQVIA products even when they are inferior and/or more expensive than those of competitors.

149.    Due to IQVIA's market power in Sales Data and Reference Data, even large companies fear angering IQVIA by switching away from its products.  Major life sciences companies have expressed reluctance to switch away from IQVIA products for fear of retaliation.

150.    Upon information and belief, these fears are inspired and encouraged by IQVIA sales teams.  IQVIA routinely conveys to customers that, should they switch, they will face all of the substantial burdens IQVIA has placed, as alleged in more detail above.  IQVIA communicates these burdens as an implicit threat to customers that switching data providers will be made costly and difficult by IQVIA.

## IQVIA'S TRADE SECRET CLAIMS ARE OBJECTIVELY BASELESS AND WERE FILED WITH THE PURPOSE AND EFFECT OF IMPEDING COMPETITION

151.    IQVIA has asserted trade secret claims against Veeva that are objectively baseless, demonstrating that IQVIA's underlying intent in bringing its lawsuit was nothing more than a cover directly to interfere with a competitor, Veeva.

152.    In tandem with its market-blocking tactics, IQVIA's allegations against Veeva in this lawsuit are a gross misuse of the legal system designed to achieve outside-the-courthouse objectives.

153.    IQVIA wanted a means to influence customers away from doing business with Veeva.  To achieve that objective, it chose to file a lawsuit with deliberately histrionic and fearmongering accusations.  IQVIA did so in order to be able to tell customers that it had sued Veeva for "theft" – and that Veeva should not be trusted.  To get there, IQVIA fabricated allegations that Veeva created its data and software products by copying or stealing data from

61

IQVIA.  IQVIA planned the lawsuit for market-blocking purposes with no good-faith basis to believe these sweeping allegations were true.

154.    Veeva has spent many millions of dollars, and years of effort from scores of personnel, to source the data for its products from a variety of lawful and public sources and to compile that data into superior product offerings.  Because the data Veeva compiles is obtained from publicly-available and lawful sources, it makes no sense for IQVIA to allege that Veeva could only have developed its OpenData product by copying or stealing data from IQVIA. Nonetheless, IQVIA has never withdrawn that false accusation, even after obtaining discovery demonstrating how Veeva has sourced data for its OpenData product.

155.    IQVIA knowingly made "trade secret misappropriation" accusations for which it never had evidence, and for which there was no objective or subjective basis to believe to be true.  For example, IQVIA was careful to use the phrase "upon information and belief" throughout its January 2017 Complaint, so that it could make objectively baseless accusations without possessing facts to support them.  When IQVIA said "information and belief," it meant that IQVIA did not have any evidence, but made the accusation anyway for ulterior, anticompetitive, and predatory purposes.

156.    For instance, IQVIA alleged that Veeva software engineers modified Veeva's software through trade secret misappropriation, in some unexplained fashion.  But IQVIA later had to concede that IQVIA does not accuse Veeva of accessing, let alone misappropriating, software source code or algorithms or anything of the like from IQVIA.

157.    During a court hearing in April 2018, IQVIA insinuated to the Court that Veeva had misappropriated data "fields" – but soon afterward disclaimed that accusation as well.

158.    The list goes on.  Again and again, IQVIA has fabricated false allegations against Veeva.  In great contrast, when a company with a valid trade secret misappropriation allegation brings a lawsuit based on real evidence, it quickly identifies specific, concrete trade secrets that it contends the defendant received, and misused.  Two years into this litigation, IQVIA has steadfastly refused to identify any specific alleged IQVIA trade secrets, much less describe with specificity how Veeva misused even one of them – a virtual admission that it filed its lawsuit in bad faith for anticompetitive purposes.

159.    Companies do not ordinarily spend time and money to press false accusations in court.  Here, IQVIA's conduct is clear.  IQVIA, the market monopolist, does not want competition from Veeva.  It wants to stop competition from Veeva.  This lawsuit has demonstrated that IQVIA is willing to engage in falsehoods to do so.  And even if IQVIA is later able to establish that it had some degree of probable cause for bringing some of its claims, inasmuch as the entire lawsuit is part of its overall scheme to intimidate customers and exclude Veeva, the lawsuit is anticompetitive.

160.    Congress and state legislatures recognized that the trade secret laws can be misused by those who file meritless lawsuits for anticompetitive goals.  That is why they created a special rule in enacting the Defend Trade Secrets Act and the Uniform Trade Secrets Act to protect defendants who are wrongfully targeted:  if a company makes trade secret accusations in bad faith, it must pay the defendant's attorneys' fees and costs.  Since it first responded to the January 2017 Complaint, Veeva has stated clearly its intention to hold IQVIA accountable for its anticompetitive, bad faith tactics.

## INJURY TO COMPETITION

161.    To date, IQVIA's illegal conduct has directly harmed competition in multiple ways.

162.     By refusing to sign TPA Agreements allowing the use of IQVIA Reference Data in Veeva MDM, IQVIA has impeded Veeva's ability to compete in those relevant markets and interfered with multiple life sciences companies' decisions to purchase Veeva's superior software products.  Life sciences companies are forced to use inferior and/or more expensive solutions, suffering losses of efficiency and other business harms.

163.     By refusing to sign TPA Agreements allowing NPI, "premium attributes," and Brick definition attributes to be loaded into Veeva's MDM software application, IQVIA has harmed competition in the MDM software solution market, restricting customers' choices and increasing prices of MDM and Reference Data paid by life sciences companies.

164.     By refusing to sign TPA Agreements allowing mapping of IQVIA Reference Data linked records to Veeva Reference Data, IQVIA has substantially increased the cost and difficulty of life sciences companies seeking to change data suppliers from IQVIA to Veeva. This has directly increased the costs and time taken by life sciences companies in such transitions, and reduced the ability to have a seamless continuation of service and damaged those companies' business operations.  Customers are thus forced into using IQVIA's OneKey Reference Data product, further securing IQVIA's data monopoly.

165.     By colluding with Reltio, IQVIA has strengthened the effect of its own exclusionary TPA policies, excluded Veeva from the Life Sciences MDM Software and Reference Data markets, and substantially reduced competition in the MDM Software market. This anticompetitive conduct has harmed competition by reducing customer choice and increasing prices in the Life Sciences MDM Software and Reference Data markets.

166.     Through its various other anticompetitive activities and tactics, IQVIA has discouraged other competitors from providing competing Reference Data, Sales Data, and MDM

Software solutions, thereby reducing the quality of the available solutions in each market and driving up costs for customers.

167.     IQVIA and Cegedim's anticompetitive conduct outside of the United States has a direct, substantial, and reasonably foreseeable effect on domestic commerce, as well as Veeva's ability to export products from the United States.  That anticompetitive conduct also gave rise to Veeva's antitrust Counterclaims.

## FIRST CLAIM FOR RELIEF
### Monopoly Maintenance – Reference Data (15 U.S.C. § 2)

168.     Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

169.     As evidenced by its overt, anticompetitive, and predatory acts as alleged herein, IQVIA has engaged in an overall anticompetitive scheme to effectuate, maintain, and enhance its monopoly power in the relevant market for the sale of Reference Data around the world. Accordingly, IQVIA has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

170.     IQVIA has willfully acquired or maintained market power in this relevant market. This market power is protected by high switching costs and high barriers to competitive entry and expansion.

171.     IQVIA's artificial creation of barriers and other conduct enhancing competitive exclusion, taken as a whole, have unlawfully excluded or suppressed competition.

172.     As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

## SECOND CLAIM FOR RELIEF
### Attempted Monopolization – MDM Software Solutions (15 U.S.C. § 2)

173.     Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

174.    IQVIA has unlawfully attempted to monopolize the worldwide market for Life Sciences MDM Software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

175.    IQVIA maintains market power in the related Healthcare Reference Data and Life Sciences Sales Data markets.

176.    IQVIA has entered into an exclusive agreement with Reltio, which sells a Life Sciences MDM Software product.

177.    IQVIA and Reltio specifically intend to monopolize the global Life Sciences MDM Software market.  Their specific intent to monopolize is apparent from their array of anticompetitive conduct that lacks any legitimate business justification.  IQVIA sought to block customers from using IQVIA's Sales Data or Reference Data in or with Veeva's MDM product, and to cut off Veeva's ability to provide MDM Software services by other means.

178.    IQVIA and Reltio have a dangerous probability of achieving monopoly power in the worldwide Life Sciences MDM Software market.  Most importantly, IQVIA is using its market power in the related Life Sciences Sales Data and Reference Data markets to block IQVIA from competing in the Life Sciences MDM Software market.  Moreover, the worldwide Life Sciences MDM Software market is concentrated, and potential new entrants to the market face extensive technological and regulatory compliance requirements and high capital costs, among other barriers to entry.

179.    Through their attempted monopolization of the worldwide Life Sciences MDM Software market, IQVIA and Reltio have harmed competition.

180.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of

higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

**THIRD CLAIM FOR RELIEF**
**Conspiracy to Monopolize – MDM Software and Reference Data (15 U.S.C. § 2)**

181.   Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

182.   IQVIA unlawfully conspired with Reltio to monopolize the global markets for Healthcare Reference Data and Life Sciences MDM Software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

183.   IQVIA and Reltio agreed to monopolize the Healthcare Reference Data and Life Sciences MDM Software markets.

184.   IQVIA and Reltio took overt acts to further their conspiracy by blocking Veeva from gaining key customers and then entering the formal IQVIA-Reltio partnership.

185.   IQVIA and Reltio specifically intended to monopolize the global Healthcare Reference Data market and the global Life Sciences MDM Software market.  Their specific intent to monopolize is apparent from their array of predatory anticompetitive conduct and the formal IQVIA-Reltio Partnership Agreement.  Neither IQVIA nor Reltio had any legitimate business justification for their actions.

186.   Through their conspiracy to monopolize the global markets for Healthcare Reference Data and Life Sciences MDM Software, IQVIA and Reltio have harmed competition.

187.   As a direct and proximate result of an unlawful conspiracy to monopolize the global Life Sciences Reference Data and MDM software markets, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act – IQVIA-Reltio Collusion**
**(Agreement in Restraint of Trade) (15 U.S.C. § 1)**

188.    Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

189.    IQVIA and Reltio have entered into an agreement to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

190.    Reltio sells a Life Sciences MDM Software product.  For a time, IQVIA also sold a Life Sciences MDM Software product.

191.    IQVIA maintains market power in the related Healthcare Reference Data and Life Sciences Sales Data markets.

192.    Prior to signing their Partnership Agreement in June 2016, when IQVIA and Reltio were still direct competitors in the MDM Software market, IQVIA and Reltio conspired to exclude Veeva from the Life Sciences MDM Software market.

193.    IQVIA and Reltio conspired to prevent Veeva from gaining Life Sciences MDM Software and Reference Data customers by coordinating sales strategy and through IQVIA's anticompetitive use of TPAs to deny customers the ability to use IQVIA data in or with Veeva products.

194.    IQVIA and Reltio's illegal conduct expanded, in June 2016, when IQVIA entered into its exclusive agreement with Reltio.  Under the agreement, IQVIA effectively discontinued its own MDM Software product and unlawfully agreed to leverage its monopoly power in the global Healthcare Reference Data and Life Sciences Sales Data markets to facilitate Reltio's monopolization of the worldwide market for Life Sciences MDM Software.

195.    IQVIA and Reltio agreed to restrain fair competition in the Life Sciences MDM Software market.  Their specific intent to monopolize is apparent from their array of anticompetitive conduct that lacks any legitimate business justification.  IQVIA has sought to

block customers from using its Sales Data or Reference Data in or with Veeva's MDM Software product, and to cut off Veeva's ability to provide MDM Software services by other means. At the same time, IQVIA and Reltio entered into an exclusive agreement whereby IQVIA would steer data customers to Reltio MDM Software.

196.    IQVIA is using its Partnership Agreement with Reltio and its market power in the related Healthcare Reference Data and Life Sciences Sales Data markets to block Veeva from competing in the Life Sciences MDM Software market. Moreover, the worldwide Life Sciences MDM Software market is concentrated, and potential new entrants to the market face extensive technological and regulatory compliance requirements and high capital costs.

197.    IQVIA-Reltio collusion is a *per se* violation of Section 1 of the Sherman Act. Alternatively, IQVIA and Reltio's collusion violates Section 1 under either a "quick look" rule of reason analysis or a traditional rule of reason analysis. To the extent such market allegations are necessary, the relevant product market for the purposes of this Claim is Life Sciences MDM Software. The relevant geographic market is global.

198.    Through their agreement to restrain trade in the worldwide Life Sciences MDM Software market, IQVIA and Reltio have harmed competition.

199.    IQVIA and Reltio's coordinated campaign to deny customers the ability to use Veeva products and to deny Veeva access to the MDM Software market had significant anticompetitive effects. It restrained competition in the MDM Software market and reduced customer choice. It also constrained innovation from Veeva, a new entrant to the market. As a result, IQVIA and Veeva's mutual life sciences company customers failed to receive the benefits that competition would have brought, including better services and lower prices.

200.     IQVIA and Reltio's actions were not reasonably necessary to accomplish any procompetitive objectives, or, alternatively, their scope is broader than necessary to accomplish any such objective.

201.     As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

**FIFTH CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act – Cegedim**
**(Group Boycott) (15 U.S.C. § 1)**

202.     Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

203.     IQVIA and Cegedim conspired to exclude Veeva from the global market for Life Sciences MDM Software by refusing to sign TPA Agreements allowing joint customers to use IQVIA or Cegedim data in Veeva's MDM Software.

204.     IQVIA and Cegedim's exclusionary conduct toward Veeva was pursuant to an agreement between IQVIA and Cegedim.

205.     IQVIA and Cegedim were direct competitors.

206.     IQVIA and Cegedim's collusion disadvantaged Veeva by, among other things, denying Veeva access to a supply of a product, a facility, or a market or a service necessary for Counterclaim Plaintiff to compete effectively.

207.     IQVIA and Cegedim's collusion occurred in international commerce and domestic commerce.

208.     The IQVIA-Cegedim group boycott is a *per se* violation of Section 1 of the Sherman Act.  Alternatively, IQVIA and Cegedim's group boycott violates Section 1 under either a "quick look" rule of reason analysis or a traditional rule of reason analysis.  To the extent

market allegations are necessary, the relevant product market for the purposes of this Claim is the Healthcare Reference Data market.  The relevant geographic market is global, or in the alternative, national markets in countries across the world.

209.    IQVIA maintains market power in the Healthcare Reference Data and Life Sciences Sales Data markets.

210.    IQVIA and Cegedim's coordinated conduct to restrain trade harmed competition.

211.    IQVIA and Cegedim's actions were not reasonably necessary to accomplish any procompetitive objectives, or, alternatively, their scope is broader than necessary to accomplish any such objective.

212.    As a direct and proximate result of IQVIA and Cegedim's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

**SIXTH CLAIM FOR RELIEF**
**Monopoly Leveraging of Reference and Sales Data (15 U.S.C. § 2)**

213.    Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

214.    IQVIA has unlawfully leveraged its monopoly power in the worldwide market for Life Sciences Sales Data to maintain its monopoly in the worldwide market for Healthcare Reference Data, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  IQVIA has also unlawfully leveraged its monopoly power in the worldwide markets for Healthcare Reference Data and Life Sciences Sales Data to gain dominance in the Life Sciences MDM Software market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  IQVIA maintains market power in the Healthcare Reference Data and Life Sciences Sales Data markets.

215.   IQVIA has sought to block customers from using Veeva Reference Data by denying or limiting customer use of IQVIA Sales Data with Veeva Reference Data, including by restricting matching.

216.   IQVIA is using its market power in the related Life Sciences Sales Data market to block Veeva from competing in the Healthcare Reference Data market.

217.   IQVIA has entered into an exclusive agreement with Reltio, which sells a Life Sciences MDM Software product.

218.   IQVIA has sought to block customers from using IQVIA's Sales Data or Reference Data in or with Veeva's MDM and other software products, and to cut off Veeva's ability to provide MDM and other software services by other means.

219.   As a result of IQVIA's abuse of its market power in the Healthcare Reference Data and Life Sciences Sales Data markets to influence the Life Sciences MDM Software market, IQVIA and Reltio have a dangerous probability of achieving monopoly power in the worldwide Life Sciences MDM Software market.  Most importantly, IQVIA is using its market power in the related Life Sciences Sales Data and Reference Data markets to block Veeva from competing in the Life Sciences MDM Software market.  Moreover, the worldwide Life Sciences MDM Software market is concentrated, and potential new entrants to the market face extensive technological and regulatory compliance requirements and high capital costs.

220.   Through its leveraging of its monopoly power in the worldwide Healthcare Reference Data and Sales Data markets, IQVIA has harmed competition in the MDM Software market.

221.   As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of

higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations of the Sherman Act alleged herein.

## SEVENTH CLAIM FOR RELIEF
### Intentional Interference with Contractual Relations

222.    Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

223.    Veeva and multiple major life sciences companies were in ongoing contracts that would have benefitted Veeva.

224.    IQVIA knew of these contracts.

225.    IQVIA intended to disrupt these contracts by negotiating TPA Agreements in bad faith and refusing to execute them without valid reason, in an attempt to monopolize the MDM Software and Healthcare Reference Data markets.

226.    Veeva was harmed by losing millions in revenue that would have flowed from those contracts.

227.    IQVIA's conduct was a substantial factor in these losses.

228.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations alleged herein.

## EIGHTH CLAIM FOR RELIEF
### Intentional Interference with Prospective Economic Advantage

229.    Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

230.    Veeva and multiple major life sciences companies were in ongoing contracts that would have benefitted Veeva.

231.    IQVIA knew of these contracts.

232.     IQVIA engaged in wrongful conduct through leveraging its monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

233.     IQVIA engaged in wrongful conduct by breaching the covenant of good faith and fair dealing with its customers by rejecting customer TPA requests for the purpose of interfering with Veeva's prospective business relations with those customers.

234.     The relationships were disrupted because the companies did not purchase Veeva Network.

235.     Veeva was harmed by the companies declining to purchase Veeva Network.

236.     IQVIA's conduct was a substantial factor in Veeva's harm.

237.     As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations alleged herein.

## NINTH CLAIM FOR RELIEF
### Violation of the Cartwright Act (Cal. Bus. & Prof. Code § 16700, *et seq.*)

238.     Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

239.     IQVIA, along with Cegedim prior to their merger, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, for all the reasons set forth in the preceding allegations. IQVIA's conspiracy is a *per se* violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

240.     As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of

higher prices, inferior products, and fewer choices. Veeva is entitled to damages for the violations of the Cartwright Act alleged herein.

## TENTH CLAIM FOR RELIEF
### Violation of the Unfair Practices Act (Cal. Bus. & Prof. Code § 17200, *et seq.*)

241.    Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

242.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include any "unlawful, unfair or fraudulent business act or practice."

243.    IQVIA has engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and California common law, including the torts of interference with contract, prospective economic advantage, and negligent misrepresentation.

244.    IQVIA's acts and practices as alleged herein have also been "unfair" under the UCL. IQVIA's conduct has threatened an incipient violation of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720), violated the policy and spirit of those laws (resulting in an effect comparable to an antitrust violation), and significantly threatened and harmed competition in the Healthcare Reference Data and Life Sciences MDM Software markets. Furthermore, any utility from IQVIA's conduct does not outweigh the harm it causes to competitors and life sciences companies.

245.    A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California and the harm to Veeva and many life sciences customers was inflicted in California, for all the reasons set forth in the preceding allegations.

246.    As a direct and proximate result of IQVIA's unlawful and unfair conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of

higher prices, inferior products, and fewer choices.  Veeva is entitled to restitution in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF
### Negligent Misrepresentation

247.    Counterclaim Plaintiff repeats and realleges paragraphs 1-167.

248.    IQVIA indicated that it would sign TPAs with Veeva customers if Veeva successfully implemented the pilot program in France.

249.    At the time of this statement, however, IQVIA had reason to believe that it would never grant Veeva a TPA even if the results of the pilot were successful.  ██████████

████████████████████████████████████████████████████████████

█████████████

250.    Veeva justifiably relied on IQVIA's promise and spent time and money to conduct the pilot program.

251.    As a direct and proximate result of IQVIA's unlawful conduct, Veeva has suffered injury to its business or property, and customers have suffered injury in the form of higher prices, inferior products, and fewer choices.  Veeva is entitled to damages for the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff prays that this Court enter judgment in its favor and enter an order:

A.    Dismissing Counterclaim Defendants' claims with prejudice;

B.    Denying all relief requested in the Complaint;

C.    Declaring that Counterclaim Defendants' conduct constitutes:

(1)    Violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,

and § 3 of the Clayton Act, 15 U.S.C. § 14; and

(2)      Violations of Section 16720 of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*.; and

(3)      Violations of Section 17200 of the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17200 *et seq*.; and

(4)      Violations of common law torts.

D.      Permanently enjoin Counterclaim Defendants and their agents and employees from continuing their unlawful actions set forth herein;

E.      Awarding Counterclaim Plaintiff damages, including its actual current and prospective damages for Counterclaim Defendants' violation of state and federal antitrust laws, which are in excess of $200 million;

F.      Awarding Counterclaim Plaintiff punitive damages for Counterclaim Defendants' Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Advantage and the California UCL;

G.      Awarding Counterclaim Plaintiff costs of suit, including reasonable attorneys' fees;

H.      Awarding pre-judgment and post-judgment interest at the highest rate allowed by law; and

I.      Awarding such other relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Counterclaim Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  December 3, 2018

By  _/s/ Arnold b. Calmann_

Steven F. Benz
Benjamin L. Rudofsky
Stefan J. Hasselblad
Daniel S. Severson
Kylie C. Kim
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
sbenz@kellogghansen.com
brudofsky@kellogghansen.com
shasselblad@kellogghansen.com
dseverson@kellogghansen.com
kkim@kellogghansen.com

Arnold B. Calmann (abc@saiber.com)
Jeffrey Soos (js@saiber.com)
Jakob B. Halpern (jbh@saiber.com)
Katherine A. Escanlar (kae@saiber.com)
**SAIBER LLC**
One Gateway Center 10th Floor, Suite 1000
Newark, New Jersey 07102
Tel.: (973) 622-3333
Fax: (973) 622-3349

Charles Tait Graves (tgraves@wsgr.com)
Joel C. Boehm (jboehm@wsgr.com)
Amit Gressel (agressel@wsgr.com)
Ziwei Xiao (zxiao@wsgr.com)
**WILSON SONSINI GOODRICH &**
  **ROSATI**
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Tel: (415) 947-2000
Fax: (415) 947-2099

_Attorneys for Defendant/ Counterclaim_
_Plaintiff Veeva Systems Inc._