UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IQVIA, INC. and IMS SOFTWARE SERVICES, LTD,<br><br>Plaintiffs/ Counterclaim Defendants,<br><br>vs.<br><br>VEEVA SYSTEMS, INC.,<br><br>Defendant/ Counterclaim Plaintiff. | Case No.: 2:17-CV-00177-CCC-MF<br><br>**ORDER & OPINION OF THE SPECIAL MASTER** |

This matter comes before the Special Master on Defendant-Counterclaim Plaintiff Veeva Systems, Inc.'s ("Veeva") motion to overrule Plaintiffs-Counterclaim Defendants IQVIA, Inc. and IMS Software Services, LTD's, (collectively "IQVIA") assertion of privilege over documents subpoenaed from Ernst & Young LLP ("EY"). After considering the submissions of the parties, based upon the following, it is the opinion of the Special Master that Veeva's motion to overrule IQVIA's assertion of privilege over documents subpoenaed from EY is **GRANTED**.

## DISCUSSION

### Background

Prior to the commencement of litigation in this matter, clients of IQVIA asked it to license certain IQVIA data to Veeva for use by Veeva in its Master Data Management ("MDM") offering. Veeva had data offerings in the market and in development that competed with IQVIA data. In light of this, Veeva provided IQVIA with various assurances that IQVIA data would not be used by Veeva to improve Veeva's offerings. EY was subsequently retained by IQVIA "to evaluate the various assurances made by Veeva that (1) IMS Health reference data could be used

1

in Veeva's MDM offering without risk that IMS Health reference data would be used, intentionally or inadvertently, to improve Veeva's own competing reference data offerings, and (2) these assurances are capable of confirmation with an audit of reasonable scope and cost." IQVIA intended to "use the information from the EY assessment to determine whether the assurances could be confirmed and serve as a basis for IMS Health to license its reference data to Veeva for use in Veeva's MDM offering."

EY prepared a Statement of Work for Third Party Access Agreement Compliance Services dated August 10, 2015. The Scope of Service provided that EY would review IQVIA's Service Providers' compliance with the terms of its Third Party Access Agreement between IQVIA and the Service Provider, including: (1) review the terms of the pre-selected TPAs; (2) review the terms of the pre-selected Client Project Confirmations; (3) review Service Providers' offerings, including Service Providers' Master Data Management offering and offerings that utilize reference data; (4) identify and analyze the relevant IME Products and Services supplied to Clients; (5) identify and analyze the relevant IMS Products and Services supplied to Service Provider under the terms of the TPAs and CPCs, or obtained by the Service Providers from Clients or otherwise; (6) review the Service Providers' process and procedures that may include the delivery, storage, usage, security and disposition of the identified IMS Products and Services, including Service Providers' production, staging and testing environments; (7) assess and document the process and procedures designed to protect IMS's intellectual property rights in the identified IMS Products and Services, including IMS data intended to enhance, improve, update, validate, create, develop, or benchmark any Service Provider data, product or offerings; and (8) identify examples of non-compliance with the terms of the TPAs and CPC in connection with the delivery, storage, usage, security or disposition of the IMS Products and Services.

With respect to the legal nature of the Scope of Service, the Statement of Work provides: "Although we have made no independent inquiry or determination with respect thereto, we acknowledge your belief that any services and reports provided by EY, or any portions of such reports…, are or may be protected from disclosure by the attorney-client privilege, work product protection, or both." In the Limitation on Scope of Work section, it provides: "None of the Services or any Reports will constitute any legal opinion or advice."

Veeva and IQVIA subsequently entered into a Factual Findings & Reimbursement Agreement wherein Veeva agreed to pay for 50% of the aggregate amount of the final invoice for EY's assessment of Veeva's assurances. In exchange, at the conclusion of the EY assessment, Veeva was to receive a full written copy of the factual findings that included all facts and observations gathered in the course of the audit but did not include any IQVIA confidential information, recommendations or advice provided to IQVIA by EY.

IQVIA subsequently filed a Complaint on January 10, 2017. In April 2018, Veeva subpoenaed EY seeking documents related to EY's audit of Veeva. These requests included: (1) documents related to IQVIA and EY's discussions of a possible audit of Veeva, including but not limited to, any discussion or negotiation of the scope of work, plans for contemplated or actual subject matter of an audit, instructions relating to the analysis or conclusions to be included, fees for the work, time to perform work, topics to pursue, goals, parameters, and further guidance; (2) documents relating to EY's audit of Veeva, including any notes, emails, reports, summaries, records of phone calls, messages, and any communications between EY and IQVIA regarding the results of EY's audit: (3) any engagement letters, scope of work, retention letters, fee schedules, or other documents governing IQVIA and EY's relationship; and (4) documents and communications relating to or concerning IQVIA's repose to EY's audit of Veeva. IQVIA

subsequently claimed privilege over a number of the documents. According to its February 15, 2019, Amended Privilege Log, IQVIA claims attorney-client privilege over 1,411 withheld documents and 893 redacted documents.

### Arguments

**Veeva**

Veeva argues that IQVIA's privilege assertions over these documents is improper as these documents do not involve communications between IQVIA and its in house counsel, but rather involve a third party, EY. Veeva does not believe EY was retained to assist IQVIA lawyers in rendering legal advice, but rather was commissioned to perform the Veeva assessment as a business project designed to help IQVIA make a business decision with respect to information obtained from internal Veeva systems. Veeva believes that in all instances, IQVIA's in-house counsel was acting in a business role. Veeva thus argues that EY's work was squarely in the business arena and that communications are not protected from disclosure by attorney-client privilege.

Veeva further argues that the *Koval* exception only applies when a client's attorneys need a third party to translate or interpret information central to the provision of legal advice and that the third party's role must be to facilitate communication between the attorney and client. Veeva argues that the narrow *Koval* exception does not apply in this matter because EY was analyzing Veeva's information, not information possessed by IQVIA. Since EY was not putting information gained from IQVIA into usable form for their attorneys to render legal advice, Veeva argues the *Koval* exception cannot apply.

Veeva finally argues that regardless of the merits of IQVIA's privilege claim, IQVIA's offensive use of the EY assessment in its Complaint and throughout its case means that IQVIA has waived privilege over the subject matter under the sword and shield doctrine.

**IQVIA**

IQVIA argues that attorney-client privilege protects IQVIA's in-house counsel's communications with EY because the documents were intended to be confidential, the work was performed for a predominately legal purpose, and the work was necessary for IQVIA's counsel's provision of legal advice.

IQVIA points to the Statement of Work, which makes clear that EY was to treat communications, work product and documentation relating the EY's services as confidential. IQVIA also highlights the fact that the Factual Findings & Reimbursement Agreement made clear that Veeva was not entitled to receive work product prepared at the direction of IQVIA, funded by IQVIA, or reflecting the work product of its auditors beyond the fact finding.

IQVIA further argues that the communications at issue were made for a predominately legal purpose and that incidental requests for business advice do not vitiate the attorney-client privilege. IQVIA argues that the *Koval* standard is satisfied here as IQVIA retained EY for insight necessary to address a legal problem regarding how to protect its intellectual property. IQVIA explains that under its TPA program, IQVIA's in-house counsel drafts TPA agreements that (1) allow its clients to share certain data licensed from IQVIA with the clients' other vendors for certain purposes; and (2) include restrictions and conditions designed to prevent third-parties from misappropriating or misusing the data to which IQVIA has agreed to give them access. IQVIA argues that EY's role was critical in allowing IQVIA's in-house counsel to evaluate whether changes, if any, were required to its TPA agreements to ensure that IQVIA's intellectual property would be safe.

IQVIA argues that EY was hired for its technical expertise in analyzing and translating complex technical systems and processes into something that IQVIA's counsel could read, understand, and use to offer IQVIA legal advice. IQVIA further argues that it is not the law in

5

this Circuit that because the focus of EY's work was Veeva's systems and related processes rather than IQVIA's own information, EY could not have been acting as an interpreter or translator.

### Opinion

At the outset, the Special Master notes that Veeva has not alleged inadequacy with IQVIA's privilege log and the parties have not provided document-by-document arguments concerning IQVIA's assertion of privilege over the documents at issue. Rather, Veeva's arguments challenge the application of the attorney-client privilege to these documents as a whole. As such, the parties have not requested and the Special Master has not required IQVIA to produce each document for *in camera* review.

The attorney-client privilege protects (1) communications (2) between "privileged persons" (3) made in confidence (4) intended to receive or give legal assistance. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007), as amended (Oct. 12, 2007) (quoting Restatement (Third) of the Law Governing Lawyers § 68 (2000)). "Privileged persons" are the client, the attorney, and "any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* (citing to § 70 of the Restatement). The purpose of the privilege is to encourage "full and frank" communication between the client and attorney. *Id.*, at 360 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)).

The party asserting the privilege bears the burden of proving that it applies. See *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012) (citing to *In re Grand Jury Empanelled February 14, 1978*, 603 F.2d 469, 474 (3d Cir. 1979) (alterations omitted) (quoting *United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978)). A party asserting waiver of the privilege bears the

6

burden of proving the waiver. See *Sampson v. Sch. Dist. of Lancaster*, 262 F.R.D. 469, 478–79 (E.D. Pa. 2008).

Although there is no accountant-client privilege, see *Couch v. United States*, 409 U.S. 322, 334, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), the attorney-client privilege may attach to communications with an accountant "where the client, or the client's attorney, retains an accountant for the purpose of obtaining or providing legal advice." See *United States v. Antolini*, 271 Fed.Appx. 268, 271 n. 1 (citing *United States v. Kovel*, 296 F.2d 918, 922 (2nd Cir.1961)). "What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (citations omitted). The critical inquiry, as noted above, is whether a communication involving a third party acting as an agent of the attorney was made for a legal purpose. *Kovel*, 296 F.2d at 922. "If the third party consultant is involved in the giving of legal advice, the privilege obtains." *In re CV Therapeutics*, 2006 WL 1699536, at *6 (citing *SmithKline*, 232 F.R.D. at 476–77).

While the Third Circuit has adopted the *Kovel* approach, it has been loath to construe the privilege broadly and has viewed what assists an attorney in rendering legal advice narrowly. See *United States v. Rockwell International*, 897 F.2d 1255, 1264 (3d Cir.1990) (holding and quoting from *Kovel*, "most vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer."); but see *In re G-I Holdings, Inc.*, 218 F.R.D. 428, 435 (D.N.J. 2004) (holding that *Kovel* does not protect all third party communication "necessary to assist the lawyer in rendering legal service to the client," and rejecting "findings of an attorney-client privilege based [solely] on the necessity or value of the provided assistance"

but rather adopting a requirement that the third-party be acting as a "translator or interpreter of client communications."). Continuing in that narrow tone, "[t]he privilege does not apply merely because a statement was uttered by or to an attorney (or an attorney's agent). Nor does it attach simply because a statement conveys advice that is legal in nature." *HPD Labs., Inc. v. Clorox Co.*, 202 F.R.D. 410, 414 (D.N.J. 2001) (citing *Westinghouse Elec. Corp.*, 951 F.2d at 1423–24). Rather, "the privilege extends to 'only those disclosures-necessary to obtain informed legal advice-which might not have been made absent the privilege.'" *Id.*

As the Supreme Court has recognized, however, "the administration of the privilege in the case of corporations presents ... special problems." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985)). "Communications which relate to business rather than legal matters do not fall within the protection of the privilege." *Leonen v. Johns–Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990); see also *Coleman v. Am. Broad. Co.*, 106 F.R.D. 201, 205 (D.D.C. 1985). Therefore, the general rule is that "while legal advice given to a client by an attorney is protected by the privilege, business advice generally is not." *In re Nat'l Smelting of New Jersey, Inc. Bondholders' Litig.*, No. 84–3199, 1989 U.S. Dist. LEXIS 16962, at *18 (D.N.J. June 29, 1989) (citation omitted); see also *Claude P. Bamberger Int'l, Inc. v. Rohm & Haas Co.*, No. 96–1041, 1997 WL 33768546, at *2 (D.N.J. Aug. 12, 1997) ("Business and personal advice are not protected by the privilege...." (citing *United States v. Davis*, 636 F.2d 1028, 1044 (5th Cir. 1981))).

Given that "legal advice is often intimately intertwined with and difficult to distinguish from business advice . . . . [and] [b]ecause it is often too difficult, impractical and unrealistic to compartmentalize whether certain advice given to a client is legal in nature or business in nature in the context of a complicated. . . transaction, the policy behind the attorney-client privilege is

best upheld where the attorney-client relationship is predominantly for the purpose of rendering legal services." *Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306 (D.N.J. 2008) (citations and quotations omitted). The party claiming privilege "should demonstrate that the communication would not have been made but for the client's need for legal advice or services" *Sealed Air Corp.*, 253 F.R.D. at 306 (citing *Leonen v. Johns-Manville*, 135 F.R.D. 94, 99 (D.N.J. 1990)).

In the instant matter, the Special Master must determine whether any attorney-client privilege that existed between IQVIA and IQVIA's in-house counsel transferred to and protected communications between EY and IQVIA, internal communications between EY staff, and documents prepared by EY during EY's assessment of Veeva's processes and systems.

Based on the record, EY was hired by IQVIA to assess Veeva's systems and processes in order to provide its professional opinions as to the assurances made by Veeva that IQVIA data would be safe in Veeva's MDM system and would not be used by Veeva to improve its own data offerings. The Scope of Service indicates that while EY was providing services for the provision of legal advice by the IQVIA legal department, the professional conclusion regarding Veeva's assurances being sought was that of EY's not IQVIA's legal team. As such, the advice being sought from the Veeva assessment was that of EY's rather than IQVIA's in-house legal team and thus no privilege exists. See *Kovel*, 296 F.2d at 922.

Additionally, it is the opinion of the Special Master that the Veeva assessment served a predominately business purpose. While the audit may also have supported IQVIA's thinking on how it would proceed with the licensing of IQVIA reference data to Veeva for master data management purposes under the TPA program and inform IQVIA's thinking on TPA agreement terms, the audit was predominantly for business purposes, not legal purposes. The primary

9

purpose of the audit was to determine the accuracy of Veeva's assurances that IQVIA reference data could be used in Veeva's MDM offering without risk that IQVIA's data would be used by Veeva to improve its own offerings. Thus the audit was intended to inform IQVIA's business decision on whether or not to allow Veeva to use its reference data in Veeva's MDM offering. While licensing of this data and TPA agreements are intimately intertwined with and difficult to distinguish from the business purposes of the EY audit, here, the EY assessment would not have been undertaken but for IQVIA's need to make a business determination as to whether, at the request of IQVIA's clients, IQVIA would allow its clients to share certain data licensed from IQVIA with Veeva for use by Veeva in its MDM offering. While this generally involves evaluation of TPA agreements and licensing protections, it does not change the fact that the central purpose of the undertaking was business in nature. EY was chiefly engaged to assess the assurances made by Veeva regarding its protection of IQVIA data. That the information obtained from EY's assessment of Veeva might inform IQVIA's decision on whether its TPA agreements were sufficient does not transform the purpose of the EY audit into a predominately legal one and thus shield all EY communications from disclosure.

Furthermore, the Special Master notes that EY was evaluating Veeva's systems and processes, not IQVIA's technical information. The fundamental purpose of attorney-client privilege is "to encourage clients to make full disclosure to their attorneys." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Here, the information being disclosed and assessed by EY was technical information possessed by Veeva, not IQVIA. Accordingly it is difficult to imagine how extending attorney-client privilege to the EY communications related to EY's assessment of Veeva's systems and processes would promote the fundamental purpose of attorney-client privilege. While EY's assessment of Veeva's

assurances may have been beneficial to IQVIA's counsel in providing advice to IQVIA, "the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). Therefore, "a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *Id.*

For the reasons stated herein, the Special Master will order IQVIA to withdraw its assertion of attorney-client privilege over the disputed EY documents, which Vceva shall be allowed to obtain from EY.

**DENNIS M. CAVANAUGH, U.S.D.J. (Ret.)**
**Special Master**

Date: May 13, 2019