UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IQVIA, INC. and IMS SOFTWARE SERVICES, LTD, <br><br> Plaintiffs/ Counterclaim Defendants, <br><br> vs. <br><br> VEEVA SYSTEMS, INC., <br><br> Defendant/ Counterclaim Plaintiff. | Case No.: 2:17-CV-00177-CCC-MF <br><br><br> **ORDER & OPINION OF THE SPECIAL MASTER** |

This matter comes before the Special Master on Defendant-Counterclaim Plaintiff Veeva Systems, Inc.'s ("Veeva") motion to compel Plaintiffs-Counterclaim Defendants IQVIA, Inc. and IMS Software Services, LTD, (collectively "IQVIA") to produce documents relating to: (1) Cegedim's TPA policy and TPA decisions with respect to OneKey (whether the vendor is Veeva or a third party); (2) Cegedim's pricing of OneKey in any non-U.S. geography, including Europe and any European regions or nations; (3) Cegedim's sale of OneKey, including customer lists, win-loss records, and invoice data; and (4) OneKey financial information, including revenue, profit, and cost. After considering the submissions of the parties, based upon the following, it is the opinion of the Special Master that Veeva's motion is **GRANTED in part.**

<u>DISCUSSION</u>

### Arguments

#### Veeva's Arguments

By way of background, Veeva explains that it alleges that IQVIA participated in a group boycott conspiracy with Cegedim, a European company that IQVIA competed against before acquiring its CRM and data business, including Cegedim's OneKey product. Veeva alleges that

although they were direct competitors, IQVIA and Cegedim conducted a coordinated campaign to categorically deny Veeva access to the MDM market, including through Cegedim's exclusionary TPA policy. In its counterclaims, Veeva specifically alleges: "IQVIA and Cegedim's anticompetitive conduct outside of the United States has a direct, substantial, and reasonably foreseeable effect on domestic commerce, as well as Veeva's ability to export products from the United States. That anticompetitive conduct also gave rise to Veeva's antitrust counterclaims."

Veeva argues that the Special Master's March 28, 2018 Order compelled IQVIA to produce "relevant documents related to the United States and global or geographic areas including the United States. After reviewing IQVIA's production of foreign documents with a nexus to the United States, Veeva determined that additional relevant foreign documents exist and are important to proving its counterclaims. Pursuant to the Special Master's Order, the parties then met and conferred. According to Veeva, IQVIA refuses to produce these four specific categories of documents related to OneKey, claiming that the documents have no reasonably foreseeable impact on U.S. commerce and that producing them would be unduly burdensome and disproportionate to the needs of the case. Veeva asserts that IQVIA, the party resisting the discovery, has the burden of clarifying and explaining its objections and providing support therefor.

Veeva argues that the Cegedim documents are relevant. According to Veeva, IQVIA's assertion that the documents concern conduct that has no reasonably foreseeable impact on U.S. commerce fails both legally and factually. Veeva asserts that Judge Cecchi's denial of IQVIA's motion to dismiss forecloses IQVIA's argument as the argument that Cegedim's exclusionary conduct is beyond the reach of the Sherman Act because it took place overseas was already

considered and rejected by Judge Cecchi. Additionally, Veeva argues that the standard is not whether the documents have a reasonably foreseeable impact on U.S. commerce as numerous decisions have stated that foreign documents relating to antitrust allegations are relevant under Rule 26(b) without evaluating their effect on U.S. commerce.

Veeva further asserts that the requested Cegedim information is relevant for liability, product market definition, market power, and damages. Veeva maintains that its request for Cegedim's TPA policy and TPA decisions with respect to OneKey (whether the vendor is Veeva or a third party), bears on the subject matter of the action because that conduct forms the heart of Veeva's group boycott claim. Veeva explains that in its counterclaim it alleges that Cegedim, as soon as its merger with IQVIA was announced (and before the merger was consummated), began to refuse to sign any TPA agreements unless they explicitly excluded Veeva MDM products. Veeva thus alleges a coordinated campaign by Cegedim and IQVIA to deny Veeva access to the MDM software market in violation of antitrust laws.

Veeva argues that similarly, IQVIA cannot show that information related to Cegedim's pricing and sale of OneKey is irrelevant. According to Veeva, Cegedim's pricing of OneKey sheds light on the relevant product market (e.g. uniform pricing across geographic regions could help establish a larger market), on market power (e.g. the pricing may far exceed cost or pricing in other regions), and on damages (e.g. what Veeva's reference product might have been able to earn in Europe had it not been for IQVIA and Cegedim's exclusionary conduct). Veeva argues the same analysis applies to OneKey sales information and financial information.

Veeva also argues that in any event, even if IQVIA were entitled to produce only documents that have a reasonably foreseeable effect on U.S. commerce, the requested Cegedim documents satisfy that criterion. Veeva explains that Cegedim's European conduct had a direct,

3

substantial, and reasonably foreseeable effect on U.S. commerce because the data markets and software markets are complementary and intertwined. Veeva believes life sciences companies prefer to standardize purchases across the world thus it explains that if a company relies on Cegedim OneKey in France and Veeva OpenData in the Unites States, it would need both Cegedim and Veeva to sign a TPA with whichever MDM provider it chooses. Under these circumstances, if Cegedim refuses to sign a TPA for Veeva's MDM, then the health sciences company would be unable to use Veeva's MDM worldwide, which would result in it choosing a different MDM provider. Therefore, Veeva explains that although Cegedim's conduct in this scenario took place entirely in France, its actions had a direct, substantial, and reasonably foreseeable effect on the MDM market in the United States. Veeva further asserts that because the data and software products are complementary, such foreign conduct also has a foreseeable effect on the Reference Data market in the Unites States, as the company is less likely to choose Veeva OpenData when it passes on Veeva's MDM Software.

Veeva points to *Hartford Fire Insurance Company*, where the Supreme Court held that manipulation in Europe of the market for one product (reinsurance) had a reasonably foreseeable effect in the U.S. market for a closely related product (insurance). Veeva believes this matter is the same, just with Reference Data substituted for reinsurance and MDM substituted for insurance.

Veeva argues that each of the six proportionality factors favor it. Veeva believes the issues at stake relating to Veeva's counterclaims are important as IQVIA's alleged anti-competitive conduct harms life sciences customers, and ultimately consumers that take drugs. Veeva argues that IQVIA's anticompetitive conduct prevents those companies from using Veeva products, reduces choice, raises customer cost, and excludes Veeva from the market. The amount

in controversy is hundreds of millions of dollars. Veeva asserts that the case is important for it

and the marketplace. As for the parties' relative access to information, Veeva argues it cannot

gain access to IQVIA's internal sales, commercial, and marketing information without discovery.

Veeva asserts that this is direct evidence of the product market, anticompetitive conduct, and

damages that prove Veeva's case. Veeva further asserts that IQVIA has a large and well-

resourced legal and financial department.

### IQVIA's Arguments

IQVIA asserts that the Special Master's March 28, 2018 Order & Opinion determined

that "the burden posed by Veeva's discovery requests is too onerous in light of the possible

benefits to Veeva's case." Thus instead of ordering the discovery requested by Veeva, the

Special Master adopted IQVIA's proposal: "IQVIA has provided the Special Master with an

acceptable method to limit the scope of Veeva's requests; it has suggested that it provide relevant

documents that relate to the United States, geographic areas such as North America that include

the United States, and documents that relate to global markets." The Special Master then ordered

Veeva to digest the information produced by IQVIA and then meet and confer with IQVIA "to

determine whether documents from additional geographic regions should be produced." IQVIA

argues that the purpose of the Court staging discovery in this manner was so that to the extent

necessary, Veeva could provide IQVIA with narrowly tailored global discovery requests that did

not impose an undue burden on IQVIA. Instead, IQVIA asserts that Veeva's additional requests

substantially overlap with those at issue in Veeva's motion to compel over a year ago.

IQVIA argues that Veeva's additional requests are as broad, and in some instances, even

broader than its previous requests. IQVIA argues that Veeva's additional requests do not reflect

considerations of the discovery IQVIA has provided and tailoring of revised requests in light of

that discovery. IQVIA asserts that it has produced substantial discovery related to Cegedim's

OneKey offering, including documents responsive to Veeva's additional requests for Cegedim OneKey pricing, sales, and financial information and Cegedim's TPA policy and decisions with respect to OneKey. IQVIA asserts that it also collected, reviewed, and produced documents from a number of Cegedim employees designated as custodians in this case and produced some 15,000 documents from these custodians prior to the Cegedim acquisition date, including approximately 700 excel spreadsheets alone that hit on financial terms.

IQVIA further argues that Veeva's requests that it produce Cegedim OneKey TPA, pricing, sales, and financial information from everywhere in the world are not narrowly tailored. IQVIA argues that the Special Master's March 28, 2018 Order expressly contemplated that, to the extent additional documents would be produced, such production would be limited, including by geographic region. IQVIA argues that Veeva's additional requests are virtually unlimited and that collection, review, and production of documents of this breadth would be unduly burdensome. By way of example, IQVIA argues it would be burdensome for it to produce all invoices for all Cegedim's sales of OneKey or cost information for the sources of Cegedim's millions of records of information, in almost 100 countries. IQVIA argues that there are less burdensome ways for Veeva to acquire the information it seeks.

IQVIA argues that Veeva has not met its burden to establish the relevance of its Additional Requests. According to IQVIA, Veeva's Cegedim allegations pertain to a discrete period in time—from the announcement of IQVIA's acquisition of certain CRM and strategic data businesses of Cegedim in June 2014, to the completion of the acquisition in April 2015. However, Veeva's requests for documents and communications related to Cegedim TPA policy and decisions and Cegedim pricing, sale, and financial information related to OneKey are far broader than the IQVIA/Cegedim conduct Veeva takes issue with.

6

With respect to Cegedim TPA policy and decisions, IQVIA argues that Veeva has not articulated why its current production is deficient or otherwise not sufficient, or what additional information Veeva seeks with specificity. As written, Veeva's requests encompass Cegedim decisions on countless TPAs requested by customers around the world. IQVIA argues the breadth of this request cannot be justified by Veeva's counterclaims, which target Cegedim's denial of TPAs relating to Veeva over a discrete time period. IQVIA asserts that it has already produced Cegedim documents relating to Cegedim decisions denying Veeva TPAs. IQVIA argues that Veeva's assertions of relevance relate entirely to Cegedim denial of TPAs concerning Veeva—and IQVIA has already produced documents responsive to this topic. IQVIA asserts that Veeva has failed to address how Cegedim TPAs relating to third parties are relevant to Veeva's counterclaims, and Veeva makes no allegation regarding Cegedim third party TPAs. Thus IQVIA argues that Veeva has not carried its burden to demonstrate the relevance of the additional documents it requests.

With respect to Cegedim's pricing and sale of OneKey Financial Information, IQVIA argues it has already produced a significant amount of information related to: (1) Cegedim's sale of OneKey, including customer lists, win-loss records, and invoice data; and (2) OneKey financial information, including revenue, profit, and cost, to the extent this information overlapped with information relating to the United States, North America, or global markets. IQVIA argues that Veeva has not explained why IQVIA's current production is deficient or otherwise not sufficient.

IQVIA argues that Veeva's requests as written would encompass Cegedim's customer-specific pricing of OneKey for customers in nearly 100 countries; documents relating to Cegedim's sale of OneKey to customers in nearly 100 countries; and OneKey financial

information such as the cost of compiling OneKey offerings in 100 countries. IQVIA argues that it is Veeva's burden to show that the information it requests is relevant, not IQVIA's burden. IQVIA rejects Veeva's assertion that the information is relevant because it may help demonstrate that IQVIA used its alleged market power to prevent Veeva from competing in the alleged global market for healthcare reference information. IQVIA argues that Veeva did not have competing reference information offerings in Europe at the time of Cegedim's purportedly exclusionary conduct. IQVIA argues that when Veeva launched its OpenData reference information at the end of March 2015, it only had reference information for the United States, China, England, and Australia. Thus IQVIA argues that Veeva's assertions that Cegedim's pricing of OneKey is relevant to establish the geographic scope of the reference data market or to establish Cegedim's market power in the alleged global reference information market fall flat.

IQVIA argues that Veeva's additional requests are unduly burdensome in light of IQVIA's production of foreign documents. IQVIA maintains that it is not its position that Cegedim's exclusionary conduct is beyond the reach of the Sherman Act because it took place oversees. IQVIA asserts that it has already produced all relevant documents that had: (1) a direct connection to the United States; and/or (2) an implied/potential connection to the United States. IQVIA asserts that it objects to the production of foreign documents beyond these two categories that are not proportional or relevant to the case. IQVIA argues that the precedent on which Veeva relies did not consider the burden of producing worldwide discovery pursuant to the proportionality standard. IQVIA argues that the Special Master already considered the precedent in Veeva's prior motion to compel and denied Veeva's motion and ordered Veeva to articulate more limited requests once it reviewed and digested IQVIA's production. IQVIA asserts that the Court gave Veeva an opportunity to demonstrate the relevance of any additional foreign

discovery it claimed it needed, and Veeva has not done so. IQVIA maintains that Veeva has not articulated a category of foreign documents that were not already produced under the Court's March 28, 2018 Order that are relevant to Veeva's counterclaims. IQVIA further argues that Veeva has also not articulated a workable standard by which IQVIA could collect, review, and produce the additional documents Veeva demands without providing worldwide discovery, which it describes as a herculean effort that Veeva previously advocated for and that the Court rejected.

### Veeva's Reply Arguments

Veeva asserts that IQVIA's arguments are wrong, but that a few of their newly proposed limitations Veeva would have accepted. Veeva maintains that the Court should order IQVIA to produce documents sufficient to show Cegedim's OneKey pricing, sales, and financial information in Europe, including comprehensive win-loss data and invoice data, and documents from 2013 through 2015 relating to Cegedim TPA decisions and TPA policy.

Veeva believes that IQVIA does not seriously dispute that Veeva's requests are relevant. Veeva argues that Cegedim TPA policies and decisions relate directly to Veeva's counterclaims. Veeva asserts that IQVIA acknowledges that documents related to Cegedim's denial of TPAs concerning Veeva are relevant. IQVIA indicated that it had produced this information but Veeva maintains that its assertions were unclear and that IQVIA only seemed to indicate that it has produced documents that on their face admit an explicit desire to block Veeva's product. Veeva argues that this does not exhaust the documents relevant to Veeva's counterclaims because it would not include: (1) Cegedim's TPA policies generally (and internal discussions surrounding the formulation of those policies); (2) Cegedim's process for evaluating TPA requests; (3) discussions of Cegedim's competitors and IP concerns in the reference data, CRM, and MDM

9

markets; and (4) communications about Veeva TPA requests that were granted (potentially because the mutual customer exerted pressure on Cegedim), and the like.

Veeva asserts that Cegedim's TPA policy documents establish the context against which individual TPA decisions would be evaluated for anti-competitive intent. Veeva argues that TPA conduct for vendors other than Veeva is relevant because how Cegedim treated other CRM and MDM providers is probative of its true motivation when it chose to engage in a group boycott of Veeva. Veeva asserts that it would also provide important context for understanding Cegedim's actions toward Veeva with respect to TPAs.

Veeva argues that Cegedim OneKey pricing, sales, and financial information is relevant and important to market definition, market power, damages, and causation. Veeva asserts that Cegedim's pricing of OneKey sheds light on relevant product market and market power, because uniform pricing across geographic regions shows a global market and pricing above cost indicates market power. Veeva further asserts that evidence regarding Cegedim's sale of OneKey goes directly to market power, damages, and causation. Moreover, Veeva alleges that Cegedim's sales information will show which contracts IQVIA/Cegedim stole through its anticompetitive conduct.

According to Veeva, its presence or absence in the market does not diminish the relevance of Cegedim pricing, sales, and financial information for defining one of the relevant product markets, Reference Data. Veeva believes this information establishes the contours of the market and IQVIA's monopolization of the market when it acquired Cegedim's data businesses. Moreover, Veeva alleges that IQVIA and Cegedim excluded Veeva from the market, including in Europe, by blocking TPAs for the use of OneKey reference data in Veeva's MDM software. In any event, Veeva argues that it began selling reference data under the same network brand

name as its MDM software as early as August 2013. Thus Veeva argues that IQVIA's one purported basis for challenging the relevance of these documents fails.

Veeva believes IQVIA's arguments as to proportionality and burden are meritless. Veeva argues its requests for foreign documents are narrowly tailored. Veeva asserts that it has asked for specific categories of documents relating to Cegedim and OneKey, with a focus on Europe. Veeva maintains that it will accept sufficient-to-show documents for Cegedim's pricing, sales, and financial information relating to its OneKey product in foreign markets. As for TPA-related documents, Veeva asserts that it is willing to limit this request to documents from 2013 through 2015.

Veeva asserts that IQVIA has not applied the six proportionality factors, nor did it articulate specific reasons why the burden of collecting and producing these documents would outweigh their relevance. Veeva argues that IQVIA relies on unsubstantiated and conclusory statements to support its burden argument.

Veeva further rejects IQVIA's argument that because it has produced some foreign documents that have a direct or potential connection to the United States, it need not produce anything else. Veeva argues that IQVIA does not get to determine for itself what is sufficient for Veeva's antitrust counterclaims.

### Opinion

Federal Rule of Civil Procedure 26(b)(1) provides that a party may obtain discovery regarding "any nonprivileged material that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or

11

expense of the proposed discovery outweighs its likely benefit." It is "well recognized that the federal rules allow broad and liberal discovery." *Pacini v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999). Relevance is a broader inquiry at the discovery stage than at the trial stage, see *Nestle Food Corp. v. Aetna Cos. & Surety Co.*, 135 F.R.D. 101, 103 (D.N.J. 1990), and "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

While relevant information need not be admissible, the burden remains on the party seeking discovery to "show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). When establishing the parameters of discovery relevance, it is the claims and defenses of the parties, in the Complaint and other pleadings, which set the guardrails for discoverable information. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Becton, Dickinson & Co.*, No. CV 14-4318 (CCC), 2019 WL 1771996, at *3 (D.N.J. Apr. 23, 2019).

A court may deny a discovery request if "[a]fter assessing the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues, . . . there exists a likelihood that the resulting benefits would be outweighed by the burden or expenses imposed as a consequence of the proposed discovery." *Salamone v. Carter's Retail, Inc.*, No. CIV.A. 09-5856 GEB, 2011 WL 310701, at *10 (D.N.J. Jan. 28, 2011), aff'd, No. CIV.A. 09-5856 GEB, 2011 WL 1458063 (D.N.J. Apr. 14, 2011) (citing *Takacs v. Union Cty.*, No. CIVA 08-711 KSH/MAS, 2009 WL 3048471, at *1 (D.N.J. Sept. 23, 2009)). "The purpose of this rule of proportionality is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of

inquiry." *Takacs v. Union Cty.*, No. CIVA 08-711 KSH/MAS, 2009 WL 3048471, at *3 (D.N.J.

Sept. 23, 2009) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n*, No. CIV. A. 97-2600 JBS,

2008 WL 1757929, at *6 (D.N.J. Feb. 27, 2008)). A party resisting discovery on the grounds of

burden or expense "bears the burden of showing specifically how the request is burdensome."

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2010 WL 4922701, at *3 (W.D. Pa. Nov. 29,

2010).

### (1)        Cegedim's TPA Policy and TPA Decisions with respect to OneKey

IQVIA asserts that it has produced substantial discovery related to Cegedim's OneKey

offering, including documents responsive to Veeva's additional requests for Cegedim OneKey

pricing, sales, and financial information and Cegedim's TPA policy and decisions with respect to

OneKey. IQVIA asserts that it also collected, reviewed, and produced documents from a number

of Cegedim employees designated as custodians in this case and produced some 15,000

documents from these custodians prior to the Cegedim acquisition date, including approximately

700 excel spreadsheets alone that hit on financial terms.

Veeva argues that this does not exhaust the documents relevant to Veeva's counterclaims

because it would not include: (1) Cegedim's TPA policies generally (and internal discussions

surrounding the formulation of those policies); (2) Cegedim's process for evaluating TPA

requests; (3) discussions of Cegedim's competitors and IP concerns in the reference data, CRM,

and MDM markets; and (4) communications about Veeva TPA requests that were granted

(potentially because the mutual customer exerted pressure on Cegedim), and the like. However,

Veeva asserts that it is willing to limit its TPA related request to documents from 2013 through

2015.

It is the opinion of the Special Master that Veeva has met its burden to demonstrate the

relevance of Cegedim's TPA policy and TPA decisions. Documents related to Cegedim's denial

13

of TPAs concerning Veeva are relevant as they relate to Veeva's counterclaims that IQVIA participated in a group boycott conspiracy with Cegedim. Veeva has also demonstrated that Cegedim's TPA policies generally and TPA conduct for vendors other than Veeva are relevant.

The burden then switches to IQVIA to demonstrate how Veeva's request is unduly burdensome. IQVIA argues that the Special Master previously determined that this information is burdensome as the additional requests substantially overlap with those at issue in Veeva's motion to compel over a year ago. IQVIA also asserts that it has already produced a significant amount of information responsive to this request.

In light of Veeva's agreement to limit its TPA related request to documents from 2013 through 2015, it is the opinion of the Special Master that Veeva has appropriately narrowed its discovery requests. However, with respect to conduct for vendors other than Veeva, while Veeva has articulated relevance by explaining that how Cegedim treated other CRM and MDM providers is probative of its true motivation when it chose to engage in a group boycott of Veeva and because it may provide important context for understanding Cegedim's actions toward Veeva with respect to TPAs, the Special Master does not believe the probative value of this information outweighs the burden or expenses imposed by the request, which would require IQVIA to produce all TPA decisions for all of its customers in nearly 100 countries. In light of this, the Special Master will require IQVIA to produce sufficient to show documents. After assessing the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues, IQVIA is ordered to produce: (1) documents relating to Cegedim's TPA policy and TPA decisions related to Veeva from 2013 through 2015; (2) documents relating to Cegedim's TPA policies generally from 2013 through 2015 (and internal discussions surrounding the formulation

14

of those policies); (3) documents relating to Cegedim's process for evaluating TPA requests generally from 2013 through 2015; and (4) documents sufficient to show Cegedim's TPA decisions related to third party vendors from 2013 through 2015. These documents are to be produced within thirty days of the date of this Order.

### (2)      Cegedim's Pricing of OneKey

Veeva asserts that Cegedim's pricing of OneKey sheds light on relevant product market and market power because uniform pricing across geographic regions shows a global market and pricing above cost indicates market power. The Special Master believes Veeva has satisfied its burden to demonstrate the relevance of Cegedim's pricing of OneKey.

IQVIA argues that Veeva's requests as written would encompass Cegedim's customer-specific pricing of OneKey for customers in nearly 100 countries and that the resulting benefits would be outweighed by the burden or expenses imposed as a consequence of the proposed discovery. However, Veeva maintains that it will accept sufficient to show documents for Cegedim's pricing, sales, and financial information relating to its OneKey product in Europe.

It is the opinion of the Special Master that Veeva has met its initial burden to demonstrate the relevance of Cegedim's pricing of OneKey. Veeva has adequately explained how pricing of OneKey may shed light on the relevant product market (e.g. uniform pricing across geographic regions could help establish a larger market), on market power (e.g. the pricing may far exceed cost or pricing in other regions), and on damages (e.g. what Veeva's reference product might have been able to earn in Europe had it not been for IQVIA and Cegedim's exclusionary conduct).

The Special Master is cognizant of IQVIA's arguments that this request would encompass pricing of OneKey for customers in nearly 100 countries. However, in light of Veeva's assertion that it will accept documents sufficient to show Cegedim's pricing of OneKey

15

in Europe, the Special Master does not believe that IQVIA has met its burden to demonstrate that producing sufficient to show documents responsive to this request would be unduly burdensome and disproportionate to the needs of the case. Accordingly, the Special Master will order IQVIA to produce documents sufficient to show Cegedim's pricing of OneKey in Europe from 2012 to the present within thirty days of the date of this Order.

      (3)      **Cegedim's Sale of OneKey**

Veeva asserts that evidence regarding Cegedim's sale of OneKey goes directly to market power, damages, and causation. Veeva believes Cegedim's sales information will show which contracts IQVIA/Cegedim stole through its anticompetitive conduct.

IQVIA argues that Veeva's requests as written would encompass documents relating to Cegedim's sale of OneKey to customers in nearly 100 countries. However, Veeva has indicated that it will accept sufficient to show documents for Cegedim's pricing, sales, and financial information relating to its OneKey product in Europe.

It is the opinion of the Special Master that Veeva has met its burden to demonstrate the relevance of Cegedim's sale of OneKey, including customer lists, win-loss records, and invoice data as this information may show evidence of market power, damages, and causation, and more specifically may show which contracts IQVIA/Cegedim allegedly stole through its alleged anticompetitive conduct.

In light of Veeva's assertion that it will accept documents sufficient to show Cegedim's sale of OneKey in Europe, the Special Master does not believe that IQVIA has met its burden to demonstrate that producing sufficient to show documents responsive to this request would be unduly burdensome and disproportionate to the needs of the case. Accordingly, the Special Master will order IQVIA to produce documents sufficient to show Cegedim's sale of OneKey in

16

Europe from 2012 to the present, including customer lists, win-loss records, and invoice data within thirty days of the date of this Order.

### (4) OneKey Financial Information

It is the opinion of the Special Master that Veeva has met its burden to demonstrate the relevance of Cegedim's OneKey financial information, as OneKey financial information may shed light on market power, damages, and causation.

In light of Veeva's assertion that it will accept documents sufficient to show Cegedim's sale of OneKey financial information in Europe, the Special Master does not believe that IQVIA has met its burden to demonstrate that producing sufficient to show documents responsive to this request would be unduly burdensome and disproportionate to the needs of the case. Accordingly, the Special Master will order IQVIA to produce documents sufficient to show Cegedim's OneKey financial information in Europe from 2012 to the present, including revenue, profit, and cost within thirty days of the date of this Order.

DENNIS M. CAVANAUGH, U.S.D.J. (Ret.)
**Special Master**

Date: July 10, 2019

17