# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IQVIA, INC. and IMS SOFTWARE SERVICES, LTD,<br><br>    Plaintiffs/ Counterclaim Defendants,<br><br>vs.<br><br>VEEVA SYSTEMS, INC.,<br><br>    Defendant/ Counterclaim Plaintiff. | Case No.: 2:17-CV-00177-CCC-MF<br><br>**ORDER & OPINION OF THE SPECIAL MASTER** |

This matter comes before the Special Master on Defendant-Counterclaim Plaintiff Veeva Systems, Inc.'s ("Veeva") motion to compel Plaintiffs-Counterclaim Defendants IQVIA, Inc. and IMS Software Services, LTD, (collectively "IQVIA") to produce responses to Veeva's Requests for Production Nos. 18-41. After considering the submissions of the parties, based upon the following, it is the opinion of the Special Master that Veeva's motion is **GRANTED in part.**

## DISCUSSION

### Background

In July 2017, Veeva served its first set of Requests for Production on IQVIA. Veeva believes that Requests for Production Nos. 18-41 requested that IQVIA produce documents showing IQVIA's products, competitors, revenue, volume of sales, profits, and customer base in the life sciences reference data, sales data, MDM, and CRM markets.

By Order dated March 28, 2018, the Special Master resolved various discovery disputes involving the parties' discovery requests. With respect to Veeva's Requests for Production Nos. 18-41, the Special Master was briefed and ruled on the geographic scope of the requests. The Special Master limited the geographic scope of Veeva's requests and Ordered IQVIA to produce

relevant documents related to the Unites States and global or geographic areas including the Unites States. Aside from the geographic scope of those requests, the Special Master did not consider and made no ruling regarding the substance of IQVIA's responses.

According to Veeva, on March 21, 2019, it requested IQVIA win/loss data and invoice data, which it believes are encompassed by its Requests for Production Nos. 18-41. Specifically, it sought win/loss data detailing relevant sales opportunities, listing the customer involved, the products involved, the geographic scope, the opportunity's value, other competitors vying for the opportunity, whether IQVIA won or lost the opportunity, and the reasons for that outcome. Veeva also requested invoice data containing pricing and related information. The parties eventually reached an impasse and Veeva filed the within motion. Veeva now seeks: (1) comprehensive win/loss data detailing relevant sales opportunities; and (2) comprehensive invoice data detailing which goods IQVIA sold to which customers, at what prices, and in what combinations.

### Arguments

#### Veeva's Arguments

Veeva explains that win/loss data sets forth information on sales opportunities and lists, among other things, details on particular sales opportunities including the customer involved, the products involved, the geographic scope, the opportunity's value, the resulting revenue, other competitors vying for the opportunity, whether IQVIA won or lost, and the reasons for that outcome.

Veeva argues that win/loss data is central to its antitrust analysis. Veeva cites case law to assert that identification of competitors involved in particular sales opportunities illustrates the scope of competition, informing market definition and market power and that the value presented by, and revenue resulting from, sales opportunities further aids market-power analysis. Veeva

2

further argues that the Special Master previously acknowledged the relevance of win/loss data as it pertains to Cegedim's OneKey product.

Veeva argues that win/loss data in plainly relevant. Veeva explains that it accuses IQVIA of maintaining monopolies in global life sciences reference data and sales data. According to Veeva, IQVIA exploits those monopolies by leveraging its Third Party Access (TPA) policy to prohibit customers from using IQVIA's monopoly data products in Veeva's MDM software. Through that exploitation, IQVIA maintains its global reference data monopoly and stifles competition in the global MDM market. Thus Veeva argues that IQVIA win/loss data relating to reference data, sales data, and MDM will advance its claims that IQVIA has market power in the global sales data and reference data markets, which it exploits, generating anticompetitive effects in the global reference data and MDM markets. Veeva further explains that although IQVIA withholds its monopoly data products from Veeva's MDM software, IQVIA has permitted its data to enter Veeva's CRM software. Veeva thus argues that IQVIA win/loss data relating to CRM will enable Veeva to show how customers benefit from competitive markets free from IQVIA's restrictive TPA policy.

Veeva argues that IQVIA maintains win/loss data in the ordinary course of business. According to Veeva, IQVIA employees enter win/loss data directly into the Salesforce.com database on a per-opportunity basis. Veeva asserts that IQVIA can generates comprehensive reports from its win/loss database. Veeva points to two win/loss reports pulled from Salesforce.com— one documenting wins and losses for the fourth quarter of 2014 ("Q4 2014 Report"), the other covering wins and losses for April and May of 2016 ("April–May 2016 Report").

3

Veeva argues that while a party should not be required to create completely new documents for discovery purposes, that is not the same as requiring a party to query an existing dynamic database for relevant information, which courts have regularly required.

Veeva further argues that IQVIA cannot withhold win/loss data based on its assertion that its win/loss data is inaccurate or incomplete. Veeva also asserts that IQVIA cannot demonstrate undue burden. It maintains that when a party can respond to discovery requests by pulling data from an internal database maintained in the ordinary course of business, the burden of production is not undue.

With respect to win/loss data detailing relevant sales opportunities, in its reply brief, Veeva states that it will accept a win/loss spreadsheet covering reference data, sales data, MDM, and CRM in the United States and Europe between January 1, 2012 and January 10, 2017. Veeva specifies that the spreadsheet should include the following fields: opportunity name; opportunity date; customers involved; products involved; competitors involved; opportunity outcome; reasons for the outcome; prices charged; revenue realized; geographic region covered; and other relevant information.

With respect to its request for comprehensive invoice data, Veeva argues the data is relevant as this is a monopolization case, and prices and other market-power metrics lie at its core. Veeva again points to the Special Master's July 11, 2019 Order to argue that if global pricing information pertaining to Cegedim's reference data product is relevant, so too is global pricing information pertaining to all relevant products—IQVIA reference data, sales data, MDM, and CRM.

Veeva further argues that production of invoice data is not undue. Veeva explains that the Special Master's October 10, 2018 Order addressed invoices IQVIA paid to its data suppliers,

while in these Requests, Veeva seeks invoices IQVIA bills to its customers. Veeva argues that prices paid by consumers are more relevant to the antitrust analysis than prices paid by competitors. Furthermore, Veeva argues that the October 10, 2018 Order hinged on the burden of producing check stubs, wire transfers, emails, agreements, etc., whereas here, Veeva believes that IQVIA can seamlessly pull invoice data from its ERP system.

With respect to invoice data, in its reply, Veeva states that it will accept information sufficient to show pricing of the relevant products (reference data, sales data, MDM, and CRM). Veeva specifies that the information should clearly convey the transaction date, customers involved, products involved, geographic region covered, and prices charged or revenue realized from the particular transaction. Veeva further clarifies that if IQVIA produces that information in the form of revenue data, then that data must be broken down by transaction (sales of relevant products to particular customers) so that Veeva can extrapolate prices. Veeva further states that it would accept price information covering the United States and Europe between January 1, 2012 and January 10, 2017.

### IQVIA's Arguments

IQVIA argues that Veeva's requests are irrelevant to its narrow antitrust allegations. IQVIA believes that support for Veeva's narrow claims lies in discrete exchanges between IQVIA and Cegedim; IQVIA and Reltio; IQVIA and potential Veeva Network or OpenData customers; and IQVIA's internal documents relating to its TPA program. Not in the broad discovery Veeva seeks.

IQVIA first asserts that the Court never ordered IQVIA to produce the win/loss or invoice information Veeva now demands. IQVIA further argues that the parties never engaged in a good faith meet and confer related to this issue. IQVIA explains that the parties exchanged a number of emails relating to Veeva's demands, and telephonically met and conferred on July 8,

2019. During the meet and confer, the parties agreed that IQVIA would follow-up with its client to further discuss the requested win/loss and invoice information, and respond to Veeva by the end of that day to confirm whether the parties had reached an impasse. Minutes later, Veeva requested a briefing schedule. IQVIA further asserts that the demands set forth in Veeva's Motion are broader than discussed during the meet and confer process. As a result, IQVIA does not believe the parties have met and conferred with respect to several issues including: (1) win/loss or invoice information relating to CRM (Veeva limited its requests to "sales data, reference data, and MDM" during the meet and confer); (2) an "invoice report"; (3) win/loss and invoice information "through the present" (Veeva never indicated that its requests exceeded the discovery period during the meet and confer); or (4) the specific fields of the reports requested in Veeva's Motion (Veeva never proposed such fields during the meet and confer).

IQVIA also argues that Request Nos. 18-41 do not extend to win/loss or invoice information. First, as it relates to win/loss information, the Requests ask for documents "sufficient to identify" IQVIA's competitors and have nothing to do with win/loss information for individual IQVIA sales opportunities whatsoever. Second, as it relates to invoices, IQVIA's invoices generally do not provide relevant pricing information (IQVIA's invoices generally reflect aggregate amounts due without details regarding deliverables, pricing or discounting), and are thus also not responsive to the Requests. IQVIA argues that Veeva makes no attempt to explain how or why the discovery it now seeks is responsive to the Requests.

IQVIA then argues that even if Veeva's demands were responsive to the Requests, the scope of Veeva's demands are improper. Veeva's demand that IQVIA produce win/loss and invoice data covering "global reference data, global sales data, global MDM, and global CRM" is contrary to the Special Master's Order limiting the geographic scope of the Requests to the

6

United States, geographic areas that include the United States, and documents that relate to global markets

IQVIA then argues that even if the Requests encompassed win/loss information—which they do not—there is no dispute that the Requests are limited to the production of custodial documents. There is no dispute that IQVIA has already produced the custodial documents that include win/loss information. IQVIA explains that as a result of the application of TAR, IQVIA has produced several internal presentations that include win/loss information. For example, IQVIA has produced dozens of quarterly operating review and quarterly business review presentations. In preparation for such reviews, IQVIA employees identified key wins, losses, and opportunities from the prior quarter. The win, loss, and opportunity information was gathered through internal communications with IQVIA employees responsible for customer accounts, and then presented to IQVIA executives.

IQVIA maintains it is willing to undertake a reasonable search of the files it collected from its custodians to identify additional presentations to senior management (i.e., operating reviews and business reviews with IQVIA executives) with win/loss information that may have been excluded from production by application of the TAR process. IQVIA argues that the burden associated with this offer is substantial, consisting of a manual process requiring attorney review of thousands of documents that it does not believe are responsive to the Requests.

IQVIA also argues that Veeva's demand that IQVIA produce "comprehensive" win/loss information by generating a report from IQVIA's Salesforce database is not possible because, as IQVIA has explained to Veeva on many occasions, IQVIA does not maintain a "comprehensive" database of IQVIA's competitors for sales opportunities. Although Salesforce software has a field to enter information about competitors for sales opportunities, IQVIA as a company does

not require that this field be populated. As a result, significant gaps exist in the competitor information in Salesforce. To the extent that information about competitors is entered into Salesforce, it would be only on an ad hoc basis.

IQVIA contends that it informed Veeva during the meet and confer process that the "Win/Loss Competitor" field in Column N of Exhibit 11 relating to "Q4 2014 Wins" is blank 90 percent of the time. Similarly, the "Win/Loss Competitor" field in Column M of Exhibit 12 relating to "US Win-Loss Q2" is blank 54 percent of the time. IQVIA asserts that even where information is entered in this field, the information is clearly incomplete, with only one competitor being identified per opportunity, despite the fact that IQVIA regularly competes against a number of competitors for a substantial number of opportunities. IQVIA believes that the blank fields in these spreadsheets confirm that there is no business process in place at IQVIA requiring that information about IQVIA's competitors for individual sales opportunities be entered, kept, maintained, reviewed, or quality controlled in the ordinary course of business at IQVIA.

IQVIA further argues that it does not rely upon win/loss information that may have been entered into Salesforce, in the regular course. Instead, IQVIA explains that it relies upon win/loss information set forth in the internal presentations previously discussed, which is gathered via direct communications with IQVIA's sales employees. IQVIA points to the certification of Renee Geron, IQVIA's Vice President of Commercial Operations & Strategic Programs who states that in order to collect win/loss information for presentations to IQVIA management, information from Salesforce may be reviewed, but information is requested directly from IQVIA sales employees as the information about competitors for sales opportunities in Salesforce is not relied upon. IQVIA contends that the documents IQVIA does rely on for this information (the

internal presentations that include win/loss information derived from internal conversations) have already been provided to Veeva, and that to the extent they have not been, IQVIA is willing to undertake a reasonable search of custodial files to produce additional information.

IQVIA argues that ad hoc information about IQVIA's competitors is not probative of IQVIA's "market power" where the Win/Loss Competitor field is left blank some 90 percent of the time. IQVIA does not maintain "comprehensive" information about its competitors for individual sales opportunities in the regular course, and cannot produce information it does not have.

With respect to invoice information, IQVIA argues that its invoices do not include the pricing information that Veeva seeks, and are thus not responsive to the Requests. IQVIA explains that its invoices generally do not include meaningful information about the deliverable being invoiced. Thus if the deliverable is a Healthcare Professional or Sub-National Market Research Offering, for example, it will not be evident from the face of the invoice what the nature of the deliverable is, such as the volume or scope or region of healthcare professional records being provided to the customer. IQVIA explains that the problem is exacerbated for IQVIA's Xponent Sub-National offering, for which every deliverable is highly customized. Without understanding the nature of the product being delivered, the pricing of that product is meaningless.

IQVIA further argues that Veeva's demand for "comprehensive" invoice-level information for "countless sales opportunities" for four separate product offerings, relating to sales opportunities anywhere in the world, from 2012 through the present, is overbroad, unduly burdensome, and otherwise not proportionate. IQVIA does not understand what Veeva means by

"an invoice report," and argues that in any event, any report based on IQVIA's invoices will suffer from the same issues.

IQVIA asserts that it is willing to produce revenue information on a customer by customer basis, for IQVIA's Healthcare Professional, Sub-National, and MDM offerings in the United States, for the years within the discovery period after Veeva offered a competing healthcare professional information product (2013 and later). IQVIA maintains that it was prepared to make this offer to Veeva during the July 8, 2019 meet and confer, but Veeva refused to engage.

## Opinion

Federal Rule of Civil Procedure 26(b)(1) provides that a party may obtain discovery regarding "any nonprivileged material that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." It is "well recognized that the federal rules allow broad and liberal discovery." *Pacini v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999). Relevance is a broader inquiry at the discovery stage than at the trial stage, see *Nestle Food Corp. v. Aetna Cos. & Surety Co.*, 135 F.R.D. 101, 103 (D.N.J. 1990), and "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

While relevant information need not be admissible, the burden remains on the party seeking discovery to "show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159

10

(D.N.J. 2000). When establishing the parameters of discovery relevance, it is the claims and defenses of the parties, in the Complaint and other pleadings, which set the guardrails for discoverable information. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Becton, Dickinson & Co.*, No. CV 14-4318 (CCC), 2019 WL 1771996, at *3 (D.N.J. Apr. 23, 2019).

A court may deny a discovery request if "[a]fter assessing the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues, . . . there exists a likelihood that the resulting benefits would be outweighed by the burden or expenses imposed as a consequence of the proposed discovery." *Salamone v. Carter's Retail, Inc.*, No. CIV.A. 09-5856 GEB, 2011 WL 310701, at *10 (D.N.J. Jan. 28, 2011), aff'd, No. CIV.A. 09-5856 GEB, 2011 WL 1458063 (D.N.J. Apr. 14, 2011) (citing *Takacs v. Union Cty.*, No. CIVA 08-711 KSH/MAS, 2009 WL 3048471, at *1 (D.N.J. Sept. 23, 2009)). "The purpose of this rule of proportionality is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry." *Takacs v. Union Cty.*, No. CIVA 08-711 KSH/MAS, 2009 WL 3048471, at *3 (D.N.J. Sept. 23, 2009) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n*, No. CIV. A. 97-2600 JBS, 2008 WL 1757929, at *6 (D.N.J. Feb. 27, 2008)). A party resisting discovery on the grounds of burden or expense "bears the burden of showing specifically how the request is burdensome." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2010 WL 4922701, at *3 (W.D. Pa. Nov. 29, 2010).

### A. Win/Loss Data

The Special Master has reviewed Veeva's Requests for Production Nos. 18–41. The Special Master notes that while these requests for the most part seek "sufficient to show"

information related to revenue, volume of sales, capital investment, costs, marginal costs, expenses, losses, marginal losses, profits, marginal profits, pricing, and customer base, of IQVIA's products and its competitors' products, by correspondence to IQVIA dated March 21, 2019, Veeva indicated that it had located some IQVIA customer win/loss data for particular customers within IQVIA's production but that it sought production of a comprehensive set of win/loss data covering all customers and relevant products (sales data, reference data, and MDM) throughout the relevant period. Thus, while Veeva's Requests for Production Nos. 18–41 did not explicitly request win/loss data, the Special Master believes win/loss data could be responsive to the information sought in Requests for Production Nos. 18–41 and that win/loss data was subsequently specifically requested by correspondence. However, the Special Master agrees with IQVIA that the March 28, 2018 Order did not deal with the substance of Veeva's Requests for Production Nos. 18–41 and did not require IQVIA to produce win/loss data.

The Special Master turns next to the relevancy and burden arguments made by the parties. After evaluating the arguments raised, the Special Master believes that Veeva has met its initial burden to demonstrate the relevance of win/loss data covering the products at issue in this matter—sales data, reference data, and MDM. The Special Master is persuaded by Veeva's arguments that IQVIA win/loss data relating to reference data, sales data, and MDM may shed light on its claims that IQVIA has market power in the global sales data and reference data markets, which it allegedly exploits, generating anticompetitive effects in the global reference data and MDM markets.

Turning to IQVIA's relevancy and burden arguments, IQVIA does not appear to dispute that its sales employees enter information into Salesforce and that this information can be generated into the type of report that Veeva seeks. Instead, IQVIA explains that this win/loss

12

information entered in Salesforce is not "comprehensive" win/loss information. IQVIA explains that when its sales employees enter information into Salesforce, they are not required to enter the "Win/Loss Competitor" field and thus it is left blank, incomplete, or is otherwise inaccurate most of the time. IQVIA thus argues that there is no business process in place at IQVIA requiring that information about IQVIA's competitors for individual sales opportunities be entered, kept, maintained, reviewed, or quality controlled in the ordinary course of business. IQVIA submitted a Declaration from Renee Geron who explains that when IQVIA needs win/loss information for internal presentations, that information is gathered via direct communications with IQVIA's sales employees and that information from Salesforce may only be reviewed as a first step.

Despite IQVIA's assertions that the win/loss information stored in Salesforce is not relevant because it is not "comprehensive" or may be inaccurate, the Special Master believes that this information is relevant and discoverable. Therefore, to the extent that IQVIA can generate win/loss data detailing relevant sales opportunities from Salesforce, the Special Master will order IQVIA to generate relevant sales opportunities in the United States and Europe between January 1, 2012 and January 10, 2017 for IQVIA's sales data, reference data, and MDM products. To the extent maintained and available in Salesforce, the reports should include the following fields: opportunity name, opportunity date, customers involved, products involved, competitors involved, opportunity outcome, reasons for the outcome, prices charged, revenue realized, and geographic region covered.

The Special Master notes that while a party should not be required to create completely new documents, that is not the same as requiring a party to query an existing dynamic database for relevant information. *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-0630-LHK (PSG), 2013 WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013). The Special Master finds the case law cited by

13

Veeva instructive, particularly, *Gonzalez v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006). In that case, the United States government was seeking, through a third-party subpoena pursuant to Rule 45, "a massive amount of information from Google's search index, and to turn over a significant number of search queries entered by Google users." *Id.* at 678. Google objected arguing, among other things, that it was unduly burdensome to produce the data the government was seeking "because [Google] does not maintain search query or URL information in the ordinary course of business in the format requested by the government." *Id.* at 683. While recognizing the "general rule" that "non-parties are not required to create documents that do not exist, simply for the purposes of discovery," the court held that it was not an undue burden on Google simply because "Google contends that it must create new code to format and extract query and URL data from many computer banks, in total requiring up to eight full time days of engineering time." *Id.* The court concluded that the technical burden of production did not excuse Google from complying with the subpoena. *Id.*

Here, IQVIA does not deny that it maintains information in Salesforce that can be generated into the type of report requested by IQVIA. Veeva has pointed to two win/loss reports pulled from Salesforce— one documenting wins and losses for the fourth quarter of 2014 ("Q4 2014 Report"), the other covering wins and losses for April and May of 2016 ("April–May 2016 Report"). The Special Master is not persuaded by IQVIA's assertions that the information it does maintain in Salesforce is seemingly irrelevant since the Win/Loss Competitor field in Salesforce is not required to be inputted by IQVIA sales employees or that the field is not solely relied upon by IQVIA management when it evaluates win/loss information for internal presentations. The Special Master further rejects IQVIA's assertion that because sales employees are not required to input the Win/Loss Competitor field, the information entered into Salesforce by sales employees

is not comprehensive and therefore need not be produced. "Inaccurate or incomplete information included in relevant documents is not a basis for withholding relevant discovery." *Jones v. Nat'l Council of Young Men's Christian Associations of the U.S.*, No. 09 C 6437, 2011 WL 3273868, at *2 (N.D. Ill. July 28, 2011). Moreover, there has been no explanation as to why the remaining fields, such as the opportunity name, sales prince, and contract value, are not relevant or otherwise inaccurate. To the extent the data entered and maintained in Salesforce is inaccurate or otherwise incomplete, the Special Master agrees with Veeva that this does not preclude discovery of the data that is maintained. IQVIA will have the opportunity at a later time to argue that the data maintained in Salesforce is inaccurate or incomplete during dispositive motion practice or at trial. IQVIA has not pointed to any discovery rule or case law that establishes that a party need not produce relevant information due to inaccurate or otherwise incomplete information contained therein.

Accordingly, to the extent that information is maintained by IQVIA in Salesforce, IQVIA shall produce win/loss data detailing relevant sales opportunities, listing the customer involved, the products involved, the geographic scope, the opportunity's value, other competitors vying for the opportunity, whether IQVIA won or lost the opportunity, and the reasons for that outcome for the United States and Europe during the relevant discovery period, January 1, 2012 to January 10, 2017, within 30 days of the date of this Order.

### B. Invoice Data

With respect to Veeva's request for comprehensive invoice data, the Special Master believes Veeva has met its burden to demonstrate that invoice data is relevant as to IQVIA's Healthcare Professional, Sub-National, and MDM offerings.

With respect to its relevancy and burden arguments, IQVIA explains that its invoices do not generally include the pricing information that Veeva seeks as the nature of the deliverable is often not evident from the face of the invoice, thus the invoices themselves are of limited value in light of the burden of producing them. Instead, IQVIA asserts that it will produce revenue information on a customer by customer basis.

Veeva is agreeable to responses that sufficiently show pricing of the relevant products, and explains that this information is acceptable in the form of revenue data, as long as the data is broken down by transaction (sales of relevant products to particular customers) so that Veeva can extrapolate prices.

As IQVIA has agreed to provide revenue data, the Special Master will not rule on the merits of IQVIA's burden arguments but will instruct IQVIA to produce revenue information on a customer by customer basis, for IQVIA's Healthcare Professional, Sub-National, and MDM offerings in the United States and Europe between January 1, 2012 and January 10, 2017. To the extent possible, the data should be broken down by transaction (sales of relevant products to particular customers) so that Veeva can extrapolate prices. If Veeva is unable to extrapolate prices from the revenue data produced by IQVIA, Veeva may bring that issue to the Special Master's attention. IQVIA is to produce this information within 30 days of the date of this Order.

C. CRM

With respect to CRM, the Special Master notes that the parties did not discuss production of win/loss data or invoice data as it relates to CRM prior to the briefing of this motion. Additionally, the Special Master does not believe Veeva has met its burden to demonstrate the relevance of win/loss data or invoice data as it relates to CRM. The Special Master fails to be persuaded that IQVIA's CRM product is relevant because it competes with Veeva's in a market

16

free from IQVIA's anticompetitive TPA restraints and thus win/loss and invoice data pertaining to IQVIA's CRM product will demonstrate how customers benefit under those conditions and gravitate toward software products when IQVIA permits it.

DENNIS M. CAVANAUGH, U.S.D.J. (Ret.)
Special Master

Date: November 14, 2019