# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IQVIA INC. and IMS SOFTWARE SERVICES, LTD., | ) ) | Case No.: 2:17-cv-00177-CCC-MF |
| | ) | |
| *Plaintiffs /* | ) | Hon. Claire C. Cecchi, U.S.D.J. |
| *Counterclaim–Defendants,* | ) | Hon. Mark Falk, U.S.M.J. |
| | ) | Hon. Dennis M. Cavanaugh, Ret. U.S.D.J. |
| v. | ) | |
| | ) | ***[HIGHLY CONFIDENTIAL]*** |
| VEEVA SYSTEMS INC., | ) | |
| | ) | ██████████████ |
| *Defendant /* | ) | |
| *Counterclaim–Plaintiff.* | ) | Motion Return Date:  July 6, 2020 |
| | ) | |
| | ) | ***Document filed electronically.*** |

---

## VEEVA SYSTEMS INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS

---

Arnold B. Calmann
**SAIBER LLC**
One Gateway Center, 10th Floor, Suite 1000
Newark, New Jersey 07102
Tel.: (973) 622-3333
Email: abc@saiber.com

Steven F. Benz
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900
Email: sbenz@kellogghansen.com

James T. Southwick
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Tel.: (713) 651-9366
Email: jsouthwick@susmangodfrey.com

Charles T. Graves
**WILSON SONSINI**
 **GOODRICH & ROSATI PC**
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Tel.: (415) 947-2000
Email: tgraves@wsgr.com

*Counsel for Defendant / Counterclaim-Plaintiff Veeva Systems Inc.*

# TABLE OF CONTENTS

**PAGE**

TABLES OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 7

I. VEEVA LAUNCHES GROUNDBREAKING LIFE SCIENCES CLOUD
SOFTWARE .................................................................................................. 7

II. RATHER THAN DEVELOPING ITS OWN SUPERIOR SOFTWARE,
IQVIA WEAPONIZES ITS TPA POLICY TO STIFLE COMPETITION ....................... 8

III. IQVIA CONCOCTS AN "IP PROTECTION" PRETEXT FOR ITS
EXCLUSIONARY TPA POLICY ...................................................................... 11

IV. DESPITE IQVIA'S SUBTERFUGE, ███████████████████ .................. 14

V. ████████████████████████████████████████████████
████████████████████ .................................................................. 17

VI. STUCK WITHOUT ANY VIABLE IP JUSTIFICATION TO DENY
CUSTOMERS TPAS, IQVIA DERAILS NEGOTIATIONS WITH
VEEVA BY FILING A SURPRISE LAWSUIT DESIGNED TO
MAINTAIN ITS MONOPOLIES ...................................................................... 19

VII. RESPONDING TO IQVIA'S LAWSUIT, VEEVA INSTITUTES A
COMPREHENSIVE GLOBAL LITIGATION HOLD AND PRODUCES
WORKING COPIES OF ITS SOFTWARE TO A DIRECT COMPETITOR ................. 20

LEGAL STANDARD............................................................................................. 21

ARGUMENT ....................................................................................................... 23

I. VEEVA'S PRE-LITIGATION DELETIONS IN THE ORDINARY
COURSE OF ITS BUSINESS WERE NOT SPOLIATION............................................ 25

   A. Veeva Could Not Reasonably Have Anticipated Litigation Until
   IQVIA Filed Suit in January 2017 ......................................................... 25

      1. The Parties' Substantial Progress Toward a TPA Resolution
      in Fall 2015 Disproves That Veeva Could Have Anticipated
      Litigation.................................................................................. 26

      2. Veeva's September 2015 Discovery of ████████████
      ████████ Did Not Create a Reasonable Expectation of
      Litigation.................................................................................. 29

3.      Veeva's May 2016 Discovery of ████████ Did
        Not Create a Reasonable Anticipation of Litigation...................................31

4.      Veeva's Mistaken, and then Corrected, "Work Product"
        Designations Do Not Support Veeva's Reasonable
        Anticipation of Litigation in September 2015 ...........................................33

B.      IQVIA Fails To Demonstrate the Relevance of Much of the Deleted
        Customer Data ...........................................................................................34

C.      IQVIA Cannot Demonstrate That Veeva Deleted Information
        "with Intent To Deprive [IQVIA] of Use in Litigation".........................36

D.      Veeva Produced Much of the Information It Allegedly "Deleted"
        Pre-litigation .............................................................................................38

1.      Far from Intentionally Deleting Customer Data To Deprive
        IQVIA of Evidence, Veeva Produced Customer Data as
        Email Attachments...................................................................39

2.      Veeva Produced ████ January 2014–May 2015 Emails
        from Other Custodians' Files...................................................39

E.      IQVIA's Actions in 2015-2016 Reveal That, if Any Party Should
        Have Anticipated Litigation, It Was IQVIA.............................................40

1.      IQVIA Prepared for Litigation in May 2015, ██ Months
        Before Instituting a Litigation Hold.........................................40

2.      IQVIA Destroyed Key Evidence During the ██ Months
        Before Its Litigation Hold........................................................42

II.     IQVIA HAS NOT MET ITS BURDEN TO SHOW THAT ANY POST-
        JANUARY 2017 DELETIONS WARRANT SANCTIONS ...........................................43

A.      Information Contained in the ████ Database Was Erased in the
        Routine Course of Business, and Its Substance Largely Has Been
        Provided ....................................................................................................44

B.      A Brief, Inadvertent Delay in Preserving Google Drive Documents
        Cannot Support Sanctions Where Any Impact Is Negligible and
        Where Veeva Undertook Every Effort To Cure It....................................48

CONCLUSION...................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**CASES**

*Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612 (E.D. Pa. 2016) .......................................38

*Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150 (D.N.J. 2009)......................................22, 38, 48, 50

*Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3d Cir. 1995) .............................................22

*Brimage v. Hayman*, 2010 WL 3339830 (D.N.J. Aug. 23, 2010) ..................................................21

*Bull v. United Parcel Serv., Inc.*, 665 F.3d 68 (3d Cir. 2012) ......................................................21

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614
        (D. Colo. 2007) ..................................................................................................30, 31

*Chirdo v. Minerals Techs., Inc.*, 2009 WL 2195135 (E.D. Pa. July 23, 2009) .............................38

*CIGNEX Datamatics, Inc. v. Lam Research Corp.*, 2019 WL 1118099
        (D. Del. Mar. 11, 2019).............................................................................................34

*Culler v. Shinseki*, 2011 WL 3795009 (M.D. Pa. Aug. 26, 2011) ..................................................38

*First Sr. Fin. Grp. LLC v. Watchdog*, 2014 WL 1327584 (E.D. Pa. Apr. 3, 2014)......................38

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494 (D. Md. 2009) .........................................26

*Hicks v. Wegmans Food Mkt.*, 2011 WL 499368 (D.N.J. Feb. 10, 2011) .........................38, 48, 50

*Hillburn v. Bayonne Parking Auth.*, 2012 WL 12862339 (D.N.J. Sept. 26, 2012),
        *aff'd*, 562 F. App'x 82 (3d Cir. 2014).......................................................................50

*Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252 (3d Cir. 1993) .............................40

*McAdams v. United States*, 297 F. App'x 183 (3d Cir. 2008) ..................................................21, 23

*Medeva Pharma Suisse A.G. v. Roxane Lab., Inc.*, 2011 WL 310697
        (D.N.J. Jan. 28, 2011) ...............................................................................................34

*Mock v. Wal-Mart Stores, E., L.P.*, 2014 WL 1652792 (D.N.J. Apr. 23, 2014)................22, 23, 48

*MOSAID Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332 (D.N.J. 2004) ............48, 49, 50

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543 (N.D. Cal. 2018)....................33

*Peterson v. Seagate US LLC*, 2011 WL 861488 (D. Minn. Jan. 27, 2011)......................................38

*Pfizer Inc. Sec. Litig.*, *In re*, 288 F.R.D. 297 (S.D.N.Y. 2013)....................................................45

*RealNetworks, Inc. v. DVD Copy Control Ass'n*, 264 F.R.D. 517 (N.D. Cal. 2009) ....................26

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
2007 WL 9782803 (D.N.J. July 12, 2007).........................................................................30

*Ruhle v. Housing Auth. of Pittsburgh*, 54 F. App'x 61 (3d Cir. 2002) .........................................21

*sanofi-aventis Deutschland GmbH v. Glenmark Pharm., Inc.*, 2010 WL 2652412
(D.N.J. July 1, 2020), *aff'd*, 748 F.3d 1354 (Fed. Cir. 2014) ...........................................33

*Scott v. IBM Corp.*, 196 F.R.D. 233 (D.N.J. 2000)........................................................................34

*State Nat'l Ins. Co. v. County of Camden*, 2011 WL 13257149
(D.N.J. June 30, 2011) ..............................................................................25, 26, 30, 34

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96 (E.D. Va. 2018) ..............................26, 30

## RULES

Fed. R. Civ. P.:

Rule 37(e)...........................................................................................................38, 40

Rule 37(e)(1).......................................................................................................22, 46

Rule 37(e)(2).......................................................................................................22, 36

## OTHER MATERIALS

29 Am. Jur. 2d *Evidence* § 177 ...................................................................................23, 48

Google, *What's new in Vault* (Mar. 7, 2019), https://support.google.com/vault/
answer/4388708?hl=en .................................................................................................24

Google Blog, *G Suite Updates* (Mar. 9, 2017), https://gsuiteupdates.googleblog.com/
2017/03/new-in-google-vault.html ..............................................................................24

IQVIA, *Data Governance and Stewardship*, https://www.iqvia.com/locations/
united-states/solutions/commercial-operations/enterprise-information-
management/data-governance-and-stewardship...........................................................35

Quinn Emanuel, *The Firm & News – About Us*, https://www.quinnemanuel.com/
the-firm/about-us/ .........................................................................................................41

## INTRODUCTION

IQVIA's hyperbolic and groundless motion for sanctions should be denied.  There was no spoliation.  Veeva told no lies and violated no orders.  There was no impropriety.  Quite the opposite:  since litigation began, Veeva has engaged in a sweeping evidence-preservation exercise that broadly encompassed relevant IT systems across Veeva's global operations, and an email-and-chat-preservation effort that covered every Veeva employee worldwide.  IQVIA's spoliation arguments are factually wrong, legally baseless, and uniformly meritless.  No sanction is warranted, much less the unprecedented sanction IQVIA seeks, which this Court has found appropriate in only the most egregious of circumstances.

Beginning in 2013 when it launched Veeva Network, and then over the next seven years, Veeva has tried (and tried and tried again) to cooperate with IQVIA for the benefit of the companies' mutual customers.  Veeva even submitted to multiple invasive (and expensive) audits of its proprietary systems, exposing granular details of its most sensitive software architecture.  Veeva's goal always has been the same:  to allow fair competition.  Veeva and IQVIA's mutual customers should be able to use the software and data products of their choice.

Veeva's good faith has continued throughout litigation.  When IQVIA launched its surprise trade-secret lawsuit in January 2017, Veeva placed a worldwide litigation hold on all emails and chat communications for all employees.  This hold was implemented at the system level by Veeva's IT organization and made the deletion of email and chats by any employee a *technical impossibility*.  Veeva also collected and produced materials, including text messages, from the Veeva laptops and personal mobile phones of individual custodians.  Then Veeva devoted vast resources to produce nearly 4.5 million documents.  And Veeva has presented dozens of witnesses for deposition worldwide.

But there's more:  Veeva's transparency and diligence have extended far beyond documents and witnesses.  Veeva has given IQVIA—its direct competitor—a full working copy of the systems Veeva uses to build and maintain its OpenData data product, as well as a complete copy of OpenData (which IQVIA incorrectly alleges was improved by IQVIA data).  In total, Veeva has produced more than 3 terabytes of data in native form from Veeva's proprietary systems (to put this into perspective, the nearly 4.5 million documents in the rest of Veeva's production is less than a single terabyte).  This is not to mention Veeva's production of nearly a terabyte of external OpenData/Network software log files.  In short:  Veeva has gone above and beyond what the discovery rules require.  Its discovery practice has been reasonable and diligent and does not warrant any sanction.

Meanwhile, IQVIA has pursued an unbroken pattern of hindrance, deceit, anticompetitive practices, and litigation overreach:

- In 2013-2014, IQVIA instituted a Third-Party Access agreement ("TPA") policy with respect to new Veeva software products that had nothing to do with intellectual property ("IP") protection but was instead a monopolistic business tactic laser-targeted to destroy competition in life sciences data markets.  IQVIA's policy continues today.

- In 2014-2015, IQVIA reached a critical juncture.  IQVIA feared losing its data monopoly to Veeva and coveted Veeva's higher revenue multiple from the larger and more lucrative software markets.  But IQVIA's own technology was dated and incapable of competing on the merits.  So IQVIA, with ███████████████ ███████ personal input, ██████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████

- In 2015, IQVIA proposed an ██████████████████████ audit of Veeva's data-security controls—purportedly to resolve the TPA impasse—but then gerrymandered and manipulated the audit to the point that █████████████ ████████████████████████████[1]  IQVIA weaponized the results of the biased audit to prejudice customers against Veeva.

---

[1] Ex. 1 ████████████████

- In 2016, IQVIA proposed a ████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████ but IQVIA still refused to sign the TPA.  IQVIA used the delay caused by █████████ to try to sell its own (inferior) software to ██████

- Also in 2016, IQVIA told its customers that █████████████ a leading digital security firm, had validated its IP concerns over Veeva Network.  That was false.  In reality, ███████████████████████████████████████████████

- Throughout this period, IQVIA misused proprietary software architecture information that Veeva provided during TPA negotiations (including during █████████████ Although Veeva provided IQVIA confidential information for the purpose of resolving the parties' TPA impasse, IQVIA misappropriated it for sales, business, and marketing purposes.

- IQVIA's deceit continues today.  While Veeva faithfully has abided by IQVIA's policy of requiring TPAs before customers can load IQVIA data into Veeva's systems, IQVIA consistently and purposefully has allowed thousands of its employees to access Veeva software without authorization—despite knowing that Veeva requires signed restricted software access agreements before access is allowed.  When Veeva raised the issue, IQVIA refused to change its practice and continues massive unauthorized access to this day.

This litigation is IQVIA's most recent anticompetitive blitz.  And IQVIA's sanctions motion is its latest volley.  Throughout this litigation, IQVIA has approached discovery opportunistically.  Instead of litigating the merits—a contest IQVIA knew it would lose—IQVIA has tried to gain a strategic advantage through a barrage of discovery motions.  Most recently, as discovery was closing, IQVIA concocted a "Veeva-destroys-evidence" conspiracy theory and filed this sanctions motion on the last day of fact discovery.  But IQVIA's motion is just as pretextual as its pre-suit discussions with Veeva:  IQVIA seeks summary relief through discovery warfare because IQVIA knows it has no hope of summary judgment on the merits.

Substantively, IQVIA seeks sanctions for two categories of alleged Veeva acts: (1) deletions before litigation (mostly more than a year before litigation) and (2) deletions during litigation.  None of IQVIA's arguments passes muster.

1.      IQVIA first challenges Veeva's alleged pre-litigation deletions of customer data in 2015 and 2016.  IQVIA alleges that those deletions evince Veeva's intent to deprive IQVIA of evidence of "trade secret misappropriation," warranting sanctions.  But spoliation sanctions are foreclosed unless Veeva knew IQVIA's lawsuit was pending or probable.  It did not.

The reality is that IQVIA points only to ordinary-course data retention and deletion carried out before Veeva could have anticipated litigation.  In 2015 and 2016, IQVIA led Veeva to believe the parties had progressed toward a TPA compromise.  Though it is now clear IQVIA was operating in bad faith, at the time the parties' apparent progress precluded Veeva's anticipation of litigation.  Veeva cannot be penalized for the routine deletion of materials it had no duty to preserve.  Indeed, in some cases, Veeva had a contractual obligation or operational requirement to delete the materials at issue.  Because litigation was unanticipated, a claim for *any* sanctions based on 2015 or 2016 deletions—let alone the apocalyptic ones IQVIA requests—collapses.

Veeva's inability to have anticipated this litigation is apparent from IQVIA's own conduct.  IQVIA contends that Veeva should have expected litigation in September 2015, when

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████[2]████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

[2]  ████████████████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Veeva had no reason to think ████████████

████████████████ or that litigation would follow.  In fact, when IQVIA learned of a

separate minor incident in May 2016, where ████████████████████████

████ IQVIA did not sue, threaten to sue, or even mention litigation.  Instead, ████████

██████████████████████████████████████████████

████████████████████████[3]  The fact that IQVIA did not hint at litigation after

████████████████████████████████████████ in May 2016

defeats any notion that Veeva should have anticipated litigation based on the substantially

similar September 2015 incident.  In both instances, █████████████████████

████████████████ In both instances, ██████████████████████ In

both instances, █████████████████████████████ IQVIA's 2016 stance

also puts the lie to its newfound indignancy.  Despite ██████████████████████

███████ in June 2016, IQVIA now *condemns* such efforts as spoliation.

     The truth is that ████████████████████████ Far from concealing

wrongdoing, ███████████████████████████████ were consistent with

Veeva's longstanding data retention and deletion practices honoring obligations to its customers

and other data providers.  Pursuant to its agreements with customers and sometimes with IQVIA,

upon completion of discrete data projects, Veeva deletes the data.  Your Honor should reject

IQVIA's attempt to transform compliance measures into scandal.

     The remainder of IQVIA's motion fares no better.  IQVIA alleges that Veeva deleted

employee ████████ emails spanning January 2014 to May 2015.  Veeva did no such thing:

---

[3] Ex. 2 ██████████████████████

Veeva has *produced* 6,800 of ▮▮▮ emails from that 17-month period (along with tens of thousands of additional emails from a broader period). ▮▮▮ 2014-2015 emails were collected from the mailboxes of other custodians. As explained to IQVIA by ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ any deletions were done years ago for a humdrum reason: to free up space on ▮▮▮ mailbox due to a system-imposed, per user mailbox storage limit—a far cry from the impropriety IQVIA's motion attempts to cook up. But even that is beside the point. Any culling of ancient emails was innocuous, and the record shows that Veeva did not anticipate litigation, and was not under any preservation obligation, until January 2017.

Finally, even accepting the counterfactual notion that Veeva could have anticipated litigation in September 2015, sanctions still would be unwarranted. First, IQVIA cannot demonstrate the relevance of the deleted data, as Veeva was explicitly authorized to possess customer data so long as it was used for discrete purposes unrelated to "us[ing] IQVIA Reference Data to build or improve Veeva OpenData." Mot. 5. Second, Veeva was able to preserve and produce much of the data IQVIA accuses it of destroying. IQVIA has suffered no harm or prejudice.

**2.** IQVIA also attacks Veeva's conduct during litigation. First, IQVIA alleges that Veeva's 2018 erasure of an ▮▮▮ database prevents IQVIA from effectively litigating its case. That is wrong. IQVIA did not originally request the retired ▮▮▮ database, which was used briefly long before this litigation to maintain and process raw datasets before they were loaded into the ▮▮▮ database. For years now, these functions have been served by ▮▮▮ the master database in which Veeva handles data change requests and delivers OpenData updates to its European customers. IQVIA has received a full working copy of ▮▮▮ Veeva deactivated ▮▮▮ long before this litigation and deleted the mothballed ▮▮▮ before IQVIA requested it as part of Veeva's unrelated global migration of computing

infrastructure to Amazon Web Services.  Sanctions cannot rest on the routine elimination of cumulative information, the relevance of which is at most highly speculative.  Veeva's actions were reasonable and are not sanctionable.

Finally, IQVIA seeks sanctions because of a brief, unintentional, and justifiable delay in preserving Google Drive documents—a cloud electronically stored information ("ESI") repository among numerous sources from which Veeva collected.  This is a non-issue.  When IQVIA sued Veeva, Veeva imposed a comprehensive global litigation hold.  Veeva's hold was thorough and included not only instructions to relevant custodians but also the institution of software controls that rendered deletion impossible.  Veeva was unaware that its vendor, Google, did not support the hold function for Google Drive at that time, and Veeva added Google Drive to the hold soon after the function became available.  This delay lasted *only 3 months* after the comprehensive litigation hold, and *only 1.5 months* after Google began offering the hold functionality for Google Drive.  Veeva has been upfront about that delay and has produced 63,000 Google Drive documents.  There is no basis to impose any sanction based on a benign misstep in the context of an extraordinarily intensive discovery campaign.

Your Honor should deny IQVIA's sanctions motion so this case can progress toward summary judgment proceedings and trial.

## BACKGROUND

### I.   VEEVA LAUNCHES GROUNDBREAKING LIFE SCIENCES CLOUD SOFTWARE

Veeva brought the era of cloud computing to the life sciences industry in 2007 by introducing a cloud-based Customer Relationship Management ("CRM") software product, empowering customers to efficiently track customer interactions and deploy lifesaving drugs and treatments.  Customers flocked to Veeva CRM, marking the industry's transition to cloud-based

commercial software.[4]

In 2013, Veeva unveiled its latest innovation:  Veeva Network, a groundbreaking cloud-based Master Data Management ("MDM") platform.  Network analyzes customer data to generate the most accurate, up-to-date healthcare information available.[5]  To complement Veeva Network and Veeva CRM, Veeva released a reference data product—a compilation of information on healthcare professionals and organizations—called OpenData.[6]  Customers' demand for Network surged, and IQVIA scrambled to blunt Veeva's success.[7]

## II.    RATHER THAN DEVELOPING ITS OWN SUPERIOR SOFTWARE, IQVIA WEAPONIZES ITS TPA POLICY TO STIFLE COMPETITION

Veeva's explosive growth threatened IQVIA—a data behemoth that had struggled to gain a foothold in the software market.[8]  IQVIA had a monopoly in reference data with its OneKey product.  IQVIA was reaping monopoly profits.[9]  But IQVIA feared that Veeva's cloud software and OpenData product would erode IQVIA's data dominance.[10]  To maintain its data monopoly and extend it to adjacent technology markets, IQVIA needed to contain customers within its



[4] Ex. 3

[5] Ex. 4
[6] Ex. 5
[7] *E.g.*, *id.* at
[8] Ex. 6

Ex. 7

Ex. 8

[9] Ex. 9
Ex. 10

[10] Ex. 11
Ex. 12

sphere of influence and prevent them from migrating to Veeva.

IQVIA was at a crossroads.  Determined not to let another Veeva product achieve the same level of success as Veeva CRM, IQVIA had to make a choice.  Should it invest in creating a superior cloud-software product that customers might choose over Veeva's?  Or should it leverage its data monopoly to destroy competition?  IQVIA chose the monopolist's path.  Monopoly windfalls were too juicy to pass up.

IQVIA's strategy was brazen:  it would suffocate Veeva by blocking customers from using mission-critical IQVIA data in Veeva's software.  IQVIA could do this because Veeva Network cannot function without reference data—a product that IQVIA monopolizes.[11]  The mechanics of IQVIA's scheme are as follows:  To load IQVIA reference data into Veeva Network, a customer needs IQVIA's authorization in the form of a TPA.  From Network's release in 2013 through the present, IQVIA has refused to execute such TPAs.[12]  All the while, IQVIA has continued to sign TPAs for Veeva CRM, knowing that extending its scheme to CRM would cause the customers to riot.[13]  IQVIA's TPA maneuver has rendered Veeva Network unusable to customers that are bound to IQVIA data without a functional alternative.[14]

Customers were truly stuck.  While a customer theoretically could adopt Veeva Network by switching reference data vendors, IQVIA itself acknowledged that ████████████████



---

[11] Ex. 9 ████████████████████████████████████████████████

[12] *E.g.*, Ex. 13 ███████████████████████████████████ *see also* Ex. 14

[13] Ex. 15 ██████████████████████████████████████████████████

[14] Ex. 16 ████████████████████████████████████████████████

████████ *see also* Ex. 17 ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████[15] IQVIA

understood the seismic disruption of a new data provider: ████████████

██████████████████████████[16] Through its TPA policy,

IQVIA locked customers into IQVIA reference data and out of Veeva Network.

Internally, IQVIA candidly affirmed its TPA policy's anticompetitive ends. After Veeva

launched Network, a senior IQVIA executive deliberated, ████████████████

████████████████████████████[17] IQVIA's

██████ responded, ████████████████████████████

██████[18] IQVIA quickly grasped the power of its scheme. It understood that reference data

█████████████████████████████████████████

████████████████████████[19] IQVIA knew that

██████████████████████████████████

█████████████████████████[20]

IQVIA data was █████████████ in customers' systems; those customers—the world's

largest pharmaceutical companies—were shackled to IQVIA reference data. By preventing

customers from using its data in Veeva Network, IQVIA exerted market power and blocked

competition. Disabling Veeva Network safeguarded IQVIA's data monopoly.[21] ██████████

██████████████████████████████

██████████████████████████████

---

[15] Ex. 18 █████████████
[16] *Id.* ██████
[17] Ex. 5 ███████████
[18] *Id.* at ███
[19] Ex. 19 ███████████
[20] *Id.*
[21] Ex. 18 ██████████ Ex. 12 █████████████



[22]

By design, IQVIA's TPA policy harmed its customers.  As an IQVIA ███████████ ███████ explained, ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████[23] ████████████████████ frustration is illustrative: ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████[24]  A ██████ manager likewise decried IQVIA's anticompetitive TPA policy: ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████[25]  The ██████ manager was nonetheless resigned to a lack of choice: ████████████████████████████ ████████████████████[26]  And customer ██████ lamented that IQVIA's TPA policy ██████████████████████████████████████████████████ ████████████████████[27] ████████████████████ commented, ██████ ████████████████████████████████████████[28]

## III.    IQVIA CONCOCTS AN "IP PROTECTION" PRETEXT FOR ITS EXCLUSIONARY TPA POLICY

Customer angst created a customer-relations problem for IQVIA.  IQVIA could not tell

---



[22] Ex. 20 ██████████████
[23] Ex. 21 ████████████████████ (emphasis added).
[24] Ex. 22 ██████████████████
[25] Ex. 23 ██████████████████████
[26] *Id.* ████
[27] Ex. 24 ██████████████████████
[28] Ex. 25 ████████████████████████

the market the true aim of its TPA policy—that is, harming customers and competition, Veeva specifically.  But IQVIA needed to say *something* to placate customer concerns and dispel its monopolist reputation.

IQVIA chose to dress up its TPA policy as an IP-protection device.  As IQVIA explained to its co-conspirator Reltio, ███████████████████████████████████████ ████████████████████████████████[29]  Although IQVIA feigned concern over Veeva's IP protections to justify its exclusionary TPA policy, in truth, IQVIA had no interest in compromising with Veeva and every interest in maintaining and expanding its monopolies. IQVIA did not say (and could not say) how the use of its data in Veeva Network jeopardized IQVIA IP.  An ██████ representative observed, ████████████████████ ████████████████████████████████████████████████ ████████████████████████████[30]  A ██████ representative voiced frustration that, ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████[31]  IQVIA's concerns were always flimsy and in flux.

First, IQVIA bewailed Network's "crowdsourcing" feature, by which customers of both Veeva Network and OpenData collectively contribute to the dataset by transmitting data change requests ("DCRs") through Network.  IQVIA purportedly feared Veeva might somehow capitalize on Network's crowdsourcing function to steal IQVIA data.  *See* Mot. 6-7.  ███████ ████████████████████████████████████████████████

---

[29] Ex. 26 ████████████████
[30] Ex. 24 ████████████████████████████████
[31] Ex. 22 ███████████████████████



[32]

IQVIA's crowdsourcing concern is pretextual and puzzling given that it has enthusiastically publicized its own crowdsourcing practices for years.

[33]

[34] The

went further,

[35]

In any event, Veeva debunked any "threat" that the crowdsourcing capabilities of Veeva Network might pose to IQVIA IP.  Throughout 2014 and 2015, Veeva gave IQVIA detailed assurances of Network's data-security protections, including proprietary descriptions and diagrams of the technical controls by which Network safeguarded third-party information.[36] IQVIA acknowledged those controls' legitimacy.

[37] Veeva had demonstrated the obvious—customers' IQVIA data will not pass through Network and into OpenData.  In so doing, Veeva satisfied IQVIA's



[32] Ex. 6

[33] Ex. 27
[34] Ex. 28
[35] Ex. 14
[36] *E.g.*, Ex. 29          Ex. 30
[37] Ex. 31

IV.     **DESPITE IQVIA'S SUBTERFUGE,** ███████████████████████████

After learning that its crowdsourcing concern was an empty one, IQVIA changed its message.  As the next step in its strategy to delay resolution of the TPA issues, IQVIA voiced apprehension about ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████[38]

IQVIA then argued that ████████████████████████████████████████[39]

In Fall 2015, Veeva agreed to the audit by █████ of the data-security controls of Veeva Network, Veeva's MDM product.  In preparation for the audit, █████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████[40]███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████[41]██████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████[42]

---

[38] Ex. 32 ████████████████████████████████████████████████████
█████████████████████████████████████████████████████ Ex. 33
████████████████████████████████████████████████████████████████
████████████████ Ex. 34 █████████████████████████████████████████
████████████████████████████████████████████████████████████████
[39] Ex. 35 ███████████████████████████████████████████████████████████
[40] Ex. 36 █████████████████████████████████████████████
[41] *Id.*; Declaration of Jonathan W. Faddis ¶ 10 ("Faddis Decl.") (filed concurrently herewith).
[42] Faddis Decl. ¶ 18.



███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████[43]████████████████████

███████████████████████████████████████

███████████████████████████████████████

███[44]████████████████████████████████████████

████████████████████████[45]███████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████[46]

    IQVIA now contends that ████████████████████████ somehow skewed the audit.  That is false.  ████████████████████ were outside of the audit's scope, which was focused solely on Veeva Network.  An ████ questionnaire defining the audit's parameters asked ██████████████████████████████████ ███████████████████████████[47]  Veeva correctly answered ████████ ████████████████████████████████████

---

[43] Any assertion by IQVIA that ████████████████████████████ ████████████████████ is based on unfounded speculation rather than on evidence. ████ ██████████████████████████████████████████ ████████████████*Id.* ¶ 18; Ex. 037 ████████████

[44] Ex. 36 ████████████████ Ex. 37 ██████████████

[45] Ex. 36 ████████████

[46] Ex. 40 █████████████

[47] Ex. 041 ████████████ *id.* at ████████████████ *id.* ████████████████████████████ *id.* at █████ ████████████████████████████████████████████ ████████████████████



[48] Further, the audit had nothing to do with data corruption or alleged misuse. As IQVIA's ███████████ acknowledged, ████████

[49]

The true story is that *IQVIA* rigged the ████ audit. From the outset, ████████████

[50]

[51] IQVIA had negotiated in bad faith: ████████████

[52]

[53] [54]

---

[48] Faddis Decl. ¶ 11.
[49] Ex. 40
[50] Ex. 41
Ex. 42
Ex. 43
[51] Ex. 001
[52] Ex. 41
[53] Ex. 44
[54] Ex. 45

**V.** ██████████████████████████████████████
████████████████

A couple months later, ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████[55] █████████████████████████████████████

████████████████████████████████████████

████████████████████████████[56]

In April 2016, ███████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████[57] ██████████████████████

██████████████████████████████████████████

[55] *E.g.*, Ex. 46 █████████████████████████
[56] *E.g.*, Ex. 47 ████████████████████████ Ex. 48 ██
███████████████████ Ex. 49 ████████████████████████
████████████████████ Ex. 50 ███████████████
███████████ Further, IQVIA even █████████████████████
██████████████ Ex. 51 ███████████████████████████
[57] Ex. 52 ██████████████████████

[58] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[59] ████████████████████████████████████████████████

████████████████████████████████████████████████ [60]

████████████████████████████████████████████

████████████████████████████████ [61] ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ [62] ██

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ [63] ██████████████████

████████████████████████████████████████████████

████████████████████████████████████ [64]

████ did not request that Veeva preserve customer data extracts or otherwise hint at

litigation.  Unknown to Veeva, however, ████ and IQVIA were hatching the ultimate plan—

---

[58] Ex. 53 ████████████

[59] Ex. 54 ████████████████████████████████

████████████████████████ *See infra*

Argument Part I.D.1.

[60] Ex. 55 ██████████ Ex. 2 ██████████

[61] *Id.* at ██

[62] *Id.* at ██

[63] *Id.* at ██

[64] *Id.* at ██

this lawsuit—to manufacture a justification for their abusive TPA policy by ███████████

██████████████████

## VI.    STUCK WITHOUT ANY VIABLE IP JUSTIFICATION TO DENY CUSTOMERS TPAS, IQVIA DERAILS NEGOTIATIONS WITH VEEVA BY FILING A SURPRISE LAWSUIT DESIGNED TO MAINTAIN ITS MONOPOLIES

During ███████████████████ both Veeva and IQVIA were trying to sell

██████ on a global MDM solution.  ████████████████████████████

███████████████████████[65]  Unable to win the ████████ business on the

merits of its antiquated software, IQVIA again used its TPA policy to stymie Veeva and keep

██████████ as a customer.

Undeterred by IQVIA's shifting IP concerns, Veeva submitted to even greater scrutiny of

Network's data-security controls.  In Summer 2016, Veeva participated in ████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████[66]██████████████████████

██████████████████████████████████████████

███████████████[67]

IQVIA nevertheless stood firm in its TPA refusals.  Its basis for doing so had little to do

with IP protection.  Rather, IQVIA sought to neutralize Veeva as a competitor in order to make

its own products palatable in the marketplace.  After pressing forward with TPA denials, IQVIA

tried to sell its own antiquated software to ██████████  In so doing, IQVIA leveraged information

---

[65] Ex. 56 ████████████████████
[66] Ex. 57 ████████████████████████████████████████████████
[67] Ex. 16 ████████████████████

Veeva had revealed to it in confidence during ████████[68]  Likewise victim to IQVIA's ploy, ███████████████████████████████ observed, ████████████████████████ ███████████████████████████████[69]  Its "IP-protection" façade on the brink of exposure, IQVIA had nothing left to tell customers.  So IQVIA sued Veeva for trade-secret misappropriation.  Three years later, IQVIA still has not identified a single trade secret that Veeva misappropriated.

## VII. RESPONDING TO IQVIA'S LAWSUIT, VEEVA INSTITUTES A COMPREHENSIVE GLOBAL LITIGATION HOLD AND PRODUCES WORKING COPIES OF ITS SOFTWARE TO A DIRECT COMPETITOR

Once IQVIA sued, Veeva exceeded its obligations to preserve relevant documents.  Veeva did not merely circulate a memo to potential persons of interest and instruct against deletion.  Veeva promptly deployed outside counsel to interview and provide in-person litigation hold instructions to key individuals.[70]  Veeva also promptly surveyed potential custodians regarding accounts and devices that might contain relevant information.[71]

In parallel, Veeva preserved key corporate systems.  This included utilizing Google Vault to preserve all emails and chats from January 1, 2010 forward, rendering deletion of such emails and chats a technical impossibility for every current and former employee throughout the global Veeva organization—more than 3,000 people.[72]  It also included disabling deletions for the

---



[68] *See id.* ████████████████████████████████
███████████████████████████████████████
██████████ *id.* ██████████████████████████
████████ *see also* Ex. 17 ████████████████████
███████████████████████████████████████
██████████
[69] Ex. 58 ████████████████
[70] Faddis Decl. ¶ 24; *see also* Ex. 59 █████████████████████
[71] Ex. 59 ███████████████████
[72] Faddis Decl. ¶ 28.

following systems:  salesforce.com, Egnyte, Confluence, Zendesk, JIRA, and key Veeva Vault

instances (███████████████████████████████████████████

██████).[73]  Veeva took these preservation measures at great cost.  As just one example,

Veeva to date has paid nearly a half-million dollars to create and maintain a distinct instance of

salesforce.com to ensure that all content was preserved as it existed at the time the litigation began.[74]

To date, Veeva has granted its direct competitor IQVIA access to working copies of the

US and EU software instances and databases used to build and maintain the Veeva data products

that compete with IQVIA.  These systems include, among other details, approximately 2.3

terabytes of data in native form.[75]  Veeva also has produced nearly a terabyte of external

OpenData/Network software log files.  It does not stop there.  Veeva has produced almost a

terabyte of information from the legacy ████ database system containing both Veeva and

customer data in native SQL form.

## LEGAL STANDARD

In seeking a sanction of dismissal and default judgment, IQVIA faces a towering burden

of proof.  "[I]t is well settled that the preference of the Third Circuit is to decide cases on the

merits."  *Brimage v. Hayman*, 2010 WL 3339830, at *1 (D.N.J.) (denying sanctions).  Both

dismissals with prejudice and defaults are "drastic sanctions," and "doubts should be resolved in

favor of reaching a decision on the merits."  *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 80

(3d Cir. 2012) (citations omitted); *see Ruhle v. Housing Auth. of Pittsburgh*, 54 F. App'x 61, 62

n.1 (3d Cir. 2002).  Likewise, "[a]n adverse negative inference is an extreme remedy" that is

disfavored.  *McAdams v. United States*, 297 F. App'x 183, 187 (3d Cir. 2008).

---

[73] *Id.* ¶ 25.
[74] *Id.* ¶ 27.
[75] Veeva is also preparing production of approximately 200 gigabytes of records and system data
processing events from three customer instances of Veeva Network.

If electronically stored information "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court . . . upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

While it is true that, in the rare circumstance that prejudice is demonstrated, the Court may presume the information was unfavorable to the accused party, instruct the jury that it must presume the information was unfavorable to that party, or dismiss the action or enter default judgment, the Court may do so "only" after also "finding that the [accused] party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Where the destruction of evidence is not aimed at subverting litigation, but rather is "properly accounted for," *no* sanctions are warranted, let alone the extraordinary ones IQVIA seeks. *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."). "In other words, there must be a finding that the spoliation was intentional and that there was fraud and a desire to suppress the truth before the Court will make a finding of spoliation." *Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150, 152 (D.N.J. 2009); *see also Mock v. Wal-Mart Stores, E., L.P.*, 2014 WL 1652792, at *2 (D.N.J.) ("With regards to the third factor [of spoliation], actual suppression or withholding of the evidence, the Third Circuit has clarified that a court must determine that the relevant actor suppressed or withheld the evidence in bad faith."). Even a negative-inference sanction—much less default judgment or dismissal—attaches " '*only* when the spoliation or destruction was intentional, and indicates fraud and a desire to suppress the truth,

and it does *not* arise where the destruction was *a matter of routine with no fraudulent intent*.'" *Mock*, 2014 WL 1652792, at *2 (quoting 29 Am. Jur. 2d *Evidence* § 177) (emphases added).

Spoliation must be both intentional and extreme. *See McAdams*, 297 F. App'x at 187 ("An adverse negative inference is an extreme remedy."). Even where the opposing party is prejudiced, not all evidence deletions merit sanctions. *See id.* ("Although the court was troubled by the Government's failure to maintain or provide records and reports which may have [led] to the discovery of additional witnesses, it concluded that the conduct did not rise to the level of spoliation of evidence."). In sum, IQVIA must show not only that Veeva destroyed relevant evidence, but also that Veeva did so fraudulently and in bad faith, intending to distort this litigation, resulting in extraordinary prejudice. IQVIA is nowhere close to meeting this burden.

## **ARGUMENT**

IQVIA requests death-penalty sanctions mostly because Veeva did not preserve certain documents in Fall 2015—about 16 months before IQVIA filed this lawsuit and more than a year before IQVIA itself began preserving documents (the "Pre-Litigation Category"). IQVIA also points to a handful of documents it contends were deleted after this litigation began (the "Post-Complaint Category"). As a matter of law, IQVIA is not entitled to any sanctions with respect to either category.[76]

As for the Pre-Litigation Category, IQVIA focuses on Veeva's alleged deletions of (1) customer data stored in its ▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮ databases; (2) instant message conversations and other materials allegedly relating to ▮▮▮▮▮▮▮▮▮ and (3) certain

---

[76] Appendix A contains a table summarizing each category of materials that IQVIA claims were deleted, and for each category whether Veeva had a duty to preserve those materials, intended to deprive IQVIA of evidence, and consequences of the deletion (if any).

emails from the files of Veeva employee ██████████ [77]  Even if these erasures occurred, they would not warrant sanctions because they preceded any anticipation of litigation.  Veeva had no pre-litigation duty to preserve documents.  Without a duty to preserve, there can be no sanctions.

IQVIA also alleges that, after litigation began, Veeva failed to preserve an ██████ database and certain Google Drive documents.  But Veeva decommissioned █████ almost a year before this lawsuit began, and IQVIA cannot show a need for █████ where Veeva produced the more comprehensive █████ database as well as emails documenting specific changes to OpenData that IQVIA allegedly seeks from the █████ database.  Veeva should not be sanctioned for deleting a non-functional database as part of its migration of data to the Amazon cloud, particularly where Veeva already produced an entire database and documents sufficient to inform IQVIA of the information it seeks from the █████ database.

As for the Google Drive documents, Veeva instituted a sweeping litigation hold promptly upon IQVIA's commencement of this lawsuit in January 2017.  Veeva believed that its hold had covered all Google applications.  Veeva later determined that Google Drive was not included in the original hold used to preserve Google email and chat sessions—in part because Google did not offer such hold functionality for Google Drive until March 2017[78]—and promptly cured its oversight in April 2017.  Despite this misstep, Veeva produced approximately 63,000 Google Drive documents and identified nothing to suggest that any relevant documents were deleted from January to April 2017.  Any non-preservation of Google Drive documents was inadvertent and inflicted no prejudice on IQVIA.  No sanctions are warranted.

---

[77] Ex. 59 ████████████████████████████████████████████████
IQVIA does not dispute that the deletions occurred pre-litigation.  *See* Mot. 24.
[78] Faddis Decl. ¶ 29; *see also* Google Blog, *G Suite Updates* (Mar. 9, 2017), https://gsuiteupdates. googleblog.com/2017/03/new-in-google-vault.html; Google, *What's new in Vault* (Mar. 7, 2019), https://support.google.com/vault/answer/4388708?hl=en.

I.    **VEEVA'S PRE-LITIGATION DELETIONS IN THE ORDINARY COURSE OF ITS BUSINESS WERE NOT SPOLIATION**

IQVIA attacks Veeva's pre-litigation deletions of (1) customer data from Veeva's █████ and ████ databases; (2) instant message conversations and other materials allegedly relating to ██████████████ and (3) emails from ██████ files.  Mot. 6-17, 22-26.  All three categories involved ordinary-course document-retention issues unrelated to any anticipation of litigation.  None of the deletions carries any legal significance.

As a matter of law, the alleged deletions cannot amount to spoliation unless Veeva anticipated litigation when they occurred.  *State Nat'l Ins. Co. v. County of Camden*, 2011 WL 13257149, at *2 (D.N.J.) ("An independent duty to preserve relevant evidence arises when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable.") (citation omitted).  But Veeva did not anticipate and could not have anticipated any lawsuit 16 months before IQVIA filed its surprise complaint.  Even if Veeva had anticipated litigation, sanctions still would be unwarranted because the customer data at issue is irrelevant to IQVIA's trade-secret claims.  In any event, many of the purportedly "deleted" materials were actually recovered and produced as a result of Veeva's discovery efforts.  For example, Veeva recovered and produced from its comprehensive email searches attachments that included data removed from ██████ and ████████  Veeva also produced ██████ January 2014–May 2015 emails from the files of other Veeva custodians.  Deletion of materials without a duty to preserve cannot warrant sanctions—particularly where the same information was produced through alternative sources.

A.    **Veeva Could Not Reasonably Have Anticipated Litigation Until IQVIA Filed Suit in January 2017**

"[P]rior to the imposition of sanctions for spoliation, the Court must initially determine 'whether the duty to preserve evidence has been triggered.'"  *State Nat'l Ins.*, 2011 WL 13257149,

at *2 (citation omitted).  "An independent duty to preserve relevant evidence arises when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable."  *Id.* (citation omitted).  Neither a "general concern over litigation" nor the "mere existence of a dispute" activates the duty to preserve.  *RealNetworks, Inc. v. DVD Copy Control Ass'n*, 264 F.R.D. 517, 526 (N.D. Cal. 2009) ("A general concern over litigation does not trigger a duty to preserve evidence."); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 510 (D. Md. 2009) (the "mere existence of a dispute" is insufficient to trigger the duty to preserve).

Typically, "it is the filing of a lawsuit that triggers the duty to preserve evidence."  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 106 (E.D. Va. 2018).  In certain situations, pre-litigation events might trigger a party's preservation obligation, including "the receipt of a demand letter, a request for evidence preservation, [or] a threat of litigation."  *Id.*

IQVIA argues that Veeva anticipated litigation in September 2015, nearly 16 months before IQVIA sued Veeva.  But nothing in the parties' dealings triggered any anticipation of litigation before IQVIA sued in January 2017.[79]

### 1. The Parties' Substantial Progress Toward a TPA Resolution in Fall 2015 Disproves That Veeva Could Have Anticipated Litigation

In September 2015—all the way through the Fall 2016 conclusion of ███████████████ — Veeva believed that it could resolve TPA issues with IQVIA through negotiations, assurances, and audits.  In 2015-2016, Veeva devoted enormous resources to assuaging IQVIA's purported security concerns.  Veeva provided detailed explanations of Network's data-security measures.[80]

---

[79] Ex. 38 ███████████████████████████████████████

███████████████████████████████████████ *see also id.*

███████████████████████████████████████

███████████████████████████████████

[80] Ex. 60 ███████████████████████████████████████

███████████████████████ IQVIA then used Veeva's confidential schematics, which

Veeva's assurances even convinced key IQVIA leaders.  Following ceaseless exchanges, throughout which Veeva worked to allay IQVIA's reservations, IQVIA's ███████████ ████████████████████████████████████████████████ ███ [81]  The truth is that, at the very moment IQVIA claims Veeva should have anticipated litigation, IQVIA had lured Veeva toward the belief that the parties were closer to a TPA resolution than ever before.

While frustrated by IQVIA's stall tactics, Veeva remained cautiously bullish that the parties would overcome their impasse.  Around the time ██████████████████ ████████████ Veeva agreed to subject Network to what IQVIA pitched as an ██████████ assessment conducted by ████ [82]  Following the audit, ████████████ ██████████ IQVIA averred to have lingering (albeit murky) "concerns."[83] IQVIA attributed them to an analysis of ██████ findings conducted by "leading digital security firm" ██████████ [84]  Yet ██████ analysis of ██████ findings was ██████████████████ ████████████████████████ [85]  Nor did ████████████████████████ ██████████████████████ [86]  Veeva persisted.

In Summer 2016, Veeva indulged IQVIA by submitting to *another* audit: ████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████

Veeva shared to bridge the TPA impasse, to try to defeat Veeva in the marketplace.  Ex. 017

[81] Ex. 31 ██████████████████████████████████

[82] Ex. 61 ████████████████████████████████████████████

[83] ████████████████████████████████████████ Ex. 34

[84] Ex. 44 ████████████████████████████████ Ex. 61

[85] ECF No. 1 (Compl.), ¶ 117, Ex. 15 ██████████████████

[86] Ex. 62 ██████████████████

[86] *Id.* ██████████



[88] But IQVIA—this time without much to say—still refused to sign ████████ TPA. ████████████████████████ observed, ████████████████████████████████ [89]

By Fall 2016, Veeva had ████████████████████████████ Its IP security was airtight, and IQVIA knew it.  Customer pressure for a TPA resolution reached its zenith.[90] A TPA resolution appeared within grasp.  Veeva even ████████████████████████[91] IQVIA took a different tack.

Left with no "IP justification" to sell to its customers clamoring to use IQVIA data with Veeva software, IQVIA sued Veeva in January 2017 for trade-secret misappropriation.  IQVIA's customer-relations-driven complaint was the company's last-ditch effort to sustain a TPA policy that customers would not tolerate.  And it worked:  IQVIA remains a monopolist, and customer TPAs remain unsigned.

Veeva has since learned in discovery that IQVIA's "good faith" was only a veneer.  The truth is that IQVIA never actually sought to resolve its TPA issues with Veeva.  As Veeva contorted itself to demonstrate its security controls, IQVIA notified its co-conspirator Reltio that



[87] Ex. 16 ████████████████
[88] *E.g.*, Ex. 57 ████████████████████████████
[89] Ex. 58 ██████████████████████████████████
[90] Ex. 63 ████████████████████████████
[91] Ex. 58 ██████████
[92] Ex. 26 ████████

██████████████████████████████████ [93]  Even after Veeva had repeatedly done so, IQVIA delayed TPA negotiations long enough to solidify its data monopolies and extend them into adjacent software markets.

### 2. Veeva's September 2015 Discovery of ████████████████ Did Not Create a Reasonable Expectation of Litigation

IQVIA argues that Veeva's September 2015 discovery of ██████████████ triggered its duty to preserve.  Mot. 30-31.  In support, IQVIA cites █████████████████ ██████  Mot. 9.  But ██████████████████████████████ disproves that Veeva anticipated, or should have anticipated, litigation upon discovering the supposed ███████ ████████████████████████████████████████ ██████████ ██████ [94] ████████████████████████████████ [95] █████████████████████████████████████████████████ ████████████████████████ [96] ██████████████████████████████ ███████████████████████ [97] ████████████████████████████████ ██████████████████████████████████ [98]  Veeva could not reasonably have anticipated litigation based on ██████████████████████████ [99]

That Veeva could not have anticipated litigation based on ████████████████ is confirmed by IQVIA's reaction to the materially similar ██████████████  In both ████████████

---

[93] *Id*.
[94] Ex. 64 ██████████████████        Faddis Decl. ¶ 11.
[95] Ex. 36 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████
[96] *Id*. at ████
[97] Ex. 64 ██████████████████        Ex. 096 (Veeva Second Supplemental Response to IQVIA Interrogatory No. 1) at 14-16.
[98] Ex. 36 ████████████████████████████
[99] Ex. 38 ████████████████████████████

████████████████████████████████████████ When
Veeva ███████████████████████ IQVIA did not send Veeva "a demand letter, a
request for evidence preservation, [or] a threat of litigation." *Steves & Sons*, 327 F.R.D. at 106.
Far from it. ███████████████████████████████████████
█████████████████████████████████████████[100]

Because IQVIA did not sue, threaten to sue, or even hint at litigation after ███████████
Veeva could not have anticipated litigation following the materially similar ██████████████

Trying to paint a sinister picture from innocuous facts, IQVIA cites an isolated statement
by Veeva ███████████████████████ When ████████████████████████
█████████████████ he speculated that ████████████████████████████
███████ Mot. 10. But speculation as to the possibility of litigation (especially by a single, non-
lawyer employee) does not activate a duty to preserve. *See Rocker Mgmt., L.L.C. v. Lernout &
Hauspie Speech Prods. N.V.*, 2007 WL 9782803, at *10 (D.N.J.) (finding unpersuasive testimony
of a fact witness who was neither "an expert on litigation holds" nor someone with "authority to
implement a litigation hold"). To trigger the duty to preserve, a party reasonably should know that
litigation is "pending *or probable*." *State Nat'l Ins.*, 2011 WL 13257149, at *2 (emphasis added).

The facts in *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614 (D.
Colo. 2007), illustrate that standard's rigor. Even a letter notifying Land O'Lakes of Cache's
trademark rights and warning Land O'Lakes to "avoid exposure" to eschew "litigation" did not
trigger the defendants' preservation obligation. *Id*. at 622-23. The court explained that, for a
demand letter to trigger the preservation duty, it "must be more explicit and less equivocal" in
"threaten[ing] litigation." *Id*. at 623. The court rejected any duty to preserve because "[the]

---

[100] Ex. 2 ████████████████████

letter did not threaten litigation and did not demand that Land O'Lakes preserve potentially relevant materials." *Id.* The possibility of litigation with IQVIA was far more remote than anything Land O'Lakes faced, confirming that Veeva's discovery of ████████████ could not have triggered its preservation duty.

IQVIA also distorts statements of other Veeva employees to argue that Veeva ████████████████████████████████████ Mot. 9; *see id.* ████████████████████ ████████████████████████████████ But those non-lawyer employees ███████ ████████████████████████████████████████████████ ████████████████[101] Once ████████████████████████████████ ████████████████ Cherry-picked statements uttered with inadequate understanding or appreciation of potential legal issues cannot support that litigation was probable.[102]

### 3.   Veeva's May 2016 Discovery of ████████████████ Did Not Create a Reasonable Anticipation of Litigation

IQVIA next asserts the May 2016 ████████████ should have alerted Veeva to probable litigation, triggering Veeva's preservation duty. *See* Mot. 14 n.39, 16-17. But, as with ███████ ████████████ closer examination of ████████████ refutes IQVIA's claim. ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

---

[101] Faddis Decl. ¶ 18. IQVIA also distorts ████████████████████████ ████████████████████ *See* Mot. 13. ████████████████████████████ ████ *See id.*; Ex. 65 ████████████████████ [102] Ex. 66 ████████████████████████████ ████████████████████████ Ex. 38 ████████████████████ ████████████████████████████

███████████████ [103] ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ rendering litigation unforeseeable to Veeva.

IQVIA relies on a Veeva employee's observation that ███████████████

████████████████████████████████ Mot. 16.  That

statement subverts IQVIA's position.  Just as the employee remarked, Veeva ██████

█████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

██████████ could not have led Veeva to anticipate litigation because (1) ██████

█████████████████████████████████████████

█████████████ [104] (2) ███████████████████████████████

██████████████████████ and (3) █████████████████████████████

████████ IQVIA did not even imply an intent to sue.  Any supposed deletions of customer data

surrounding ███████████ cannot support Veeva's pre-litigation anticipation of litigation or

duty to preserve. [105]

---

[103] Ex. 2 ████████████████████ (emphasis added).
[104] ██████████████████████████████████████████████████
████████████████████████████████ *See* Ex. 051 █████████████████████████

[105] IQVIA cites to ██████████████ Mot. 17.  Those ████ are unrelated to ██████████ or even █████████
████████████████ The ████ refer to employee deletions of records for inactive
projects for particular customers, in keeping with Veeva's standard operating procedure and
promises to those customers.  Ex. 67 ███████████████████████████████
██████ Ex. 68 ███████████████████████████████████████ *see also* Ex. 69
████████████████████████████

**4.    Veeva's Mistaken, and then Corrected, "Work Product" Designations Do Not Support Veeva's Reasonable Anticipation of Litigation in September 2015**

Finally, IQVIA relies on certain attorney-work-product designations on Veeva's privilege log of documents dating to September 2015 to suggest that Veeva anticipated litigation at that time.  Although the duty to preserve is commonly triggered upon the earliest date that a party asserts work-product protection, the consequences of such a designation should not apply here.  *See sanofi-aventis Deutschland GmbH v. Glenmark Pharm., Inc.*, 2010 WL 2652412, at *5 (D.N.J.), *aff'd*, 748 F.3d 1354 (Fed. Cir. 2014).

Veeva already has explained to IQVIA that its September 2015 work-product claims were erroneous and has withdrawn those privilege claims.[106]  Mistaken claims of work-product protection cannot activate a party's duty to preserve.  *See Oracle Am., Inc. v. Hewlett Packard Enter. Co*., 328 F.R.D. 543, 550 (N.D. Cal. 2018) (concluding that privilege-log entries for documents that plaintiff withheld under work-product doctrine on the basis they were prepared or reviewed in anticipation of litigation regarding plaintiff's policies were insufficient to show that the documents related specifically to the issues in the present litigation and did not demonstrate that plaintiff's duty to preserve arose at the time period of the entries).

IQVIA does not dispute that Veeva's deletions of customer data from ▮▮▮ and ▮▮▮ and ▮▮▮ January 2014–May 2015 emails, preceded this litigation.  Veeva could not have anticipated litigation at that time, as the parties appeared primed to reach a TPA settlement, despite IQVIA's persistent hindrances and delays.  Veeva's discovery of ▮▮▮▮▮ ▮▮ did not create a reasonable expectation of litigation, as ▮▮▮▮▮▮▮▮▮▮▮

---

[106] Ex. 70 (1/6/20 email from M. Pecknay (Veeva) to M. Schmit (IQVIA)); *see also* Ex. 71 (Veeva's Mot. to Overrule IQVIA's Assertion of Priv. Over Docs. Subpoenaed from ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████████ likewise

did not lead Veeva to anticipate litigation, as █████████████████████████████

████████████████████████████████████████████████████████████████

Because Veeva could not have anticipated this litigation before it commenced, any pre-litigation

deletions cannot support spoliation or sanctions.  *See State Nat'l Ins.*, 2011 WL 13257149, at *2

(absence of a preservation duty precludes spoliation and sanctions).

## B.   IQVIA Fails To Demonstrate the Relevance of Much of the Deleted Customer Data

Even assuming Veeva had a duty to preserve before this litigation began, its deletions of

customer data still would be non-sanctionable.  The duty to preserve extends only to "relevant"

evidence "likely [to] be requested" in litigation.  *Scott v. IBM Corp.*, 196 F.R.D. 233, 248-49

(D.N.J. 2000).  "[A] party seeking spoliation sanctions must 'come forward with plausible,

concrete suggestions as to what [the missing] evidence might have been.'"  *Medeva Pharma*

*Suisse A.G. v. Roxane Lab., Inc.*, 2011 WL 310697, at *14 (D.N.J.) (citation omitted).

Speculation as to the content of deleted documents cannot satisfy the moving party's burden of

proving relevance.  *See CIGNEX Datamatics, Inc. v. Lam Research Corp.*, 2019 WL 1118099, at

*5 (D. Del.) (denying motion for sanctions because "Lam's suggestion as to the potential

contents of the lost emails appears to be speculation").

Much of IQVIA's motion amounts to rank speculation that any IQVIA data in Veeva's

possession would contribute to the improvement of OpenData, constituting misappropriation.

IQVIA asserts that Veeva deleted ████████████████████████████████████

████████████████████████████████████████████████████████ Mot.

12.  IQVIA cites ████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████     Mot. 16.  IQVIA's accusations reflect both IQVIA's

misunderstanding of ██████████████████████████████████████ and its inability to

demonstrate relevance.

    As explained, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████[107]  ████████

███████████████████████████████████████████████████

██████████████████[108]  █████████████████████████████████

█████████████████████████████[109]  ████████████████████

███████████████████████████████████████████[110]

    IQVIA points to ████████████████████████████████████

████████████████████████████████████████████████

█████     Mot. 12.  But IQVIA *authorizes* Veeva's access to Xponent and DDD.[111] █████████████

███████████████████████████████████████████████████████████

████████████████     [112]  Veeva could not have "misappropriated" that which IQVIA

---

[107] Ex. 59 ████████████████████████████████ Ex. 37 ████████
████████████████████████████████████████████████████████

[108] Ex. 72 █████████████████████████████████████████████
[109] Ex. 63 ████████████████████████████████████████ IQVIA, *Data Governance and Stewardship*, https://www.
iqvia.com/locations/united-states/solutions/commercial-operations/enterprise-information-
management/data-governance-and-stewardship (describing data governance and stewardship as
"critical processes" that impact "the accuracy of your data").
[110] *See supra* note 107.
[111] *E.g.*, Ex. 73 ████████████████████████████████████████████
████████ Ex. 74 ████████████████████████████████
[112] Exs. 75 ████████████ 76 ████████████ 73 ████████████ 77 ██████
████████ 78 ████████████

authorized it to access, and any relevance of the authorized IQVIA data in Veeva's systems to IQVIA's misappropriation claims is based on speculation.  IQVIA's inability to demonstrate the relevance of the deleted customer data precludes sanctions.

### C.    IQVIA Cannot Demonstrate That Veeva Deleted Information "with Intent To Deprive [IQVIA] of Use in Litigation"

As IQVIA acknowledges, the sanctions IQVIA requests require a finding that the non-moving party deleted evidence " 'with the intent to deprive [the moving] party of the information's use in litigation.' "  Mot. 28 (quoting Fed. R. Civ. P. 37(e)(2)).  IQVIA claims that, when Veeva deleted customer data, it did so in order to subvert this litigation.  Yet Veeva deleted the data in the ordinary course pursuant to its contractual obligations and standard operating procedure. Litigation had nothing to do with it.

Before it could have anticipated litigation, Veeva continued routine deletions of customer data in the ▮▮▮ and ▮▮▮ databases according to its agreements with customers and Veeva's standard operating procedure, which require Veeva to delete customer data upon Veeva's completion of projects on the customer's behalf.[113]  IQVIA TPAs likewise require deletion upon completion of the permitted use.[114]  When Veeva receives authorization to access a data extract or dataset, it is for a particular purpose, including a ▮▮▮▮▮▮▮▮▮▮[115]  Once Veeva fulfills the purpose for which its access to customer data was authorized, Veeva deletes the data



[113] Ex. 79 ▮▮▮▮▮▮▮▮▮

[114] Ex. 80 ▮▮▮▮▮▮▮

[115] *E.g.*, Ex. 2 ▮▮▮ Ex. 81 ▮▮▮

from its systems.[116]  In so doing, Veeva ensures that its access to third-party confidential

information remains confined to its permitted use.  What's more, as in ████████████ Veeva

deleted ████████████████████████████ to *prevent* unauthorized access to third-

party information.[117]  Far from evincing willful deprivation of evidence, Veeva deleted customer

data as part of its standard practice of honoring obligations to customers and data providers.[118]

Had Veeva retained rather than deleted the data, IQVIA would have cried foul just as loudly.

IQVIA cannot have it both ways.  As one Veeva employee put it, ████████████████████

████████████████████████[119]

        IQVIA attributes ████████ "missing" emails to Veeva's "intentional" "destruction of

evidence." Mot. 32.  But both ██████ and ████████████████ supplied a reasonable and

innocuous explanation supported by contemporaneous system documents: ████████ reached a

system-imposed, per user mailbox storage size limit.[120]  He was not alone in facing this email

storage limit.[121]  But, especially as ████████████████████████████████

---

[116] Ex. 82 ████████████████████████████████████ Ex. 59
████████████████████████████████

[117] Ex. 83 ████████████████████████████████████████
████████████████ Ex. 84 ████████████

[118] Ex. 85 ████████████████████████████████████████████

Ex. 81 ████████████████████████████████████████████
████████████████████████████████████████████

[119] Ex. 79 ████████████████████████████████████████
████████████████████████████████████████

[120] Ex. 59 ████████████████████████████████████████
████████████████████████████ Ex. 037 ████████

[121] Ex. 86 ████████████████████████████████████████
████████████████████████████████

---

██████████████████████████████████████████████████████ [122]  To the

extent ██████ January 2014–May 2015 emails were removed, the purpose was to free space in

██████ mailbox—not to "intent[ionally] . . . deprive IQVIA of evidence."  Mot. 33.  *See Bensel*,

263 F.R.D. at 153 (no sanctions without finding of bad faith); *Hicks v. Wegmans Food Mkt.*,

2011 WL 499368, at *2 (D.N.J.) (same); *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612,

618 (E.D. Pa. 2016) ("[A]n adverse inference is appropriate *only* on a finding that the party

responsible for the destruction of the lost information *acted with the intent* to deprive another

party of access to the relevant information."); *see also Culler v. Shinseki*, 2011 WL 3795009, at

*7 (M.D. Pa.) (no bad faith where emails deleted in normal course due to document-retention

policy); *First Sr. Fin. Grp. LLC v. Watchdog*, 2014 WL 1327584, at *7 (E.D. Pa.) (same); *Chirdo

v. Minerals Techs., Inc.*, 2009 WL 2195135, at *2 (E.D. Pa.) (same); *Peterson v. Seagate US LLC*,

2011 WL 861488 (D. Minn.) (no spoliation when data deleted in normal course because company

had deletion policy in part due to storage limits).

## D. Veeva Produced Much of the Information It Allegedly "Deleted" Pre-Litigation

Even if Veeva had a pre-litigation duty to preserve, and even if the customer data was

relevant, sanctions still would remain off the table.  To support its claim for sanctions, IQVIA

must show that the supposedly deleted information "cannot be restored or replaced through

additional discovery."  Fed. R. Civ. P. 37(e).  It cannot do so.  IQVIA omits that Veeva actually

produced as email attachments customer data ███████████████  Veeva also produced emails

sent or received by ██████ from other custodians' files.  Accordingly, IQVIA already has the

---

[122] *Id.* ████████████████████████████████████████████████

████████████████████████ Ex. 37 ██████████████████████████████████

██████████████████████████

material on which its claim for sanctions is based.

### 1. Far from Intentionally Deleting Customer Data To Deprive IQVIA of Evidence, Veeva Produced Customer Data as Email Attachments

Although Veeva made reasonable efforts to delete all customer data from its systems, data sometimes persisted in employees' mailboxes, in emails from customers themselves or internally exchanged in the process of ███████████  After this lawsuit alerted Veeva that such customer data could fall within the preview of IQVIA's claims, Veeva took extraordinary measures to prevent deletion of such data from employees' emails and to track down and produce such data.[123] Veeva's efforts are chronicled in its responses to IQVIA's interrogatories.[124]  IQVIA has known about and been in possession of such preserved customer data for *years*.  Yet IQVIA now misrepresents to Your Honor that the data is irretrievable.  Mot. 31.

### 2. Veeva Produced ██████ January 2014–May 2015 Emails from Other Custodians' Files

Along similar lines, IQVIA makes much ado about nothing when it points to allegedly "missing" emails from ██████████ files spanning January 2014 through May 2015.  *See* Mot. 22-23.  In crafting a story of Veeva's malevolent behavior, IQVIA neglects to mention that Veeva produced 6,800 of ███████ emails from that precise 17-month period.[125]  Veeva also produced approximately 65,000 emails from ███████ files outside that period, including long

---

[123] *E.g.,* ████████████████████████████████████████████████████████████████████████████████████████████  A customer data extract generally is formatted as a spreadsheet with several thousand rows of data.  Because even a single data extract can span hundreds or thousands of pages, we have not appended any data extracts to this filing.  Veeva would be happy to provide the above-cited extracts as a representative sample of the produced extracts, at Your Honor's request.

[124] Ex. 87 (Veeva Second Supplemental Response to IQVIA Interrogatory No. 1) at 16-20 ("Marketing Comparisons").

[125] *E.g.,* Ex. 88 ████████████████████████  Ex. 89 ████████████████████ ████████

before Veeva bore any obligation to preserve them.  Any gap created by the deletions was "restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  IQVIA cites no evidence indicating otherwise.

**E.    IQVIA's Actions in 2015-2016 Reveal That, if Any Party Should Have Anticipated Litigation, It Was IQVIA**

In 2015-2016, IQVIA led Veeva to believe it genuinely was interested in resolving the TPA roadblock.  Simultaneously, IQVIA girded for litigation:  by May 2015, ███████████ ███████████████████████████████████████████████████ and by Fall 2015 ███████ ████████████████████ Yet IQVIA did not begin preserving documents until █████ ████—nearly ██ months later.  During that period, IQVIA purposely destroyed key evidence.

**1.    IQVIA Prepared for Litigation in May 2015, ██ Months Before Instituting a Litigation Hold**

IQVIA's representations in its own privilege log demonstrate that it anticipated litigation as early as May 2015.  ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████[126] ████████████████████████████ plainly indicating its May 2015 anticipation of litigation.[127]  *See Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1261 (3d Cir. 1993) (a document is entitled to work-product protection only if it is "prepared in anticipation of litigation").  And, while ████████████████ ████████████████████████████████████████████[128] IQVIA

---

[126] Ex. 90 ████████████████████████████ (emphasis added).

[127] To be clear, in keeping with its privilege log's inadequacy, IQVIA does not specify the privilege claimed for any of its withheld documents.  But ████████████████████████ ████████████████████████████

[128] Ex. 71 (Veeva's Mot. to Overrule IQVIA's Assertion of Priv. Over Docs. Subpoenaed from ████████████████████████████████████████████████ ███████████████████████

█████████████████ [129]

      IQVIA's document preservation double-standard does not end there. ███████████

██████████████████████████████████████████████████

███████████████████████████████████ [130] ███████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ [131] █████████████

███████████████████████████████ triggering its duty to preserve relevant documents.

      IQVIA's ██████████████████████████ further establishes its mid-2015

anticipation of litigation.  By September 2015, IQVIA ████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ [132] ██████████████████

████████ [133] ███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ [134]

      Despite ███████████████████████████████████████

IQVIA concedes it did not institute its litigation hold until ██████ ████ [135]—nearly ██ *months*

---

[129] ████████████████████████████████████

   ███ *E.g.*, Ex. 90 ██████████████████████████████

[130] *E.g.*, Ex. 90 ███████████████████████████

[131] Ex. 22 █████████████████

[132] Ex. 91 ██████████████████████████

[133] Quinn Emanuel, *The Firm & News – About Us*, https://www.quinnemanuel.com/the-firm/about-us/.

[134] Ex. 90 █████████████████████████████

[135] Ex. 15 ████████████████

*after* ███████████████████████████ more than *one year after* ████████

███████████████████████ and *two months after* ███████████████████

████████████████████

### 2.   IQVIA Destroyed Key Evidence During the ██ Months Before Its Litigation Hold

During the months between when ████████████████████████ and when

it began to preserve documents, IQVIA deleted key materials.  A pivotal witness in Veeva's

antitrust case is ██████████ IQVIA's ████████████████████ during this

case's critical period.[136] ██████ was an influential force behind IQVIA's exclusionary TPA policy,

explaining that ██████████████████████████████████████

███████████████████████████████████████████████

████████████████████████[137]

Despite ███████████████████████████████████████

IQVIA did not preserve ██████ documents.  When Veeva requested that IQVIA add ██████ as a

document custodian, IQVIA responded that ████████████████████████

███████████████████████████████████████████████

████████████████████████[138] ██████ left IQVIA in ██████████ and

returned in ██████ ██████.[139]  By IQVIA's own admission, while ███████████████

███████████████████████████████████████████

██████████ ██████.[140]), IQVIA capitalized on ████████████ by destroying his documents.

---

[136] Ex. 92 ████████████████
[137] Ex. 19 ████████████████ (emphasis added).
[138] Ex. 93 (5/16/19 email from M. Pecora (IQVIA) to J. Boehm (Veeva)).
[139] Ex. 92 ████████████████
[140] Ex. 90 ████████████████████████

IQVIA's deletions were widespread.  ▮▮▮▮ was an IQVIA executive who presided over IQVIA's TPA policy.[141]  In addition to perpetuating IQVIA's "crowdsourcing" pretext for its TPA denials, ▮▮ facilitated unlawful collusion between IQVIA and Cegedim, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and while IQVIA and Cegedim remained distinct entities.[142]  But Veeva cannot ascertain the extent of ▮▮ influence over IQVIA's exclusionary conduct because, again, IQVIA deleted his documents while anticipating litigation.[143]  IQVIA destroyed ▮▮▮ documents upon his departure from the company in ▮▮▮▮ three months after IQVIA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and while IQVIA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[144]

The bulk of IQVIA's motion addresses Veeva's alleged pre-litigation deletions.  Yet Veeva could not have anticipated litigation, and had no duty to preserve documents, before this lawsuit commenced.  Veeva nonetheless preserved and produced those materials that it had in its possession.  Veeva's pre-litigation conduct was not sanctionable.

## II.   IQVIA HAS NOT MET ITS BURDEN TO SHOW THAT ANY POST-JANUARY 2017 DELETIONS WARRANT SANCTIONS

IQVIA next complains about information that Veeva supposedly deleted post-complaint.

---

[141] Ex. 94 ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 105 ▮▮▮▮▮▮▮▮▮
[142] Ex. 95 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[143] Ex. 96 (6/14/19 email from M. Pecora (IQVIA) to T. Korman (Veeva)) ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[144] IQVIA also deleted documents from ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
resorted to IQVIA's TPA policy to steer customers from Veeva Network toward IQVIA MDM.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 97 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 98
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Despite ▮▮▮▮▮ enthusiasm for tapping into IQVIA's data
monopolies, IQVIA eliminated his documents in or after ▮▮▮▮▮▮ when he left IQVIA.  Ex. 93
(3/15/2019 email from M. Pecora (IQVIA) to J. Boehm (Veeva)).

Yet IQVIA fails to show that the allegedly erased information was deleted in bad faith, that any erasure caused prejudice, or that the material "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

First, IQVIA complains about Veeva's deletion of the ███████ database. But that database was decommissioned almost a year before the lawsuit, and IQVIA cannot satisfy its burden to show that the routine erasure of this material resulted in any prejudice. The lack of prejudice is manifest: Veeva already produced the more comprehensive ████████ database as well as emails documenting specific changes to OpenData that IQVIA allegedly seeks from the ████████ database.

Second, IQVIA complains that Veeva delayed its preservation of Google Drive documents until April 2017, three months after this litigation began. As Veeva has explained to IQVIA, Veeva timely issued its litigation hold promptly upon IQVIA's commencement of this lawsuit in January 2017.[145] Veeva mistakenly believed that its hold covered all Google applications, including Google Drive. But, as it turns out, Google did not even offer such hold functionality for Google Drive until March 2017.[146] When Veeva later discovered that Google Drive documents were inadvertently omitted in April 2017, Veeva expanded the preservation hold—only three months after its comprehensive litigation hold, and only 1.5 months after Google began offering the hold functionality for Google Drive. Veeva then scoured its records and produced approximately 63,000 Google Drive documents. Because any non-preservation of Google Drive documents was inadvertent and non-prejudicial, sanctions cannot be imposed.

> **A.  Information Contained in the ████████ Database Was Erased in the Routine Course of Business, and Its Substance Largely Has Been Provided**

IQVIA alleges that Veeva's decommissioning and deletion of the ████████ database was

---

[145] Ex. 59 ████████████████████████████████

[146] *See supra* note 78.

sanctionable spoliation.  Yet IQVIA does not dispute that Veeva produced the more comprehensive ████████ the master database in which Veeva keeps its European OpenData product, updates its data (in part by processing data change requests), and sends those updates to its OpenData customers.  *See*, *e.g.*, *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 325 (S.D.N.Y. 2013) (concluding that sanctions were not warranted because the requesting party "failed to demonstrate the relevance of the spoliated evidence" given that the missing evidence, a 2002 report, had already been produced in draft form and the information in the missing document was "consistent with the results of other studies that were produced").  ████████ was a short-lived database in which Veeva collected and processed raw data from 2015 to early 2016 before loading them into ████████[147]  Even during that brief period, Veeva processed data change requests—████████████████████████████ *see* Mot. 19 n.59—directly in ████████[148]  As Veeva's data services in Europe improved, Veeva streamlined operations by loading data directly into ████████ phasing out ████████  Once ████████ grew superfluous by February 2016, it was decommissioned.[149]  By 2018, the non-functional ████████ database amounted to dead-space in the cloud for two years.  As part of Veeva's global migration of computing infrastructure to Amazon Web Services in 2018, ████████ was deleted.

   To the extent any data stored in ████████ was incorporated into OpenData, details about that incorporation—including the general source information, the date of the incorporation request, and the individual who made the incorporation request—were logged in ████████ which Veeva produced.[150]  Also, before the 2016 decommission of ████████ Veeva ████████

---

[147] Ex. 99 ████████████████████████████ Ex. 100
[148] Ex. 100 ████████████████████████████████████
[149] *Id*. at ████
[150] ████████ contains detailed information about source of data, including whether a customer

███████████████████████████████████████████ [151]  In addition, Veeva produced

emails documenting specific changes to OpenData that IQVIA allegedly seeks from the ████

database.  Accordingly, Veeva already has produced materially similar information that IQVIA

seeks in ██████ through ██████ and various emails.

       IQVIA insists it needs both ██████ and ██████ for █████████████████

████ Mot. 18.  According to IQVIA, the only information uniquely accessible from ████

are ████████████████████████████████████████████████

█████████████████████████████████████████ *Id*.  Yet ██████ provides

those details, listing, for example, █████████████████ [152]  IQVIA knows as much

because it derived its (baseless) ████ allegations from ██████ and already has used the

extensive materials available about the well-chronicled ████ events in its deposition of Veeva

employee ██████ [153]  *See* Mot. 19-20, 22.  The relevant information that IQVIA seeks in

██████ was "restored or replaced" through Veeva's productions.  *See* Fed. R. Civ. P. 37(e)(1).

       Further, despite being told that certain raw data processed in ██████ (i.e., the ██████)

have been archived in a separate repository and is still recoverable, IQVIA never requested

production of that repository and instead used the deletion of ██████ to suggest a nefarious

cover-up. [154]  One way IQVIA suggests this is by resorting to semantics:  although Veeva

---

requested the change or whether the record derives from publicly available sources such as the
official registry provided by the National Health Service of Great Britain.
[151] *Id*. at ████
[152] IQVIA Ex. 60, at 3 ████████████████████ Ex. 101 ██████████████
███████████████████████
[153] IQVIA was able to determine ███████████████████████████████████
███████████████████████ Mot. 20 n.64.  IQVIA also could see ██████████
███████████████████ IQVIA Ex. 58.
[154] Ex. 59 █████████████████████████████████████████████
█████████████████

informed IQVIA that ███████ was *decommissioned* in 2016, almost a year prior to this lawsuit, IQVIA argues that statement was false because ███████ was *deleted* in 2018. *See* Mot. 22. Those facts are not contradictory and instead show that ███████ was sitting idle for more than two years before Veeva decided to delete it. Also, Veeva already has explained to IQVIA that the deletion was prompted by a 2018 company-wide transition to Amazon Web Services, during which Veeva IT deleted unused software environments.[155]

IQVIA also cannot avoid the fact that it never initially requested the ███████ database. Not one of IQVIA's requests for production could cover ███████ IQVIA nevertheless argues that Veeva should have produced the ███████ *database* pursuant to IQVIA's request for "*audit logs* and similar computer generated *documentation*."[156] IQVIA argues that a storage space used for any comparison of customer data constitutes such a "log" or "documentation." Mot. 20-21. IQVIA also claims that Veeva is in violation of the court order compelling production of such audit logs. *See id.* That does not make sense. Veeva already has produced approximately a terabyte of external OpenData/Network software log files.[157] IQVIA's new assertion that its request for audit logs implied a request for the ███████ database is unsupported by IQVIA's discovery requests and Your Honor's prior order, which orders production in response to IQVIA's request and does not support IQVIA's after-the-fact interpretation of its discovery request.[158] IQVIA's faulty interpretation cannot be a basis to argue that Veeva should have preserved a database decommissioned before the lawsuit, when an active, more comprehensive version already has been produced.

---

[155] *Id.* ███████████████████████████████████████████████

[156] Ex. 102 ████████████████████████████ (emphases added).

[157] Ex. 103 (3/8/19 email from J. Boehm (Veeva) to S. Olson (IQVIA)).

[158] *See* ECF No. 115, at 6-7.

In sum, Veeva deleted the inert ███████ after decommissioning it in February 2016, nearly a year before Veeva could have anticipated litigation.  Because Veeva produced the more comprehensive ███████ and approximately a terabyte of "audit logs," IQVIA cannot claim that Veeva acted fraudulently or in bad faith.  Instead, Veeva deleted ███████ as part of its migration to Amazon Web Services—" 'a matter of routine with no fraudulent intent' " to which sanctions cannot attach.  *Mock*, 2014 WL 1652792, at \*2 (quoting 29 Am. Jur. 2d *Evidence* § 177).

## B.   A Brief, Inadvertent Delay in Preserving Google Drive Documents Cannot Support Sanctions Where Any Impact Is Negligible and Where Veeva Undertook Every Effort To Cure It

After IQVIA sued in January 2017, Veeva instituted an expansive litigation hold that exceeded its preservation obligations.  Veeva inadvertently excluded Google Drive from that hold—an oversight that it promptly cured.  Veeva remediated any prejudice that might have resulted from its temporary oversight by scouring its records and producing responsive materials.

Brief, inadvertent oversights in preservation, inflicting negligible prejudice, cannot merit sanctions.  This Court often has refused to impose sanctions without proof of destruction of evidence in bad faith.  *See Bensel*, 263 F.R.D. at 153 (declining to issue a spoliation inference or impose any other sanctions because the court did not find evidence of bad faith, even though the party against whom sanctions were sought "should have moved more quickly to place litigation holds on the routine destruction of certain documents and electronic data"); *see also Hicks*, 2011 WL 499368, at \*2 (denying plaintiff's request for adverse spoliation inference where plaintiff alleged defendant was, at minimum, negligent in destroying or failing to produce evidence because plaintiff offered "no evidence that the destruction was in bad faith").

Where the Court has imposed sanctions without a showing of bad-faith destruction of evidence, the sanctioned party neglected to institute *any* litigation hold.  In *MOSAID Technologies Inc. v. Samsung Electronics Co.*, 348 F. Supp. 2d 332 (D.N.J. 2004), the Court

imposed a "spoliation inference" sanction based on Samsung's failure to preserve *any* relevant emails after it was sued. *Id*. at 339. The Court found that "Samsung waited approximately three years after the beginning of this litigation, over a year after the close of fact discovery and approximately seven months after MOSAID filed its sanctions motion before it actually expended any effort to comply with" its discovery obligations. *Id*.[159]

By contrast, Veeva instituted a sweeping litigation hold promptly upon IQVIA's initiation of this lawsuit.[160] After IQVIA sued, Veeva promptly instituted litigation hold measures for every IT system within Veeva that reasonably was expected to be at issue in the case, including salesforce.com, Egnyte, Confluence, Zendesk, JIRA, and key Veeva Vault instances (███████████████████████████████).[161] Veeva also worked to archive all communications circulated among Veeva's Google applications by installing Google Vault.[162] As ███████████████ testified, Google Vault ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████[163]

IQVIA points to the ███████████████ to demonstrate Veeva's "contradict[ory]" "representations" with respect to its Google Drive preservation. Mot. 26. ███████████ Veeva's ███████████████████████ was not personally involved in implementing the litigation hold and mistakenly represented that Veeva began preserving Google Drive documents before April 2017. ██████ believed that representation was accurate because

---

[159] Although Samsung did not preserve *any* relevant emails *after* it was sued, the Court still declined to impose the extraordinary sanctions that IQVIA requests. *See* 348 F. Supp. 2d at 339.

[160] Ex. 59 ████████████████████████████████

[161] *Id.* ████████ Faddis Decl. ¶ 25 ███████████████████████████

[162] Ex. 59 ████████████████ Faddis Decl. ¶ 28.

[163] Ex. 59 ██████████████████████████

he was unaware that Google did not offer "Vault" functionality for Google Drive until March 2017 and was instead relying on the December 2016 date on which Veeva began subscribing to a comprehensive suite of Google products called Google Suite (which included Google Vault).[164] Also, ▮▮▮ was not the only person confused about Google Vault's changing services: Veeva's ▮▮▮▮▮▮▮▮ at the time, ▮▮▮▮▮▮▮ appears to have been likewise unaware that Google did not offer the "Vault" functionality for Google Drive until March 2017, and he belatedly activated the function for Google Drive in April 2017.[165] ▮▮▮▮▮▮▮ mistake cannot elicit sanctions.[166]  *See Bensel*, 263 F.R.D. at 153; *Hicks*, 2011 WL 499368, at *2; *MOSAID*, 348 F. Supp. 2d at 339.

Veeva's post-complaint deletion of ▮▮▮▮ database is not sanctionable.  Veeva already has produced the more comprehensive ▮▮▮▮  And Veeva's inadvertent delay in extending its comprehensive litigation hold to Google Drive likewise cannot elicit sanctions.

## **CONCLUSION**

Your Honor should deny IQVIA's motion because Veeva's discovery conduct does not warrant sanctions.[167]

---

[164] *See supra* note 78; Faddis Decl. ¶¶ 28-29.
[165] *Id.* ¶ 29 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[166] IQVIA's claim that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. 26, is pure speculation.  There is no evidence that documents were deleted during the three-month window in 2017.  Veeva has produced approximately 5,000 of ▮▮▮▮ documents, and 2,000 of ▮▮▮▮ documents, from Google Drive.
[167] Veeva reserves the right to seek fees and costs attributable to defending against IQVIA's groundless motion to deter diversionary filings and promote the expedient resolution of this case. *See Hillburn v. Bayonne Parking Auth.*, 2012 WL 12862339, at *4 (D.N.J.) (Cavanaugh, J.) (fee-shifting is "intended to deter baseless filings in the District Court and thus streamline the administration and procedure of the federal courts") (citation and alteration omitted), *aff'd*, 562 F. App'x 82 (3d Cir. 2014).

Dated:  May 14, 2020                                Respectfully submitted,

                                              By:    /s/ Arnold B. Calmann
                                                     Arnold B. Calmann (SBN 287781973)
Steven F. Benz (*pro hac vice*)                      Jeffrey Soos (SBN 032431994)
Daniel S. Severson (*pro hac vice*)                  Jakob B. Halpern (SBN 001582004)
Kylie C. Kim (*pro hac vice*)                        Katherine A. Escanlar (SBN 028042004)
Christopher M. Sarma (*pro hac vice*)        **SAIBER LLC**
Christopher C. Goodnow (*pro hac vice*)      One Gateway Center, 10th Floor, Suite 1000
**KELLOGG, HANSEN, TODD,**                   Newark, New Jersey 07102
   **FIGEL & FREDERICK, P.L.L.C.**           Tel.: (973) 622-3333
Sumner Square                                Email: abc@saiber.com
1615 M Street, N.W., Suite 400               Email: jsoos@sailber.com
Washington, D.C. 20036                       Email: jhalpern@saiber.com
Tel.: (202) 326-7900                         Email: kescanlar@saiber.com
Email: sbenz@kellogghansen.com
Email: dseverson@kellogghansen.com
Email: kkim@kellogghansen.com                James T. Southwick (*pro hac vice*)
Email: csarma@kellogghansen.com              Ryan Caughey (*pro hac vice*)
Email: cgoodnow@kellogghansen.com            Michael Brightman (*pro hac vice*)
                                             Robert Travis Korman (*pro hac vice*)
                                             **SUSMAN GODFREY L.L.P.**
Charles T. Graves (*pro hac vice*)           1000 Louisiana, Suite 5100
Amit Gressel (*pro hac vice*)                Houston, Texas 77002-5096
**WILSON SONSINI**                           Tel.: (713) 651-9366
   **GOODRICH & ROSATI PC**                  Email: jsouthwick@susmangodfrey.com
One Market Plaza, Spear Tower, Suite 3300    Email: rcaughey@susmangodfrey.com
San Francisco, California 94105              Email: mbrightman@susmangodfrey.com
Tel.: (415) 947-2109                         Email: tkorman@susmangodfrey.com
Email: tgraves@wsgr.com
Email: agressel@wsgr.com
                                             Michael Gervais (*pro hac vice*)
                                             **SUSMAN GODFREY L.L.P.**
Joel C. Boehm (*pro hac vice*)               1900 Avenue of the Stars, Suite 1400
**WILSON SONSINI**                           Los Angeles, California 90067
   **GOODRICH & ROSATI PC**                  Tel.: (310) 789-3100
900 South Capital of Texas Highway           Email: mgervais@susmangodfrey.com
Las Cimas IV, Fifth Floor
Austin, Texas 78746
Tel.: (512) 338-5418                         Jenna G. Farleigh (*pro hac vice*)
Email: jboehm@wsgr.com                       **SUSMAN GODFREY L.L.P.**
                                             1201 Third Avenue, Suite 3800
                                             Seattle, Washington 98101
                                             Tel.: (206) 505-3826
                                             Email: jfarleigh@susmangodfrey.com


               *Counsel for Defendant / Counterclaim-Plaintiff Veeva Systems Inc.*

**APPENDIX A**

| | Duty to preserve? | Intended to deprive IQVIA of evidence? | Consequences? |
|---|---|---|---|
| Customer data | No (litigation not pending or probable) | No (deleted in ordinary course per contractual obligations and standard operating procedure) | None (irrelevant and already produced) |
| ███ emails | No (litigation not pending or probable) | No (deleted to free space in ███ mailbox due to system-imposed, per user mailbox storage limit) | None (Veeva produced 6,800 of his January 2014 through May 2015 emails, alongside countless others outside that period) |
| ███ | No (decommissioned before lawsuit) | No (deleted during global migration of computing infrastructure to Amazon Web Services) | None (materially similar information produced in ███ and emails) |
| Google Drive | Yes | No (good-faith, reasonable mistake about which Veeva was upfront, and which Veeva made every effort to remedy) | None (63,000 documents produced) |