## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

IQVIA, INC. and
IMS SOFTWARE SERVICES, LTD,

        Plaintiffs/Counterclaim Defendants,

v.

VEEVA SYSTEMS, INC.,

        Defendant/Counterclaim Plaintiff.

Civil Action No. 17-00177 (JXN) (JSA)

**OPINION**

**FILED UNDER SEAL**

**NEALS**, District Judge

    This matter comes before the Court on the following: (1) Defendant/Counterclaimant Veeva Systems Inc.'s ("Veeva") notice of objections to the overruling Veeva's assertion of attorney-client privilege over certain documents ("Privilege Motion") (ECF No. 355);[1] (2) Veeva's notice of objections to the Special Master's Order dated May 7, 2021, recommending sanctions against Veeva ("Sanctions Motion") (ECF No. 353);[2] and (3) Plaintiffs-Counterclaim Defendants IQVIA, Inc. and IMS Software Services, LTD's (collectively "IQVIA") appeal of the Special Master's Order dated September 15, 2022, overruling IQVIA's assertions of privilege (ECF No. 471).[3] The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Veeva's objections to the Special Master's ruling on the Privilege Motion (ECF No. 355) is **DENIED**; the Court's judgment on Veeva's objection to the Special Master's

---

[1] IQVIA opposed the motions (ECF No. 371), and Veeva replied in further support (ECF No. 400).

[2] IQVIA opposed the motions (ECF No. 373), and Veeva replied in further support (ECF No. 398). The Court also considered the following letters filed by the parties at ECF Nos. 541, 549, 550, 551, 552, 554.

[3] Veeva opposed the motion (ECF No. 475), and IQVIA replied in further support (ECF No. 478).

ruling on the Sanctions Motion (ECF No. 353) is **RESERVED**; and IQVIA's appeal of the Special Master's Order dated September 15, 2022, overruling IQVIA's assertions of privilege (ECF No. 471) is **DENIED**.

## I.    BACKGROUND

The facts and procedural history are well-known to the parties and have been detailed in several Court opinions and orders. (*See, e.g.*, ECF Nos. 55, 90, 115, 153, 349, 431, 465, 497 & 536.) As such, the Court includes only the facts and procedural history necessary to decide the instant appeals. Direct citations are mostly omitted.

IQVIA and Veeva are competitors in the healthcare reference data and life sciences software markets. Both parties sell healthcare reference data, which they collect from various sources. In 2007, Veeva began selling to the parties' mutual clients a cloud-based Customer Relationship Management ("CRM") software offering that hosted client data, including IQVIA's proprietary market research offerings ("Reference Data"). Many mutual clients licensed Reference Data from IQVIA and hired Veeva to host it and other data in a CRM system. To facilitate this process, and at those clients' requests, IQVIA licenses – called Third Party Access ("TPA") agreements –allowed Veeva to host IQVIA Reference Data for this limited purpose.

In 2013, Veeva unveiled Veeva Network, master data management ("MDM") software that generates up-to-date healthcare information. Veeva also announced it would use "crowdsourcing" to build and improve its reference data product—a compilation of information on healthcare professionals and organizations—called "Veeva OpenData." This product would compete directly with IQVIA's OneKey and HCRS reference data offerings, which raised concerns for IQVIA— including that Veeva might improperly use its access to its Reference Data to build the competing data offering. However, Veeva assured IQVIA that it had stringent protections in place to prevent

this from occurring.

*The Genentech Incident*

In 2015, in response to IQVIA's concerns and in furtherance of seeking TPA agreements for certain mutual clients, Veeva agreed to an Audit by Ernst & Young to assess Veeva's safeguards to protect IQVIA's Reference Data (the "E&Y Audit"). Veeva prepared for the audit by launching an internal investigation of its operations, during which it learned of a "data corruption" problem, which originated from a company called – AdvantageMS ("AMS") – that Veeva had acquired in 2013. AMS' customer, Genentech, provided AMS with a dataset for data research and data improvement services, which included IQVIA records. Veeva discovered that because of a configuration error in a data table storing Genentech's address data, IQVIA address records were included as a source in Veeva's "best address" algorithm to verify address records in OpenData (the "Genentech Incident"). Further, the database storing those records, Healthcare Data Management ("HDM"), was viewable by Veeva's OpenData data stewards. After discovering the Genentech Incident, Veeva employees engaged in a series of internal communications to determine the extent of the "data corruption" and the business response thereto. Veeva's executives set forth their findings in a memo to Veeva's CEO, which contemplated that IQVIA would file a lawsuit due to the Genentech Incident (the "OpenData Data Corruption Memo"). After the E&Y Audit, the parties continued their business relationship.

*The Shire Incident*

Subsequently, in 2016, Veeva obtained a data extract from one of the parties' mutual customers, Shire Pharmaceuticals ("Shire"), for a Data Report Card ("DRC"),[4] which resulted in

---

[4] DRCs are tools by which data vendors educate potential data customers on the accuracy of their data. Veeva's DRC process worked as follows: Veeva obtained a potential customer's data extract directly from that company or Veeva's CRM system. In so doing, that company affirmed its right (under licensing agreements or otherwise) to authorize Veeva's use of the extract to conduct a DRC. Veeva then generated a comparison between the extract and OpenData.

unauthorized access to IQVIA data (the "Shire Incident"). In this instance, Veeva obtained authorization from Shire's IT department to generate a DRC. However, Shire did not have a TPA agreement with IQVIA and realized that it had inadvertently authorized the use of an extract containing IQVIA data without IQVIA's authorization. Shire informed Veeva of the mistake, and Veeva promptly deleted the Shire extract from its systems, assuring IQVIA that the data did not contribute to Veeva 's OpenData product.

### IQVIA files a trade secret theft case against Veeva in 2017

On January 10, 2017, IQVIA filed the instant action against Veeva, alleging that, among other things, Veeva misused its Reference Data for the purpose of developing and improving Veeva's own data and technology products and assisting in marketing and promoting Veeva's competing brand. In response, Veeva counterclaimed against IQVIA for antitrust violations alleging that IQVIA engaged in a global campaign to exclude Veeva from the software and data markets by reversing IQVIA's policies and denying TPA agreements to customers who sought to use IQVIA's Reference Data with Veeva's software.[5]

On January 10, 2018, a year after this litigation began, the Court appointed the Honorable Dennis M. Cavanaugh, U.S.D.J. (Ret.) as Special Master ("Special Master") pursuant to Fed. R Civ. P. 53 to assist the Court with discovery and pretrial disputes. (ECF No. 110).

### James Kahan's Emails

In June 2019, the Special Master ordered Veeva to produce the custodial documents of the Senior Director of Veeva OpenData, James Kahan ("Kahan"). Veeva produced documents in

---

The exercise identified inaccuracies or omissions in customer data that OpenData could cure.

[5] *See IQVIA Inc. et. al. v. Veeva Systems Inc.*, No. 2:17-cv-00177 ("*IQVIA I*"). Aside from *IQVIA I*, there are two additional related cases pending before the Court regarding the alleged trade secret theft and purported antitrust violations: *IQVIA Inc. et. al. v. Veeva Systems Inc.*, No. 2:19-cv-15517, and *Veeva Systems, Inc. v. IQVIA Inc., et al.*, No. 2:19-cv-18558, which have been consolidated ("*IQVIA II*").

September 2019. However, the production was missing emails from January 2014 through May 2015, which coincided with the timeframe in which Kahan served as the senior manager responsible for Veeva OpenData. Initially, Veeva claimed that Kahan had deleted the emails, but Kahan denied this at his deposition and testified that he did not know who deleted his emails. Veeva insists that it is unaware who deleted Kahan's emails or when they were deleted, other than them being deleted in the ordinary course, pre-litigation.

### EUStage

When Veeva began building OpenData in Europe in 2015, it designed a two-part computer system in which Veeva employees would work: (1) an intermediate OpenData database and (2) a final OpenData database. Each database was stored in a separate "instance" of Veeva Network, Veeva's cloud master data management software. The intermediate OpenData database was stored in an instance called "EUStage." This was the "staging" environment where the database was built. The final OpenData database was stored in a separate production "instance" called "EUMaster." Each "instance" has its own audit trail, which tracks where the data contained within the instance originated. On August 10, 2018, Veeva deleted EUStage.

### The DataDestroyed Spreadsheet

After *IQVIA I* was filed in January 2017, Veeva's General Counsel, Jonathan W. Faddis ("Faddis"), instructed employees to prepare a spreadsheet documenting (1) customers for whom Veeva had generated DRCs and (2) the status of data received as part of the DRC process so that he could evaluate IQVIA's lawsuit and assess any legal obligations Veeva had to customers and IQVIA regarding data obtained as part of the DRC process. Veeva inadvertently produced the two versions of the DataDestroyed Spreadsheet[6] and clawed them back on November 21, 2019, and

---

[6] As noted in the Special Master's Order dated May 7, 2021, Veeva refers to the DataDestroyed Spreadsheet as the "Data Tracking Spreadsheet." However, "[t]o avoid confusion, the Special Master refers to it as the "DataDestroyed

January 31, 2020, asserting attorney-client privilege. The DataDestroyed Spreadsheet identifies documents and/or information in existence at the time of its creation, along with notations concerning whether those documents and/or information were deleted or needed to be deleted.

*IQVIA Moves to Overrule Veeva's Assertion of Privilege and to Impose Sanctions*

In February 2020, IQVIA filed the Privilege Motion and the Sanctions Motion against Veeva (collectively the "Motions"). In the Privilege Motion, IQVIA sought to overrule Veeva's assertion of the attorney-client privilege over the two versions of the DataDestroyed Spreadsheet. IQVIA argued that the DataDestroyed Spreadsheet provided a contemporaneous record of Veeva's systemic efforts to destroy incriminating evidence in the months after *IQVIA I* was filed.

In the Sanctions Motion, IQVIA requested sanctions against Veeva for spoliation of evidence. IQVIA alleged that Veeva intentionally and permanently deleted evidence that is central to IQVIA's case and did so, in some cases, after the Special Master had ordered Veeva to produce the evidence in question. IQVIA argued that Veeva should have anticipated litigation in September 2015, and thus, any evidence destroyed in connection with the Genentech Incident and the Shire Incident constitutes spoliation of evidence. IQVIA claimed that Veeva deleted the EUStage and various James Kahan emails after IQVIA filed this lawsuit. IQVIA argued that Veeva acted with the highest level of intent and sought case-terminating sanctions or alternatively, an adverse inference charge.

The parties briefed the Motions, and the Special Master heard oral argument on October 29, 2020.

## A.  **The Special Master's 2021 Order**

---

Spreadsheet," as set forth in the moving papers, with the understanding that this is not an official title of the document, but rather, a label provided by the moving party. (ECF No. 349 at 11.)

The Special Master issued a 115-page Order dated May 7, 2021 (the "Special Master's 2021 Order"). (ECF No. 349.) IQVIA's Privilege Motion and Sanctions Motion were Granted in part.[7]

The Privilege Motion: With respect to the DataDestroyed Spreadsheet, the Special Master concluded that the document was discoverable pursuant to the crime-fraud exception to the attorney-client privilege. (ECF No. 349 at 27.) After an *in camera* review of Veeva's DataDestroyed Spreadsheet, the Special Master found that IQVIA had made a *prima facie* showing that Veeva was engaging or intended to engage in a crime or fraud – specifically the spoliation of evidence – and that the DataDestroyed Spreadsheet was used in furtherance of that purpose. (*Id*. at 27.) The Special Master found that "there were indications that the spreadsheet tracked the deletion of evidence after the litigation commenced." Specifically, the Special Master noted that the spreadsheet identified documents and information that were "FOUND" at the time of its creation and included notations suggesting the deletion of those documents, such as "PURGED" or instructions to check and purge them. (*Id*. at 25.) The Special Master determined that the use of "future-tense language to "CHECK AND PURGE" further supported the inference that the spreadsheet is related to the deletion of evidence." (*Id*. at 26.) The Special Master also found "the fact that Veeva provides no explanation for the future-tense language to purge or delete evidence in the document is telling." (*Id*.) Additionally, the Special Master determined that the evidence referred to in the DataDestroyed Spreadsheet was relevant, as Veeva's General Counsel, Faddis, admitted (via declaration) that he instructed Veeva employees to create the DataDestroyed Spreadsheet "so that [he] could evaluate IQVIA's lawsuit," and because of IQVIA's claims in the

---

[7] The Court will only reference the portions of the Special Master's 2021 Order required to address Veeva's objections to the Special Master's decision on the DataDestroyed Spreadsheet in the Privilege Motion and the sanctions recommended against Veeva.

lawsuit regarding Veeva's DRC process. (*Id*. at 26-27.)

The Sanctions Motion: The Special Master found that Veeva should have anticipated litigation with IQVIA in September 2015 as a result of the Genentech Incident and, therefore, had a duty to preserve evidence at that time. (*Id* at 70.) The Special Master noted that the OpenData Data Corruption Memo, which Veeva employees prepared in response to the Genentech Incident, contemplated that IQVIA would file a lawsuit as a result of the Genentech Incident and that Veeva's exposure could be high. (*Id*. at 71.) The Special Master concluded that

> after discovering the extent of the Genentech Incident and identifying the likelihood of litigation as a result thereof, rather than begin to preserve relevant evidence and suspend document destruction policies, Veeva actively and purposefully deleted evidence relating thereto.

 (*Id*. at 72.)

The Special Master concluded that Veeva had engaged in spoliation of evidence in several instances. First, with regard to Veeva's deletion of over two hundred directories on its NAS server, thousands of tables within its HDM database, and over one thousand DVI tables, the Special Master found that the information contained in those repositories was relevant because Veeva cites to the absence of such evidence to argue that IQVIA cannot prove that Veeva engaged in trade-secret theft. (*Id*. at 73.)

Second, the Special Master found that spoliation occurred when Veeva failed to preserve EUStage, which was permanently deleted on August 10, 2018. (*Id*. at 78.) The Special Master noted that the ESI Order entered in this case on October 27, 2017, provided explicitly that "[n]o ESI or backup media created or received prior to January 1, 2010, will be preserved. The parties agree to preserve all other ESI that they, in good faith, believe may be potentially discoverable in this matter." (*Id*. at 79; *see also* ECF No 93.) Further, the Special Master noted that in his March 28, 2018 Order, he granted IQVIA's request to compel Veeva to respond to RFP Nos. 1(E) and

2(E), dated September 12, 2017, which sought audit logs reflecting any copying, transfers, or other computer-based actions involving various IQVIA data. (*Id*. 78-79.) Thus, IQVIA requested the audit logs from Veeva networks, and Veeva should not have deleted EUStage in light of the ESI Order entered in this case. (*Id*. at 80.) The Special Master noted that he was not persuaded by Veeva's arguments that it produced an adequate substitution for the evidence contained in EUStage by producing EUMaster and various e-mails documenting specific changes to OpenData. The Special Master explained that the final data in EUMaster did not contain the raw source information IQVIA requires to support its claims. (*Id*.) The Special Master concluded that IQVIA had met its burden in showing that Veeva acted with intent to deprive it of the evidence. (*Id*. at 81.) Specifically, the Special Master stated that:

> There is strong suspicion as to the timing of the deletion of EUStage, marking it for deletion three days after Veeva provided its June 1, 2018, response indicating that it had no audit log that would show that Veeva performed data copying. Moreover, under the ESI Order, Veeva was clearly obligated to preserve EUStage. The Special Master finds this circumstantial evidence to be a sufficient basis on which to find that Veeva acted with the intent to spoliate relevant evidence.

(*Id*. 81-82.)

Lastly, with respect to Veeva's destruction of Kahan's emails, the Special Master determined that by September 2015, Veeva should have suspended any deletions of Kahan's emails, whether due to storage limitations or other reasons. (*Id*. at 86.) The Special Master found that "Veeva was in control of Kahan's e-mails, the deletion of the e-mails was intentionally performed, and the deletion occurred after Veeva anticipated litigation," and it was "highly suspicious that no one at Veeva is able to confirm when, how, or why Kahan's e-mails were deleted." (*Id*. at 88- 89.) The Special Master found that "[o]nly an intentional action could have resulted in the deletion of e-mails" and sanctioned Veeva for "depriv[ing] [IQVIA] of critical evidence." (*Id*.)

The Special Master concluded that the information contained in the HDM database, a related storage NAS server, and the EUStage were "not recoverable and cannot be restored or replaced by other discovery. (*Id*. at 74-75, 82.) The Special Master also found that Kahan's "potentially relevant e-mails were [also] lost." (*Id*. at 87.)

In addressing Sanctions, the Special Master determined that IQVIA was prejudiced pursuant to Rule 37(e)(1) and found that Veeva had the requisite intent pursuant to Rule 37(e)(2). After weighing these factors, the Special Master determined that the prejudice suffered by IQVIA and the degree of fault attributable to Veeva warrant an adverse jury instruction inference. The Special Master recommended sanctions for Veeva's spoliation of evidence, specifically (1) Veeva's pre-litigation destruction of all evidence of its theft of IQVIA Reference Data from its HDM database—where it built its OpenData offering in the U.S.; (2) Veeva's post-litigation destruction of EUStage; and (3) Veeva's deletion of 17 months of Kahan's emails. (*Id*. at 82-83, 89, 115.) The Special Master recommended the District Court allow IQVIA to present evidence to the jury regarding the loss of the evidence and to issue an adverse inference jury instruction that it deems fit to assist in the jury's evaluation of such evidence. (*Id*. at 83, 89, 90.) The Special Master also granted IQVIA an award of fees and costs in connection with its Fraud Motion and the Sanctions Motion as it relates to the Genentech Incident, EUStage, and James Kahan's emails. (*Id*. 115.) The Special Master ordered IQVIA to provide a full accounting of relevant fees and costs within 60 days so the Special Master could determine an appropriate award. (*Id*.)

### *Veeva's Appeals to the Special Master's 2021 Order*

On June 4, 2021, Veeva filed two objections to the Special Master's 2021 Order granting IQVIA's Privilege Motion (ECF No. 355) and granting in part IQVIA's Sanctions Motion and recommending sanctions (ECF No. 353). IQVIA filed opposition (ECF Nos. 373, 371), and Veeva

filed replies in further support (ECF Nos. 400, 398).

*Veeva Moves to Compel IQVIA to Produce TPA-Related Communications*

Veeva moved to compel IQVIA's Senior Vice President and Deputy General Counsel Harvey Ashman's ("Ashman") TPA-policy communications that IQVIA withheld as privileged.[8] Veeva argued that because IQVIA's TPA policy served a predominately business purpose, any communication involving in-house counsel related to IQVIA's TPA policy was not protected by attorney-client privilege. Veeva argued that the challenged communications were nonprivileged or, alternatively, that IQVIA waived the privilege by placing Ashman's TPA assessments at issue. (*Id.*)

The parties briefing on the motion was fully submitted on November 23, 2020. The Special Master engaged in a comprehensive two-year review of the parties' briefs and *in camera* document-by-document inspection of the challenged materials.

**B.  The Special Master's 2022 Order**

On September 15, 2022, following a comprehensive review of the parties' briefs, including an *in camera* inspection of the challenged materials, the Special Master issued a 68-page Order (the "Special Master's 2022 Order") overruling IQVIA's assertions of privilege over Ashman's TPA-related communications. (ECF No. 465.) The Special Master concluded that by asserting that its TPA program served a valid business justification and putting forward Ashman to support that defense, IQVIA put all aspects of its TPA program as it relates to Ashman at issue. (*Id.* at 25.) Specifically, the Special Master found that IQVIA affirmatively contends that it promulgated its TPA policy in good faith to support its business justification defense and intends to utilize Ashman

---

[8] IQVIA argued that although Veeva claimed it challenges 167 communications, Veeva's Appendix contained 194 privilege log entries falling within 166 distinct families. (ECF No. 472-18 at 5 n.16.)

as its primary trial witness for its business justification defense. (*Id*.) Thus, by using Ashman in support of its defense, IQVIA placed Ashman's "business" and "legal" involvement with the formation and application of the TPA program at issue, including Ashman's legal communications involving his assessments, consultations, and evaluations related to the TPA program. (*Id*.) The Special Master found that "just as in *In re Human Tissue Liability Litigation*, …IQVIA has impliedly waived the attorney-client privilege with respect to Ashman's TPA program communications." Further, the Special Master found that barring access to the challenged communications prejudices Veeva's ability to prosecute its antitrust case and test IQVIA's business justification defense. The Special Master noted that "[c]ontrary to IQVIA's arguments, at issue waiver is not so narrow that a communication would only be put at issue if it is specifically relied upon in support of its business justification defense." (*Id*. at 24) (citing *In re Human Tissue Liability Litigation*, 255 F.R.D. 151.) The Special Master determined that:

> In relying on the testimony of Ashman, IQVIA cannot produce information and select communications of Ashman that support its defense and then utilize attorney-client privilege to withhold purportedly "legal" information or communications of Ashman related to legal aspects of IQVIA's TPA program and its application. To allow otherwise would be unfair. Veeva must be permitted to challenge the veracity of IQVIA's business justification defense and probe the extent to which IQVIA devised its TPA program to advance monopolistic objectives, as alleged. Shielding "legal" information and communications of Ashman related to the formation and application of IQVIA's TPA program would severely hinder Veeva's ability to challenge IQVIA's assertion that its TPA program served a valid business justification.

(*Id*.) However, the Special Master rejected Veeva's "blanket conclusion that since IQVIA's TPA policy is predominately business in nature, all communications involving IQVIA in-house counsel referring to the TPA program therefore serves a predominately business nature and cannot be privileged." (*Id*. at 17.) Instead, the Special Master determined that "each challenged communication must be evaluated on an individual basis to determine whether the communication

was made predominantly for the purpose of rendering legal advice as opposed to business advice. (*Id*. at 17-18.) Thus, the Special Master conducted a comprehensive review of all the challenged communications, together with IQVIA's privilege log and, in several cases, corresponding documents, so that each privilege assertion could be properly evaluated. (*See id*. at 26.) The Special Master recorded his decisions as to the privileged status of each communication as it related to "at issue" waiver, which is detailed in the Appendix attached to the Special Master's 2022 Order. (*See id*.) With respect to those documents that the Special Master ordered to be produced, IQVIA was directed to produce the documents within 15 days of the date of the Special Master's Order. (*Id*.)

### *IQVIA Appeals the Special Master's 2022 Order*

On October 14, 2022, IQVIA filed the instant appeal of the Special Master's Order overruling IQVIA's privilege assertions. (ECF No. 471.) Veeva opposed the appeal (ECF Nos. 475), and IQVIA replied in further support (ECF Nos. 478). The parties agreed to stay production of materials over which IQVIA has asserted privilege pending the resolution of this appeal. (ECF No. 467.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 53 sets forth the standards for this Court to apply in its review of the Special Master's Orders. Objections to the Special Master's findings of fact and conclusions of law are reviewed de *novo*. Fed. R. Civ. P. 53(f)(3) and (f)(4); *see, e.g., Wachtel v. Guardian Life Ins. Co.,* Nos. 01–4183, 03–1801, 2006 WL 1320031, at *3 (D.N.J. May 12, 2006). The Court may only set aside a Special Master's ruling on a procedural matter for abuse of discretion. Fed. R. Civ. P. 53(f)(5); *see, e.g., Wachtel,* 2006 WL 1320031, at *3; *accord Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 196–97 (3d Cir.2000).

Here, the Special Master made rulings concerning the application of the attorney-client

privilege. In the Third Circuit, "the applicability of a privilege is a factual question" and "determining the scope of a privilege is a question of law." *TransWeb, LLC v. 3M Innovative Properties Co.*, No. CIV. 10-4413 FSH PS, 2012 WL 2878075, at *1 (D.N.J. July 13, 2012) (quoting *In re Bevill, Bresler, & Schulman Asset Mgmt. Corp.,* 805 F.2d 120, 124 (3d Cir.1986)).

The Court is mindful that conducting a de novo review of the Special Master's finding of facts and conclusions of law "does not necessarily mean a review that includes the submission of new evidence, particularly when evidentiary proceedings previously occurred before the Special Master." *Net2Phone, Inc. v. Ebay, Inc*., No. CIV.A. 06-2469 KSH, 2008 WL 8183817, at *4 (D.N.J. June 26, 2008). As noted by the Court in *Net2Phone*,

> When a record on review "is sufficiently developed, the district court may, in its discretion, merely conduct a de novo review" of the decision, making its own independent determination. Although de novo review refers to the review based on the record below plus any additional evidence received by the reviewing court, it also refers to review of the decision based only on the record below. The plain language of Rule 53 shows that the review of a Special Master's decision requires the court to make a de novo determination, not conduct a de novo hearing. Rule 53 is similar to 28 U.S.C. § 636(b)(1)(C), when a district court reviews the recommendations of a magistrate judge, the district judge "may accept, reject, or modify" the findings made by the magistrate and "may receive further evidence." Unlike a de novo hearing, "a de novo determination requires the district judge to 'consider the record which has been developed before the magistrate [judge] and make his own determination on the basis of that record, without being bound to adopt the findings and conclusions of the magistrate [judge].'"

*Id*. (quoting *Commissariat à l'Energie Atomique v. Samsung Electronics Co*., 245 F.R.D. 177, 179 (D. Del.2007)).  "The phrase 'de novo determination' ... means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *United States v. Raddatz*, 447 U.S. 667, 690, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (Stewart, J., dissenting) (citing *United States v. First City Nat'l Bank*, 386 U.S. 361, 368, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967)). This, however, does not require the reviewing court to hear new arguments. In fact, courts generally "exclud[e] evidence of new arguments on objections ... [because]

[s]ystematic efficiencies would be frustrated and the [Special Master's] role reduced to a mere dress rehearsal.... In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the [Special Master] ... and—having received an unfavorable recommendation—shift gears before the [reviewing] judge." *Dunkin' Donuts Franchised Restaurants LLC v. Mehta*, Civ. No. 07–0423, 2007 WL 2688710, at \*1–2 (W.D.Pa.2007) (citing *Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co*., 840 F.2d 985, 991 (1st Cir.1988))

The Court reviews the findings and conclusions of the Special Master accordingly.

## III.    DISCUSSION

### A.  Veeva's Objections to the Special Master's 2021 Order

1. <u>The Special Master's ruling that Veeva's DataDestroyed Spreadsheet is discoverable pursuant to the crime-fraud exception to the attorney-client privilege</u>

The attorney-client privilege, which protects confidential communications between client and attorney, is strictly construed. *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005). "A principal and reasonable exception is that the privilege may not be used for the purpose of obtaining advice to promote crime or fraud. Although broad, the privilege does not allow a client to shield evidence of an intent to use an attorney's advice to further a criminal purpose." *Id.* Thus, a crime-fraud exception applies to those communications "between an attorney and client that are intended to further a continuing or future crime or tort." *Id*. (internal quotation marks omitted). In determining whether the exception applies,

> the client's intention controls, and the privilege may be denied even if the lawyer is altogether innocent." *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979). The privilege is not lost if the client innocently proposes an illegal course of conduct to explore with his counsel what he may or may not do. Only when a client knowingly seeks legal counsel to further a continuing or future crime does the crime-fraud exception apply.

*Doe*, 429 F.3d at 454. To determine whether the exception applies, the court must apply the reasonable basis test. *In re Grand Jury*, 705 F.3d 133, 155 (3d Cir. 2012). The "party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud." *Id*.

First, the Court notes that the scope of the attorney-client privilege is not an issue here as the Special Master, and this Court agrees that the attorney-client privilege applies to the DataDestroyed Spreadsheet. (*See* ECF No. 349 at 24.) Thus, the only issue before this Court is whether the Special Master correctly determined that the DataDestroyed Spreadsheet is subject to the crime-fraud exception.

In its objection, Veeva argues that the Special Master's opinion has no basis in fact or law. Veeva contends that the Special Master failed to consider "unrebutted evidence" in finding that the crime-fraud exception applied. (ECF No. 355 at 18.) Veeva asserts that it did not engage in intentional spoliation and that it prepared the DataDestroyed Spreadsheet at its general counsel's direction in order to track historical deletions of DRC extracts. (*Id*. at 10.) Veeva further claims that the Special Master ignored the record and focused solely on comments made by a Veeva employee, R.J. Johnston, in a prior draft of the spreadsheet, which recommended deletions of old data files. (*Id*. at 11.) However, Veeva claims that those statements do not reflect intentional spoliation; they propose ordinary-course deletions pursuant to Veeva's data-retention policy, which, according to Veeva, occurred before *IQVIA I* was filed. (*Id*.)

IQVIA, on the other hand, argues that the Special Master had a reasonable basis to suspect that Veeva was committing or intending to commit a crime, the spoliation of evidence, and used

the DataDestroyed Spreadsheet in furtherance of that crime. IQVIA contends that the "plain language of the DataDestroyed Spreadsheet provides a reasonable basis for this conclusion on its face alone—and "this is enough to break the privilege." (ECF No. 371 at 14-15) (quoting *In re Grand Jury*, 705 F.3d 133, 153 (3d. Cir. 2012)). The Court agrees.

As an initial matter, the Court notes that the Special Master ruling on the DataDestroyed Spreadsheet is based on his extensive analysis of the dozens of pages of briefing the parties submitted related to the DataDestroyed Spreadsheet alone, numerous exhibits, and the parties' oral argument. The Special Master carefully considered the text, instructions, and commentary in the DataDestroyed Spreadsheet itself, the arguments Veeva raised with respect to the document, the relevant law, and the statements in the Faddis Declaration. (*See* ECF No. 349 at 6-27.)

Next, the Court finds that the Special Master's decision thoroughly addressed all the factors in considering whether the crime-fraud exception to the attorney-client privilege applied. The Special Master determined that IQVIA met its burden in showing that there is a reasonable basis to suspect (1) that Veeva was committing or intending to commit spoliation of evidence and (2) that the DataDestroyed Spreadsheet was used in furtherance of that crime. *In re Grand Jury*, 705 F.3d at 155. Specifically, the Special Master determined that the DataDestruction Spreadsheet itself provided a "reasonable basis" to suspect spoliation of evidence. The Special Master Special Master found that "although Faddis has certified that it was neither his intention nor his instruction that the DataDestroyed Spreadsheet be used for such a purpose, the document itself suggests that it was." (ECF No. 349 at 25.) In analyzing the contents of the DataDestroyed Spreadsheet, the Special Master noted the spreadsheet identified documents and/or information in existence at the time of its creation, along with notations concerning whether those documents and/or information were deleted or needed to be deleted. (*Id.*) For example, the spreadsheet identified documents and

information that were "FOUND" at the time of its creation and included notations suggesting the deletion of those documents, such as "PURGED" or instructions to check and purge them. (*Id*.) The Special Master noted that "[a]s this document was created after litigation commenced, and it is identifying documents or information that were "FOUND" at that point in time, the fact that a column contains references to the documents being "PURGED" would suggest that these documents were deleted post-litigation. (*Id*. at 25.) As a result, the Special Master determined that the use of "future-tense language to "CHECK AND PURGE" further supported the inference that the spreadsheet is related to the deletion of evidence." (*Id*. at 26.) The Special Master also found "the fact that Veeva provides no explanation for the future-tense language to purge or delete evidence in the document is telling." (*Id*.) Further, the Special Master stated that Veeva's contention that because it produced some extracts identified in the DataDestroyed Spreadsheet, it could not have schemed to delete other customer extracts was belied by the discovery produced in this matter. The Special Master noted that Veeva's interrogatory responses identified nineteen extracts in the DataDestroyed Spreadsheet that were deleted and not produced in discovery and another eight that were identified in the DataDestroyed Spreadsheet but were not identified in Veeva's interrogatory responses. (Id at 27.) Lastly, the Special Master determined that the evidence referred to in the DataDestroyed Spreadsheet was relevant, as Veeva's General Counsel, Faddis, admitted (via declaration) that he instructed Veeva employees to create the DataDestroyed Spreadsheet "so that [he] could evaluate IQVIA's lawsuit," and because of IQVIA's claims in the lawsuit regarding Veeva's DRC process. (*Id*. at 26-27.) He further noted that "it is hard to reconcile how certain information was deemed relevant to Veeva in its evaluation of its legal obligations in connection with this lawsuit, yet irrelevant for preservation purposes." (*Id*.) Consequently, this Court finds, under the *de novo* standard, the Special Master's determination that the DataDestroyed

Spreadsheet is discoverable pursuant to the crime-fraud exception to the attorney-client privilege is amply supported by the record. Thus, Veeva's objection to the Special Master's ruling that the DataDestroyed Spreadsheet is discoverable pursuant to the crime-fraud exception to the attorney-client privilege (ECF No. 355) is denied, and this portion of the Special Master's 2021 Order is affirmed.

<b>2.   <u>Veeva's Objection to the Special Master's Ruling on the Sanctions Motion</u></b>

Spoliation occurs with "the destruction or significant alteration of evidence, or the failure to preserve [or produce] property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Techs. Inc. v. Samsung Elecs. Co*., 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (internal quotation omitted); *see also Bull v. United Parcel Serv., Inc*., 665 F.3d 68, 73 (3d Cir. 2012) (recognizing that spoliation can occur when evidence is destroyed, altered, not preserved, or not produced); *Pace v. Wal-Mart Stores East, LP*, 799 F. App'x 127, 130 (3d Cir. 2020).

A party possessing relevant evidence must preserve that evidence if it knows litigation is pending or probable and "can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008). As a result, a court may find spoliation where a party exercised control over the evidence; "the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and[] the duty to preserve the evidence was reasonably foreseeable to the party." *Bull*, 665 F.3d at 73 (citation and footnote omitted). Foreseeability is a fact-sensitive inquiry that looks to whether the duty to preserve was "objectively foreseeable." *Bull*, 665 F.3d at 78. The Court exercises discretion to determine foreseeability based

on "the myriad factual situations inherent in the spoliation inquiry." *Id*. at 77-78 (internal quotation marks omitted).

Accordingly, the Court must determine if there was an obligation to preserve and, if so, whether there was spoliation; upon finding spoliation, the Court then turns to the appropriate remedy. *See West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999); *Kounelis*, 529 F. Supp. 2d at 519. Sanctions may include dismissal of a claim or defense, suppression of evidence, an adverse inference, fines, and/or an award of attorneys' fees and costs. *See Kounelis*, 529 F. Supp. 2d at 519 (citing *Mosaid Tech*., 348 F. Supp. 2d at 335). In fashioning an appropriate sanction, the Court considers the degree of fault on the party who spoliated, "the degree of prejudice suffered by the opposing party, [and] whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp*., 13 F.3d 76, 79 (3d Cir. 1994). A court will dismiss a claim or defense as a sanction only if another party's case "is severely impaired" based on the spoliation of the evidence. *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Bull*, 665 F.3d at 83). Ultimately, the District Court maintains discretion to determine the appropriate sanction. *See, e.g., Micron Tech., Inc. v. Rambus Inc*., 645 F.3d 1311, 1326 (Fed. Cir. 2011); *Kounelis*, 529 F. Supp. 2d at 520-21.

In its appeal, Veeva argues that there is no basis from which the Special Master could have concluded that Veeva intentionally destroyed evidence while anticipating litigation. (*See* ECF No. 353-28.) According to Veeva, the Special Master committed four points of error in holding (1) that Veeva should have anticipated litigation with IQVIA in September 2015 as a result of the Genentech Incident and therefore, had a duty to preserve evidence at that time (*id*. at 7); (2) that the scope of the duty could not be extended to "irrelevant" NAS directories and HDM tables (*id*.

at 19); (3) that Veeva "intended to deprive" IQVIA of NAS directories and HDM tables, EUStage, and James Kahan's emails (id. at 21); and (4) that fees and costs are warranted as Veeva did not commit "fraud" (*id* at 30).

In opposition, IQVIA argues that the Special Master's detailed findings are supported by substantial—indeed, overwhelming—evidence. IQVIA points to the conclusion of Veeva's executives, presented in the OpenData Data Corruption Memo to their CEO in 2015, that once the data corruption is revealed, IQVIA "will file a lawsuit as a result of the [theft] and that Veeva's exposure could be high. (ECF No. 373 at 13.) The Special Master also found that, as a result of Veeva's decision to destroy evidence, "Veeva's degree of fault is high, and IQVIA's degree of prejudice is also high." (*Id*. at 2.) IQVIA argues that Veeva provides no reason for this Court to find that the Special Master abused his discretion in reaching these conclusions. IQVIA asserts that the Special Master was correct in sanctioning Veeva for destroying an entire database ("EUStage") and correctly found that Veeva's intentional and permanent deletion of EUStage deprived IQVIA of critical evidence of Veeva's trade secret theft. (*Id*. at 26.) IQVIA asserts that, like the rest of Veeva's spoliation campaign, this misconduct was extraordinary and wholly improper, and the Special Master was well within his discretion in sanctioning Veeva for what it had done. As a result, IQVIA asks the Court to affirm the Special Master's ruling on the Sanctions Motion.

Here, after careful consideration of the Special Master's ruling on the Sanctions Motion (ECF No. 349), Veeva's objections and reply (ECF Nos. 353, 398), and IQVIA's opposition to Veeva's objections (ECF No. 373), as well as the supplemental letters submitted by the parties (ECF Nos. ECF Nos. 541, 549, 550, 551, 552, 554), the Court will reserve judgment with respect to the Special Master's recommended sanctions for Veeva's spoliation of evidence, specifically

(1) Veeva's pre-litigation destruction of all evidence of its theft of IQVIA Reference Data from its HDM database—where it built its OpenData offering in the U.S.; (2) Veeva's post-litigation destruction of EUStage; and (3) Veeva's deletion of 17 months of Kahan's emails. (*Id*. at 82-83, 89, 115.) The Special Master recommended that the District Court allow IQVIA to present evidence to the jury regarding the loss of the evidence and to issue an adverse inference jury instruction that it deems fit to assist in the jury's evaluation of such evidence. (*Id*. at 83, 89, 90.)

The Special Master also granted IQVIA an award of fees and costs in connection with its Fraud Motion and the Sanctions Motion as it relates to the Genentech Incident, EUStage, and James Kahan's emails. (*Id*. 115.) Further, the Special Master ordered IQVIA to provide a full accounting of relevant fees and costs within 60 days so the Special Master could determine an appropriate award. (*Id*.) As previously stated, a court will dismiss a claim or defense as a sanction only if another party's case "is severely impaired" based on the spoliation of the evidence. *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Bull*, 665 F.3d at 83). Ultimately, the District Court maintains discretion to determine the appropriate sanction. *See, e.g., Micron Tech., Inc. v. Rambus Inc*., 645 F.3d 1311, 1326 (Fed. Cir. 2011); *Kounelis*, 529 F. Supp. 2d at 520-21. Accordingly, upon the completion of discovery and pretrial motions in this matter, the Court will determine whether and to what degree IQVIA has been impaired and the appropriate sanctions. This includes whether at trial, the Court will submit to the jury the issue of whether Veeva acted with an intent to deprive IQVIA of relevant evidence when it was deleted. The 2015 Advisory Notes outline this process:

> Subdivision (e)(2) requires a finding that the party acted with the intent to deprive another party of the information's use in the litigation. This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial. If a court were to conclude that the intent finding should be made by a jury, the court's instruction should make clear that the jury may infer from the loss of the

information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive another party of the information's use in the litigation. If the jury does not make this finding, it may not infer from the loss that the information was unfavorable to the party that lost it.

Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37.

Accordingly, the Court reserves ruilng on the appropriate sanctions at this time.

### B.  IQVIA's Appeal of the Special Master's 2022 Order

Generally, "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party..." Fed. R. Civ. P. 26(b)(1). The fundamental purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients." *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citing *Upjohn Co. v. U.S.,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)); *Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888) (privilege is "founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or apprehension of disclosure.") However, "[w]hen a party puts privileged matter in issue as evidence in a case, it thereby waives the privilege as to all related privileged matters on the same subject. § 2016.6 Privileged Matter—Putting Privileged Material in Issue, 8 Fed. Prac. & Proc. Civ. § 2016.6 (3d ed.) As Judge Learned Hand explained with regard to the Fifth Amendment, "the privilege is to suppress the truth, but that does not mean that it is a privilege to garble it; * * * it should not furnish one side with what may be false evidence and deprive the other of the means of detecting the imposition." (*Id.*) (quoting U S v. St. Pierre, 132 F.2d 837, 840 (C.C.A. 2d Cir. 1942), cert. granted, 318 U.S. 751, 63 S. Ct. 769, 87 L. Ed. 1126 (1943). Both the Court of Appeals as well as this Court have found that the attorney-client privilege is waived when "the client has made a conscious decision to inject the advice of counsel as an

issue in the litigation." Williams v. BASF Catalysts, LLC, No. CV 11-1754, 2017 WL 3317295, at *11 (D.N.J. Aug. 3, 2017), objections overruled, No. CV 11-1754, 2017 WL 4220282 (D.N.J. Sept. 21, 2017) (quoting *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486 (3d Cir. 1995). *See also In re G–I Holdings, Inc.*, 218 F.R.D. 428, 431–32 (D.N.J. 2003) ("Once a party places attorney-client communications at issue, that party waives the privilege with regard to all communications on the same subject matter.")). The waiver here may not be a complete waiver but rather a limited one that permits Defendants' access to previously privileged information that Plaintiffs have put at issue by relying on what the underlying counsel was told and the nature of advice given by counsel as a result of what counsel was led to believe. (*Id.*).

Further, the general rule regarding the voluntary disclosure of privileged attorney-client communications is that the disclosure waives the privilege as to all other communications on the same subject. *Katz v. AT&T Corp.*, 191 F.R.D. 433, 439 (E.D. Pa. 2000) (citing *Helman v. Murry's Steaks, Inc.,* 728 F.Supp. 1099, 1103 (D.Del.1990)). The rationale underlying the waiver of the attorney privilege in this situation is one of "fairness." *Kelsey–Hayes Co. v. Motor Wheel Corp.,* 155 F.R.D. 170, 172 (W.D.Mich.1991).

The Court agrees with the Special Master that it would be "fundamentally unfair to allow IQVIA to rely on Ashman to support its TPA program business justification defense while also permitting IQVIA to withhold the privileged information and communications of Ashman related to IQVIA's TPA program." (ECF No. 465 at 25.) Courts have recognized that it would be fundamentally unfair to allow a party to disclose opinions that support its position and to simultaneously conceal those that are unfavorable or adverse to its position. *Saint–Gobain/Norton Indus. Ceramics Corp. v. General Elec. Co.,* 884 F.Supp. 31, 33 (D.Mass.1995)

IQVIA appeals the portion of the Special Master's 2022 Order, ruling that because IQVIA

plans to present testimony from Harvey Ashman, IQVIA's Senior Vice President and Deputy General Counsel ("Ashman"), about certain business decisions he made relating to IQVIA's Third-Party Access ("TPA") program, IQVIA has waived protection over privileged legal analyses about that program sent to or from Mr. Ashman. (ECF No. 472-1 at 1.) IQVIA contends that the Special Master's ruling that IQVIA waived its attorney-client privilege by putting documents relating to the TPA program "at issue" is "clearly erroneous under black-letter law." (*Id*.) IQVIA maintains that the Special Master's ruling is "fundamentally erroneous under Third Circuit law" because IQVIA has not affirmatively relied on any legal communications to support its defenses to Veeva's antitrust claims. (*Id*. at 18, 22.)

In its opposition, Veeva notes that its antitrust case against IQVIA centers on IQVIA's TPA policy, by which IQVIA prohibits customers from using its monopoly life-sciences data products with its rival Veeva's software applications—their software of choice. (ECF No. 475 at 1.) Veeva alleges that IQVIA's TPA policy demonstrably harms competition and reduces consumer choice for customers who wish to use IQVIA data in Veeva software but are precluded from doing so. (*Id*.) Veeva argues that IQVIA has constructed its business-justification affirmative defense almost exclusively through its Ashman and that Ashman created and wields near-total control over IQVIA's TPA policy. (*Id*.) Further, Veeva notes that IQVIA presented Ashman to sit for over 28 hours of deposition testimony in his individual capacity and as IQVIA's corporate representative on its TPA policy and business-justification defense and that Ashman will testify at trial. (*Id*. at 2.)

Here, the Court agrees with the Special Master's conclusion that "at issue waiver is not so narrow that a communication would only be put at issue if it is specifically relied upon in support of its business justification defense." (ECF No. 465 at 24.) In *Rhone-Poulenc Rorer Inc. v. Home*

*Indem. Co*, the Third Circuit noted the proposition that a party can waive the attorney-client privilege by asserting claims or defenses that put their attorney's advice in issue in the litigation. 32 F.3d 851, 863 (3d Cir. 1994). Further, "[a] defendant may also waive the privilege by asserting reliance on the advice of counsel as an affirmative defense." *Id*. (citing *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156 (9th Cir.1992) (party's claim that its tax position was reasonable because it was based on the advice of counsel puts advice in issue and waives privilege); *see also, Hunt v. Blackburn,* 128 U.S. at 470, 9 S.Ct. at 127, (client waives privilege when she alleges as a defense that counsel misled her). *See generally,* E. Cleary, *McCormick on Evidence* § 93, at 343 (3d ed. 1984). In an action for patent infringement, where a party is accused of acting willfully and where that party asserts as an essential element of its defense that it relied upon the advice of counsel, the party waives the privilege regarding communications pertaining to that advice. *Mellon v. Beecham Group PLC,* 17 U.S.P.Q.2d 1149, 1151, 1991 WL 16494 (D.N.J.1991); *see also, e.g., W.L. Gore & Associates, Inc. v. Tetratec Corp.,* 15 U.S.P.Q.2d 1048, 1051, 1989 WL 144178 (E.D.Pa.1989) (client waived privilege by asserting reliance upon advice of counsel as an essential element of his defense. The Special Master adopted IQVIA's position that "[t]he applicability of the attorney-client privilege is determined on a case-by-case basis." (*Id*. at 14) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 396-97 (1981)). Consistent with that ruling, the Special Master conducted a comprehensive two-year review of the parties' briefs, including an *in camera* document-by-document inspection of the materials Veeva sought to compel, the results of which were attached in an Appendix to the Special Master's 2022 Order. (See Appendix to the Special Master's 2022 Order ("App'x"), ECF No.. 465 at 27–68.) Ultimately, the Special Master overruled IQVIA's assertion of privilege in some documents and affirmed it in others.[9] IQVIA argues that the Special

---

[9] IQVIA does not contest the following document-specific determinations in this appeal: App'x Nos. 558, 1215, 1225, 2591, 4212, 4435, 4474, 4824, 5143, 5435, 5436, 5627, 5628, 5629, 5631, 5633, 5634, 5635, 5636, 5637, 5656, 5658,

Master disregarded the need for individualized determinations of privilege as to certain documents and instead credited Veeva's argument regarding the "at issue" waiver and directed IQVIA to turn over to Veeva all communications about the TPA program involving Mr. Ashman—even those concerning the confidential provision of legal advice.[10] (ECF No. 472-1 at 15.) The Court disagrees with IQVIA's assessment. The Special Master found that 59 of the 133 challenged documents were not privileged. The Special Master correctly found that IQVIA waived privilege over Ashman's TPA communications by placing them at issue. Specifically, the Special Master concluded that

> (1) IQVIA affirmatively contends that it promulgated its TPA policy in good faith to support its business justification defense; (2) IQVIA intends to utilize Ashman as its primary trial witness for its business justification defense; (3) by utilizing Ashman in support of its defense IQVIA had placed Ashman's "business" and "legal" involvement with the formation and application of the TPA program at issue, this includes Ashman's legal communications involving his assessments, consultations, and evaluations related to the TPA program; and (4) that barring access to the challenged communications prejudices Veeva's ability to prosecute its antitrust case and test IQVIA's business justification defense.

(ECF No. 465 at 23-24.) Veeva cannot, in fairness, be expected to rely on IQVIA's selective disclosures blindly. *In re Intel Corp. Microprocessor Antitrust Litig.*, 258 F.R.D. 280, 291 (D. Del. 2008). "Having chosen to go beyond mere denial of [Veeva's] claims," IQVIA cannot present Ashman to support its business justification "while at the same time depriving [Veeva] of access to this information on the basis of privilege. To do so prevents [Veeva] from effectively challenging [IQVIA's] good faith … and therefore undercuts the fairness considerations

---

5659, 5665, 5666, 5670, 5687, 5688, 5699, 5703, 5846, 5847, 5848, 6942, 11851, 11878, 13137, 13165, 13166, 13168, 13169, 13817, 14866, 15844, 14613, 15183, 24886, 25548, 25984, 25985, 28027, 28785, 28826, 28828, 29375, 29454, 29485, 30662, 30663, 30666, 30667, 37979, 37980, and IMS02198320.

[10] IQVIA disputes the 'at issue' waiver to privilege the Special Master applied to the following: App'x Nos. 575, 702, 763, 841, 1605, 2239, 2240, 2250, 2251, 2252, 2253, 2255, 2256, 2257, 2258, 2259, 2268, 2279, 2321, 2436, 2475, 2477, 2829, 3073, 3452, 4051, 4055, 4454, 4465, 4480, 5047, 5190, 5227, 5231, 5261, 5283, 5441, 5639, 5640, 5641, 5844, 5857, 5869, 6822, 6823, 9063, 10283, 14006, 14017, 15886, 15887, 15888, 17391, 17392, 21830, 22514, 25821, 28610, 26811, 28884, 36706, 36707, 38912.

underlying the attorney-client privilege doctrine." *In re Human Tissue*, 255 F.R.D. at 161. The Special Master did not find that IQVIA placed Ashman's TPA communications at issue merely because they were "relevant" or reflective of IQVIA's "state of mind." (ECF No. 465 at 21–25.) Instead, the Special Master correctly concluded that, as in *In re G-I Holdings, In re Human Tissue*, and *Harding*, by raising a business-justification defense and channeling it almost exclusively through Ashman, IQVIA placed Ashman's TPA evaluations, assessments, and consultations at issue. (Id.) The Special Master appropriately defined the scope of IQVIA's waiver. The Third Circuit concluded that *Glenmede* waived privilege not only as to the opinion letter and related matters but also "as to all communications, both written and oral, to or from counsel as to the entire transaction." *Id*. at 487 (emphases added). Accordingly, IQVIA's appeal (ECF No. 471) is denied, and the Special Master's 2022 Order is affirmed.

## IV.   CONCLUSION

For the foregoing reasons, Veeva's objections to the aspects of the Special Master's Order dated May 7, 2021 (ECF No. 349), overruling Veeva's assertion of attorney-client privilege (ECF No. 355) is **DENIED**, and Special Master's 2021 Order as it relates to the Privilege Motion is **AFFIRMED**. Next, as to Veeva's Appeal of the Special Master's ruling on the Sanctions Motion, judgment is **RESERVED** as set forth herein. Lastly, IQVIA's  appeal  of the Special Master's Order dated September 15, 2022 (ECF No. 465), granting Veeva's motion to overrule IQVIA's assertion of attorney-client privilege (ECF No. 471) is **DENIED**, and the Special Master's 2022 Order (ECF No. 465), is **AFFIRMED**.

**DATED:** March 30, 2024

JULIEN XAVIER NEALS
**United States District Judge**